# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

[1] BLACK EMERGENCY RESPONSE TEAM,

[2] UNIVERSITY OF OKLAHOMA CHAPTER OF THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,

[3] OKLAHOMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

[4] AMERICAN INDIAN MOVEMENT INDIAN TERRITORY,

[5] PRECIOUS LLOYD, as next of friend of S.L.,

[6] ANTHONY CRAWFORD, and

[7] REGAN KILLACKEY,

*Plaintiffs*,

v.

[1] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General,

[2] JOY HOFMEISTER, in her official capacity as Oklahoma Superintendent of Public Instruction,

[3] WILLIAM FLANAGAN,
[4] CARLISHA BRADLEY,
[5] JENNIFER MONIES,
[6] ESTELA HERNANDEZ,
[7] BRIAN BOBEK,
[8] TRENT SMITH, in their official capacities as members of the Oklahoma State Board of Education,

[9] KEVIN STITT, in his official capacity as Governor of Oklahoma,

Case No. CIV-21-1022-G

**COMPLAINT**

[10] JEFFREY HICKMAN,
[11] MICHAEL TURPEN,
[12] STEVEN TAYLOR,
[13] DENNIS CASEY,
[14] JAY HELM,
[15] ANN HOLLOWAY,
[16] JOSEPH PARKER JR.,
[17] JACK SHERRY,
[18] COURTNEY WARMINGTON, in their official
capacities as the Oklahoma State Regents for Higher
Education,

[19] MICHAEL CAWLEY,
[20] FRANK KEATING,
[21] PHIL ALBERT,
[22] NATALIE SHIRLEY,
[23] ERIC STEVENSON,
[24] ANITA HOLLOWAY,
[25] RICK NAGEL, in their official capacities as
members of the Board of Regents of the University of
Oklahoma,

[26] ANGELA GRUNEWALD, in her official
capacity as the Superintendent of Edmond Public
Schools,

[27] JAMIE UNDERWOOD,
[28] CYNTHIA BENSON,
[29] KATHLEEN DUNCAN,
[30] LEE ANN KUHLMAN, in their official
capacities as members of the Board of Education of
Edmond Public Schools,

*Defendants*.

**INTRODUCTION**

1.     This is an action brought by Oklahoma students and educators challenging the state legislature's unprecedented and unconstitutional censorship of discussions about race and gender in schools through the passage of House Bill 1775 (codified as 70 O.S. § 24-157 (2021)) (hereinafter "H.B. 1775" or "the Act") and its implementing regulations (codified as Okla. Admin. Code § 210: 10-1-23) (hereinafter "the Rules").

2.     H.B. 1775 severely restricts discussions on race and gender in Oklahoma's elementary, secondary, and higher education schools without any legitimate pedagogical justification, using language that is simultaneously sweeping and unclear. Public universities are prohibited from offering "any orientation or requirement" that presents "any form of race or sex stereotyping" or "bias on the basis of race or sex," leaving educators and students to guess at the scope of such broad, undefined terms and how this impacts the treasured principle of academic freedom in the state's universities. The Act further prohibits elementary and secondary school teachers from "mak[ing] part of a course" a list of eight banned "concepts" copied verbatim from an executive order issued in September 2020 by then-President Trump, which a federal court ultimately blocked as impermissibly vague. The Act's vague, overbroad, and viewpoint discriminatory provisions leave Oklahoma educators with an impossible—and unconstitutional—choice: avoid topics related to race or sex in class materials and discussions or risk losing their teaching licenses for violating the law.

3.     The Act's confounding language is not only facially unconstitutional but its application has also chilled and censored speech that strikes at the heart of public education and the nation's democratic institutions. Educators at all levels are blacklisting books by diverse authors and adapting their instructional approaches to avoid raising complex questions about race and gender. District administrators have struck texts by Black and women authors from their reading lists, including *To Kill a Mockingbird*, *Their Eyes Were Watching God*, *I Know Why the Caged Bird Sings*, *Narrative of the Life of Frederick Douglass*, and *A Raisin in the Sun,* while leaving in place texts by White and male authors. Teachers have received guidance to comply with H.B. 1775 by avoiding terms such as "diversity" and "white privilege," while administrators have simultaneously acknowledged that "no one truly knows what [the Act] means or can come to agreement on its meaning." Professors have stopped testing on certain theories related to the implications of race on society, and university librarians are afraid to purchase materials related to race and gender. In response to serious complaints of racism and discrimination on its campus and to provide a safer climate for all, the University of Oklahoma ("OU") had required all students to participate in sexual harassment training and diversity, equity, and inclusion coursework; but now, OU is prohibited under the Act from mandating the training and coursework. Across the state, educators are censoring their speech to avoid deeper student inquiry around race, gender, and inequality because they do not know where the line between lawful and unlawful conduct lies.

4.     This suppression of speech robs students of the information, ideas, and instructional approaches that result in the type of robust dialogue and analytical thinking

that courts have long recognized are essential to the preservation of America's

democratic system. Describing schools as the "nurseries of democracy," *Mahanoy Area*

*Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021), the Supreme Court has

emphasized that:

> The classroom is peculiarly the "marketplace of ideas." The Nation's future
> depends upon leaders trained through wide exposure to that robust
> exchange of ideas which discovers truth "out of a multitude of tongues,
> (rather) than through any kind of authoritative selection."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (quoting

*Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (alteration in original)).

5.      By erasing the perspectives of historically marginalized communities and

restricting the robust exchange of ideas, H.B. 1775 prevents students from accessing

information that will help prepare them to be active participants in democracy. This

censorship directly contravenes Oklahoma's own instructional goals as well as

constitutional values. Oklahoma's educational standards guide educators to prepare

students "to become informed, contributing, and participating citizens in this democratic

republic"[1] by engaging in curricula that is "inclusive of the identities that reflect the

richness and diversity of the human experience"[2] to cultivate a more complete

---

[1] Okla. State Dep't of Educ., *Oklahoma Academic Standards for Social Studies, Pre-K–
12*, at 3(Feb. 28,
2019), https://sde.ok.gov/sites/default/files/documents/files/Oklahoma%20Academic%20
Standards%20for%20Social%20Studies%208.26.19.pdf [hereinafter "Social Studies
Practices"].

[2] Okla. State Dep't of Educ., *2021 Oklahoma Academic Standards for English Language
Arts* 5,
https://sde.ok.gov/sites/default/files/documents/files/2021%20Oklahoma%20Academic%

understanding of the past and present. If schools and colleges are to fulfill their public purpose and fashion civic-minded Oklahomans, they must remain places where ideas—even ones deemed controversial by politicians—can be freely and robustly exchanged, including those related to racism and other forms of discrimination.

6.      Open dialogue about race and gender carries particular importance in Oklahoma, whose history is checkered with attempts to suppress the perspectives of Black, Indigenous, and other marginalized people from the classroom. For a century, government-run "Indian boarding schools" subjected Indigenous Oklahomans to schooling designed to "kill the Indian in him, and save the man."[3] The majority of Oklahomans have never learned about the Tulsa Race Massacre of 1921, when a violent White mob destroyed the prosperous Black neighborhood of Greenwood, killing hundreds of its residents. These events continue to shape the lives of Oklahomans, carrying fruitful lessons for tackling today's most pressing issues and building a stronger, more inclusive future for all Oklahomans.

7.      Efforts were ongoing to rectify this historic erasure and provide a fuller account of historical events, incorporating diverse perspectives. Leading up to H.B. 1775, students took action, calling for greater diversity and inclusion in education, and such

---

20Standards%20for%20English%20Language%20Arts.pdf [hereinafter Okla. Educ. Standards for Language Arts].

[3] Addison Kliewer et al., *"Kill the Indian, Save the Man": Remembering the Stories of Indian Boarding Schools*, Enid News & Eagle (Mar. 10, 2020), https://www.enidnews.com/oklahoma/remembering-the-stories-of-indian-boarding-schools/article_2dab0af4-62f2-11ea-8b72-63670b5a9f9b.html.

demands mounted in 2020 and into 2021 as the state and country engaged in mass movements for racial and gender justice. In response, schools and educators incorporated robust culturally responsive curricula and instruction, anti-racist practices, diverse perspectives, and a variety of diversity, equity and inclusion ("DEI") training programs in the best interests of their students. These approaches allow educators to lead their students to deeper levels of analysis and evaluation, as well as to bridge connections with students. Such approaches benefit all students but especially students who are of color, women and girls, and LGBTQ+ (collectively, "historically marginalized students") whose stories are often underrepresented and whose educational interests have largely been ignored for decades.

8.    Bypassing the normal legislative process and acting on an "emergency" basis without evidentiary support, the Oklahoma legislature enacted H.B. 1775 to override the choices of professional educators. Proponents of the law made no attempt to conceal their desire to impose their own political and racial views upon the state's public school students. H.B. 1775's lead authors in the House and Senate transparently declared that the Act's purpose was to prohibit conversations related to "implicit bias" and "systemic racism," concepts that innumerable studies have shown are innate to the human experience, and the open discussion of which creates more inclusive, safe, and engaging educational spaces for historically marginalized students. Legislative supporters openly disparaged the Black Lives Matter movement and drew parallels to the Ku Klux Klan, and they sought to vilify concepts with which they disagreed by calling them "Marxist," "un-American," and "revolutionary" programs.

9.      H.B. 1775 is an unlawful intrusion by politicians into the classroom—without input from educators—that dictates not just *what* can be taught, but *how* teachers must teach in service of an avowedly political agenda. By seeking to "cast a pall of orthodoxy over the classroom" based on partisan and racial interests, the Act impinges on the "transcendent value" of academic freedom that courts safeguard to preserve the very foundations of democracy. *Keyishian*, 385 U.S. at 603.

10.     Under the rules promulgated by the Oklahoma State Board of Education (hereinafter "SBE") pursuant to the Act, teachers and educational institutions face severe sanctions for violating the law's unclear parameters, including the loss of education licenses, certificates, and accreditation. And the State has declared open season on all elementary and secondary school educators and educational institutions by allowing any member of the public to file a complaint with their district or the State Board of Education.

11.     This type of state censorship is wholly unconstitutional. H.B. 1775 must be struck down on its face and as applied under the First and Fourteenth Amendments because the U.S. Constitution firmly rejects the Act's improper racial and partisan motives and methods for effectuating censorship. H.B. 1775 silences speech through its vague, overbroad and viewpoint discriminatory terms, and intentionally targets and denies access to ideas aimed at advancing the educational and civic equality of historically marginalized students because of the legislators' own discomfort and disagreement with certain viewpoints.

12.     Plaintiffs respectfully urge this Court to declare the Act and its implementing regulations unconstitutional under the First and Fourteenth Amendments, and issue injunctive relief barring Defendants from enforcing it.

## PARTIES

**Plaintiffs**

13.     Plaintiff Black Emergency Response Team ("BERT") sues on its behalf and on behalf of its members. BERT is a group of Black student leaders at OU dedicated to creating a safer and more supportive university experience for Black students. The purpose of the association is to advocate on behalf of Black students to OU's administration and to help Black students navigate access to support and resources when they experience racism on campus. BERT was formed in January of 2019, shortly after an OU student was filmed using blackface and the n-word, the latest in a series of racist incidents on campus, to respond to "any racial incidents in the future and play a strategic role in making the University of Oklahoma a more inclusive environment." BERT's members are harmed by the passage of H.B. 1775 because the law prohibits any "training or requirement that presents any form of race or sex stereotyping" among other restrictions. In response to the law, OU's DEI course and sexual harassment training is now optional rather than mandatory for all students. As a result, BERT's members now face heightened levels of racial and gender hostility and harassment, and the organization must be more vigilant in responding to incidents of racism and sexual assault. BERT's members are further harmed by H.B. 1775 in their classrooms. Due to the Act's chilling effect on professors' speech, BERT's members are denied access to essential information

7

related to race and sex. Several members fear that H.B. 1775 greatly diminishes the value of their degrees, particularly for the fields of African American Studies, Anthropology, and other related majors.

14.    Plaintiff University of Oklahoma Chapter of the American Association of University Professors (hereinafter "OU-AAUP") sues on its behalf and on behalf of its members. OU-AAUP is a nonprofit association of faculty and academic professionals. The American Association of University Professors (hereinafter "AAUP") develops standards and procedures that maintain quality in education and academic freedom in U.S. colleges and universities. The OU-AAUP was founded in 2020 for AAUP members employed by OU. H.B. 1775 has harmed OU-AAUP's members by infringing on their academic freedom to present and research topics regarding race and sex. One OU-AAUP member was instructed not to include critical race theory (also referred to as "CRT") on exams. Other members are restructuring their pedagogical approach wholesale to avoid topics related to race, gender, or sexual orientation. Still more members fear complaints and sanctions for continuing to teach material related to race, gender, and sexual orientation. A Department Chair is considering whether they may offer classes in Black Literature under H.B. 1775. A librarian is concerned that they may be unable to purchase texts and materials relating to race, gender, and sexual orientation for the library. Many professors of marginalized backgrounds fear for their safety in their classrooms, on campus, and in their neighborhoods under the hostile culture empowered by H.B. 1775.

