# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al., | ) ) ) ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) ) ) |
| [l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al., | ) ) ) ) ) |
| *Defendants*. | ) ) ) |

Case No. 5:21-cv-01022-G

Hon. Charles B. Goodwin

## MOTION FOR A PRELIMINARY INJUNCTION & MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Genevieve Bonadies Torres
David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
  UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005

Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian Tabrizi
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022

Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

I.      PRELIMINARY STATEMENT ........................................................... 1

II.     STATEMENT OF FACTS ................................................................... 3

        A.      Background ............................................................................... 3

        B.      Text of H.B. 1775 and the Emergency Rules ............................ 6

        C.      Implementation of the Act ....................................................... 9

III.    ARGUMENT ..................................................................................... 11

        A.      Plaintiffs Are Likely to Succeed on The Merits of Their Claims .............. 12

                1.      The Act is too vague for Oklahoma educators to understand its provisions .................................................... 12

                2.      The Act is a viewpoint discriminatory and overbroad infringement on academic freedom ................................. 16

                3.      The Act, for no legitimate purpose, restricts students' access to information ..................................................... 19

        B.      Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury ................ 23

        C.      Plaintiffs' Injury is Great, and Preliminary Relief Will Not Harm Defendants ........................................................................ 23

        D.      An Injunction Would Serve the Public Interest ....................... 24

IV.     CONCLUSION ................................................................................. 25

PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ..................................................................... 21

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) ................................................................. 24

*Axson-Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) ...................................................... 19, 21, 22

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ............................................................... 1, 19, 20, 22

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
    269 F.3d 1149 (10th Cir. 2001) ................................................................. 11

*Dr. John's, Inc. v. City of Roy*,
    465 F.3d 1150 (10th Cir. 2006) .......................................................... 12, 15

*Elam Constr., Inc. v. Regional Transp. Dist.*,
    129 F.3d 1343 (10th Cir. 1997) ................................................................. 25

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................................. 23

*Faustin v. City & Cty. Of Denver, Colo.*,
    423 F.3d 1192 (10th Cir. 2005) ................................................................. 12

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ................................................................... 23

*Giebel v. Sylvester*,
    244 F.3d 1182 (9th Cir. 2001) ................................................................... 16

*Gonzalez v. Douglas*,
    269 F. Supp. 3d 948 (D. Ariz. 2017) .......................................................... 21

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .......................................................................... 12, 15

*Griswold v. Connecticut,*
    381 U.S. 479 (1965)..................................................................................20

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988)........................................................................1, 19, 20

*Hill v. Colorado,*
    530 U.S. 703 (2002)..................................................................................12

*Hynes v. Mayor and Council of Borough of Oradell,*
    425 U.S. 610 (1976)..................................................................................12

*Keyishian v. Board of Regents,*
    385 U.S. 589 (1967)........................................................................1, 16, 17

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy,*
    141 S. Ct. 2038 (2021)..........................................................................21, 25

*Miles v. Denver Pub. Sch.,*
    944 F.2d 773 (10th Cir. 1991)..................................................................21

*N.A.A.C.P. v. Button,*
    371 U.S. 415 (1963)..................................................................................17

*Pac. Frontier v. Pleasant Grove City,*
    414 F.3d 1221 (10th Cir. 2005)................................................................25

*Regents of Univ. of Cal. v. Bakke,*
    438 U.S. 265 (1978)..................................................................................17

*Roberts v. Madigan,*
    921 F.2d 1047 (10th Cir. 1990)................................................................19

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
    508 F. Supp. 3d 521 (N.D. Cal. 2020)..................................................6, 12

*South Wind Women's Center, LLC v. Stitt,*
    455 F. Supp. 3d 1219 (W.D. Okla. 2020)................................................11

*Stanley v. Georgia,*
    394 U.S. 557 (1969)..................................................................................19

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957)......................................................................1, 17, 25

*Verlo v. Martinez*,
  820 F.3d 1113 (10th Cir. 2016) ........................................................................ 23, 25

*W. Va. Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ...................................................................................... 20


**STATUTES**

70 O.S. § 24-157 ................................................................................................*passim*

Okla. Admin. Code § 210:10-1-23 ............................................................... 1, 8, 16


**OTHER AUTHORITIES**

Addison Kliewer et al., *'Kill the Indian, Save the Man': Remembering the Stories of Indian Boarding Schools*, Enid News & Eagle (Mar. 10, 2020) .................................... 3

House Rules of the Oklahoma House of Representatives, 58th Leg. (2021–22) ............... 6

Janel George, *A Lesson on Critical Race Theory*, ABA (Jan. 11, 2021) ......................... 11

Matt Trotter, *GOP Lawmakers Send Stitt Bill To Ban Critical Race Theory in Oklahoma Schools*, Tulsa Public Radio (Apr. 29, 2021) ............................................................. 6

Nuria Martinez-Keel, *'A Conspiracy of Silence': Tulsa Race Massacre Was Absent from Schools for Generations*, The Oklahoman (May 26, 2021) ........................................... 3

Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 29, 2021) .................................... 6, 9, 24

Okla. S. 44, 58th Leg., 1st Reg. Sess. (April 21, 2021) ........................................ 9, 24

Okla. State Dep't of Educ.,
  *2021 Oklahoma Academic Standards for English Language Arts* .......................*passim*

Okla. State Dep't of Educ.,
  *2021 Oklahoma Academic Standards for Social Studies* ......................... 8, 10, 21, 25

Okla. State Dep't of Educ.,
  *Oklahoma Academic Standards* (July 22, 2021) ............................................... 8

Okla. State Dep't of Educ.,
  *Oklahoma Public School Fast Facts 2020–21* (Aug. 2021) ................................... 7

iv

Okla. State Regents,
   *Degrees of Progress: The State of Higher Education in Oklahoma* (2020)....................6

Press Release, Bill Prohibiting "Critical Race Theory" Curriculum Passes House, Okla.
   H.R. (Apr. 29, 2021) ........................................................................................9

