# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al., <br><br> *Plaintiffs*, <br> v. <br><br> [l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al., <br><br> *Defendants*. | Case No. 5:21-cv-01022-G <br><br> Hon. Charles B. Goodwin |

**Declaration of the University of Oklahoma Chapter of American Association of University Professors**

I, Michael Givel, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am the President of the University of Oklahoma Chapter of the American Association for University Professors (OU-AAUP), in the above captioned matter. I am authorized to provide this declaration on behalf of the OU-AAUP. I have held the position of President since August 27th, 2020.

3. The AAUP is a national nonprofit membership association of faculty and academic professionals founded in 1915 to advance academic freedom, define professional values, promote the economic security of academic professionals, and ensure higher education's contribution to the common good. The AAUP has chapters and members at universities across the country that work to advance the mission of the AAUP through advocacy, organizing, and, in some states, collective bargaining. The AAUP has 45,800 members nationwide. Advancing and protecting academic freedom is the AAUP's core mission. Its mission statement quotes the *1940 Statement of Principles on Academic Freedom and Tenure*,

professing that "[t]he common good depends on the free search for truth and its free exposition."

4. The University of Oklahoma Chapter of the AAUP was founded in 2020 to "defend academic freedom at OU and throughout academe," promote the "interests of higher education and research," "increase the usefulness and advance the standards, ideals, and welfare of the profession," and "protect and advance the professional status and interests of all faculty and university staff." OU-AAUP has 57 members, including faculty and academic staff. Our members are diverse across race, ethnicity, gender, and sexual orientation, and we have several members who identify with minoritized identities, including members who are Black, Indigenous, and LGBTQ+.

5. H.B. 1775 is a direct affront to academic freedom and the free exchange of ideas, the very purpose of our association and our profession. By its vague terms, H.B. 1775 has invited arbitrary enforcement against our members and motivated self-censorship in others. Still more fear dire consequences for continuing to teach concepts involving race, gender, and sexual orientation.

6. Faculty, staff, and administrators at the University of Oklahoma ("OU") have experienced a great deal of confusion and concern around the meaning and implementation of H.B. 1775. Its language is convoluted and confusing. OU-AAUP members are confused about what the law means by "requirement" and whether that applies to general education courses, courses required for a given major, or any requirement within a given course. Members are also confused about the meaning and scope of the phrases "any form of race or sex stereotyping" and "bias on the basis of race or sex." The terms "stereotyping" and "bias" are broad and undefined, causing confusion and uncertainly for professors. Additionally, members are unsure whether the prohibition includes discussions of discriminatory ideas like racism and sexism, historic oppression like the Japanese Internment Camps and sundown towns, or systemic racism like redlining and colonialism.

7. More insidious still is the disconnect between the language of the bill and the conversation around it. The bill does not mention Critical Race Theory, yet legislators have spoken about how it is necessary to stop Critical Race Theory and the teaching of concepts like whiteness and white privilege. Many of our members fear the law will be enforced by fearful, cautious, and confused administrators according to their interpretation of the law's intent rather than by its language. One member, a librarian who works directly with faculty and students, stated that

people at OU are enforcing H.B. 1775 according to how they think their supervisor will interpret the law. That fear of arbitrary enforcement will chill the speech of professors who fear backlash for addressing race, sex, and gender. The speech of queer, female, Black, Indigenous, and brown professors is chilled more drastically because professors of minoritized identities feel more vulnerable to the potential consequences of violating or being seen to violate H.B. 1775.

8. H.B. 1775 chills professor speech both in and out of the classroom. In addition to limiting what professors may address in their classes, H.B. 1775 chills professors from applying for grants related to race and racism. One member, Professor Jill Hicks-Keeton, Associate Professor in Religious Studies, expressed concern that her research, which treats race and sex, might no longer receive funding from university entities. A Full Professor also expressed concern that H.B. 1775 will decrease funding for and therefore the availability of research on race. H.B. 1775 discourages professors from researching sexism and racism, resulting in a societal lack of knowledge of topics crucial for understanding our systems and cultures.

9. Entire departments are unsure of whether they can offer classes with subject matter relating to sex and gender under H.B. 1775. The Chair of the English Department, Professor Roxanne Mountford, expressed concern over whether it is possible to schedule courses in Black literature. Failing to do so would be a grave insult to the validity of the department because it is necessary to teach the entire scope of writings in the English language, which includes literature about the black experience. While she has decided to continue offering Black literature classes in the English Department, she fears that could be disciplined and other non-tenured professors could be fired for teaching them. She expressed concern for lecturers who teach the lower-level composition courses because they often engage with anti-racist pedagogy and texts and are not tenured. H.B. 1775 creates a chilling effect on the sense of academic freedom for all the first-year composition lecturers and places the integrity of the English Department at risk.

