# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> [l] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al., <br><br> *Defendants*. | Case No. 5:21-cv-01022-G <br><br> Hon. Charles B. Goodwin |

**Declaration of Anthony R. Douglas, the Oklahoma State Conference of the National Association for the Advancement of Colored People ("NAACP-Oklahoma")**

I, Anthony R. Douglas, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal first-hand knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am the President of the Oklahoma State Conference of the National Association for the Advancement of Colored People ("NAACP-Oklahoma"), in the above-captioned matter. I am authorized to provide this declaration on behalf of the NAACP-Oklahoma. I have held the position of President for sixteen years.

3. The NAACP is the nation's oldest and largest civil rights organization. Founded in 1909, the NAACP's mission is "to secure the political educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons." To advance this mission, the NAACP's principal objectives are to ensure the political, educational, social and economic equality of all citizens; to achieve equality of rights and eliminate racial prejudice among the citizens of the United States; to remove all barriers of racial discrimination through democratic, legal, educational, economic, and social processes; to seek enactment and enforcement of federal, state and local laws securing civil rights; to inform the public of the adverse effects of racial discrimination and to seek its elimination; and to educate persons

    as to their constitutional rights and to take all lawful action to secure the exercise thereof.

4. The NAACP-Oklahoma implements the mission of the NAACP at the state level. Founded in 1913, the NAACP-Oklahoma is the oldest civil rights organization in Oklahoma and serves as the umbrella organization for local branch units throughout the state.

5. To support this mission, the NAACP's key goals include educational advocacy to ensure that all students have access to a quality, integrated public education. We are dedicated to eliminating the severe racial inequities that continue to plague our education system. We strive to enable every student to graduate ready for college or a career by ensuring access to great teaching, fair discipline, equitable resources and a rigorous and inclusive curriculum that ensures all students can meaningfully engage with the material and all students are best prepared to succeed in our increasingly diverse state and global society. Our ultimate goal is that every student, including students from historically marginalized groups, receives a quality public education that prepares him or her to be a contributing member of a democracy. The NAACP-Oklahoma has been at the forefront of many of the state's most significant advances in integrating our education system and dismantling discriminatory barriers. For example, the NAACP-Oklahoma represented Ada Sipuel in the lawsuit *Sipuel v. Board of Regents*, 332 U.S. 631 (1948) which struck down Oklahoma's racial segregation laws in higher education and resulted in the integration of the University of Oklahoma. Moreover, the NAACP-Oklahoma and its chapters have long been engaged in desegregation efforts in the K-12 level. For decades, NAACP members, like the late-Clara Luper, have been fierce advocates for public school integration and equal access to places of public accommodation.

6. The NAACP-Oklahoma includes over 1500 members who reside in all 77 counties of Oklahoma. While most of our members identify as African American or Black, we also have members who identify as Native American or Indigenous, as white, of mixed Black and European descent, and a diverse range of other ethnic backgrounds. The NAACP-Oklahoma aims to support all people of color and members of underrepresented and vulnerable populations, regardless of membership in the NAACP-Oklahoma. Thus, the NAACP serves as a resource for vulnerable populations across the entire state – members and non-members – who continue to face systemic racism and sexism. To advance this work, the NAACP-Oklahoma holds discussions and tackles issues at the intersection of various identities including race, sex, gender and ethnicity. We have also held meetings to explore and discuss implicit bias and cultural competency.

7. A substantial number of our members include students, parents, and teachers at all levels of public education – elementary, middle and high schools, and colleges – throughout the state. This includes middle school and high school students, and such students' parents, in the school districts of Ardmore, Chickasha, Edmond, Enid, Lawton, Muskogee, Oklahoma City, Tulsa, and others around the state.

8. The NAACP-Oklahoma's members and chapters actively participate in the NAACP's Youth & College Division. Created in 1936 to develop future leaders, the NAACP's Youth & College Division's mission is to "inform youth of the problems affecting African Americans and other racial and ethnic minorities; to advance the economic, educational, social and political status of African Americans and other racial and ethnic minorities and their harmonious cooperation with other peoples; to stimulate an appreciation of the African Diaspora and other people of color's contribution to civilization; and to develop an intelligent, effective youth leadership."

