## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM, et al. ) | |
| ) | |
| *Plaintiffs*, ) | |
| v. ) | |
| ) | Case No. CIV-21-1022-G |
| [1] JOHN O'CONNOR, in his official capacity as ) | |
| Oklahoma Attorney General, et al. ) | |
| ) | |
| *Defendants*. ) | |

**OU BOARD DEFENDANTS, MICHAEL CAWLEY, FRANK KEATING, PHIL ALBERT, NATALIE SHIRLEY, ERIC STEVENSON, ANITA HOLLOWAY AND RICK NAGEL'S, MOTION TO STRIKE AFFIDAVITS OF BLACK EMERGENCY RESPONSE TEAM, UNIVERSITY OF OKLAHOMA CHAPTER OF AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, AND MARVIN LYNN, PH.D. AND BRIEF IN SUPPORT**

COME NOW Defendants Michael Cawley, Frank Keating, Phil Albert, Natalie Shirley, Eric Stevenson, Anita Holloway and Rick Nagel (OU Board), in their official capacities, and respectfully request this Honorable Court strike the affidavits of the Black Emergency Response Team ("BERT") and the University of Oklahoma Chapter of American Association of University Professors ("OU-AAUP"), and portions of the affidavit of Marvin Lynn in support of Plaintiffs' Motion for a Preliminary Injunction. In support of their Motion, Defendants state as follows:

## ARGUMENT AND ANALYSIS

**I. The Court should strike the BERT and OU-AAUP affidavits because they are speculative and not based on personal knowledge.**

The BERT and OU-AAUP affidavits [Docs. 27-3, 27-4] fail to provide evidence to support Plaintiffs' allegations that the Act is a viewpoint discriminatory and overbroad infringement on academic freedom or restricts students' access to information, or that absent an injunction, Plaintiffs will suffer irreparable injury. Instead, each affidavit is a composite of speculations and conjectures.

The BERT affidavit [Doc. 27-3] purports to be a factual accounting based on the personal knowledge of affiant Lilly Amechi but is rife with projections and hearsay. Amechi states that H.B. 1775 "gives students more leeway to commit racist acts against other students with impunity" without any concrete examples that she has observed to back up this assertion. BERT Decl. ¶ 11. Amechi claims that "the students most in need of exposure to [the information offered in a DEI course] are the least likely to access it" and that "H.B. 1775 enables students to grow more comfortable in beliefs that threaten [her] life and the lives of [BERT] members." BERT Decl. ¶ 12. Amechi makes a similar claim about sexual harassment training, now voluntary following the passing of H.B. 1775. *See* BERT Decl. ¶ 13. Amechi goes on to say that "[t]he Gender and Equality Center has already seen an increase in sexual assaults reported as compared to the same time frame in years prior". *Id*. Amechi does not attest that she is affiliated with the Gender and Equality Center. She describes as the "negative effects of no longer requiring sexual harassment training" as hearing "directly from freshman women about the inappropriate way male students will often speak to and approach them." BERT Decl. ¶ 14. Amechi details BERT members refraining from talking to new people and walking around "ready to defend

themselves at any moment." BERT Decl. ¶ 15. There are no instances of attempted attacks described in the declaration.

Amechi describes concerns about the value of certain areas of study because professors *might* leave or be prevented from coming to the University because of the effects of H.B. 1775, or because professors might not teach Critical Race Theory. *See* BERT Decl. ¶¶ 16-17.  These declarations make such definitive statements as "[Jamelia Reed] is being denied the education for which she signed up" with little more than doomsday projections to support them. *Id*. These projections and conclusions are mere beliefs. They are not facts or evidence to which Amechi can attest with personal knowledge.