15.    Plaintiff Oklahoma State Conference of the National Association for the Advancement of Colored People (hereinafter "NAACP-Oklahoma") sues on its behalf

8

and on behalf of its members. Founded in 1913, NAACP-Oklahoma is the oldest civil rights organization in Oklahoma. Its mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination. To advance its mission, NAACP-Oklahoma's key goals include educational advocacy to ensure that all students have access to a quality, integrated public education. NAACP-Oklahoma actively participates in the NAACP's Youth & College Division, and NAACP-Oklahoma has Youth & College Division chapters at nearly every public university in Oklahoma, including OU.

16.    NAACP-Oklahoma serves as the umbrella organization for local branch units throughout the state and includes more than 1500 members in all 77 counties of Oklahoma. The majority of NAACP-Oklahoma's members identify as African American or Black, but the organization also includes members who are Native American or Indigenous, of mixed Black and European descent, and from a diverse range of other ethnic backgrounds. NAACP-Oklahoma also includes members of diverse gender identities, including LGBTQ+ people. A substantial number of NAACP-Oklahoma's members include elementary, middle, and high school students, and such students' parents, in the school districts of Ardmore, Chickasha, Edmond, Enid, Lawton, Muskogee, Oklahoma City, Tulsa, and other areas of the state, including:

a.    NAACP-Oklahoma member Student A.A., who is a 9th grade student in Edmond Public Schools and who identifies as White. Student A.A. desires greater access to diverse texts, particularly texts by non-White and women authors, because such perspectives broaden Student A.A.'s

9

worldview, better prepare Student A.A. to participate in a multiethnic democracy, and enable Student A.A. to engage in advanced inquiry and problem-solving. H.B. 1775 restricts Student A.A.'s access to information and ideas that are essential for academic growth and success.

b.      NAACP-Oklahoma member Teacher B.B., who identifies as African American and teaches in Muskogee Public Schools. As a result of H.B. 1775, Teacher B.B. had to change their approach to teaching, including avoiding topics that could possibly lead to discussion of banned concepts and approaches that push students to engage in higher levels of thinking, including analysis and evaluation. For example, Teacher B.B. no longer plans to introduce information related to current events, such as the detention centers at the border, because such topics are not enumerated in the state standards and discussing them could be interpreted as violating H.B. 1775 by prompting inquiry about systemic racism and implicit bias. These discussions also may make certain students "feel discomfort," which is outlawed under H.B. 1775 but difficult, if not impossible, for Teacher B.B. to predict given the law's highly subjective standard. Teacher B.B. is concerned that these changes will make the classroom environment less engaging, inclusive, and rigorous. Teacher B.B. has modified their curriculum due to fear of sanctions.

c.      NAACP-Oklahoma member Principal C.C., who is a principal in

Chickasha Public Schools. Principal C.C. recently identified possible DEI

training for their teaching staff to address difficult topics involving race and

gender, which is essential to improving the inclusivity of the curriculum

and environment at their school. These trainings included discussing the

concept of implicit bias and data about racial disparities within the school

system. Principal C.C. wants to build an inclusive school community but

will not be able to offer this training because H.B. 1775's vague and

overbroad terms make Principal C.C. fearful of sanctions. As a result,

Principal C.C. has not been able to utilize the tools and resources that

leading experts recommend to improve the campus climate, recruit faculty

members, and increase the engagement and achievement of students from

all backgrounds, particularly those from historically marginalized groups.

17.     Plaintiff American Indian Movement Indian Territory (hereinafter "AIM

Indian Territory") sues on its behalf and on behalf of its members. AIM Indian Territory

is a grassroots chapter of the prominent Native American rights organization, the

American Indian Movement, which was founded in 1968 to address the plight of Urban

Indians. The AIM Indian Territory has 37 members statewide, who come from a variety

of tribal nations and/or identify as multi-racial. Approximately 30 of AIM's members are

parents of children currently enrolled in Oklahoma elementary and secondary public

schools. AIM Indian Territory's mission is to protect and fight for Indigenous rights and

to better Indigenous communities throughout the State of Oklahoma and across Turtle

Island, which includes addressing issues of education justice, poverty, systemic racism, treaty rights, cultural preservation, and self-determination. One of AIM Indian Territory's key goals is to ensure that all students—including Native American students—receive a culturally relevant and inclusive education that enriches students' critical thinking skills and promotes cross-cultural exchange and appreciation for diverse cultures. H.B. 1775 harms AIM Indian Territory's mission and members by chilling classroom conversations that cultivate an educationally inclusive environment that best supports AIM members' safety, scholastic success, and skills to tackle barriers faced by their communities.

18.     Plaintiff S.L. is an eleventh-grade student in Millwood High School who identifies as a Black woman. S.L. is enrolled in Plaintiff Anthony Crawford's English 4 class. S.L. is passionate about discussing current events and real-world topics in the classroom. S.L. is especially interested in learning about the histories and perspectives of Black, Indigenous, and other people of color because the curriculum too often leaves these viewpoints out. H.B. 1775 directly threatens S.L.'s ability to access important concepts and information that allows them, and other students, to formulate their own opinions and solutions regarding the challenges facing American society.

19.     Plaintiff Anthony Crawford identifies as Black and is a high school teacher at Millwood High School. Mr. Crawford is dedicated to providing all students in his classroom with an atmosphere of inquiry so that they develop the reading, writing, and communication skills necessary to succeed as workers, leaders, and citizens in broader society. Because of H.B. 1775's confusing, broad and vague language, Mr. Crawford has been unable to discern what type of conduct violates the law and he fears sanctions and

12

punishment. Mr. Crawford teaches material that he believes best meets the needs of his students—including certain readings about injustice, particularly on the basis of race and gender, which could be swept into the category of prohibited topics and subject him to punishment. H.B. 1775 hampers Mr. Crawford's ability to impart information and skills that enable his students to succeed on state exams, excel in college and graduate courses, and thrive within broader society.

20.     Plaintiff Regan Killackey identifies as White and has been an English Teacher at Edmond Memorial High School for over 14 years and a teacher for 19 years. Mr. Killackey and his colleagues at Edmond Public Schools are dedicated to creating an inclusive environment for all students and helping them build the critical thinking skills needed to write and speak about issues of social, political, and cultural significance. Following the passage of H.B. 1775, Mr. Killackey was instructed to avoid certain concepts, phrases like "diversity" and "white privilege", and books by non-White and female authors. Mr. Killackey is no longer able to lead appropriate educational classroom discussions on topics related to race, sex, and gender. H.B. 1775 prohibits Mr. Killackey from fully and effectively guiding the next generation of responsible citizens capable of collectively forming robust public opinion.

**Defendants**

21.     Defendant John O'Connor is the Attorney General. He is sued in his official capacity. According to the emergency rules promulgated by the SBE, he is partially responsible for enforcement of H.B. 1775.

13

22.     Defendant Joy Hofmeister is the Oklahoma State Superintendent and President of the SBE. The SBE is vested with the supervision of instruction in public schools, and charged with performing "all functions necessary to the administration of a school district in Oklahoma,"[4] including the adoption of "a social studies core curriculum with courses of instruction for all students enrolled in the public schools that reflect the racial, ethnic, religious, and cultural diversity of the United States of America."[5] Defendant Hofmeister is sued in her official capacity. Defendants SBE and Hofmeister are responsible for enforcing H.B. 1775.

23.     Defendants William Flanagan, Carlisha Bradley, Jennifer Monies, Estela Hernandez, Brian Bobek, and Trent Smith are members of the SBE (hereinafter "SBE members"), and have concurrent responsibility to supervise instruction in public schools and adopt a curriculum in compliance with the Oklahoma School Code, §70-1-101, et al. The SBE also adopted emergency rules governing the implementation of H.B. 1775 in public schools. Defendant SBE members are sued in their official capacities and are responsible for enforcing H.B. 1775.

24.     Defendant Governor Kevin Stitt is the Chief Executive of Oklahoma. He is sued in his official capacity. Defendant Stitt is responsible for signing H.B. 1775 into law and approving the promulgated emergency rules by the SBE. He is responsible for enforcing H.B. 1775 as the Chief Executive of Oklahoma.

---

[4] 70 O.S. § 5-117.

[5] 70 O.S. § 11-103.6b.

14

25.     Defendant Oklahoma State Regents for Higher Education (hereinafter "State Regents") have broad authority to determine standards and coursework across the state's higher education system. The State Regents members are: Chair Jeffrey W. Hickman, Vice Chair Michael Turpen, Secretary Steven Taylor, Assistant Secretary Dennis Casey, Jay Helm, Anne Holloway, Joseph Parker Jr., Jack Sherry, and Courtney Warmington (hereinafter "State Regents members"). Defendant State Regents members are sued in their official capacities. Defendants State Regents and State Regents members are responsible for enforcing H.B. 1775.

26.     Defendant University of Oklahoma Board of Regents (hereinafter "OU Regents") is the official governing body of The University of Oklahoma, Cameron University, and Rogers State University. The OU Regents members are: Chair Michael Cawley, Vice Chair Frank Keating, Phil B. Albert, Natalie Shirley, Eric Stevenson, Anita Holloway, and Rick Nagel (collectively, "OU Regents members"). OU Regents members are sued in their official capacities. Defendants OU Regents and OU Regents members are responsible for enforcing H.B. 1775.

27.     Defendant Angela Grunewald is the Edmond Public Schools Superintendent and executive officer of the Edmond Public Schools Board of Education, which governs Edmond Public Schools (hereinafter "EPS"). EPS is the third largest district in Oklahoma, serving more than 23,800 students. The district has 17 elementary schools, six middle schools, three high schools, an alternative high school, and an early childhood center. EPS is the largest full-time employer in Edmond, with over 3,000 employees. The district is 62% White, 11% Black, 11% Hispanic, 9% Mixed, 5% Asian,

and 2% American Indian.[6] EPS's instructional vision is based on five pillars:

collaboration, creativity, choice, inquiry, and reflection. Defendant Grunewald is sued in

her official capacity. Defendant Grunewald is responsible for enforcing H.B. 1775.

28.     The Edmond Public Schools Board of Education (hereinafter "EPS Board")

is responsible for the supervision of instruction in EPS. The EPS Board members are:

President Jamie Underwood, Vice President Cynthia Benson, Kathleen Duncan, and Lee

Ann Kuhlman (hereinafter "EPS Board members"). The EPS Board members are sued in

their official capacities. Defendants EPS Board and EPS Board members are responsible

for enforcing H.B. 1775.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

1343 because this action arises under the First and Fourteenth Amendments to the United

States Constitution and 42 U.S.C. § 1983.

30.     In addition, this Court has jurisdiction to grant declaratory relief under 28

U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57.

31.     Venue is proper in this District under 28 U.S.C § 1391(b) and (e) because

Defendants are public officials in the State of Oklahoma and sued in their official

capacities. Defendants reside within this District and/or perform official duties within the

---

[6] Edmond Pub. Schs., *2019-2020 Report to the Community* 4 (2020),
https://edmondschools.net/wp-content/uploads/2019/09/FINAL-2019-2020-ANNUAL-
REPORT.pdf.

State of Oklahoma. This Court, accordingly, has personal jurisdiction over the

Defendants.

## FACTUAL ALLEGATIONS

I.   **Freedom Of Speech In Schools Is Central To Fostering And Preserving A Democratic Society.**

32.     Schools play an essential role in the preservation of democratic institutions

and ideals. As the Supreme Court has recognized, America's schools are vital for

"prepar[ing] citizens to participate effectively and intelligently in our open political

system if we are to preserve freedom and independence." *Wisconsin v. Yoder*, 406 U.S.

205, 221 (1972). They are "a principal instrument in awakening the child to cultural

values, in preparing him for later professional training, and in helping him to adjust

normally to his environment." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). The

Supreme Court has also recognized the "fundamental role" of higher education "in

maintaining the fabric of society." *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003)

(citation omitted).