Press Release, Sen. Standridge Issues Statement Thanking Fellow Members for
   Supporting H.B. 1775, Okla. S., (Apr. 22, 2021)........................................................9

Sarah Schwartz, et al., *Map: Where Critical Race Theory is Under Attack, Education
   Week* (June 11, 2021)......................................................................................5

Univ. of Okla. Dep't of History, *Requirements for the History Major* ...........................17

Univ. of Okla*., Mission & Goals* .....................................................................18

Univ. of Okla., *Regents' Policy Manual for the University of Oklahoma*.......................18

## I.     PRELIMINARY STATEMENT

H.B. 1775, codified as Okla. Stat. tit. 70, § 24-157 (the "Act"), unconstitutionally restricts discussions on "race and sex" in Oklahoma's schools without any legitimate pedagogical justification, using language that is simultaneously sweeping and unclear. "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). And it is long-settled that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967). Yet the Act does precisely what Supreme Court precedent forbids. It unconstitutionally restricts students' access to information about race and sex, based on "narrow[] partisan and political" interests, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982), that are not "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

The Act's vague, overbroad, and viewpoint discriminatory language—coupled with implementing regulations that threaten to strip teachers of their licenses, Okla. Admin. Code § 210:10-1-23(j)(2)—is resulting in censorship in schools and universities across Oklahoma. Schools have struck books like *To Kill a Mockingbird* from reading lists and instructed teachers to avoid the terms "diversity" and "white privilege"; universities have ended requirements for trainings and courses that teach about harmful stereotypes and biases; and classroom teachers and college faculty are avoiding discussions about racism and sexism with students. The Act is depriving students of

information that is crucial for building the analytical skills needed to thrive in a heterogeneous community. The Act severely impinges on professors' and teachers' academic freedom and leaves them with an impossible choice: avoid topics related to race or sex in class materials and discussions, or speak about those topics and risk the loss of their livelihoods.

The Act's injurious effects are an unavoidable consequence of the Act's vague and overbroad language. It prohibits "mak[ing] part of a course" the concept that "members of one race and sex cannot and should not attempt to treat others without respect to race or sex," 70 O.S. § 24-157(1)(B)(1)(d), a restriction that is incomprehensible on its face. The Act is likewise overbroad as it prohibits, for example, "any orientation or requirement that presents any form of race or sex stereotyping or bias" at Oklahoma's public universities. *Id.* § 24-157(1)(A)(1). Such terms ban required trainings and courses that teach about harmful stereotypes in order to counteract them. The Act's restrictions, like the prohibition of the concept that "any individual should feel discomfort, guilt, anguish […] on account of his or her race or sex," *id.* § 24-157(1)(B)(1)(g), chill speech on important educational topics and violate students' right to receive information.

The Act is inflicting these harms *now*, irreversibly robbing students of the free and open exchange of ideas in academic settings that the Constitution and Supreme Court precedent have long protected. The Act on its face and as applied by Defendants is denying Plaintiffs their First and Fourteenth Amendments rights. For these and other reasons discussed herein, the Court should preliminarily enjoin enforcement of the Act.

II.   **STATEMENT OF FACTS**

A.   **Background**

Schools play a fundamental role in preparing children and adults to participate in a diverse, pluralistic society. As Oklahoma's Academic Standards recognize, it is essential that the "classroom is a place that is inclusive of the identities that reflect the richness and diversity of the human experience."[1] In order to meet the State's educational goals, "[a]ll learners must hear the voices of their own heritage in the literature they encounter."[2]

But it was not always so. Oklahoma's history is checkered with attempts to suppress the perspectives of Black, Indigenous, and other marginalized people from entering the classroom. For a century, government-run "Indian boarding schools" subjected Indigenous Oklahomans to schooling designed to "kill the Indian in him and save the man."[3] An Oklahoma legislator described how "a conspiracy of silence" kept people from learning about the parts of history that "our city and state aren't that proud of."[4] In fact, over three quarters of Oklahomans never learned about the rise and fall of Tulsa's "Black Wall Street" and the Tulsa Race Massacre in their elementary and secondary education ("Pre-K–12").[5]

---

[1] Okla. State Dep't of Educ., *2021 Oklahoma Academic Standards for English Language Arts* 5, https://bit.ly/3vDJ86w [hereinafter "Okla. Educ. Standards for Language Arts"].
[2] *Id.*
[3] Addison Kliewer et al., *'Kill the Indian, Save the Man': Remembering the Stories of Indian Boarding Schools*, Enid News & Eagle (Mar. 10, 2020), https://bit.ly/3no7Sw7.
[4] Nuria Martinez-Keel, '*A Conspiracy of Silence': Tulsa Race Massacre Was Absent from Schools for Generations*, The Oklahoman (May 26, 2021), https://bit.ly/3jtNybd.
[5] *Id.*

Until H.B. 1775, efforts were underway to tell a more complete story of Oklahoma's past. Plaintiffs are among the many educators who have worked to teach the full scope of American history and help students understand "the world around them." *See* Exhibit 8, Crawford Decl. ¶¶ 12, 20. Because of the Act, they now fear sanctions for doing so. *Id.*

Plaintiff University of Oklahoma Chapter of the American Association of University Professors's ("OU-AAUP") members are academic professionals who teach about race, gender, and the history of prejudice. They are now "self-censoring and changing their entire pedagogy practice to avoid potentially violating H.B. 1775's vague language." Exhibit 4, OU-AAUP Decl. ¶¶ 11, 13, 20, 29. Plaintiff Anthony Crawford is a high school English teacher in Millwood Public Schools who exposes his students to multiple viewpoints to create a "classroom culture of learning," but now fears punishment because of the Act's ambiguous language. Crawford Decl. ¶¶ 6, 9, 18, 20. Plaintiff Regan Killackey is a high school English teacher in Edmond Public Schools who planned to teach *To Kill a Mockingbird*, but because of the Act, his district struck the book from its reading list and instructed teachers not to say "diversity" or "white privilege." Exhibit 9, Killackey Decl. ¶¶ 12–13, 16. Plaintiff National Association for the Advancement of Colored People's ("NAACP") members include teachers and administrators who now avoid lessons and trainings related to racism, sexism, and implicit bias—material that makes school more "engaging, inclusive, [and] rigorous"— due to the Act's broad terms and severe sanctions. Exhibit 5, NAACP Decl. ¶¶ 23, 25–26.