10. Librarians charged with selecting materials for the OU library and with teaching professors and students how to research materials are concerned about how H.B. 1775 may be applied to them. An OU librarian who works directly with faculty and students, is regularly asked by professors to teach their students how to research topics for students' assignments and is unsure whether, under H.B. 1775, they can use examples that include race or gender. This is particularly detrimental when they visit classes in departments that extensively address issues of race and gender, given the constitution of the departments. They are also profoundly concerned about the chilling effect H.B. 1775 will have on selecting library

3

    materials for the university library. Librarians are unsure whether they can continue to select library materials that include issues of race, gender, and sexual orientation without facing disciplinary action. The key mission of a research library is to reflect the ongoing scholarship. People are researching racism. Therefore, to exclude texts addressing racism is to deny the very purpose of a library. It also stifles research at OU on those issues. It is an affront to academic and intellectual freedom, a core tenant of the librarian profession and mission of a university.

11. The law's vagueness is the danger to our members because the law could be applied to any content related to racism or sexism. After Black-led activism resulted in a mandatory Diversity, Equity, and Inclusion course, Gateway to Belonging, at the University of Oklahoma, professors here understand H.B. 1775, which directly targets that course, to be pushback to racial and gender justice at the university.

12. At least one of our members has already been instructed to change their teaching to comply with H.B. 1775. An Instructor of Human Relations in the Arts and Sciences College was told by the Office of the Dean of the Arts and Sciences College that they can no longer test students on Critical Race Theory in their Human Relations class, Human Relations Theory, a class in the Human Relations Department about social categorization and its impact on systems of power. Critical Race Theory as a concept and as it applies to other learning objectives is a central theme of the class. This Instructor has lost the ability to test on and ensure students understand key concepts in their class. This Instructor believes this enforcement of H.B. 1775 against them is a violation of their academic freedom. The Instructor is not tenured and fears losing their job if they test on Critical Race Theory or otherwise is seen to violate H.B. 1775. The Instructor is also concerned that their queer identity will make them more vulnerable to the consequences of H.B. 1775's enforcement.

13. Several other members of OU-AAUP are changing their curriculum out of fear that H.B. 1775 will be enforced against them.

14. A contracted Assistant Professor and Lecturer of French in the Modern Language, Literature, and Linguistics Department has changed their curriculum entirely. They used to include themes of gender and race when teaching French texts about the Holocaust, francophone literature, and the writings of Rousseau in her French classes. They will no longer include themes of sexuality, sexual orientation, and gender when teaching French literature for fear of being fired for violating H.B.

1775. From the French Capstone, this contracted Assistant Professor will exclude entirely certain texts which directly address race, gender, and sexual orientation, including Aimé Cesaire's *A Tempest*, Denis Diderot's *The Nun*, Molière's *The Learned Ladies*, Marguerite Duras' *Hiroshima, My Love*, and Maryse Condé's, *Tituba, Black Witch of Salem*. As these texts center issues of identity and oppression, they cannot include them without discussing race, gender, and sexuality. To avoid the consequences of potentially violating H.B. 1775, they will avoid them and texts with similar themes altogether.

15. This contracted Assistant Professor is extremely concerned about the professional and personal consequences of students or OU administrators believing that they have violated H.B. 1775. If students think they have violated the law, they can and likely would file a complaint with their Department Chair and the Dean. They have already received student complaints when they addressed issues of white privilege as presented by the course texts. They believe that H.B. 1775 will empower students to file complaints if they discuss material related to race that makes them uncomfortable. If they receive multiple complaints, they could be fired. They are also concerned about bullying from students if they are presented with ideas with which they disagree or perspectives that cause them discomfort. They believe H.B. 1775 has only emboldened students to disrupt the learning environment of their classroom. Tension already exists in classrooms during difficult and meaningful class discussions. They understand H.B. 1775 as a legal framework for that tension. They believe it is intentionally written to be vague to allow its enforcement against professors who challenge existing systems.

16. The exclusion of texts and themes addressing race, gender, and sexual orientation significantly diminish the value of this contracted Assistant Professor's class to their students. Without those themes, their students lose the opportunity to learn about historical contexts and cultures that are different from their own. Students lose the opportunity to learn about relevant issues, become more aware of the world around them, and develop empathy.

17. The loss to the learning environment is especially detrimental for their minoritized students. When this contracted Assistant Professor taught texts and themes involving identity and oppression, their minoritized students identified with the material on a personal level and were more engaged in class. They also learned the language for articulating issues they have faced their entire lives.