9. Young people in NAACP have long been involved in advocating for educational and equal justice issues. For example, on August 19, 1958, Clara Luper—an Oklahoma City public school Teacher and advisor for the Oklahoma City NAACP's Youth Council—led a group of Black students in the chapter's Youth Council through one of the Nation's earliest sit-ins to desegregate places of public accommodations at the Katz Drug Store.

10. Today, as part of its Youth & College Division, the NAACP-Oklahoma has over a dozen active Youth Chapters, whose members are under 25 and pay dues. Such chapters receive support from their communities, universities, and schools. The NAACP-Oklahoma also has active chapters at colleges throughout Oklahoma, including The University of Oklahoma, Langston University, University of Central Oklahoma, Oklahoma City University, The University of Tulsa, Oklahoma State University, Bacone College, Cameron University, and Northeastern State University. These college chapters strive to advance the mission of the NAACP by providing support and training for Black students and other students of color on campus and by coordinating between many different student groups and community partners towards the shared goal of promoting racial and social equity.

11. At the elementary and secondary school level, our members who are students, parents, guardians, and educators have shared that HB 1775 has directly harmed their access to an inclusive, well-rounded education that best prepares students to meet Oklahoma's instructional standards, thrive in college, and become leaders and contributing citizens in our multiracial, multiethnic democracy.

*Harms caused by Edmond Public School District's application of HB 1775*

12. For example, one NAACP-Oklahoma member is a parent of a 9th grade student ("Student A.A.") in Edmond Public Schools("EPS"). Upon information and belief, EPS has issued guidance to English Language Arts teachers at Student A.A.'s school that directs them to no longer use the terms "white privilege" and "diversity." EPS has also removed *To Kill a Mockingbird* and *Raisin in the Sun* from its list of anchor texts, while retaining books by white male authors. EPS also excluded books from the curriculum written by prominent Black authors including: *Their Eyes Are Watching God*, *Why the Caged Bird Sings*, and *Narrative of the Life of Fredrick Douglass.*

13. Student A.A. is directly and adversely impacted by EPS's actions stemming from HB 1775. Student A.A. has lost access to texts by Black and female authors that explicitly discuss racial and gender relations, and the corresponding classroom discussions that explore such issues from multiple angles. Student A.A. identifies as white and male and desires greater access to diverse texts, particularly texts by non-white and female authors, because such perspectives broaden Student A.A.'s worldview, better prepare Student A.A. to participate in a multiethnic democracy, and enable Student A.A. to engage in advanced inquiry and problem-solving. EPS's ban on certain terms has also denied Student A.A. the opportunity to critically evaluate texts from different viewpoints including a racial lens. While Student A.A. will strive to learn about diverse viewpoints outside of class, this direct denial of information and ideas stymies Student A.A.'s educational growth and ability to develop the type of critical thinking skills espoused by Oklahoma's own educational goals. Student A.A. believes that discomfort is part of the learning process, and pushes students towards greater understanding.

14. EPS's actions also inflict harm on the NAACP-Oklahoma's broader mission and members, who predominantly identify as Black, by making the classroom environment less inclusive for Black, LGBTQ+, and female students. EPS's actions also hinder NAACP-Oklahoma's mission because EPS students are less exposed to diverse viewpoints which foster innovation, cross-cultural understanding, and the leadership skills necessary to tackle today's most pressing issues that often implicate race, sex, and persistent inequities.

*Harms to Teacher B.B.*

15. NAACP-Oklahoma member "Teacher B.B." provides another example of the harms of HB 1775 for students, our members, and our mission. Teacher B.B. teaches in Muskogee Public Schools and has reported that HB 1775 is so vague and confusing that they do not understand what conduct is prohibited under the law. Teacher B.B. is concerned that HB 1775 and the Emergency Rules have not sufficiently defined terms. For example, they are unclear on what conduct will be interpreted as making a banned concept "part of a course," discussing

"unconscious[]" racism or bias, causing feelings of "discomfort, guilt, anguish or…psychological distress on account of … race or sex," or the ways in which "meritocracy" is associated with racist or sexist frameworks. The lack of definition makes Teacher B.B. worried that HB 1775's provisions are open to subjective interpretation. As a result, Teacher B.B. is not clear on what they can and cannot teach.