In the same fashion, the OU-AAUP affidavit [Doc. 27-4] does not set out actual facts to which its affiant can attest with personal knowledge. Affiant Michael Givel details professors expressing concern about not receiving funding for research and draws the conclusion that it "chills professors from applying for grants related to race and racism." OU-AAUP Decl. ¶ 8. Givel also details the fear of a department chair that scheduling courses in Black literature could result in discipline or termination for non-tenured professors. OU-AAUP Decl. ¶ 9. Givel similarly describes librarians' uncertainty about selecting materials without facing disciplinary action. *See* OU-AAUP Decl. ¶ 10 Changing curricula because of fear of losing jobs or bullying is a central theme in OU-AAUP declarations 12-15. *See* OU-AAUP Decl. ¶¶ 12-15. None of these declarations offers evidence that anyone has been disciplined or terminated for offering courses and materials or teaching subjects on race, gender, or sexual orientation. Most of the statements amount

to fears, concerns, and beliefs. The only outlier, OU-AAUP Decl. ¶ 12, describes an instruction not to test on Critical Race Theory, and that instruction is not to Givel. Givel does not identify who made the comment or to whom the comment was made. There is no attestation as to how Givel came to perceive that instruction, therefore the only reasonable conclusion is that it is hearsay.

An affidavit used to support a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). An affidavit is inadmissible under the personal knowledge standard if the witness "could not have actually perceived or observed that which he testifies to." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F. 3d. 1193, 1200 (10th Cir. 2006). "'[S]tatements of mere belief' in an affidavit must be disregarded." *Id*. at 1200 (quoting *Tavery v. United States,* 32 F.3d 1423, 1427 n. 4 (10th Cir.1994)). Additionally, if the content of the statement contains inadmissible hearsay, courts should disregard those statements. *See Argo*, 453 F. 3d. at 1199.

Every statement in the BERT and OU-AAUP affidavits relied upon by the Plaintiffs in their Preliminary Injunction Motion is either a belief or inadmissible hearsay. Amechi, the affiant for BERT, has stated no facts that show that she is in a position or occupation that would allow her to have observed or perceived some of the events of which she purports to have personal knowledge. *See id*. at 1200 (observing that the plaintiff was not a human resources official, and therefore was not in a position to acquire comprehensive knowledge about the performance and discipline of female coworkers of which he claimed

to be personally familiar). Her position in BERT does not give her direct access to the reports of the Gender and Equality Center or the ability to analyze its data. Givel, the affiant for OU-AAUP, is a coworker to the other members of OU-AAUP. Just like the plaintiff in *Argo*, Givel is not in a position to acquire personal knowledge of what instructions or discipline his coworkers receive. Finally, the bulk of the remaining statements on the effects of H.B. 1775 in these affidavits are essentially beliefs about things that have not happened.

## II. The Court should strike portions of the Lynn affidavit because it is not admissible under the *Daubert* standard.

The Lynn affidavit [Doc. 27-10] cites a number of journal articles, studies, and the sworn declarations of the other affiants in order to offer expert testimony on the effects of H.B. 1775. To the extent Plaintiffs offer this affidavit as expert testimony for their allegations, this Court must strike the portions that do not meet the *Daubert* standard.

Lynn's own body of research centers on "how teachers draw on students' cultural resources to promote academic success for students of color" and his experience includes a near-thirty-year teaching career in elementary school and in higher education. Lynn Decl. ¶¶ 1, 3. The research upon which Lynn relies in part to form his expert opinion has to do with the impact that "culturally relevant," "culturally responsive," and "culturally sustaining" teaching have on the academic success of students with diverse identities. *See* Lynn Decl. ¶¶ 6-12. Lynn reaches the conclusion that "efforts to curtail teachers' ability to

use these practices will **likely** negatively impact the overall success of students of color."
Lynn Decl. ¶ 16 (emphasis added).

Lynn examines research[1] done on workplace sexual harassment training, connects this research to sexual harassment on college campuses, and then draws on his own observations from his time as a university administrator to make the inference that "increased understanding about what constitutes sexual harassment and discrimination would lead students on college campuses to reflect more deeply about their behavior and how it contributes to the overall creation of environments that are safe for women and girls." Lynn Decl. ¶ 33. Lynn's attestation of his expertise and experience does not lend itself to an expert level of authority on this area of analysis.