33.     Reflecting the important role of education in a democratic society, the First

Amendment protects "the right to receive information and ideas." *Stanley v. Georgia*, 394

U.S. 557, 564 (1969); *Bd. of Educ. v. Pico*, 457 U.S. 853, 866–68 (1982) (plurality

opinion). "[J]ust as access to ideas makes it possible for citizens generally to exercise

their rights of free speech and press in a meaningful manner, such access prepares

students for active and effective participation in the pluralistic, often contentious society

in which they will soon be adult members." *Pico,* 457 U.S. at 868.

34.     Academic freedom is similarly a "special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. A necessary component of academic freedom is the freedom of teachers and students "to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire,* 354 U.S. 234, 250 (1957); *see also Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2046 ("the school itself has an interest in protecting a student's unpopular expression . . . [because] America's public schools are the nurseries of democracy"). The interest in preserving academic freedom is especially strong in the context of higher education. *See Sweezy*, 354 U.S. at 250 ("The essentiality of freedom in the community of American universities is almost self-evident . . . To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation").

35.     Consonant with the importance of preserving the right to receive information is the constitutional requirement that all students, regardless of their race or sex, have equal access to education and the academic freedom available therein. The ability of students to access education equally impacts their "ability to study, to engage in discussions" and to "exchange views with other students." *Brown*, 347 U.S. at 493 (quoting *McLaurin v. Oklahoma State Regents*, 339 U.S. 637, 641 (1950)). Moreover, diversity in all its forms is central to achieving the democratic goals of education, inasmuch as "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized." *Grutter*, 539 U.S. at 331–332.

36.     Oklahoma's governing education standards, developed by a wide range of experienced educators, reflect these important goals and values. For example, the Oklahoma Academic Standards for Social Studies, state, in part:

> Having a literate citizenry rests on a commitment to democratic values and the practice of them. It requires the ability to use knowledge about one's community, nation and world, apply inquiry processes, and employ skills of data collection and analysis, collaboration, decision-making; and problem-solving. . . .

> A well-rounded, vigorous social studies education encourages and enables each student to acquire a core of basic knowledge, an arsenal of useful skills, and a way of thinking drawn from many academic disciplines. Thus equipped, students are prepared to become informed, contributing, and participating citizens in this democratic republic – the United States of America.[7]

37.     H.B. 1775 stands in opposition to these core democratic principles and constitutional rights. Rather than offering students the ability to engage broadly and inclusively in academic debate and discourse, the law severely restricts discussions and coursework about race and sex. Further, the Act's censorship of speech rests upon illicit motives and inflicts disparate harm: H.B. 1775 was enacted with the particular intent of harming historically marginalized students, and the Act has had its intended effect.

---

[7] Social Studies Practices at 3.

II.   **H.B. 1775 Prohibits Opportunities For Free Debate And Discussion, And Is Overbroad, Vague, And Viewpoint Discriminatory.**

     a.   ***The plain text of H.B. 1775 is overbroad, vague, and viewpoint discriminatory.***

38.   On May 7, 2021, Governor Stitt signed H.B. 1775 into law, codified as 70 O.S. § 24-157. It became effective on July 1, 2021.

39.   The text of the Act is ambiguous and confusing, leaving educators, legislators, and enforcers to guess what it means, chilling protected speech and expression, and encouraging arbitrary and discriminatory enforcement. Legislators themselves recognized the broad ambiguity of the law's terms, and this vagueness was left unaddressed in the final version of the law. As one concerned legislator pointed out in the House debate, it is unclear whether the Act prohibits teaching about a staggeringly wide range of topics from the wage gap to Hitler's motivation for World War II.[8]

40.   Section (1)(A)(1) provides that:

> No enrolled student of an institution of higher education within The Oklahoma State System of Higher Education shall be required to engage in any form of mandatory gender or sexual diversity training or counseling; provided, voluntary counseling shall not be prohibited. Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited.

---

[8] Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 29, 2021, 10:34:07 AM), https://www.okhouse.gov/Video/Default.aspx [hereinafter "April 29th House Session"].

70 O.S. § 24-157(1)(A)(1). On the House floor, Representative Meloyde Blancett (D) repeatedly asked for clarification on what these provisions meant, saying "it's not clear."[9] No clarification was provided.

41.     The vagueness of these terms makes it unclear which of the many forms of on-campus speech and expression are impacted by the prohibition. The law does not define the terms "training" or "counseling," "orientation," or "requirement." The lack of specificity is particularly problematic in a law addressed to the higher education setting, where the purpose animating the institution is to educate or "train" students, and where certain courses are "required" and every course contains "required" readings and assignments.

42.     It is still further unclear what it would mean for a student to be "required to engage" in a training or counseling. For example, it is not clear whether the law prohibits requiring active participation or extends to required attendance and passive receipt of information. Moreover, on a college campus, many forms of "training" or "counseling" may occur. For example, the law could prohibit trainings as required parts of a student's orientation to campus, on-campus jobs, or extracurricular activities. The law also does not make exceptions for training or counseling that may be instituted to remedy a violation of state or federal law civil rights laws, including laws addressing racial and sexual harassment.

---

[9] *Id.* at 11:32:15–11:32:37 AM.

43.     It is also unclear what topics are covered by "gender or sexual diversity." For example, universities are obligated to explain their gender-based discrimination, sexual harassment, and sexual assault policies to all students, faculty, and staff, but the Act appears to prohibit them from doing so.

44.     Nor does the law define how any "orientation" or "requirement" might "present . . . stereotyping or bias." Vast swaths of coursework are seemingly censored under the law for interrogating how stereotypes and bias play out in society. For example, the law on its face—and even more so when interpreted through the comments of H.B. 1775's sponsors specifically targeting and disparaging "the theory of implicit bias"[10]— chills a professor's ability to require that students read or learn about the concept of implicit bias; *i.e.*, the idea that people can act on the basis of racial, gender, sexual orientation or other stereotypes without consciously intending to do so. Yet implicit bias has long been an important concept in a variety of academic disciplines, including cognitive psychology, sociology, organizational behavior and others.

45.     Section (1)(B)(1) is also vague and overbroad. The section lists eight vaguely worded concepts aimed at censoring classroom discussions and materials. 70 O.S. § 24-157(1)(B)(1). The banned concepts listed in this section were copied verbatim from former President Donald Trump's Executive Order 13950 (hereinafter "EO 13950") (discussed *infra* Section IV(a)). Although a federal court barred EO 13950 from going

---

[10] Press Release, Bill Prohibiting "Critical Race Theory" Curriculum Passes House, Okla. H.R. (Apr. 29, 2021), https://www.okhouse.gov/members/PrintStory.aspx?NewsID=8125.

into effect, in part, under the First Amendment in December 2020, *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020), the Oklahoma Legislature enacted H.B. 1775 months later without curing vague terminology.

46.     Section (1)(B)(1) provides: that "[n]o teacher, administrator or other employee of a school district, charter school or virtual charter school shall require or make part of a course" the enumerated concepts. *Id.* In the first instance, the law applies to any "teacher" or "administrator," and could conceivably be applied to a teacher or administrator at any level of education, including pre-school teachers and college professors. On the House floor, legislators noted that the bill is "confusing" and that "it's unclear as to what applies to higher education versus common education and so forth."[11]

47.     Further, the term "require or make part of a course" is not defined by the law. To prohibit making any "concept" a "part of a course" reaches an unlimited scope of classroom discussion and of the general free speech and expression that occurs within a school. It is further unclear what the distinct prohibition on "requiring" a "concept" is intended to address. By its terms, the law is not limited to "courses" or "require[ments]" for students and applies to any "employee of a school district" or charter school. In this way, the law reaches broadly to implicate requirements made of employees or other facets of the administration of a school system. When combined with the vagueness of the enumerated concepts, the law's capacity to chill protected expression and to be applied in an arbitrary and discriminatory manner is vast.

---

[11] April 29th House Session at 10:12:03–10:13:40 AM.

48.     Section (1)(B)(1)(a) prohibits the concept that "one race or sex is inherently superior to another race or sex." *Id.* § 24-157(1)(B)(1)(a). H.B. 1775's vague and overbroad language puts educators at risk of losing their livelihoods if they teach about historical events and individuals who subscribed to these viewpoints, even if they do so to critique these positions and without advocating these positions. Thus, this provision causes educators to shy away from open and frank dialogue on these topics.

49.     Section (1)(B)(1)(b) prohibits the concept that "an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously." *Id.* § 24-157(1)(B)(1)(b). Particularly as interpreted in light of legislators' statements, this broad and vaguely worded provision deprives students of information about (among other things) "implicit bias," which, as noted above, is a concept relevant to many academic fields.

50.     Section (1)(B)(1)(c) prohibits the concept that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex." *Id.* § 24-157(1)(B)(1)(c). This sweeping prohibition chills classroom discussion of important contemporary topics, as educators fear the significant repercussions of making an erroneous guess as to what discussions are permissible and what discussions are forbidden.

51.     Section (1)(B)(1)(d) prohibits the concept that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." *Id.* § 24-157(1)(B)(1)(d). While treating others with respect, or treating others equally and fairly, would be laudable goals to teach and encourage, H.B. 1775's contorted prohibition of the

concept that people "cannot and should not attempt to treat others without respect to race or sex" is undecipherable. It is unclear what it would mean to treat a person "without respect to race or sex," and it is further unclear what it would mean to teach that a person "cannot or should not attempt" to do so. Combining these phrases in one prohibition creates a confusing double negative. Both state and federal laws and regulations addressing discrimination are well established, but the Oklahoma Legislature did not reference existing law to clarify its meaning or explain the intended operation of H.B. 1775 in relation to these laws. While the Oklahoma Legislature intended subsection (d) to have some force and effect, it is not clear what it prohibits. As such, students and educators are left to guess at its meaning, violating their due process rights and chilling their speech and expression.

52.     Additionally, section (1)(B)(1)(g) prohibits the concept that "any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex." *Id.* § 24-157(1)(B)(1)(g). The lack of clarity in the law encourages application to prohibit any discussion or expression that might result in a person experiencing, among other emotions, "discomfort," without regard to the intent of the speaker. Students frequently confront subject matter that may prompt "discomfort," "guilt," "anguish," or "distress." When students study art, philosophy, history, science, or any other subject matter, they encounter new and complex ideas and a range of viewpoints, any of which may prompt a range of emotions as part of the educational process. This is no more or less true when the subject matter touches on race or sex. Discussions of American and world history, including the Holocaust, slavery, and

25

segregation, for example, undoubtedly invoke a range of emotions. Moreover, avoiding or ignoring race and sex when relevant to a subject of study or as experienced in students' lives can itself produce feelings of discomfort or anguish. The law therefore puts teachers in an impossible situation.

53.    Section (1)(B)(1)(h) also bans the concept that "meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race." *Id.* § 24-157(1)(B)(1)(h). Again, it is unclear what this means and how it is to be enforced. The law could be applied to prohibit any critiques of systems of "meritocracy" in the past—such as discussing the debunked science surrounding the eugenics movement—or engaging with present debates about reliance on standardized tests and legacy college admissions, for example. Again, a wide range of classroom discussion and student thought and expression is chilled by this vaguely worded prohibition.

54.    Section (1)(B) asserts that "[t]he provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." *Id.* § 24-157(1)(B). However, the law's prohibitions are so broad and open-ended that there is no clear way to interpret and apply the law without presenting conflicts or potential non-alignment with the Oklahoma Academic Standards and the law fails to define "align," leading educators to silence a wide range of permissible speech to avoid sanctions.

55.    H.B. 1775 incorporates numerous vague and overbroad terms that add further ambiguity to the Act when taken as a whole. H.B. 1775 is additionally overbroad in that it places restrictions on what educators can teach and what students can learn

26

based on political ideology, singling out disfavored discussions of the topics of race and gender. The ambiguities in the law lead educators and students to steer wide of its terms, chilling a broad scope of protected speech and undermining the role that education plays in preparing students to participate in the state's and nation's diverse and democratic society. The law further chills certain disfavored speech—about race and sex—and is amenable to arbitrary and discriminatory application that harms all students, but inflicts pronounced harms on historically marginalized students.

56.     When asked if he could understand that H.B. 1775 "seems like it would come from a dictatorial society," the House sponsor of the bill Representative Kevin West (R) replied, "for this to be falling under a dictatorship-type of legislation, it would be saying *this is what you're going to teach*, and we would spell that out . . . What this is doing is saying that you're not gonna [teach] these areas—these concepts that based solely on your race or your sex, that you are automatically *this*."[12] But, as House Representative John Waldron (D) predicted, "the wise teacher will learn to watch their words. They'll learn to avoid controversy. They'll teach a sanitized view of American and Oklahoma history so as to avoid the fate of John Scopes. Our children will suffer for they will not know their history."[13]

---

[12] April 29th House Session at 11:23:16–11:24:00 AM.