4

Plaintiffs also include students who are now deprived of information that broadens their worldview and that enhances their safety and participation in class. Plaintiff Black Emergency Response Team ("BERT"), a student group founded in 2019 after several racist incidents at the University of Oklahoma ("OU"), successfully advocated for courses to help students thrive in a diverse learning community. Due to the Act, OU removed the course requirements. Exhibit 3, BERT Decl. ¶¶ 6, 8–9, 11. Plaintiff S.L. is an Eleventh-grade student in Millwood Public Schools threatened by the Act's suppression of ideas because she seeks access to information about issues Black students "are experiencing both inside and outside of the classroom." Exhibit 7, S.L. Decl. ¶¶ 8, 10–11, 16. Plaintiff NAACP's members include students whose ability to learn about racism and implicit bias has been stymied by H.B. 1775, denying them information that "sheds light on the root causes of racial and gender disparities" that directly impact their communities. NAACP Decl. ¶¶ 7, 31–32. American Indian Movement Indian Territory's ("AIM") members include Native American students who are directly impacted by H.B. 1775's chilling of diverse perspectives because AIM's members benefit from seeing their communities reflected in the curricula. Exhibit 6, AIM Decl. ¶¶ 26, 28.

As part of a nationwide effort to ban inclusive education,[6] a partisan majority of Oklahoma legislators has now overridden the pedagogical judgments of teachers and education officials in order to stifle the exchange of ideas with which they disagree.

---

[6] Laws, policies, and resolutions have been introduced in more than half the states. *See* Sarah Schwartz, et al., *Map: Where Critical Race Theory is Under Attack, Education Week* (June 11, 2021), https://bit.ly/3Bp04z7.

## B.     Text of H.B. 1775 and the Emergency Rules[7]

On February 1, 2021, H.B. 1775 was introduced in the Oklahoma House of

Representatives. The bill originally related to medical services at school athletic events.

After going to the Senate, the bill was wholly rewritten with a list of banned concepts

copied verbatim from former President Trump's Executive Order 13950, which a federal

judge had partly enjoined on constitutional grounds. *See Santa Cruz Lesbian & Gay*

*Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020). Oklahoma legislators in both

parties agreed the rewritten bill violated the legislature's "germaneness" rule, so

Republicans suspended the rules.[8] Worried it might become "part of the curriculum that

all white people owned slaves and because you're white, you're responsible for that"[9]—

without presenting any evidence that anyone was teaching such notions—legislators

passed H.B. 1775 as an "emergency" measure along strictly partisan lines. Governor Stitt

signed the Act on May 7, and it became effective on July 1, 2021.

Section 1(A) of the Act applies to "institution[s] of higher education within The

Oklahoma State System of Higher Education," 70 O.S. § 24-157(1)(A), encompassing 25

colleges and universities serving over 200,000 students.[10] Section (1)(A)(1) prohibits

"mandatory gender or sexual diversity training or counseling" in public higher education

---

[7] The Act is attached as Exhibit 1 and the Rules are attached as Exhibit 2.

[8] House Rules of the Oklahoma House of Representatives, 58th Leg. §§ 7.6(d), 8.13 (2021–22); Matt Trotter, *GOP Lawmakers Send Stitt Bill To Ban Critical Race Theory in Oklahoma Schools*, Tulsa Public Radio (Apr. 29, 2021), https://bit.ly/3EqGAfn.

[9] Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 29, 2021, 10:42:41 AM) (Rep. West), https://www.okhouse.gov/video/default.aspx [hereinafter "April 29th House Session"].

[10] Okla. State Regents, *Degrees of Progress: The State of Higher Education in Oklahoma* 9, (2020), https://bit.ly/3B8Smck.

institutions, and "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex." *Id.* § 24-157(1)(A)(1).

Section 1(B) applies to any "teacher, administrator or other employee of a school district, charter school or virtual charter school" under the supervision of the State Board of Education, which oversees over 1,800 schools, serving nearly 700,000 students, and employing nearly 43,000 teachers.[11] Section (1)(B)(1) provides that:

No teacher, administrator or other employee of a school district, charter school or virtual charter school shall require or make part of a course the following concepts:

    a.  one race or sex is inherently superior to another race or sex,

    b.  an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,

    c.  an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,

    d.  members of one race and sex cannot and should not attempt to treat others without respect to race or sex,

    e.  an individual's moral character is necessarily determined by his or her race or sex,

    f.  an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,

    g.  any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or

    h.  meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.

*Id.* § 24-157(1)(B)(1).

Notwithstanding the list of prohibited concepts, Section (1)(B) provides that the Act "shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." *Id.* § 24-157 (1)(B). But the Academic Standards require that students "tak[e]

---

[11] Okla. State Dep't of Educ., *Oklahoma Public School Fast Facts 2020–21* 9, 11, (Aug. 2021), https://bit.ly/3pxe2fX.

into consideration multiple points of view represented in arguments"[12] and encourage including diverse points of view in coursework.[13] Because the standards are "guides for developing curriculum"[14] that "[d]o not dictate how teachers should teach,"[15] teachers do not know what particular content is covered by the Act's carve-out provision. Crawford Decl. ¶ 18.

As required by the Act, the State Board of Education released temporary emergency rules for the implementation and enforcement of the Act (the "Rules"), which establish sanctions for individuals and entities that violate the Act, including loss of accreditation and teaching licenses. Okla. Admin. Code § 210:10-1-23(h), (j). Staff members subject to penalties include "superintendents of schools, principals, supervisors, librarians, school, [*sic*] classroom teachers or other personnel performing instructional, administrative and supervisory services in the public schools." *Id.* § 210:10-1-23(j). The Rules also exacerbate the chilling effect of the Act and the risk of inconsistent enforcement by allowing *any* private citizen to file a complaint and initiate an investigation into a possible instance of prohibited speech. *Id.* § 210:10-1-23(g)(1).