18. A tenured Full Professor of Anthropology and former Director of the Women and Gender Students Program will change the way they present material in their Race

and Ethnicity class. In particular, they are working through how to present an article about critical race theory through a lens that does not include critical race theory. The article is entitled "*Activism, Intersectionality, and Community Psychology: The Way In Which Black Lives Matter Toronto Helps Us To Examine White Supremacy In Canada's LGBTQ Community*." This Full Professor is engaging in this seemingly impossible task to avoid consequences for potentially violating H.B. 1775 while still including the best text in their class. Even if they are still able to include the article, their students lose the benefit of its honest and thorough presentation. By including themes of race, oppression, sexual orientation, and intersectionality, their students can challenge ideas of identity and power. They gain new perspectives, learn about people different from themselves, and gain a basic understanding of each other. H.B. 1775 is depriving this Full Professor's students of a multicultural education and a learning environment of free interaction, expression, and empathy.

19. This Full Professor of Anthropology fears the professional consequences of potentially violating H.B. 1775. They fear students complaining to their department Chair and Dean if they believe they have violated the law. They believe that this censorship is a violation of their academic freedom.

20. An Associate Professor of English is concerned by H.B. 1775's vague and confusing language and does not know what of their curriculum violates the text of the law or what an administrator or student would see as a violation. The law's unclear prohibitions and lack of explicit enforcement mechanisms is a source of terror for this Professor. As a result, they are self-censoring and changing their entire pedagogy practice to avoid potentially violating H.B. 1775's vague language. Some of the content they will reframe to comply with H.B. 1775 include *The Battle of Algiers*, *Do the Right Thing*, *The Spook Who Sat By My Door*, *The Tempest* by Aime Cesaire, and *The Wretched of the Earth* by Frantz Fanon. Each of these films, plays, and novels address themes of anti-colonialism, racism, white supremacy, and whiteness – themes that may challenge his students to re-evaluate themselves and their understanding of their place in a global society.

21. This Associate Professor of English fears that if they do not reframe their curricula to avoid issues of whiteness, racism, oppression, and colonialism, their students will file complaints with their department Chair and Dean, stating that they are violating H.B. 1775. They are concerned that multiple student complaints could jeopardize their chances of receiving promotions, grant money, and other professional opportunities. This professor is also self-censoring because H.B. 1775 empowers students to reject the presentation of other cultures and values. As a

6

result, they are concerned that continuing to teach about racism, colonialism, and other concepts related to race will lead to heightened levels of hate mail and harassment from students and others.

22. To comply with H.B. 1775, this Associate Professor of English is denying students a full and honest presentation of the curricula, which exposes them to divergent worldviews, enables them to think in new ways, and unsettles their preconceived notions.

23. Professors and staff fear the professional and personal consequences for their continued discussion of race, gender, and sexual orientation. Professors are unclear about what is prohibited and what content could result in professional discipline or personal harm.

24. A Full Professor of Philosophy is unsure whether their curricula violate H.B. 1775. The vagueness of the law has created doubts about whether they can include topics about intersectionality, racism, and sexism. Because they are tenured and cannot be fired, they plan to continue teaching those topics despite their doubts. However, they are concerned about other professional consequences for doing so. They expect student complaints and negative student evaluations from students empowered by H.B. 1775 to reject discomfort in the learning process. This Full Professor fears that the complaints and evaluations may cost some faculty members opportunities for advancement.

25. I, Professor Michael Givel, am a Full Professor of Political Science and am similarly unsure of the meaning of H.B. 1775 or how it will be enforced. Because of how vague the law is, it could be enforced against anything to do with racism or sexism. Therefore, much of my current curricula is subject to H.B. 1775's enforcement. For example, I teach a class entitled Global Urban Politics and believe that its content could be made subject to H.B. 1775 because it deals with colonialism, racism, race as a social construct, patriarchal white supremacy, the racial caste system of the United States, the Oklahoma 1889 Land Run, and Norman's history as a sundown town. Because I am protected by tenure, I do not plan to change my curriculum, despite my concerns. However, I am afraid of other professional consequences for continuing to teach issues regarding race and gender. I expect student complaints and negative evaluations from students empowered by H.B. 1775 and uncomfortable with challenging material. I fear that the complaints and evaluations will deny me opportunities for advancement at OU.