16. Teacher B.B. has also heard legislators say that the boundaries of the restrictions will be clarified "on the ground" as parents raise complaints. This lack of clarity and ad hoc process for identifying violations is a significant concern for Teacher B.B. because it will likely lead to arbitrary application of punishment. Teacher B.B. is aware that the emergency rules that were passed by the State Board of Education allow parents, school staff, or any other members of the public to report a teacher and open an investigation. Teacher B.B. is also aware that that sanctions could involve losing their teaching license. Teacher B.B. is concerned the law will cause school officials to "make examples" of certain teachers, and they worry these punishments will disproportionately fall on teachers of color as has been the trend across history and our penal system writ large.

17. The guidance that Teacher B.B. has been given on how to abide by HB 1775 has been insufficient, and created greater confusion. Teacher B.B.'s administrative leadership repeated HB 1775's exception that teachers can still teach to "state standards." But Teacher B.B. has shared this explanation makes the line for prohibited conduct even more confusing and unclear. For example, Teacher B.B. is not clear whether they are still permitted to teach about historical figures who are not named in the state standards. Black women such as Mae Jemison, Mary McCleod Bethune, and others have made significant contributions to our society, and we can draw lessons from their efforts. But Teacher B.B. now no longer feels comfortable teaching about them because they are not named in the state standards and such discussions often touch upon gender biases throughout history. Teacher B.B. also no longer feels comfortable bringing in many current events to their classroom. For example, Teacher B.B. no longer plans to introduce information related to the Black Lives Matter movement, or the detention centers at the border because Teacher B.B. worries that these modern movements are not mentioned in the state standards and could be interpreted as introducing a banned concept because such topics often bring up discussions about racial oppression, white privilege, systemic racism, and implicit bias.

18. Teacher B.B.'s district leadership also encouraged teachers to "be careful." District leadership suggested teachers only discuss topics that touch upon systemic racism and sexism if a student raises a question about it. This concerns Teacher B.B. because students often do not have the background knowledge to ask questions that could be a source of valuable information. It

5

also concerns Teacher B.B. because it will result in teachers providing varying information across classrooms, whereby students can only access information related to critical topics associated with race, gender, and systemic privilege if they or one of their peers raises a question about it.

19. As a result of uncertainty paired with potential sanctions, Teacher B.B. plans to change the way they teach, and the end result is that students' access to compelling and critical resources, pedagogies, and information will be harmed. For example, Teacher B.B. normally engages in project-based learning because—based on their experience and training—project-based learning engages higher levels of thinking on Bloom's taxonomy of learning[1] such as "analyzing, evaluating, and creating." To facilitate project-based learning, Teacher B.B. often engages in asking the class questions to deepen their evaluation of particular issues and consider all sides of a particular topic. Because of HB 1775, Teacher B.B. fears asking questions related to systemic power, oppression, or privileges because Teacher B.B. worries that such questions could be interpreted as introducing a banned concept related to race and gender.

20. Teacher B.B. also no longer feels comfortable teaching entire passages that they taught in the past. For example, there is a lesson in the Passages Curriculum about Cesar Chavez. They are concerned that they will need to skip this entirely because it addresses systemic racism. In addition, Teacher B.B. would typically talk about Dolores Huerta and her important contributions to the labor movement as part of that lesson. They would specifically raise how much Dolores Huerta helped the labor movement but Cesar Chavez received most of the credit. This type of discussion touches upon sexism and gender bias, which they worry could be interpreted as a banned concept. In a similar manner, Teacher B.B. no longer feels comfortable asking questions related to Jim Crow segregative practices for books that discuss Ruby Bridges or Martin Luther King Jr. from fear that such questions could be interpreted as suggesting an "oppressor" race or other banned concept. Furthermore, Teacher B.B. also plans to avoid entire topics such as the racial wealth gap out of fear that such discussions could be interpreted as banned under HB 1775.

21. Teacher B.B. also shared that one recommended pedagogical practice is to share a personal story to model how students can connect with the curricula and make meaning out of complex material. However, Teacher B.B. no longer feels comfortable engaging in this practice because—based on Teacher B.B.'s lived experience—their personal narrative could raise

---

[1] Bloom's taxonomy of learning is a hierarchical model that categorizes learning objectives into varying levels of complexity, from basic knowledge and comprehension to advanced evaluation and creation.