Even if it did, such analysis regarding sexual harassment training in Lynn Decl. ¶ 33, and diversity courses in Lynn Decl. ¶¶ 34-35 only points to the positive outcomes of offering such curriculum. What this analysis does not logically or scientifically point to is the conclusion reached in Lynn Decl. ¶ 37, namely that making the DEI course and sexual harassment training voluntary will make the campus "less safe, welcoming, and engaging for all students but especially marginalized students."

---

[1] The research cited does not, in fact, mention sexual harassment on college campuses. *See* Heather Antecol & Deborah Cobb-Clark, *Does Sexual Harassment Training Change Attitudes? A View from the Federal Level*, 84 SOC. SCI. Q., Dec. 2003, at 826. The only mention about training made in Lynn's other source within this declaration is that more training is needed, not that it leads "individuals to be more reflective about the types of workplace behaviors that can be construed as discriminatory or harassing" (Lynn Decl. ¶ 33). *See* Bernice Resnick Sandler, *Title XI: How We Got It and What a Difference It Made*, 55 CLEV. ST. L. REV. 473 (2007).

An expert's testimony must be based on knowledge that implies a grounding in the methods and procedures of science and not subjective belief or unsupported speculation. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 2795, (1993) Any inference or assertion must be supported by appropriate validation. *See id.* "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000). The Lynn affidavit lists a number of credentials, but ultimately it relies upon speculation in order to project the irreparable injury of H.B. 1775. The Court should strike the Lynn affidavit to the extent it relies on such unsupported speculation.

Furthermore, the connection between Lynn's credentials and some of the conclusions drawn in his affidavit is tenuous at best. His lengthy career in higher education does not automatically render his opinion on all matters in higher education admissible. *See, e.g.*, *Ho v. Michelin N. Am., Inc.,* 520 F. App'x 658, 665 (10th Cir. 2013)("Experience is not necessarily a password to admissibility[.]") In his extensive list of experiences and published works, mentions of comprehensive work or study in sexual harassment or LGBTQ+ inclusivity are sparse. Therefore, the Court should strike the Lynn affidavit to the extent it refers to sexual harassment training or LGBTQ+ issues.

## CONCLUSION

Based on the foregoing, this Court should strike these Affidavits. The BERT and OU-AAUP affidavits do not contain facts based on personal knowledge. Instead, they express mere beliefs and inadmissible hearsay. The Lynn affidavit contains unsupported

speculation that is not admissible expert testimony, and the Court should strike any such

portions. As such, the Court should strike the Affidavits as set forth above.

Respectfully submitted,


s/Tina S. Ikpa
M. DANIEL WEITMAN, OBA #17412
TINA IKPA, OBA #32193
University of Oklahoma
Office of Legal Counsel
660 Parrington Oval, Suite 213
Norman, Oklahoma  73109
Telephone: (405) 325-4124
Facsimile: (405) 325.7681
E-Mail: dan.weitman@ou.edu
E-Mail: tsikpa@ou.edu

*ATTORNEYS FOR DEFENDANTS MICHAEL
CAWLEY, FRANK KEATING, PHIL ALBERT,
NATALIE SHIRLEY, ERIC STEVENSON,
ANITA HOLLOWAY AND RICK NAGEL*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of December 2021, I transmitted the attached document to the Clerk of Court using the ECF system for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Genevieve Bonadies Torres
David Hinojosa
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW, Suite 900
Washington, DC 20005

Megan Lambert
American Civil Liberties Union
Foundation of Oklahoma
P.O. Box 13327
Oklahoma City, OK 73113

Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian Tabrizi
Ramya Sundaram
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Emerson Sykes
Leah Watson
Sarah Hinger
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004

Andy N. Ferguson
Zachary P. West
Attorney General's Office
313 NE 21 St
Oklahoma City, OK 73105

F. Andrew Fugitt
Justin C. Cliburn
The Center for Education Law
900 N Broadway Ave., Suite 300
Oklahoma City, OK 73102

s/Tina S. Ikpa
Tina S. Ikpa