[13] *Id.*

**b.     The emergency rules approved by the State Board of Education to implement H.B. 1775 expand its scope and impose severe sanctions.**

57.     As directed by H.B. 1775, the SBE approved temporary, emergency rules regarding the implementation and enforcement of H.B. 1775 (the "Rules") on September 10, 2021 (codified as Okla. Admin. Code § 210: 10-1-23). Rather than clarify the vague terms of H.B. 1775, the implementing Rules adopt an expansive interpretation of H.B. 1775, demonstrating and solidifying both its ambiguity and reach.

58.     Regarding elementary and secondary education, the Rules establish a broad, non-exhaustive definition of "course" as "any forum where instruction or activities tied to the instruction are provided, including courses, training, seminars, professional development, lectures, sessions, coaching, tutoring, or any other class." Okla. Admin. Code § 210:10-1-23(b)(1)(B). Thus, the Rules fail to provide clarity and only emphasize the breadth and ambiguity in the law's reach. Moreover, where H.B. 1775 was vague, the implementing Rules clearly sweep in speech directed to school employees by referencing "professional development," for example.

59.     The Rules prohibit public schools from "adopting programs or utilizing textbooks, instructional materials, curriculum, classroom assignments, orientation, interventions, or counseling that include, incorporate or are based on [the banned concepts.]" *Id.* § 210:10-1-23(d)(3). The Rules likewise prohibit entering into "agreements" based on such concepts. The laundry list of regulated information set forth in the Rules highlights the broad sweep of H.B. 1775 and introduces further vagueness. The Rules make clear that particular textbooks and materials are subject to the

prohibitions, meaning that educators could be prohibited from exposing students to a book that contained the banned "concepts," even if the purpose of a lesson was to critically examine the arguments put forth in the book. Moreover, where the law prohibits "requir[ing] or mak[ing] part of a course" the banned concepts, the Rules introduce additional terms to which the prohibition extends, including "programs," "counseling," and "interventions," without definition.

60.     In addition, the Rules prohibit school support for "affinity groups . . . unless specifically permitted by Title IX." *Id.* § 210: 10-1-23(d)(8). "Affinity groups" is not defined by the law. Merriam-Webster defines "affinity group" as "a group of people having a common interest or goal or acting together for a specific purpose (as for a chartered tour)."[14] Moreover, the Rules do not clarify what it would mean for a school to "support" an affinity group. This prohibition could be applied to a wide range of student clubs, groups, and activities—chess club, academic bowl, or even a senior class field trip—that make up an important part of the educational experience.

61.     The Rules further affirm the broad reach of H.B. 1775 and the broad range of staff members who face penalties, including: "superintendents of schools, principals, supervisors, librarians, school, [*sic*] classroom teachers or other personnel performing instructional, administrative and supervisory services in the public schools." O.A.C. § 210: 10-1-23(J).

---

[14] Affinity Group, Merriam-Webster, https://www.merriam-webster.com/dictionary/affinity%20group.

62.     The Rules also confirm the State's intent to enforce H.B. 1775 broadly, compounding the chilling effect of the law. They establish sanctions for individuals and entities that fail to comply with H.B. 1775 and the implementing regulations. Individuals face suspension or license revocation if found in violation of H.B. 1775 or the Rules. *Id.* A school found in violation faces accreditation penalties. *Id.* § 210: 10-1-23(h).

63.     The Rules also lay out several mechanisms permitting members of the public to file complaints against individuals and school districts, and to facilitate investigations. Reports of violations may be filed by "students, parents, teachers, school staff, and members of the public" through the school's designated employee to receive and resolve such complaints, *id.* § 210: 10-1-23(g)(1), or directly with the State Department of Education (hereinafter "SDE"). *Id.* § 210: 10-1-23(g)(4). The Rules also encourage the filing of complaints by affording parents the "right to inspect curriculum, instructional materials, classroom assignments, and lesson plans to ensure compliance with [H.B. 1775]," and by providing "whistleblower protections" to complainants. *Id.* § 210: 10-1-23(e), (l).

64.     Further, the Rules provide that, so long as a complaint is "legally sufficient," the school "shall be required" to conduct an investigation. But the Rules do not define "legally sufficient," and the terms of both the Rules and H.B. 1775 are vague and overbroad. Teachers, administrators, librarians and other school personnel therefore know that if they say or do anything that any member of the public could claim was a violation of H.B. 1775, they will, at a minimum, be the subject of an official school investigation that could take up to three months to complete, while their profession hangs

30

in the balance. *Id.* § 210: 10-1-23(g)(3). This broad enforcement mechanism thus further chills free speech and expression.

65. The Rules also require districts to "adopt policies and procedures, including incorporating into employee and student handbooks" terms that comply with the requirements of H.B. 1775 and the implementing regulations. *Id.* § 210: 10-1-23(g). Such policies must include designating an employee to receive complaints and specifically notifying individuals of the right to file complaints. *Id.* § 210: 10-1-23(g)(2).

### c.   *H.B. 1775 has censored and chilled protected speech and expression in elementary and secondary schools.*

66. In attempting to comply with H.B. 1775 and its implementing rules, EPS has adopted guidance for teachers. As the guidance authors express, "[u]nfortunately, no one truly knows what [the law] means or can come to an agreement on its meaning." *See* Exhibit 1. The guidelines also offer that, "If a student asks, 'What is CRT?' then a teacher may respond with, 'it's often a theory used in higher education to look at laws in society.' This response would not violate the law." *Id.* As this guidance demonstrates, in attempting to steer clear of the law's prohibitions, educators are chilled in their ability to provide students with anything but the most ambiguous answers to their questions, stymieing students' ability to learn and engage with subject matter.

67. In interpreting and applying H.B. 1775, EPS has also prohibited teachers from using the terms "diversity" and "white privilege." Exhibit 2. It has struck the only books by women authors or authors of color—*To Kill a Mockingbird* by Harper Lee and A *Raisin in the Sun* by Lorraine Hansberry—from its list of anchor texts, the texts around

31

which teachers build curriculum, while retaining books by White male authors. It has also removed other commonly taught texts by Black and women authors—*Their Eyes Are Watching God* by Zora Neale Hurston, *I Know Why the Caged Bird Sings* by Maya Angelou, and *Narrative of the Life of Fredrick Douglass* by Fredrick Douglass—from its curriculum.

68. In addition, EPS did not offer the "Diversity Module" training that had been provided to teachers in 2020, which encouraged teachers to "embrace uncomfortable and courageous conversations about race," "reflect on how marginalized students have barriers they must navigate every day," and "share tips and ideas for moving forward to build courageous classrooms and professional teams where everyone belongs."

69. Plaintiff NAACP-Oklahoma's member who is an EPS student ("Student A.A.") identifies as White and as a boy and desires greater access to diverse texts, particularly texts by non-White and women authors, because such perspectives broaden Student A.A.'s worldview, better prepare A.A. to participate in a multiethnic democracy, and enable Student A.A. to engage in advanced inquiry and problem-solving. As a result of H.B. 1775 and its application through the policies of EPS, Student A.A. has lost access to texts by Black and women authors that explicitly discuss racial and gender relations, and the corresponding classroom discussions that explore such issues from multiple angles. Plaintiff Killackey, an EPS teacher, likewise attests that the loss of these texts is a detriment to the students' social, cognitive, and emotional development since such books create robust dialogue and create a stimulating, supportive environment for all students.

32

70.     Teachers across the state fear similar restrictions under H.B. 1775. Through utilization of vague terms with a harsh enforcement mechanism, H.B. 1775 chills permissible speech by teachers who are uncertain whether their instruction could lead students to inquire about a prohibited concept. Plaintiff NAACP-Oklahoma's member Teacher B.B. reported that H.B. 1775 is so vague and confusing that they do not understand what conduct is prohibited under the law, and fear that school officials will make examples of certain teachers. They worry these punishments will disproportionately fall on teachers of color. Further, since the passage of H.B. 1775, Teacher B.B.'s school district has not offered DEI training, a training that was provided at the start of prior school years.

71.     Likewise, Plaintiff Crawford, a high school teacher in the Millwood Public Schools, structures his courses to stimulate debate among students by intentionally including multiple viewpoints. However, based on the Act's vague terms, Mr. Crawford is not clear whether he can expose students to certain viewpoints and theories that are relevant to the public discussion of contemporary issues. For example, he is uncertain whether the law prohibits presenting the idea that the wealth gap stems from systemic racism and sexism, alongside alternative ideas that the wealth gap results from individual decision-making.

72.     Plaintiff S.L., a high school student enrolled in Mr. Crawford's class, desires access to information and theories related to systemic racism, discrimination, and the perspectives of Black community members and scholars. By threatening Mr.

33

Crawford's ability to include such content in his courses, H.B. 1775 threatens Plaintiff S.L.'s access to such information and ideas.

73.    Similarly, H.B. 1775's chilling effect on DEI trainings and curricula negatively impacts Plaintiff AIM Indian Territory's continued advocacy for Indigenous awareness and cultural competence in schools. By restricting students' access to the full range of historical, literary, and contemporary accounts, H.B. 1775 also deprives AIM's members of ideas that facilitate greater inquiry, understanding, and problem-solving. Moreover, H.B. 1775's effect of creating campus climates that are less inclusive and hostile for students of color inflicts harm on AIM Indian Territory's student members who often face harassment and alienation in school—ranging from having their braids forcibly cut by classmates to bans on traditional regalia at graduation—which arise from cultural misunderstanding and prejudice that could be ameliorated by the type of inclusive speech that H.B. 1775 chills.

> ### d.    As a result of H.B. 1775, academic freedom in higher education has been limited.

74.    Following the passage of H.B. 1775, OU ended two mandatory student courses and trainings. First, OU ended the requirement that students attend training on sexual violence, a requirement that had been in place for several years and formed a part of OU's efforts to comply with federal law. Second, OU scrapped a requirement for incoming students to take a diversity course, "Gateway to Belonging," adopted in response to student demands following a series of racially hostile acts on campus and developed in collaboration with students from BERT. By making the DEI course and

sexual harassment training voluntary rather than mandatory in order to comply with H.B. 1775, students of color, including members of BERT, now feel less safe on campus.

75.     Pursuant to H.B. 1775, students and professors at OU, including members of BERT and OU-AAUP, have had their academic freedom significantly restricted. AAUP members have removed from their courses texts which directly address race, gender, and sexual orientation; they are unsure if they can select library materials reflecting recent research on issues of race, gender, and sexual orientation; they are amending their courses to avoid critical inquiry into issues related to racism, oppression, and colonialism; and they will no longer teach through the analytical lens of critical race theory, alongside other frameworks.

76.     For example, BERT seeks exposure to the full range of information related to race and sex because understanding the sources of prejudice better equips members to deconstruct and dismantle it. BERT's members have expressed that the Act puts their education at risk because it deprives them of the theoretical frameworks and historical perspectives that are essential to their majors and courses of study, including Anthropology and African American Studies.

77.     H.B. 1775 and state and local actions implementing the law are vague, restrict students' access to information, and limit academic freedom in overbroad and viewpoint discriminatory terms. They are open to arbitrary and discriminatory enforcement, and evidence from the limited time that the law has been in effect demonstrates the uneven nature of its application to silence certain speech by educators and students. It is not an accident that the law disparately and discriminatorily chills

speech by and supporting students of color and other historically marginalized students. The history leading up to the Act's passage, as well as the debate and discussion of the Act, make clear that this was an intended and foreseeable form of the law's arbitrary and discriminatory application.

III.  **Oklahoma Educators Recognize That Inclusive Education, Consistent With The State's Instructional Goals, Better Prepares Students To Participate In Democratic Institutions And In A Diverse Society.**

a.  *Oklahoma educators responded to students' calls for discussions about race and gender by providing exposure to diverse viewpoints and ideas.*

78.    Following the killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and numerous other Black people in 2020, Oklahomans and Americans across the country increased their calls for advancing racial justice throughout all sectors of society. A multiracial coalition of millions of people engaged in racial justice demonstrations, often organized under the banner of Black Lives Matter, making the 2020 protests among the most significant mass movements in the country's history. Across Oklahoma, thousands of peaceful protestors marched for racial justice in Ardmore, Bartlesville, Brown Arrow, Edmond, Lawton, Muskogee, Norman, Oklahoma City, and many other cities.