---

[12] Okla. State Dep't of Educ., *2021 Oklahoma Academic Standards for Social Studies* 6, 82, https://tinyurl.com/3tjh2mm5 [hereinafter "Social Studies Practices"].
[13] *See generally id.*
[14] Okla. Educ. Standards for Language Arts at 3.
[15] Okla. State Dep't of Educ., *Oklahoma Academic Standards* (July 22, 2021), https://sde.ok.gov/oklahoma-academic-standards.

C.      Implementation of the Act

At the time it was passed, legislators made clear that the Act was intended to silence and suppress speech with which they disagreed. Legislators explained the Act's purpose was to prohibit discussions of "the theory of implicit bias";[16] to stop the use of words like "diversity" instead of "excellence" and "equity" instead of "equality";[17] to suppress discussion of "police brutality" and "intersectionality";[18] and to eliminate school trainings that discussed "institutionalized racism," "white supremacy," and "whiteness" as concepts.[19]

Oklahoma school districts have responded to the Act by censoring curricula and eliminating diversity trainings. For example, Defendant Edmond Public Schools ("EPS") directed Plaintiff Regan Killackey and other English teachers to "[a]void the terms 'diversity' and 'white privilege' in class," *see* ELA 12 Align re 1775 at 3, ECF No. 1-2,[20] despite the words "diverse" or "diversity" appearing in the English Language Arts Standards 43 times.[21] EPS also removed all books authored by Black people and women

---

[16] Press Release, Bill Prohibiting "Critical Race Theory" Curriculum Passes House, Okla. H.R. (Apr. 29, 2021), https://bit.ly/3vTcDSh.

[17] April 29th House Session at 12:35:59–12:36:15 PM.

[18] April 29th House Session at 12:08:20 PM (Rep. Humphrey); Okla. S. 44, 58th Leg., 1st Reg. Sess. (April 21, 2021, 11:29:19–11:29:23 PM) (Sen. Bullard), https://oksenate.gov/live-chamber [hereinafter "April 21st Senate Session"].

[19] April 21st Senate Session at 11:10:20–11:11:40 PM; Press Release, Sen. Standridge Issues Statement Thanking Fellow Members for Supporting H.B. 1775, Okla. S., (Apr. 22, 2021), https://bit.ly/3nnXJPN.

[20] Following the filing of this lawsuit on October 19, 2021, EPS has reportedly removed this specific guidance from their training PowerPoint.

[21] *See* Okla. Educ. Standards for Language Arts. The Academic Standards also state: "The language arts classroom is a place that is inclusive of the identities that reflect the

from the list of anchor texts—books around which teachers build their curriculum.

Killackey Decl. ¶¶ 8–9, 13. Anchor texts used to include Lorraine Hansberry's *A Raisin*

*in the Sun*, Zora Neale Hurston's *Their Eyes Were Watching God*, Maya Angelou's *I*

*Know Why the Caged Bird Sings*, Harper Lee's *To Kill a Mockingbird*, and the

autobiographical *Narrative of the Life of Frederick Douglass, an American Slave*. Now

they only include books by White male authors.[22] *Id.*

Likewise, Muskogee Teacher B.B., a member of Plaintiff NAACP, has modified

their[23] curriculum—which was initially designed to develop students' analytical skills

and creativity—because they fear that asking questions related to systemic power and

oppression could be interpreted as introducing a banned concept. NAACP Decl. ¶ 19.

Teacher B.B. is no longer comfortable teaching students about Dolores Huerta's

contributions to the labor movement for which Cesar Chavez received most of the credit,

because alluding to issues of sexism could be interpreted as including banned concepts

in the course. *Id.* at ¶ 20. Students across the state have lost access to information critical

to their social, cognitive, and emotional development. Exhibit 10, Dr. Lynn Decl. ¶ 31.

---

richness and diversity of the human experience." *Id.* at 6. Similarly, Oklahoma's "Social Studies Practices" place primary value on *including* diverse points of view, not restricting access to differing ideas or opinions. The Practices expressly state students should be able to "Analyze and Address Authentic Civic Issues," including a demonstrated "ability to investigate problems taking into consideration multiple points of view represented in arguments, structure of an explanation, and other sources." Social Studies Practices at 6.
[22] Only F. Scott Fitzgerald's *The Great Gatsby* and Arthur Miller's *The Crucible* remain.
[23] The gender-neutral pronouns "they", "them," and "their" are used to maintain the anonymity of Teacher B.B. and other NAACP members.

University professors are also changing their curricula to avoid violating the Act. OU-AAUP Decl. ¶¶ 10–21. The Office of the Dean of Arts and Sciences told one OU-AAUP member that he could no longer test on critical race theory[24] in classes designed to teach theories of human relations and intersecting identities. OU-AAUP Decl. ¶ 12. Other professors are dramatically changing how they present material on race, sex, and sexual orientation, and rethinking their entire pedagogy so as to avoid sanctions under the Act's vague terms. OU-AAUP Decl. ¶¶ 13, 18–19, 21. Rather than risk violating the law, some professors are refraining from mentioning race, gender, or sexual orientation altogether. OU-AAUP Decl. ¶¶ 13–14, 20. Because of the Act, OU made optional its previously mandatory sexual harassment training and a new diversity course—both adopted to address issues of equal educational access. BERT Decl. ¶¶ 13–14. Now that students are not required to learn about anti-racism and rape prevention, OU community members—particularly women, LGBTQ+ students, and students of color—face an increased risk of harassment and prejudice. *See* Dr. Lynn Decl. ¶¶ 33–37.