26. An Assistant Professor in the Department of International and Area Studies is confused about whether H.B. 1775 applies to their curricula. They are also concerned that, because of the law's vague language, a student will misconstrue their class content and seek to have H.B. 1775 enforced against them. They believe that their themes of race, gender, sex, colorism, structural racism, misogyny, and homophobia put them at risk for the professional consequences of H.B. 1775. They are also afraid of students submitting complaints to their department Chair and Dean. Complaints could prevent them from getting tenure or hurt their promotion. They also believe they are more vulnerable to complaints and to consequences of complaints, like tenure denial, because of their marginalized identity.

27. H.B. 1775 harms the OU-AAUP as an organization. It has emboldened students and faculty to harass professors teaching anti-racism pedagogy, and the OU-AAUP must spend time and resources defending professors from harassment and threats to their academic freedom. For example, a first year English Composition lecturer gave a voluntary workshop for other professors in April of 2021 to help professors maintain safe and productive classroom learning environments for all students. A month later, H.B. 1775 was enacted. A month after that, another instructor leaked the video of the training, which received national attention and backlash for presenting anti-racist pedagogy to colleagues. The lecturers who gave the workshop were flooded with hate mail and death threats from across the United States. The OU-AAUP dedicated our limited time and resources to publicly supporting and defending the lecturers and writing on the importance of protecting academic freedom. The OU-AAUP expects the necessity of spending time and resources defending professors and academic freedom to drastically increase as students and others including outside the university are emboldened and provided a legal framework by H.B. 1775.

28. H.B. 1775 is an outrage to the OU-AAUP's core principle of academic freedom. Professors have the right to present topics some student may not like. Learning happens through discomfort, and H.B. 1775 denies professors their right to present unpopular ideas and to encourage growth and development in their students made possible only through discomfort.

29. Inclusive education prohibited and chilled by H.B. 1775 has profound benefits for the learning environment and for a democratic society. Professors of various fields, including philosophy and anthropology, see increased student participation when discussing issues of race and gender. Students take issues of identity very seriously. Discussions of race and gender also empower students of minoritized

identities to see themselves represented in the course work. The presentation of other perspectives made possible by intersectional discussions of identity and power increase students' critical thinking skills and social consciousness. It gives them the tools to articulate and advance anti-racist work. Education about the history of prejudice empowers students to make sense of current events in our culture and to see early and varied signs of oppression. Inclusive education inherently challenges systems of oppression because exposure to different perspectives decreases bias. It provides students the tools to think about the difficult questions facing society and to examine ideas about the nature of freedom and democracy.

30. H.B. 1775 deprives students of the benefits of inclusive education, harming the classroom environment, the university, and the state. H.B. 1775 increases classroom hostility and tension toward students and professors of minoritized identities. Black, female, and queer professors expressed particular concern about how H.B. 1775 will disrupt the power balance of their classroom and create an embattled learning environment. The fear and sense of surveillance accompanying H.B. 1775 decreases class discussion, as does the lack of empirically engaging content around race and gender. Professors are also concerned about the resulting increase in queer, women and Black, Indigenous, and People of Color (BIPOC) students' discomfort in class, stating that students of minoritized identities are already more prone to discomfort. It has halted OU's stated mission of creating a more inclusive culture on campus and changed what protection and support minoritized students can expect from the university. It will harm retention and recruitment of professors, particularly professors of minoritized identities, and make the OU faculty whiter rather than more diverse. H.B. 1775 is an embarrassment to the state.

31. H.B. 1775's damage to the quality of education in Oklahoma will have profound ripple effects throughout our society. The insultingly incomplete education presented under the pall of H.B. 1775 fails to address intersectionality and anti-racism, leaving students with a lack of understanding of their own history. It also denies exposure to different views and perspectives, preventing students from questioning and re-evaluating themselves. That lack of self-evaluation creates a generation of people plagued by unexamined, assumptions and poses a serious threat to our culture. It denies students the ability to learn how to reframe discriminatory structures in ways that are more just, a central purpose of education. Inclusive education is needed to break down cultural barriers and to create a new generation of problem solvers. H.B. 1775 is also damaging to civil discourse by denying students the ability to practice discourse and analysis

respectfully engaging with one another about difficult and often deeply personal subjects. Education is the center for free exchange of information, where people practice decency and empathy. University professors are society's last defense of knowledge, reason, and civility. Each of those values are threatened when academic freedom is threatened.

32. H.B. 1775 mandates a new generation of people utterly unaware of their history and unchallenged by different perspectives. Ignorance of cultural differences breeds fear of those differences, which, in turn, motivates dehumanization and justifies oppression. For some members, the threat of H.B. 1775 is personal. The ignorance and fear engendered by H.B. 1775 makes professors of minoritized identities worried not just for their status as a professor but as a human being.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this  16th  day of October 2021.

*Michael Givel*
_____
OU-AAUP