6

concepts related to race, sex, privilege, and intersectional inequities that may be banned under HB 1775.

22. Teacher B.B. also shared that Muskogee Public Schools had a student come out as transgender and transition over the summer. Teacher B.B. would typically include discussions and lessons about sexual orientation and gender identity to build a more inclusive classroom culture. These discussions prepare students to be more welcoming of students with non-conforming gender identities. Now, Teacher B.B. no long feels comfortable introducing these discussions when the student returns. Based on district leadership's instruction that teachers should wait for "students to ask a question" before addressing controversial topics, Teacher B.B. worries that the student will have to be bullied or made fun of before Teacher B.B. can introduce any topic or tool meant to create inclusion for students of varying gender identities.

23. Teacher B.B. plans to modify their curriculum in the aforementioned ways due to a fear of keeping their job and avoiding investigation and sanctions. Based on experience and training, Teacher B.B. has expressed that these changes will make the classroom environment less engaging, inclusive, and rigorous. The harms will be especially felt by students of color and other marginalized identities who will feel less connected to the material, which has been associated with lower levels of learning and higher levels of alienation. However, the harms will also extend to students of all backgrounds who benefit from learning about a diverse array of backgrounds, perspectives, and cultural histories.

24. In addition, Teacher B.B. has reported that Teacher B.B.'s school did not offer the diversity, equity, and inclusion ("DEI") trainings that have been provided to teachers in prior years. Teacher B.B. believes this change in DEI training results from the school's concerns and confusion about HB 1775. Teacher B.B. explained such DEI trainings are critical because they increase teachers' capacity to support and engage all students. Such trainings also reduce teachers' use of unnecessary punitive measures and exclusion of students of color, LGBTQ+ students, and other historically marginalized groups. It also reduces the use of inappropriate interventions for students of color and LGBTQ+ students, such as the misidentification of special education needs. Without such trainings, Teacher B.B. worries about an increase in punitive and exclusionary measures against students of color.

*Harms caused to Principal C.C.*

25. Another NAACP-Oklahoma member "Principal C.C." is a principal with Chickasha Public Schools. They have been an advocate of improving diversity and inclusion within their district's schools for years. Based on

7

experience, Principal C.C. believes that training teachers to adequately address difficult topics involving race and gender will be essential to improve the inclusivity of the curriculum and environment at his school. These trainings include discussing implicit bias and racial disparities within the school system. Principal C.C. shared HB 1775 presents a roadblock obstructing these efforts to advance diversity and inclusion.

26. Principal C.C. no longer feels comfortable hosting important DEI training because a parent can request lesson plans and report school officials based on their subjective feelings about what is offensive or suggests biases related to race and gender. Principal C.C. recognizes that this creates a climate in which teachers will not address any sensitive topics that could potentially cause offense. In this way, Principal C.C. feels that HB 1775 makes it even harder to make the strides needed to advance diversity and inclusion.

27. Principal C.C. has also advocated for their district to develop a diversity and equity plan so the district can better evaluate its progress and shortcomings in serving students of color and other historically underserved groups. The Emergency Rules ban incorporating the banned concepts into any diversity plan, thereby preventing ongoing evaluative measures to examine and address educational inequities across racial and gender demographics. It also prevents the provision of trainings or support on implicit bias or culturally responsive teaching whether through mandatory or voluntary means. As a result, Principal C.C. has not been able to avail themselves of the tools and resources that leading experts recommend to improve the campus climate for historically marginalized groups, recruit faculty members from underrepresented backgrounds, and increase the engagement and achievement of students from all backgrounds, and particularly those from underserved groups.

*Harms to college members*

28. On the collegiate level, Oklahoma HB 1775 hinders the ability of our members to further the purpose and mission of the NAACP on their campuses and their ability to discuss racial and gender justice issues that are pressing for their university communities.