79.    These calls for racial justice reflected a larger shift across the country. According to a 2020 study conducted by Monmouth University, a newfound majority of

Americans agreed that: "racism and discrimination is a 'big problem,'" and "there's a lot of discrimination against black Americans in society."[15]

80.     The 2020 movement for racial justice included demands for gender justice, as Black trans and queer leaders brought attention to the disproportionate violence faced by LGBTQ+ people of color. Mass movements such as the "Me Too" and "Time's Up" campaigns further shed light on the rampant discrimination faced by women, especially against women of color. And battles for equal treatment for LGBTQ+ individuals likewise continued, especially in light of key court cases, including the *Bostock v. Clayton County* transgender employment case. 140 S.Ct. 1731 (2020). LGBTQ+ people celebrated victories in Oklahoma as well when the state elected Representative Mauree Turner, who became Oklahoma's first openly nonbinary lawmaker.

81.     These social and legal shifts popularized discussions about how to dismantle racism and sexism and how to increase inclusivity, surfacing concepts such as "structural" "systemic" or "institutional" racism, and "racial privilege" or "white privilege." Students in Oklahoma witnessed these events and participated in these conversations.

82.     On OU's campus, BERT held a sit-in and hunger strike in February 2020 in response to recurring experiences of anti-Black disrespect and denigration (including the recent use of blackface and the n-word on campus by professors and students). BERT

---

[15] Nate Cohn & Kevin Quealy, *How Public Opinion Has Moved on Black Lives Matter*, N.Y. Times (June 10, 2020), https://www.nytimes.com/interactive/2020/06/10/upshot/black-lives-matter-attitudes.html.

peacefully demanded that OU create a mandatory DEI course to make OU a safer place for Black students and other historically marginalized students.

83.     Elementary and secondary school students also sought to discuss these issues in their schools. In July 2020, students from the state Student Advisory Council met with the Superintendent of Public Instruction and "[p]rompted by current events and nationwide protests . . . discussed their experiences with racial and ethnic identity in schools," calling for new ways to discuss these issues in schools.[16] For example, one council member suggested a diversity course as a high school requirement, arguing that "[w]e're really lacking the ability to have the hard conversations. We have financial literacy. How can we have 'communication literacy?'" The council member conveyed that "[e]veryone in my class looked like me, and I wasn't aware of the struggles other people faced. I couldn't sympathize with it because I didn't understand it." Other council members also conveyed a desire to address these issues directly through their education. As one member conveyed, "[w]e have to go back and face our problems. They won't go away on their own." Another similarly stressed that "[w]e need a better curriculum to teach people the mistakes of our past and how we can do better going forward."

84.     In response to students' calls for greater exposure to diverse voices and ideas, many schools and educators increased access to information that acknowledges and addresses the past and present experiences and inequities faced by historically

---

[16] Press Release, Okla. State Dep't of Educ., Hofmeister's Student Advisory Council Shares Thoughts on Distance Learning, Systemic Racism (June 30, 2020), https://sde.ok.gov/newsblog/2020-07-01/hofmeister%E2%80%99s-student-advisory-council-shares-thoughts-distance-learning-systemic.

marginalized students (hereinafter "Inclusive Speech"). Inclusive Speech is not intended

to harm any student groups. Inclusive Speech includes "culturally responsive curricula"

(also known as "culturally inclusive" curricula), which seek to present a more robust and

informed portrayal of topics by, for example, including the perspectives and experiences

of diverse communities in historical and present-day examples of injustice like slavery,

Jim Crow, segregation, and racial discrimination.[17] Inclusive speech also includes

discussions about stereotypes, prejudice, explicit and implicit bias, or "unconscious" bias,

which refers to the "the attitudes or stereotypes that affect our understanding, actions, and

decisions in an unconscious manner."[18]

85.     Inclusive Speech may also include anti-racism education and, in higher

education settings, critical race theory, which is a body of scholarship most commonly

used in law schools and graduate schools that involves: (1) the pursuit of understanding

how racial subordination originated and has been maintained in the United States,

especially in relation to the legal system; and (2) a desire to change the legal system so

that it no longer supports racial subordination.

---

[17] Antonia L. Hill, Culturally Responsive Teaching: An Investigation of Effective Practices for African American Learners 23–24 (Dec. 2012) (Ph.D. dissertation, Loyola University Chicago), https://ecommons.luc.edu/cgi/viewcontent.cgi?article=1352&context=luc_diss; Dr. Chastity McFarlan, *Supporting Marginalized Students Through Culturally Relevant Pedagogy*, Renaissance (Sept. 10, 2021), https://www.renaissance.com/2021/09/10/blog-supporting-marginalized-students-through-culturally-relevant-pedagogy/.

[18] NEA Ctr. for Soc. Just., *Implicit Bias, Microaggressions, and Stereotypes Resources* (Jan. 2021), https://www.nea.org/resource-library/implicit-bias-microaggressions-and-stereotypes-resources.

86.     Inclusive Speech takes many forms but it is unified by the aim of ensuring equal access to educational content for students of all backgrounds, and exposure to various perspectives that reflect the diversity of Oklahoma and America.

87.     In higher education, OU fostered Inclusive Speech by responding to BERT's request for curricula that combats discrimination and cultivates a racially inclusive campus climate. In July 2020, OU revised its strategic plan to incorporate mandatory DEI coursework for all incoming freshmen. The course sought to "help students gain an understanding of diverse perspectives from people of different abilities, identities, cultures, and social backgrounds, building an intercultural awareness that will allow them to interact more effectively with others." The course would identify the sources of prejudice and discrimination, with an emphasis on combatting racism.

88.     School districts likewise engaged in Inclusive Speech to meet student and community calls for greater equity. For example, in June 2020, the Oklahoma City Public Schools ("OKCPS") adopted the "Resolution on George Perry Floyd Protests." The Resolution affirmed the Board's belief that:

> [T]he long term, systemic solution to the problem of implicit bias, institutional racism, structural racism, and bigotry can and should be addressed by the public school systems in this country, through intentional acts, to provide equal opportunities for all children to have a high-quality education.[19]

---

[19] Okla. City Public Schools Bd. of Educ., Resolution on George Perry Floyd Protests (June 8, 2020), https://www.okcps.org/site/default.aspx?PageType=3&DomainID=4&ModuleInstanceID=5049&ViewID=6446EE88-D30C-497E-9316-3F8874B3E108&RenderLoc=0&FlexDataID=9844&PageID=0

The Board further resolved to

> [R]oot out practices stemming from implicit bias, prejudice, and discrimination, by implementing our educational equity framework, continuing our work with the Student Experience and Equity Committee, and providing training to every district employee to recognize and correct implicit and explicit bias.[20]

89.     Similarly, Tulsa Public Schools held a training in 2020 to discuss how teachers could develop coursework around "environmental racism and what effects it has had at the local, national, and international levels," and "misogyny and racism in STEM fields and how to counter it."[21] These efforts built upon trainings by the Center for Transformative Teacher Training (referred to as "CT3") that Tulsa Public Schools had provided since 2016 to educate employees on the dangers of racially exclusive practices and to intentionally celebrate the diversity of its students.

**b.     *Educators' and students' interest in diverse perspectives and diverse viewpoints to address barriers resonates with the state's own goals.***

90.     Educators' and students' augmented efforts throughout 2020 to increase the inclusion of diverse voices and viewpoints advanced the state's own educational values and goals.

91.     Diversity is a bedrock value of higher education institutions to cultivate robust intellectual exchange. The OU Regents' policies emphasize OU's "obligation…to provide a full range of materials on any subject, even though some views might be

---

[20] *Id.*

[21] Ray Carter, *Tusla Schools Include 'Social Justice' in Staff Training*, OCPA Think (Sept. 24, 2020), https://www.ocpathink.org/post/tulsa-schools-include-social-justice-in-staff-training

41

currently unpopular or controversial."[22] OU asserts it is "educationally desirable that

students be confronted with diverse opinions of all kinds."[23]

92.    Oklahoma's elementary and secondary school guidance similarly places

primary emphasis on the inclusion of diverse perspectives. Oklahoma Statute § 11-103.6b

mandates that the

> State Board of Education shall adopt a social studies core curriculum with
> courses of instruction… that reflect the racial, ethnic, religious, and cultural
> diversity of the United States of America [and that] shall include, but not be
> limited to, African Americans, Native Americans, and Hispanic Americans.

93.    The SBE's published "Social Studies Practices" similarly reflects this value

for diverse points of view, stating students should be able to "Analyze and Address

Authentic Civic Issues," including a demonstrated "ability to investigate problems taking

into consideration multiple points of view represented in arguments, structure of an

explanation, and other sources."[24]

94.    Other subject areas similarly reflect the SBE's emphasis on exposing

students to diverse perspectives. Oklahoma's 2021 English Language Arts (hereinafter

"ELA") Academic Standards require that students at nearly every grade level "work

---

[22] Univ. of Okla. Bd. of Regents, *Regents' Policy Manual for the University of Oklahoma*
12, https://www.ou.edu/regents/official_agenda/CurrentPolicyManual.pdf.

[23] *Id.*

[24] Okla. Educ. Standards for Social Studies, *supra* note 1 at 6.

effectively and respectfully in diverse groups," particularly in developing listening and speaking skills.[25]  The ELA Academic Standards also state:

> The language arts classroom is a place that is inclusive of the identities that reflect the richness and diversity of the human experience. All learners must hear the voices of their own heritage in the literature they encounter. They must also be given the opportunity to speak with the voices they choose for themselves in the writing they create.[26]

95.    The State's educational guidance makes it equally clear that students are not only capable but expected to engage with uncomfortable aspects of American history by encouraging "[a] balanced study of history [which] helps students understand the how and why of the challenges and successes of past societies."[27] Students are encouraged to read texts that espouse ideas with which they may disagree in order to "[r]einforce critical thinking by evaluating and challenging ideas and assumptions."[28] The state's educational framework embraces the inclusion of differing viewpoints to hone students' "ability to investigate problems taking into consideration multiple points of view."[29]

96.    The State's own educational objectives recognize that students of every age benefit from deeply engaging with issues related to race, sex, and America's social structures. For example, the state standards expect third graders to be able to "explain the

---

[25]  ELA Academic Standards at 44.

[26] Social Studies Practices at 5.

[27] *Id.* at 4.

[28] *Id.* at 76.

[29] *Id.* at 6.

processes of cultural diffusion, acculturation, assimilation, and globalization," and discuss ethnicity and gender, amongst other topics.[30] By fifth grade, Oklahoma students are expected to be able to "examine multiple points of view regarding the evolution of race relations in Oklahoma."[31] By seventh grade, Oklahoman students are expected to be able to "explain how bias, discrimination and use of stereotypes influence behavior with regard to gender, race, sexual orientation and ethnicity."[32] By ninth grade, Oklahoman students are expected to "examine contemporary challenges and successes in meeting the needs of the American citizen and society," including race relations, civic engagement, "perceived biases in the media," and other domestic issues.[33]

97.     In high school, students are expected to critically examine and analyze bias in a text by:

> evaluat[ing] how authors writing on the same issue reached different conclusions because of differences in assumptions, evidence, reasoning, and viewpoints, including examining rhetorical appeals, bias, and use of logical fallacies.[34]

98.     Each of these learning objectives are thwarted by H.B. 1775. Oklahoma's own instructional goals demonstrate that students in the state are capable of understanding and engaging with these complex topics.

---

[30] *Id.* at 63.

[31] *Id.* at 45.

[32] *Id.* at 49.

[33] *Id.* at 62.

[34] ELA Academic Standards at 115.

99.     The student members of Plaintiffs BERT, NAACP-Oklahoma, and AIM Indian Territory, and Plaintiff S.L. are capable and eager to engage in lessons that expose them to diverse ideas and viewpoints related to race, sex, and systemic inequality. Plaintiffs AAUP-OU, Mr. Crawford, and Mr. Killackey, who are educators or have members who are educators, affirm that their students benefit from engaging in complex conversations related to race, sex, and systemic inequality because it stimulates the type of discussion, debate, and inquiry that cultivates higher-level thinking skills and problem-solving that results in greater academic success and civic engagement.

## IV.     The Oklahoma Legislature Passed H.B. 1775 With The Racial And Partisan Intent To Chill Speech That Increases The Educational Achievement, Success, And Safety Of Historically Marginalized Students.

100.    The sequence of events leading up to the passage of H.B. 1775, contemporaneous legislative statements, the historical background of the Act, and departures from procedural and substantive norms all demonstrate that H.B. 1775 represents a politically motivated use of the power of the state government to chill, censor, and prohibit Inclusive Speech, which benefits all students, and particularly historically marginalized students.