## III.   ARGUMENT

To obtain a preliminary injunction, Plaintiffs must establish:

> "(1) a substantial likelihood of prevailing on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary

---

[24] Critical race theory is a body of legal scholarship and an academic movement that examines the role that race and identity play in the legal system and society. *See,* Janel George, *A Lesson on Critical Race Theory*, ABA (Jan. 11, 2021), https://bit.ly/2XH7srR. Critical race theory has been used more recently as a catch-all phrase for anti-racist and reformist ideas. *See* Rashawn Ray & Alexandra Gibbons, *Why Are States Banning Critical Race Theory*, Brookings (Aug. 2021), https://brook.gs/3vIeWYg.

injunction; and (4) that the injunction would not be adverse to the public interest."

*South Wind Women's Center, LLC v. Stitt*, 455 F. Supp. 3d 1219, 1228 (W.D. Okla. 2020) (quoting *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001)).

**A.  Plaintiffs Are Likely to Succeed on The Merits of Their Claims**

  *1.  The Act is too vague for Oklahoma educators to understand its provisions.*

The Act's vague directives force ordinary persons to guess at their meaning—with substantial consequences if they guess wrong. A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Faustin v. City & Cty. Of Denver, Colo.*, 423 F.3d 1192, 1201 (10th Cir. 2005). Where First Amendment rights are at stake, "[s]tricter standards of permissible statutory vagueness may be applied." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 620 (1976)). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2002). The Act does both. Indeed, a federal court examining many of the same banned concepts in former President Trump's Executive Order 13950 found the plaintiffs in that case were likely to succeed on the merits of their vagueness claim and preliminarily enjoined enforcement of the banned concepts. *Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 543.

12

At the college and university level, Section (1)(A)(1) prohibits "any form of mandatory gender or sexual diversity training or counseling." 70 O.S. § 24-157(1)(A)(1). But "gender or sexual diversity" is not a commonly-used formulation and the Act provides no definition or guidance as to what this provision proscribes. Does it refer to sexual orientation? Gender identity? The reader is left to guess.

Section (1)(B)(1) lists eight concepts that teachers may not "require or make part of a course." *Id.* § 24-157 (1)(B)(1). But what does it mean to "require" a concept, or to make a concept "part of a course"? Is a concept "required" if it is addressed—even for the purposes of denouncing it? Is a concept "part of a course" if it is in some way depicted by a poster on the classroom wall? This vague language creates fear among high school teachers like Mr. Crawford who do not know whether merely exposing students to the existence of a banned concept will subject them to penalties. *See* Crawford Decl. ¶ 15.

Section (1)(B)(1)(d) forbids making part of a course the concept that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." 70 O.S. § 24-157(1)(B)(1)(d). But what does it mean to "not attempt to treat others without respect to race or sex"? The language is indecipherable. Does highlighting the race or sex of a character in a play or a figure in a painting, or analyzing the use of racial or gender stereotypes in such a work, violate this provision? As the Edmond Public Schools' guidelines admit: "Unfortunately, no one truly knows what this means or can come to agreement on its meaning." Guidance from Edmond Written at 2, ECF No. 1-1.

Section (1)(B)(1)(f) bans the concept that "an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of

13

the same race or sex." 70 O.S. § 24-157(1)(B)(1)(f). In this context, what does it mean to "bear[] responsibility" for others' actions? Does this refer to moral responsibility, or concepts like collective or societal responsibility? Is it unlawful to discuss reparations for past oppression in class? This section is directed at chilling discussions about the legacy of historic injustices, but due to the lack of clarity, Mr. Crawford cannot know whether he will be punished if he and his students discuss whether the wealth gap stems partly from systemic racism. Crawford Decl. ¶ 15.

Likewise, Section (1)(B)(1)(g) prohibits the concept that "any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex." 70 O.S. § 24-157 (1)(B)(1)(g). But what constitutes "any other form of psychological distress"? It is impossible for teachers to accurately predict how "any individual" will react to a given topic, much less guarantee that lessons concerning slavery, Jim Crow laws, the Holocaust, the Women's rights movement, voting rights, or immigration will not cause anyone "discomfort."

The vagueness that permeates the concepts is only compounded by Section (1)(B), which provides that the Act "shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." *Id.* § 24-157 (1)(B). This is confusing because the rest of the Act appears to ban concepts that the Academic Standards encourage teachers to teach. The Twelfth Grade English Language Arts standards state that "[s]tudents will evaluate how authors writing on the same issue reached different conclusions because of differences in assumptions, evidence, reasoning, and viewpoints, including examining

rhetorical appeals, bias, and use of logical fallacies."[25] Yet the Act bans discussions of Nazi rhetoric that portrayed "Aryans" as an inherently superior race, and anti-Black bias underlying the "Three-Fifths Compromise," because such discussions entail the concept that "one race or sex is inherently superior to another." *Id.* § 24-157 (1)(B)(1)(a)*.*

Teachers are at a loss to discern what it means for content to "align" with the Standards so as to render permissible an otherwise illegal discussion. *See* Crawford Decl. ¶¶ 17–19; NAACP Decl. ¶ 17. Plaintiff Crawford wonders if he is "allowed to include a concept that is 'prohibited' [if teaching the concept] could allow a student to meet [state] standards." Crawford Decl. ¶ 18. Likewise, "Teacher B.B. is not clear whether they are still permitted to teach about historical figures who are not named in the state standards," including important historical Black women such as Mae Jemison and Mary McCleod Bethune. NAACP Decl. ¶ 17. In other words, the Act's "uncertain terms" cause teachers to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked"—triggering precisely the concern that requires invalidating a vague law that implicates First Amendment rights. *Dr. John's, Inc.*, 465 F.3d at 1157 (quoting *Grayned*, 408 U.S. at 109).

Edmond's ban on saying "diversity" and "white privilege" illustrates the kind of arbitrary enforcement that the Act invites. Killackey Decl. ¶ 12. Teachers do not know "how state authorities will interpret the vague language," *see* Crawford Decl. ¶ 20, and fear school officials will "make examples" of certain teachers, NAACP Decl. ¶ 16. The

---

[25] Crawford Decl. ¶ 17; *see also* Okla. Educ. Standards for Language Arts at 123.