29. For example, the University of Central Oklahoma's NAACP chapter hosts events that express Black culture, provide an open forum to discuss diversity issues, and raise awareness on a variety of issues like know your rights trainings, hair discrimination in the workplace, and the Movement for Black Lives. Likewise, the Langston University NAACP chapter—the only NAACP chapter in Oklahoma at an Historically Black College & University (HBCU)—leads a peer mentorship program called "Role Modelz" to assist fellow classmates with feeling more connected to the

campus and their educational goals, to support students in developing or refining their ability to articulate and formulate plans to actively pursue their academic and career goals, as well as to help students transition to college life. The chapter has also partnered with other campus organizations to promote sexual health and wellness. Moreover, the University of Oklahoma NAACP chapter hosts campus-wide events to create inclusive spaces for Black students to discuss mental health and other issues impacting the community. The chapter has also facilitated courageous conversations about Transphobia in communities of color, led events to raise student consciousness around advocacy and community engagement, and hosted panels to discuss police brutality and accountability. HB 1775's vague language and the chilling effects threaten members' access to information and ideas that inform and strengthen such efforts.

30. HB 1775 also raises substantial concerns related to sex and gender for our college members. HB 1775's vague prohibition on mandatory counseling makes it unclear if counselors will continue to provide the necessary trainings to prevent harassment and provide support to survivors of sexual assault, which requires particularized sensitivities to the intersectional challenges faced by women of color and LGBTQ+ people of color.

*Harms across membership*

31. In the 21st Century, it is critical that students receive an education that includes diverse viewpoints and discusses contentious issues related to race and sex so that students are best equipped to work together in teams to solve the most challenging issues facing our increasingly diverse country, along with the myriad of other benefits that flow from diversity. NAACP-Oklahoma's members and community partners report that teaching about systemic racism and biases – conscious and unconscious – is critical and actively sought by members because it serves to broaden perspectives; sheds light on the root causes of racial and gender disparities across healthcare, policing, education, and many other social sectors which directly impact their communities; develops solutions for our society to build a better, more equitable future; combats ignorance which can result in hostility; and empowers the Black community and other groups to know their history, including their triumphs and tools for overcoming challenges.

32. The chilling effect of HB 1775 on discussions and trainings related to race and gender have been immediate. Members and community members across the state have reported how HB 1775 has caused schools to consider removing books that center the Black community, censored educators from applying the most engaging instructional strategies, and spawned a general culture of fear and confusion surrounding race and gender issues. These

effects increase the prevalence of racial hostility, racially disproportionate exclusionary practices, and a one-sided and often inaccurate view of history, literature, and the sciences by centering white males and sidelining (or excluding entirely) the experiences, perspectives, and contributions of all racial and ethnic groups.

33. These harms fall on all students, but they are disproportionately borne by students of color, women and girls, and LGBTQ+ students who cannot see themselves in the curricula or have many of their lived experiences discussed or understood. Moreover, such students are disproportionately harmed because HB 1775 inhibits the ability of Oklahomans to tackle the racial and gender barriers faced by historically marginalized groups.

*Organizational harm*

34. Organizationally, the NAACP-Oklahoma will be greatly impacted by the outcome of this lawsuit. In recent years, the NAACP-Oklahoma's advocacy docket has included challenging the disproportionate removal of students of color and other historically marginalized groups from classrooms based on minor disciplinary infractions. We anticipate an increase in disciplinary disparities if teachers are not being trained around implicit bias and developing inclusive curricula, and members have observed an increase in such exclusionary practices. An increase in complaints will in turn increase our case load.

35. The NAACP-Oklahoma has also been involved in advocacy and legal action calling on Oklahoma schools to remove the names of confederate generals from school buildings. HB 1775 will likely discourage schools from addressing the names of schools that venerate confederate history and thereby marginalizes and harms Black students and other people of color.

36. Altogether, HB 1775 inflicts substantial harm on NAACP-Oklahoma's mission, our membership, and the communities across Oklahoma that we serve. By cutting off access to such critical conversations, students cannot understand how far we have come as a Nation in ensuring equal justice under law, or appreciate how much further we must go to make that goal a reality. Prohibiting Oklahoma students from discussing systemic racism and other similar topics bears disturbing resemblance to the slavery- and Jim Crow era tactic of depriving Black people and other communities of color equal access to education as a method of racial subjugation and preserving the status quo's racial and gender inequities.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Oklahoma this <u>29th</u> day of October 2021.

*Anthony R. Douglas*
Anthony R. Douglas