101.    This censorship does not stand in isolation. H.B. 1775 is part of a nationwide attempt, seeded by former President Donald Trump, to censor discussions of race and gender in the classroom. Republican lawmakers across the country proposed bills that attempt to ban educators from teaching about gender and race discrimination, as well as concepts relating to racial equity, critical race theory, and other forms of speech

aimed at acknowledging and addressing the past and present inequities facing historically

marginalized communities in education and other social sectors.

      *a.*     ***President Trump attacked and illegally prohibited speech aimed at addressing bias, prejudice and discrimination through Executive Order 13950.***

    102.    As the state and the nation participated in peaceful protests promoting

racial justice throughout the spring and summer of 2020, President Trump took a series of

actions to publicly attack and suppress speech with which he disagreed, including speech

that sought to address bias, prejudice, and discrimination in the workplace and to

dismantle systemic racism and sexism.

    103.    On September 17, 2020, President Trump hosted a White House

Conference on American History, where he maligned critical race theory in education

and the 1619 Project[35] as "crusade[s] against American history," "toxic propaganda," and

"ideological poison, that, if not removed [would] . . . destroy our country."[36] President

Trump also announced that he would soon establish the 1776 Commission by Executive

Order to "promote patriotic education."[37]

    104.    On September 22, 2020, President Trump issued EO 13950, which sought

to censor certain viewpoints and chill speech that diverged from President Trump's own

---

[35] President Trump Remarks at White House History Conference, National Archives Museum (Sept. 17, 2020), https://web.archive.org/web/20201001042035/https://www.whitehouse.gov/briefings-statements/remarks-president-trump-white-house-conference-american-history/.

[36] *Id.*

[37] *Id.*

notions of the country's founding ideals. Specifically, EO 13950, in part, banned federal contractors and federal grant recipients from engaging in workplace training that purportedly "inculcates" employees on the following concepts:

(1)    one race or sex is inherently superior to another race or sex;

(2)    the United States is fundamentally racist or sexist;

(3)    an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(4)    an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

(5)    members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(6)    an individual's moral character is necessarily determined by his or her race or sex;

(7)    an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(8)    any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

47

(9)     meritocracy or traits such as a hard work ethic are racist or sexist, or

were created by a particular race to oppress another race.[38]

105.    In issuing EO 13950, President Trump and his administration expressly

sought to censor concepts such as "intersectionality," "critical race theory," "white

privilege," systemic racism, and the Black Lives Matter movement by calling such

concepts "radical," "leftist," and anti-American, among other derogatory descriptors.

106.    On December 20, 2020, a federal court partially enjoined EO 13950 on the

grounds that the plaintiffs were likely to succeed on their vagueness challenge. *Santa*

*Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 543. The district court found that EO

13950's banned concepts are "so vague that it is impossible for Plaintiffs to determine

what conduct is prohibited." *Id.* In reaching this decision, the district court flatly rejected

the government's argument that the plaintiffs' chilled speech "furthers race a[nd] sex

stereotypes and scapegoating," noting that such a position "is a gross mischaracterization

of the speech Plaintiffs want to express and an insult to their work of addressing

discrimination and injustice towards historically underserved communities." *Id.* at 546.

107.    As noted earlier, H.B. 1775 copied eight of the nine banned concepts

verbatim from EO 13950. *See* 70 O.S. § 24-157(1)(B)(1)(a)–(h).[39]

---

[38] Combatting Race and Sex Stereotyping, Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020), https://www.federalregister.gov/documents/2020/09/28/2020-21534/combating-race-and-sex-stereotyping.

[39] The lone exception is concept (3) of EO 13950 (that "the United States is fundamentally racist or sexist"), which is not expressly prohibited by H.B. 1775.

48

    *b.*       ***The Oklahoma legislature deviated from its own procedure to pass H.B. 1775, in furtherance of its racial and partisan interests.***

108.    In March 2021, Rep. West, Senator David Bullard (R), and their Republican colleagues exploited the legislative committee process to re-write H.B. 1775, an existing bill with entirely different content, to specifically target and censor the Inclusive Speech and related educational programs popularized by 2020's movements for racial and gender justice, with which many Republican legislators disagreed.

109.    H.B. 1775 was originally introduced on January 20, 2021 by House Representative Sherrie Conley (R). It was entitled: "Schools; [. . .] changing act name to Riley's Rule; requiring development of an Emergency Action Plan."[40] It would ensure that schools hosting athletic activities had emergency plans in place in preparation for medical emergencies.

110.    The Common Education Committee of the House of Representatives made minor amendments to the bill. However, the Senate Education Committee, led by Sen. Bullard and Rep. Conley, made substantial changes, including a new title, new summary, and entirely new provisions on mandatory training and the inclusion of certain concepts related to race and sex.

---

[40] The summary of H.B. 1775 initially read:

> An Act relating to schools; amending Section 1, Chapter 141, O.S.L. 2020 (70 O.S. Supp. 2020, Section 27-104), which relates to emergency medical services at athletic events or activities; changing act name to Riley's Rule; requiring development of an Emergency Action Plan; specifying contents of plan; providing for annual rehearsal of plan; requiring review of plan prior to certain athletic events; providing for certain filing of plan; and providing an effective date.

Okla. Admin. Code § 210:10-1-23.

111. Sen. Bullard and Rep. West were substituted as authors of the bill and moved to accept the amendments in their respective legislative chambers. Rep. West said the amendment's purpose was to "end the requirements for race-based biased curriculum in our schools and mandatory gender or sexual diversity training while also allowing for voluntary counseling."[41]

112. After the House Chair ruled that the amendment was not germane to the subject of the introduced bill, in accordance with Oklahoma House Rule 8.21(c), Republicans moved to suspend the germaneness rule.

113. A vote was cast for an absent representative to reach the number needed to suspend the rule, resulting in another vote being taken to adopt the motion and send H.B. 1775 to the Governor's desk.

114. The law was passed on May 3, 2021 on an emergency basis because representatives wanted to ensure it went into effect for the upcoming school year. The legislature did not reference a particular change in Oklahoma educational practices, either in the recent past or pending, that the legislature needed to address on an emergency basis. All Republican members of the legislature present and voting voted in favor of H.B. 1775; all Democratic members present and voting voted against it.

115. Following the passage of H.B. 1775, the Oklahoma legislature continued to target Inclusive Speech and programs. On May 24, 2021, Rep. Conley introduced House

---

[41] April 29th House Session at 9:57:46–9:57:57 AM.

Resolution 1038 ("H.R. 1038"): "A Resolution discouraging schools from mandating professional development for teachers that cover critical race theory, Project 1619 or the issues provided in Enrolled House Bill No. 1775 of the 1st Regular Session of the 58th Oklahoma Legislature." The Resolution was co-authored by Rep. West, the principal author of H.B. 1775. H.R. 1038 was adopted by the House on May 27, 2021.

### c.   *H.B. 1775 was animated by racial and partisan interests, not improving the quality of education for Oklahoma students.*

116.   Statements by H.B. 1775's authors and its supporters during the legislative debates and in the media also reveal H.B. 1775 was motivated, in part, by racial and partisan interests. Indeed, H.B. 1775's banned concepts—and their suppression of different viewpoints, particularly those of Black and LGBTQ+ advocates—contrast directly with Oklahoma's own aforementioned learning standards, which celebrate "diversity."

117.   Rep. West said the bill would "end the requirements for race-based biased curriculum in our schools and mandatory gender or sexual diversity training while also allowing for voluntary counseling."[42] Rep. West's comments revealed that the true target of H.B. 1775 was speech embraced by advocates promoting diversity, equity, and belonging:

> "We are in a fight for the future of our children and grandchildren . . . Critical Race Theory proscribes a revolutionary program that would overturn the principles of the Declaration [of Independence] and destroy the remaining structure of the Constitution. Critical race theorists are masters

---

[42] April 29th House Session at 9:57:46–9:57:57 AM.

of language manipulation by changing definitions or making slight modifications to words that are used…. [Examples include the use of] "diversity" instead of "excellence," "equity" instead of "equality," the "collective" instead of "individualism," and "just communities" instead of "justice."[43]

118.    In the floor debates, Democratic representatives repeatedly pressed Rep. West to offer specific examples of an Oklahoma "curriculum" or "course" that H.B. 1775 sought to ban.[44] Rep. West's singular answer was: "critical race theory and CT3,"[45] the latter referring to the Center for Transformative Teacher Training that contracts with Tulsa Public Schools to better support diverse students. *See supra* Section III.

119.    Instead of providing a cohesive and accurate definition of CRT, Rep. West and other supporters of H.B. 1775 used the term as a catch-all for ideas with which they disagreed and to instill fear among the public. Their piecemeal depictions of CRT were false, incomplete, distorted, and intended to vilify and stigmatize the approach. Rep. West issued a press statement asserting critical race theory is based on "Marxist ideology that is designed to teach children to hate American exceptionalism and distrust others based on skin color or gender."[46] Senator Nathan Dahm (R), co-author and co-sponsor of H.B. 1775 in the Senate, celebrated H.B. 1775's passage on Twitter by posting: "Just got

---

[43] April 29th House Session at 12:34:20–12:36:08 PM.

[44] April 29th House Session at 11:28:40–11:28:50 PM.

[45] April 29th House Session at 11:28:53–11:28:53 PM.

[46] Connor Hansen, *Proposed Law Would Ban Teaching Certain Race and Gender Topics*, Fox 25 (Apr. 30, 2021), https://okcfox.com/news/local/proposed-law-would-ban-teaching-certain-race-and-gender-topics?fbclid=IwAR1iRjQOf9W4dSWv69K--YFg0fdLxB4BZbF3VhDElnKEsNP37c-OHnmEnlY

a call from @GovStitt that he has signed HB1775 which would prohibit our students from being forced to learn the racist, Marxist concepts known as #CriticalRaceTheory. This is a huge win in stopping this indoctrination."[47] Senator Shane Jett (R), co-author and co-sponsor of H.B. 1775, similarly expressed his support of H.B. 1775 as necessary to address CRT, which he characterized as "Marxist indoctrination."[48]

120.    Comments about CRT also expose that H.B. 1775's underlying motive included suppressing discussions of implicit bias and systemic racism, particularly against Black people. In his press release celebrating the passage of H.B. 1775, Rep. West disparaged critical race theory and described it as "teach[ing] that most laws and systems in America are historically rooted in the racist oppression of black people and other marginalized groups. It promotes the theory of implicit bias and inherent racism due to one's skin color."[49]

121.    Legislators' comments also make plain that H.B. 1775 sought to censor entire topics and approaches that received increased attention in 2020 as important for increasing the educational and civic equality of historically marginalized students.

---

[47] Nathan Dahm (@NathanDahm), Twitter(May 7, 2021, 6:34 PM), https://twitter.com/NathanDahm/status/1390797145222127621.

[48] James Varney, *Shane Jett, Oklahoma State Senator, Wants to Ban Critical Race Theory from Being Taught in Schools*, Wash. Times (Mar. 1, 2021), https://www.washingtontimes.com/news/2021/mar/1/shane-jett-oklahoma-state-senator-wants-to-ban-cri/

[49] *Bill Promoting "Critical Race Theory" Curriculum Passes House*, Okla. H.R. (Apr. 29, 2021), https://www.okhouse.gov/members/PrintStory.aspx?NewsID=8125.

122.    During the House debate, House Representative Justin Humphrey (R) spoke in favor of H.B. 1775 and likened the Black Lives Matter movement to the Ku Klux Klan. In response, Rep. West agreed that the Black Lives Matter movement met the description of a "terrorist group."[50] In an outside media appearance corresponding with the passage of H.B. 1775, Rep. West explicitly shared a desire to end teachings related to the Black Lives Matter movement, as well as teachings related to critiques of "colorblindness."[51]

123.    Rep. Humphrey vocalized his strong support of the bill by asserting "Police brutality is a lie…Those are the kind of lies that we must end."[52] Days before Governor Stitt signed the bill into law, Rep. West appeared on the local news to explain that H.B. 1775 was necessary to respond to concerns over "culturally responsive teaching."[53]

124.    Proponents of H.B. 1775, such as Senator Rob Standridge (R), were also explicit about their desire to eliminate school trainings that discussed "institutionalized racism," "white supremacy," and "whiteness" as concepts.[54]

---

[50] April 29th House Session at 11:09:59–11:10:48 AM.

[51] Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 21, 2021 11:29:21–11:29:38 PM), https://www.okhouse.gov/Video/Default.aspx [hereinafter "April 21st House Session"].

[52] April 29th House Session at 12:08:20–12:08:38 PM.

[53] West, *supra* note 67.