Rules make arbitrary and discriminatory enforcement even more likely by allowing individuals to file complaints and to initiate investigations at the state or district level. Okla. Admin. Code § 210:10-1-23(g)(1). Plaintiffs fear the Act has already "emboldened students and faculty to harass professors teaching anti-racism pedagogy." OU-AAUP Decl. ¶ 27.

   2.   *The Act is a viewpoint discriminatory and overbroad infringement on academic freedom.*

   The legislature's micromanagement of the concepts that educators may discuss violates Plaintiffs' academic freedom rights and is viewpoint discriminatory. In excising certain viewpoints, the Act has cast an unconstitutional "pall of orthodoxy" in schools. *Keyishian*, 385 U.S. at 603. It has chilled professors' speech and caused them to stop teaching texts "which directly address race, gender, and sexual orientation," OU-AAUP Decl. ¶ 14, discussing "whiteness, racism, oppression, and colonialism," *id.* at ¶ 21, and exposing students to the analytical lens of critical race theory alongside other frameworks, *id.* at ¶ 29. Particularly in the university setting, "it is 'axiomatic' that viewpoint-based suppression of speech is impermissible." *Giebel v. Sylvester,* 244 F.3d 1182, 1189 (9th Cir. 2001) (citation omitted).[26] Silencing a particular viewpoint—here,

---

[26] Pre-K–12 educators, too, are afforded some degree of academic freedom. *Cary v. Bd. of Ed. of Adams-Arapahoe Sch. Dist. 28-J, Aurora, Colo.*, 427 F. Supp. 945, 955 (D. Colo. 1977), *aff'd,* 598 F.2d 535 (10th Cir. 1979) ("The selection of the subject books as material for these elective courses in these grades is clearly within the protected area recognized as academic freedom"); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969) (recognizing that academic freedom likely entitled a high school English teacher to discuss a dirty word in a reading assignment).

that overcoming racism and sexism requires discussing racism and sexism—violates the First Amendment.

"Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978). In *Sweezy v. New Hampshire*, the Supreme Court explained that "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." 354 U.S. at 250. And the Court has made clear that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Keyishian*, 385 U.S. at 604 (citing *N.A.A.C.P. v. Button*, 371 U.S. 415, 438 (1963)).

The Act prohibits "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex." 70 O.S. § 24-157(1)(A)(1). This provision reaches beyond any legitimate regulation of academic speech by prohibiting the mere *presentation* of racial and sex stereotypes or bias in any required forum. OU requires all students to take a U.S. History course,[27] but professors teaching that course may be punished under the Act if they discuss how racial and sex stereotypes have fueled discrimination or undergirded American laws, or even how stereotypes about race and sex have evolved over time. How could a professor address slavery, Jim Crow, the Tulsa Race Massacre, or the movement for women's rights without presenting information

---

[27] Univ. of Okla. Dep't of History, *Requirements for the History Major*, https://bit.ly/3bmgSfH.

about racial and gender bias? Indeed, the Chair of OU's English Department worries teaching courses in Black literature may violate the Act. OU-AAUP Decl. ¶ 9.

The Act severely limits academic freedom in a viewpoint discriminatory manner and conflicts with OU's assertion that it is "educationally desirable that students be confronted with diverse opinions of all kinds."[28] OU aims to meet its pedagogical goals by providing "a full range of materials on any subject, even though some views might be currently unpopular or controversial,"[29] and by creating "a safe, healthy environment in which students may live, study, socialize and work."[30] But the Act targets OU's diversity programming, which was adopted for the purpose of combatting anti-Black racism and exposing students to diverse opinions. *See supra* Section II.B.

The plain letter of the law prohibits any mention of the banned concepts, not merely the affirmative promotion of racist ideas. For example, the Act does not mention "critical race theory." But according to EPS, "If a student asks, 'What is C[ritical] R[ace] T[heory]?' then a teacher may respond with, 'it's often a theory used in higher education to look at laws in society.' This response would not violate the law." Guidance from Edmond Written at 2. The suggested response does not use the word race, which is literally central to critical race theory. The Act requires educators to provide opaque, misleading answers to students' important questions—an infringement on the teachers' academic freedom.

---

[28] Univ. of Okla.*, Mission & Goals*, https://bit.ly/3B7Uwsx.
[29] Univ. of Okla.*, Regents' Policy Manual for the University of Oklahoma* 12, https://bit.ly/3vTdvGx.
[30] Univ. of Okla.*, supra* note 31.

3.    *The Act, for no legitimate purpose, restricts students' access to information.*

The Act's vague and overbroad provisions not only violate educators' speech rights; they also infringe upon students' rights to access information and ideas. "It is now well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Students, in particular, have a right to access information in schools. *See Pico,* 457 U.S. at 866–68; *see also Roberts v. Madigan*, 921 F.2d 1047, 1056 (10th Cir. 1990). "[J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico,* 457 U.S. at 868.

While governmental actors enjoy some discretion in fashioning school curricula, this discretion has constitutional limits. To avoid violating the First Amendment, the state's restrictions on students' access to information must be "reasonably related to a legitimate pedagogical interest." *Hazelwood Sch. Dist.*, 484 U.S. at 273. Even if a state demonstrates a legitimate interest, a plaintiff may establish a First Amendment violation by proving that the reasons offered by the state in fact serve to mask other illicit motivations. *See Pico*, 457 U.S. at 853;[31] *see also Axson-Flynn v. Johnson,* 356 F.3d

---

[31] In *Pico*, a plurality of the Supreme Court recognized that school boards could not remove library books based on "narrowly partisan or political" interests of "racial animus."  457 U.S. at 870, 871. Although Justice Rehnquist dissented from the judgment in *Pico*, he "cheerfully concede[d]" that such "discretion may not be exercised in a

1277, 1290 (10th Cir. 2004). Illegitimate motives include restricting students' access to information based upon "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the governmental actor] disagree[s]." *Pico,* 457 U.S. at 870–72.