[54] April 29th House Session at 11:10:20 - 11:11:40 PM; *Sen. Standridge Issues Statement Thanking Fellow Members for Supporting H.B. 1775*, Okla. S., (Apr. 22, 2021), https://oksenate.gov/press-releases/sen-standridge-issues-statement-thanking-fellow-members-supporting-hb-1775 .

125.   Furthermore, H.B. 1775's supporters explicitly expressed a desire to suppress any discussion of intersectionality, gender identity, and gender fluidity. Sen. Bullard stated H.B. 1775's banned concepts were necessary because "[Critical Race Theory] teaches a lie called 'intersectionality,' it teaches about systemic racism, inherent racism, and automatically assumes white supremacy in anyone . . . . It is a poison to the minds of our kids." [55] Rep. Humphrey proclaimed his support for the bill based on his opposition to teaching in school that "talk[s] about taking away gender so that we say there is no woman."[56] In an outside media appearance to promote H.B. 1775, Rep. West explained the law was necessary to address concerns about teachers inserting into the classroom discussions about "differences between gender identification, biological sex, and gender expression."[57]

126.   Legislators' statements in support of the legislation also made clear that H.B. 1775's provisions were specifically meant to target OU's mandatory DEI programming, which had been adopted for the purpose of combatting anti-Black racism on campus. When asked for a justification for the bill's provision, Rep. West stated that he "has spoken with OU students about the bill" who called OU's diversity training "completely pointless," and felt "the training is more an exercise in determining school-

---

[55] Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 21, 2021 11:29:21–11:29:38 PM), https://www.okhouse.gov/Video/Default.aspx.

[56] April 29th House Session at 12:07:55–12:08:05 PM.

[57] West, *supra* note 67.

approved responses than anything."[58] Other legislators paired their support of H.B. 1775 with their disparagement of OU as un-American in its support of CRT. Rep. Jett complained that critical race theory was "Marxist indoctrination" that was now taught at OU, which he referred to as "the Democratic People's Republic of Norman."[59]

127.    There was an utter absence of evidence in the legislative record to substantiate any of the alleged harms that the Act purports to address. During the floor debates, legislators arguing in support of H.B. 1775 did not specifically reference, collect, or heed the input of state education officials, school administrators, or teachers. In fact, legislators actively disregarded the concerns shared publicly by numerous educators and education officials who spoke out against the Act.

### d.    *The Oklahoma legislature also departed from substantive norms in passing H.B. 1775.*

128.    The passage of H.B. 1775 reflects an unprecedented intrusion into the authority normally afforded to local educators and administrators. Oklahoma's lawmakers and courts have routinely viewed educators and administrators as best positioned to tailor the specific contours of classroom discussion to achieve the state standards, meet the particularized needs of students and the local community, and promote the civic literacy skills that are vital for engaging in today's pluralistic, diverse world. H.B. 1775's establishment of state control over teachers' specific curricular

---

[58] Ray Carter, Ban on Racist Stereotyping Contrary to OU's Goals, President Says, OCPA (May 7. 2021), https://www.ocpathink.org/post/ban-on-racist-stereotyping-contrary-to-ous-goals-president-says.

[59] Varney, *supra* note 64.

speech and pedagogies represents a significant departure from Oklahoma's educational norms.

129.    Oklahoma's Deregulation Act ("EDA"), for example, ensures that local schools have the necessary freedom to innovate and improve education systems in order to maximize student learning and performance." 70 O.S. § 3-125. Similarly, 70 O.S. § 18-101 states that "maximum public autonomy and responsibility for public education should remain with the local school districts and the patrons of such districts."

130.    While the legislature retains certain decision making over elementary and secondary education policy, Oklahoma law states "[s]chool districts shall exclusively determine the instruction, curriculum, reading lists and instructional materials and textbooks, subject to any applicable provisions or requirements as set forth in law, to be used in meeting the subject matter standards." 70 O.S. § 11-103.6a.

131.    The SBE's website likewise explains that state standards:

> Do not dictate how teachers should teach… Do not mandate a specific curriculum… Do not limit advanced work beyond the standards… Do not prescribe all that can or should be taught… Do not prescribe interventions for students below grade-level.[60]

132.    The State's higher education framework also typically affords substantial deference to educators. For example, the State Regents—who are constitutionally

---

[60] Okla. State Dep't of Educ., *Oklahoma Academic Standards* (July 22, 2021), https://sde.ok.gov/oklahoma-academic-standards.

endowed to manage university affairs, Okla. Const. art. XIII, §3 [61]—state in their

handbook that they "recognize the primary role of institutional faculty, administrators,

and governing boards in initiating and recommending needed changes in educational

programs. The institutional faculty are the discipline experts responsible for developing

and teaching the curriculum."[62]

133.     The law also departs from education norms by *excluding* certain

viewpoints. There are no other provisions in Oklahoma's school code that require

excising entire "concepts," or points of view, related to race or sex or similar category.

134.     Taken together, legislators' contemporaneous statements show H.B. 1775

was specifically intended to eliminate Inclusive Speech and related programs that arose to

enhance the educational and civic experiences of Black people and other historically

marginalized groups.

**V.     By Passing Rules That Broaden The Censorship Initiated By The Legislature, The State Board Of Education's Actions Further Reflect The Racial And Partisan Motives Underlying The Act.**

135.     The promulgation of Emergency Rules provides additional evidence of a

racial motive through the SBE's departure from ordinary norms, lack of transparency,

and implicit and explicit references to race.

---

[61] Okla. Const. art. XIII, § 3; *see also Bd. of Regents of Univ. of Okla. v. Baker,* 638 P.2d 464, 467 (1981) (observing that the Oklahoma Constitution reflects an "inten[t] to limit legislative control over University affairs. Oklahoma is one of only a few states in which the legal status of public universities is constitutional rather than statutory.").

[62] *Chapter 3: Academic Affairs*, Section 3.4, Okla. State. Regents for Higher Educ., https://www.okhighered.org/state-system/policy-procedures/part3.shtml.

136.    On July 12, 2021, the SBE released temporary, emergency rules detailing

the implementation and enforcement mechanisms for H.B. 1775 after a flawed process.

Tulsa Public Schools expressed its disappointment and concerns about the process:

> The lack of notice, the disregard for the operational needs of the public
> school districts it serves, and the absence of engagement with those who
> will bear the burden of these rules demonstrate a lack of transparency in the
> Oklahoma State Board of Education's process for considering an issue of
> such magnitude.[63]

137.    While state lawmakers rarely attend SBE meetings, numerous Republican

legislators attended, including Rep. West and several co-sponsors of H.B. 1775. Their

attendance, another departure from the norm, demonstrates the influence that Oklahoma

legislators tried to exert on the SBE's rulemaking process.

138.    Seven members of the public made comments. Only one of the seven

commentators publicly identified as Black and as a student, and that student spoke

against the Rules.[64]

139.    When discussion by the SBE commenced, the SBE's lone Black member,

Carlisha Bradley, spoke at length in opposition to the Rules.[65] She emphasized that H.B.

---

[63] Brady Halbleib & Katie Keleher, *State Board of Education Passes Temporary Rules on Teaching Critical Race Theory*, KJRH (Jul. 12, 2021), https://www.kjrh.com/news/local-news/republican-lawmakers-asking-state-board-of-education-to-set-guidelines-for-the-ban-on-critical-race-theory.

[64] Okla. State Dep't of Educ., *Oklahoma State Board of Education Meeting*, Facebook (July 12, 2021, at 1:21:24–1:26:00) [hereinafter "SBE Meeting"], https://www.facebook.com/OklaSDE/videos/547623546410680/.

[65] *Id.* at 2:05:45–2:07:27.

1775 was based on a fundamental misunderstanding of CRT, which was taught in colleges and not elementary and secondary schools, as "it is an advanced theory and study."[66] She also faulted the Rules for lack of transparent process, whereby members only received the Rules "minutes before [the] meeting."[67] Ms. Bradley voiced her concern over the fact that schools, teachers, and students—who are most impacted by this rule—were not able to weigh in on the impact of this decision, and that this process excluded "the voices of those who are most proximate to this work."[68]

140.   An SBE member spoke in favor of the Rules and said the state's "largest districts . . . to whom much is given" deserve to be admonished for some of their practices to date.[69] The two largest school districts in Oklahoma are Oklahoma City Public Schools and Tulsa Public Schools, both of which have increasingly embraced Inclusive Speech in recent years.

141.   Ms. Bradley pushed back and pointed out that the "large school districts" referred to by proponents of H.B. 1775 served student populations that include proportionately more students of color, who would be the students most harmed by the Rules.

142.   The Rules were adopted with no amendments by the SBE through a 5-1 vote, with the only "no" vote cast by Bradley.

---

[66] *Id.* at 2:07:07–2:07:12.

[67] *Id.* at 2:06:14–2:07:17.

[68] *Id.* at 2:06:18–2:06:41.

[69] *Id.* at 2:05:12–2:05:17.

143.    On August 26, 2021, the SBE announced the adopted emergency rules required a revote because of "technical errors."[70] Superintendent Hofmeister blamed the unspecified "scrivener's errors" on a "rushed and unorthodox process."[71]

144.    On September 10, 2021, the SBE re-approved the Rules that were identical in substance to the July emergency rules with the technical errors corrected.

145.    As described previously, *see* Section II(a), the SBE Rules further draw out serious constitutional concerns with the law. They introduce wide-ranging and unrestrained reporting mechanisms, and impose severe sanctions for those found in violation of the Act's vague terms. In doing so, the Rules increase the Act's reach into protected speech, its chilling effect, and its likelihood of arbitrary enforcement. And spurred on by Oklahoma legislators who enacted H.B. 1775 with discriminatory intent, the SBE's actions further reflect the racial and partisan motives underlying the Act's unprecedented censorship.

## VI.    The Harms Of H.B. 1775 Disproportionately Fall On Students Of Color, With Compounded Harms For LGBTQ+, Women, And Girls Of Color.

146.    H.B. 1775's censorship of Inclusive Speech harms all Oklahomans because its inclusion in classrooms provides a multitude of benefits for students and society at large. Student body diversity—and the resultant diversity in views and perspectives that flows from such diverse students' participation—improves critical thinking and problem

---

[70] Ray Carter, *Education Agency Botches Anti-Racism Regulations*, OCPA (Aug. 26, 2021), https://www.ocpathink.org/post/education-agency-botches-anti-racism-regulations.

[71] *Id.*

solving, increases cross-racial understanding, reduces stereotypes and prejudices, and develops leadership skills and many other skills necessary to thrive in an increasingly diverse society.[72] Research also shows that a culturally inclusive education can increase graduation rates, school attendance, and standardized test scores.[73] These benefits manifest for all students.

147.    While all Oklahomans are harmed by H.B. 1775, the Act's censorship of Inclusive Speech inflicts disproportionate injury on students of color, with compounded harms for LGBTQ+, women, and girls of color. Inclusive Speech and related programs serve to close existing opportunity gaps and inequalities faced by students of color and other historically marginalized groups. Research demonstrates that increasing cultural proficiency among teachers and introducing culturally responsive teaching practices and pedagogy can provide effective support for students of color.[74] Studies in brain science and education find that drawing on learners' background knowledge shapes comprehension.[75] Research also illustrates that instructional materials, assignments, and texts that reflect students' backgrounds and experiences are critical to engagement and

---

[72] *See, e.g.,* Roslyn Arlin Mickelson, *Research Brief: School Integration and K-12 Outcomes: An Updated Quick Synthesis of the Social Science Evidence* 5, Nat'l Coal. on Sch. Diversity (Oct. 2016), https://files.eric.ed.gov/fulltext/ED571629.pdf.

[73] *See, e.g.,* Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127, 217 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf.

[74] *Id.* at 127–66.

[75] *See Understanding Culturally Responsive Teaching,* New Am., https://www.newamerica.org/education-policy/reports/culturally-responsive-teaching/understanding-culturally-responsive-teaching/ (discussing and citing studies).

deep, meaningful learning.[76] Additional research shows that enrollment in an ethnic studies course results in positive academic outcomes across a variety of indicators, including a 21% increase in ninth-grade attendance rates and average GPA increase of 1.4 grade points.[77]

148.    Prohibiting Inclusive Speech for students of color and other historically marginalized groups exacerbates existing disparities in education. On the whole, historically marginalized groups are underrepresented in educational curricula. As a result, educational curricula and programs do not reflect the diversity of historically marginalized groups' past and present contributions, challenges, and perspectives. When historically marginalized figures do appear, they often are portrayed as victims, or in overly simplified or stereotyped roles. For example, many Oklahoma public school students have been required to participate in reenactments of the 1889 Land Run—which glorify the western expansion period of United States and Oklahoma history during which Indigenous people were forcibly displaced. Only recently have some school districts begun to revisit this practice to teach historical accounts from Indigenous perspectives. By further restricting the perspectives of people of color and other marginalized groups, H.B. 1775 inflicts pronounced harm on students of color who already do not see their communities reflected in the curricula and, therefore, feel less engaged by and connected to classroom discussions.