In *Pico,* a plurality of the Supreme Court held that school boards violate the First Amendment if they "remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Removing books—as opposed to acquiring books—implicated students' First Amendment rights because "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Id.* at 861–62; 866 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965)).

In *Hazelwood,* the Court re-emphasized the constitutional limits placed on school officials' discretion by holding a school could only "exercise editorial control" over "student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 270–71, 273. While the Tenth Circuit has not yet explicitly adjudicated what standard applies to curricula

---

narrowly partisan or political manner" or based on "racial animus." *Id.* at 907 (internal quotation marks omitted). Consequently, five members of the Supreme Court subscribed to the view that the First Amendment forbids school officials from removing materials from school libraries to further narrowly partisan, political, or racially discriminatory ends.

development, it has required the government to show that restrictions placed on school-sponsored in-class speech are reasonably related to a legitimate pedagogical interest. *See Miles v. Denver Pub. Sch.*, 944 F.2d 773, 775 (10th Cir. 1991); *Axson-Flynn*, 356 F.3d at 1289. Moreover, the Tenth Circuit has recognized the court must scrutinize any proffered justification to ensure it is not a "sham pretext for an impermissible ulterior motive." *Axson-Flynn*, 356 F.3d at 1292–93.[32]

The Act violates students' right to information because it undermines the State's pedagogical goals and only serves to advance "narrowly partisan" interests. Oklahoma's Pre-K–12 standards encourage assigning texts with which students may disagree in order to "[r]einforce critical thinking by evaluating and challenging ideas and assumptions"[33] and including differing viewpoints to hone students' "ability to investigate problems taking into consideration multiple points of view."[34] Moreover, state law requires a social studies curriculum that "reflect[s] the racial, ethnic, religious, and cultural diversity of the United States of America." 70 O.S. § 11-103.6b. And, as America's "nurseries of democracy," Pre-K–12 public schools must protect the "marketplace of ideas." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038 (2021).

---

[32] In examining remarkably similar restrictions on students' access to ideas, the Ninth Circuit also required state officials to demonstrate a legitimate pedagogical interest to justify removing materials from local classrooms. *Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015). On remand, the district court struck provisions based on illicit racial motives. *Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 973 (D. Ariz. 2017).
[33] Social Studies Practices at 76.
[34] *Id.* at 6.

In enforcing the Act, EPS removed *A Raisin in the Sun*, *Their Eyes Were Watching God*, *I Know Why the Caged Bird Sings*, *To Kill a Mockingbird*, and *Narrative of the Life of Frederick Douglass, an American Slave* from the curriculum. The only remaining "anchor texts"—those around which teachers build their curriculum—are authored by White men. Killackey Decl. ¶ 13. This decision lacks a legitimate pedagogical purpose and runs contrary to the plurality opinion in *Pico*, which noted that students' constitutional rights would be violated if a school board, "motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration." *Pico*, 457 U.S. at 871. EPS's response to the Act has an immediate and irremediable adverse impact on Student A.A, by infringing on Student A.A.'s ability to access such information. NAACP Decl. ¶ 13; Exhibit 10, Dr. Lynn Decl. ¶¶ 6–8, 2.

The Act similarly violates Plaintiff BERT and other college students' right to receive ideas, which carries even greater weight in higher education. *See, e.g.*, *Axson-Flynn,* 356 F.3d at 1289–90. Here, adult students' rights are severely restricted by a partisan law serving no legitimate pedagogical purpose. The Act denies students—like those enrolled in OU's African American Studies, Human Relations, and Anthropology programs—access to information that is integral to their fields of study, because it could make some students uncomfortable. BERT Decl. ¶¶ 12, 16–17; OU-AAUP Decl. ¶¶ 9–22.

### B.   Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016). The irreparable injury caused by the Act has already begun to accrue. School is in session, and educators are altering curricula. Because of the Act, Teacher B.B.'s students are not learning about Black women who are not named in Oklahoma's state standards. NAACP Decl. ¶ 17. And many Edmond students will not read books by Black or women authors. Killackey Decl. ¶ 13. Losing educational opportunities at this stage of students' education has long-term irremediable effects. Dr. Lynn Decl. ¶¶ 15–17, 32, 36. An ultimate victory cannot redress the harm that students are experiencing now.

For university students, the Act similarly puts education "at risk." BERT Decl. ¶ 19. Professors have scrubbed their curricula for materials that could be interpreted as presenting biases on the basis of race or sex, *see, e.g.*, OU-AAUP Decl. ¶ 20, leaving many students unable to study issues at the core of their fields, *see, e.g.*, BERT Decl. ¶ 17.

### C.   Plaintiffs' Injury is Great, and Preliminary Relief Will Not Harm Defendants

Absent an injunction, students will be denied the education that Oklahoma's standards envision, because teachers will remain too afraid to expose them to potentially controversial concepts. An injunction would not harm Defendants, because "[d]elayed

implementation of a measure that does not appear to address any immediate problem will generally not cause material harm, even if the measure were eventually found to be constitutional and enforceable." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). There is no evidence that Oklahoma teachers are teaching students that one race is superior to another, or that moral character is determined by race or sex.

Representative Waldron (D) worried, "we are barring things without establishing that they are actually happening in Oklahoma. We are chasing boogeymen for the purpose of stirring things up all to win cheap political points. And in doing so we are committing to a massive government overreach into our classrooms."[35] Senator Merrick (R) insisted that "even if it's not being taught anywhere in Oklahoma . . . it is wise of us to take action now and defend our kids and protect our kids against any possibility of them hearing in their ears that they are racist because of the color of their skin."[36]

Defending against "any possibility" of hearing disfavored viewpoints cannot justify the harm that students and educators will suffer if the State continues to dictate which topics and words students and teachers are allowed to hear and say.