---

[76] Alfred Tatum, *Black Males and Critical Literacy* 66, The Reading Teacher, 661–69 (2013).

[77] Dee & Penner, *supra* note 89, at 129.

149.    In addition, Inclusive Speech serves to break down stereotypes and prejudices that disproportionately inflict harm on students of color, both within the educational system and broader society across healthcare, the penal system, and workplaces. For example, trainings on implicit bias help to counteract existing prejudice which research suggests results in educators disciplining Black students more harshly than their White peers for similar offenses.[78]

150.    Such barriers are compounded for students of color who have other marginalized identities, including LGBTQ+ students of color. LGBTQ+ students are subject to bullying and harassment at much higher rates. One state survey assessing school climate for LGBTQ+ youth in Oklahoma's secondary schools found that up to 76% of respondents reported verbal harassment for gender, gender expression, and sexual orientation, and up to 34% reported physical harassment and 15% of those cases resulting in physical assaults.[79] LGBTQ+ students of color face additional barriers, as surveys indicate that LGBTQ+ youth of color report a higher likelihood of dropping out of school due to hostile school climates as compared to their White LGBTQ+ peers.[80] While Inclusive Speech serves to address these barriers, H.B. 1775's censorship further deprives

---

[78] *See, e.g., Educator Bias is Associated with Racial Disparities in Student Achievement and Discipline*, Brookings (July 20, 2020), https://www.brookings.edu/blog/brown-center-chalkboard/2020/07/20/educator-bias-is-associated-with-racial-disparities-in-student-achievement-and-discipline/.

[79] *School Climate for LGBTQ Students in Oklahoma*, GLSEN (2019), https://www.glsen.org/sites/default/files/2021-01/Oklahoma-Snapshot-2019.pdf.

[80] *Educational Exclusion: Drop Out, Push Out, and the School-to-Prison Pipeline Among LGBTQ Youth*, GLSEN (2013), https://www.glsen.org/sites/default/files/2019-11/Educational_Exclusion_2013.pdf.

LGBTQ+ youth of color of anti-discrimination measures, educational supports, and engaging curricula.

151.    Women and girls of color also face a range of compounded barriers in the education context due to the intersections between their racial and gender identity. For example, girls of color disproportionately face punitive disciplinary measures in school and sexual harassment. Inclusive speech can serve to effectively address these intersectional barriers.

152.    As discussed further above, many schools and educators proactively sought Inclusive Speech and related programs to particularly address the needs of historically marginalized students facing these persistent opportunity gaps. *See, e.g., supra* Section III(b). H.B. 1775's supporters sought to reverse course.

153.    During the floor debates, H.B. 1775's supporters singled out diversity and inclusion programs and other forms of Inclusive Speech that aimed to help improve the education for historically marginalized students. *See supra* Section IV(c). They further used code words and disparaged Black-led movements. *Id.*

154.    Plaintiffs' lived experiences confirm the findings that Inclusive Speech is vital for the provision of a quality education and thriving democracy for all Oklahomans, and particularly Oklahomans of color. All Plaintiffs who are educators, or have educator members, affirm that Inclusive Speech has increased the engagement, participation, and sense of belonging for students of color in their classroom. Plaintiffs who are students of color, or have student members of color, similarly express their desire to gain greater exposure to the perspectives of communities of color and theories related to race and

gender because such conversations make them feel more connected to the curricula and prepared to tackle the issues facing their communities. Inclusive Speech makes them more comfortable and confident to participate in courses and share their viewpoints in classroom and campus discussions.

155.    In this vein, NAACP-Oklahoma's members and community partners report that teaching about systemic racism and biases—conscious and unconscious—is critical for broadening perspectives; developing solutions for society and building a better, more equitable future; combatting ignorance; and empowering the Black community and other groups to know their history, including their triumphs and tools for overcoming challenges.

## CLAIMS FOR RELIEF
### First Cause of Action
### Fourteenth Amendment — Vagueness

156.    All prior paragraphs are incorporated here by reference.

157.    A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Faustin v. City & Cty. of Denver*, 423, F.3d 1192, 1201 (10th Cir. 2005). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule). And where First Amendment rights are at stake, "[s]tricter standards of permissible statutory vagueness may be applied." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *Hynes v. Mayor and Council of*

*Borough of Oradell,* 425 U.S. 610, 620 (1976)). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000).

158.    The Act is unconstitutionally vague on its face and as applied to Plaintiffs because it fails to provide fair notice of what educators can and cannot include in their courses, and because it invites arbitrary and discriminatory enforcement—up to and including the loss of teaching licenses.

159.    Educators, including Plaintiffs Killackey, Crawford, and NAACP-Oklahoma's members who are educators, at every level are confused about what they can legally teach and risk the loss of employment, licenses and certifications.

160.    H.B. 1775 is vague and violates the Fourteenth Amendment rights of Plaintiff NAACP-Oklahoma and Plaintiff Killackey facially and as applied by Defendants Joy Hofmeister, SBE members, John O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, OU Regents members, Angela Grunewald, EPS Board, and the EPS Board members.

161.    H.B. 1775 is vague and violates the Fourteenth Amendment rights of Plaintiff S.L., Plaintiff AIM Indian Territory, and Plaintiff Crawford facially and as applied by Defendants Joy Hofmeister, SBE, SBE members, John O'Connor, and Governor Kevin Stitt.

162.    H.B. 1775 is vague and violates the Fourteenth Amendment rights of Plaintiff BERT and Plaintiff OU-AAUP facially and as applied by Defendants John

67

O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, and OU Regents members.

163.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights to due process.

## Second Cause of Action

### First Amendment – Right to Receive Information

164.    All prior paragraphs are incorporated here by reference.

165.    The First Amendment binds the State of Oklahoma pursuant to the incorporation doctrine of the Fourteenth Amendment. In all of the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

166.    The First Amendment protects the right to receive information and ideas as well as the right to disseminate ideas. Laws regarding school curricula that impede the rights of students to receive information and ideas, without legitimate pedagogical justification, violate the First Amendment. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). H.B. 1775 violates the First Amendment, both on its face and as applied, because it prohibits educators from teaching about specific concepts on the topics of race and sex, and it imposes restrictions on the ideas that students may be exposed to in public schools. These restrictions are unconstitutionally designed to promote a narrowly partisan, political, or racially biased agenda. *See Pico*, 457 U.S. at 870. To the extent that the Act could be interpreted as having any legitimate pedagogical

68

purpose, it is overbroad, because "a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

167.    H.B. 1775 is overbroad and violates the First Amendment right to receive ideas of Plaintiff NAACP-Oklahoma facially and as applied by Defendants Joy Hofmeister, SBE, SBE members, John O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, OU Regents members, Angela Grunewald, EPS Board, and EPS Board members.

168.    H.B. 1775 is overbroad and violates the First Amendment right to receive ideas of Plaintiff S.L. and Plaintiff AIM Indian Territory facially and as applied by Defendants Joy Hofmeister, SBE, SBE members, John O'Connor, and Governor Kevin Stitt.

169.    H.B. 1775 is overbroad and violates the First Amendment right to receive ideas of BERT facially and as applied by Defendants John O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, and OU Regents members.

170.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their First Amendment rights to receive information and ideas.

## Third Cause of Action

### First Amendment – Overbroad and Viewpoint-Based Restriction on Academic Freedom

171.    All prior paragraphs are incorporated herein by reference.

172.    The First Amendment binds the State of Oklahoma pursuant to the incorporation doctrine of the Fourteenth Amendment. In all of the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

173.    The Act is overbroad and imposes unconstitutional viewpoint-based restrictions on academic freedom. The Supreme Court has repeatedly held that academic freedom deserves First Amendment protection. *Keyishian*, 385 U.S. at 603; *Sweezy*, 354 U.S. at 250; *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) ("Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment."); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) (stressing importance of free speech rights in public school context); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 237 (2000) (Stevens, J., concurring) ("Our understanding of academic freedom has included not merely liberty from restraints on thought, expression, and association in the academy, but also the idea that universities and schools should have the freedom to make decisions about how and what to teach."). *See also Dow Chem. Co. v. Allen,* 672 F.2d 1262, 1274–76 (7th Cir. 1982); *Gray v. Bd. of Higher Educ.,* 692 F.2d 901, 909 (2d Cir. 1982).

174.    The purpose and effect of enforcing the Act is to ban speech about biases on the basis of race or sex because of legislators' objections to the messages that discussion of such topics may convey. The Act is not narrowly tailored to achieve any compelling interest that may be served by this type of censorship.

70

175.    H.B. 1775 is overbroad and discriminates by viewpoint against Plaintiff OU-AAUP and Plaintiff BERT in violation of the First Amendment facially and as applied by Defendants John O'Connor, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, and OU Regents members.

176.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their First Amendment rights to speech because the Act is overbroad, viewpoint discriminatory, and infringes on academic freedom.

## Fourth Cause of Action
### Fourteenth Amendment – Racially Discriminatory Purpose

177.    All prior paragraphs are incorporated here by reference.

178.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

179.    An official action taken for the purpose of discriminating on account of race has no legitimacy under the United States Constitution. *City of Richmond, Va. v. United States*, 422 U.S. 358, 278–79 (1975).

180.    Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Instead, the plaintiff's burden is to show that discriminatory purpose was a motivating factor, rather than the primary or sole purpose. *Id.* at 265–66.

71

181.   Discriminatory intent does not require racial animus, hatred or bigotry but rather "[t]he 'intent to discriminate' forbidden under the Equal Protection Clause is merely the intent to treat differently." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).

182.   "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights,* 429 U.S. at 266.

183.   Because legislation that "appears neutral on its face" may nonetheless be motivated by discrimination, the United States Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent, including: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports." *Id.* at 266–68; *see also Dowell by Dowell v. Bd. of Educ. of Okla. City Pub. Sch.*, 8 F.3d 1501, 1518 (10th Cir. 1993).

184.   Application of the *Arlington Heights* factors reveals that the Act was enacted, in part, with the purpose to discriminate against students of color by chilling and suppressing Inclusive Speech aimed at enhancing the educational, social, and civic experiences of students of color and their families. The Act explicitly singles out concepts related to sex and race. The Act will foreseeably disparately harm students of

72

color, with compounded harms for students of color who also identify as women, girls, and LGBTQ+.

185.   Comments by H.B. 1775's sponsors make it explicitly clear that H.B. 1775 targets the elimination of curriculum, instruction, conversations and programming designed to improve the educational, social, and civic experiences of historically marginalized groups. The Act, however, does not address the exclusion and underrepresentation of such historically marginalized groups' interests in the present-existing curriculum and instruction.

186.   The Act's history and Oklahoma's own history of racial and gender discrimination, known and reasonably foreseeable discriminatory impact, sequence of events and substantive departures from the normal legislative process that resulted in its enactment, and the tenuousness of the stated justifications for the new law, all show that it was enacted with a discriminatory purpose in violation of the Equal Protection Clause of the Fourteenth Amendment.

187.   H.B. 1775 violates the Fourteenth Amendment right to equal protection of Plaintiff NAACP-Oklahoma as applied by Defendants John O'Connor, Joy Hofmeister, SBE members, Governor Kevin Stitt, State Regents, State Regents members, OU Regents, OU Regents members, Angela Grunewald, the EPS Board, and EPS Board members.

188.   H.B. 1775 violates the Fourteenth Amendment right to equal protection of Plaintiff S.L. and Plaintiff AIM Indian Territory as applied by Defendants John O'Connor, Joy Hofmeister, SBE, SBE members, and Governor Kevin Stitt.

73

189.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights to equal protection.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

1. Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing the Act;

2. Declare 70 O.S. § 24-157 and Okla. Admin. Code § 210: 10-1-23 unconstitutional, facially and as applied, under the First and Fourteenth Amendments to the United States Constitution;

3. Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1998; and

4. Grant such additional relief as the interests of justice may require.

Dated: October 19, 2021

Genevieve Bonadies Torres*
David Hinojosa*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
   UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005


Gary Stein*
Michael Cutini*
Sara Solfanelli*
Elahe Hosseini*
Amir Shakoorian*
Ramya Sundaram*
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Emerson Sykes*
Leah Watson*
Sarah Hinger*
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004


*Counsel for Plaintiffs*


**Pro Hac Vice application forthcoming*