### D.     An Injunction Would Serve the Public Interest

The Act chills and censors speech, jeopardizing the future of the nation's democratic institutions. Oklahoma's "nurseries of democracy" cannot prepare students "to become informed, contributing, and participating citizens in this democratic

---

[35] April 29th House Session at 11:54:27–11:54:49 AM.
[36] April 21st Senate Session at 11:05:38–11:06:04 PM.

republic"[37] when teachers fear that exposing students to controversial issues will result in loss of their teaching licenses. Scholarship and research will suffer as professors attempt to devise curricula that the Act's proponents would approve of, and university students will be unable to "gain new maturity and understanding." *Sweezy*, 354 U.S. at 250.

The Tenth Circuit has repeatedly recognized that "[v]indicating First Amendment freedoms is clearly in the public interest." *See, e.g.*, *Pac. Frontier v. Pleasant Grove City,* 414 F.3d 1221, 1237 (10th Cir. 2005); *Verlo*, 820 F.3d at 1127; *Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343, 1346–47 (10th Cir. 1997). Here, vindicating First Amendment freedoms in Oklahoma's public schools and universities will benefit students, teachers, and the public as a whole. *See Mahanoy,* 141 S. Ct. at 2046. Inclusive education benefits not only every student who receives it, but also society as a whole, because it allows youth to work towards a more perfect union by understanding and combatting inequities and the systems that reproduce them. *See* Dr. Lynn Decl. ¶¶ 8, 30–31. As expressed by Dr. Lynn, H.B. 1775 results in "'the closing of the American mind' which is ultimately undemocratic." *Id.* ¶ 30.

## IV.    CONCLUSION

For the above reasons, Plaintiffs respectfully ask this Court to preliminarily enjoin Defendants from enforcing this vague, overbroad, and viewpoint discriminatory Act.

---

[37] Social Studies Standards at 3.

Dated: October 29, 2021                          Respectfully submitted,


Genevieve Bonadies Torres                        /s/ Megan Lambert
David Hinojosa                                   Megan Lambert
LAWYERS' COMMITTEE FOR CIVIL RIGHTS              AMERICAN CIVIL LIBERTIES UNION
   UNDER LAW                                         FOUNDATION OF OKLAHOMA
1500 K Street NW, Suite 900                      P.O. Box 13327
Washington, DC 20005                             Oklahoma City, OK 73113
                                                 Tel.: 405-524-8511
                                                 mlambert@acluok.org

Gary Stein
Michael Cutini                                   Emerson Sykes
Sara Solfanelli                                  Leah Watson
Elahe Hosseini                                   Sarah Hinger
Amir Shakoorian Tabrizi                          AMERICAN CIVIL LIBERTIES
Ramya Sundaram                                      UNION FOUNDATION
SCHULTE ROTH & ZABEL LLP                         125 Broad Street, 18th Floor
919 Third Avenue                                 New York, NY 10004
New York, NY  10022


                                                 Counsel for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) ) | Case No. 5:21-cv-01022-G |
| [1] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al., | ) ) ) ) ) | Hon. Charles B. Goodwin |
| *Defendants*. | ) ) ) ) | |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Black Emergency Response Team, et al. respectfully move the Court, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Local Rule 7.1, for the entry of a preliminary injunction against the enforcement of H.B. 1775, codified as Okla. Stat. tit. 70 § 24-157. H.B. 1775 is vague and is a viewpoint discriminatory and overbroad infringement on academic freedom on its face and as applied to Plaintiffs.

As more fully set forth in Plaintiffs' Memorandum of Support, Plaintiffs are likely to succeed on the merits of their claims and will suffer irreparable harm from the

enforcement of the Act in the absence of preliminary relief. The balance of equities tilts strongly in their favor, and an injunction protecting their constitutional rights is in accord with the public interest.

Wherefore a preliminary injunction should issue.

Dated: October 29, 2021

Genevieve Bonadies Torres
David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
   UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005

Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian Tabrizi
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Plaintiffs*

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2021, I electronically filed the foregoing Motion for a Preliminary Injunction & Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction with the Clerk of Court using the CM/ECF system. The following, who are not registered participants of the Electronic Case Filing System, will be served by U.S. Mail:


**John O'Connor**
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105


**Joy Hofmeister**
Oklahoma Superintendent of Public Instruction
Oklahoma State Department of Education
Oliver Hodge Building, 2500 North Lincoln Boulevard
Oklahoma City, OK 73105


**William Flanagan**
**Carlisha Bradley**
**Jennifer Monies**
**Estela Hernandez**
**Brian Bobek**
**Trent Smith**
Members of the Oklahoma State Board of Education
Oliver Hodge Building, 2500 North Lincoln Boulevard
Oklahoma City, OK 73105


**Kevin Stitt**
Office of the Governor of Oklahoma
Oklahoma State Capitol, 2300 N Lincoln Blvd.
Oklahoma City, OK 73105

**Jeffrey Hickman**
**Michael Turpen**
**Steven Taylor**
**Dennis Casey**
**Jay Helm**
**Ann Holloway**
**Joseph Parker, Jr.**
**Jack Sherry**
**Courtney Warmington**
Oklahoma State Regents for Higher Education
655 Research Parkway, Suite 200
Oklahoma City, OK 73104


**Michael Cawley**
**Frank Keating**
**Phil Albert**
**Natalie Shirley**
**Eric Stevenson**
**Anita Holloway**
**Rick Nagel**
Members of the Board of Regents of the University of Oklahoma
University of Oklahoma
660 Parrington Oval # 119
Norman, OK 73019


**Angela Grunewald**
Office of the Superintendent, Edmond Public Schools
1001 W. Danforth Rd.,
Edmond, OK 73003-4801


**Jamie Underwood**
**Cynthia Benson**
**Kathleen Duncan**
**Lee Ann Kuhlman**
Members of the Board of Education of Edmond Public Schools
Edmond Public Schools
1001 W. Danforth Rd.,
Edmond, OK 73003-4801

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@aclu.ok.org


*Counsel for Plaintiffs*