21-CV-1022-G

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

BLACK EMERGENCY
RESPONSE TEAM, *et al.*

*Plaintiffs,*

v.

JOHN M. O'CONNOR,
*in his official capacity, et al.*

*Defendants.*

## RESPONSE OF DEFENDANTS [1-18]
## TO MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

    A.   Controversy Over Race and Sex-Based Classroom Teaching.................................3

    B.   Oklahoma House Bill 1775 and Emergency Rules....................................7

    C.   Procedural History ..................................................................................9

ARGUMENT ..................................................................................................................10

I.     Plaintiffs are unlikely to succeed on the merits. ...............................................11

    A.   HB 1775 does not violate the First Amendment ....................................12

    B.   HB 1775 is not facially vague .................................................................17

    C.   HB 1775 is not unconstitutionally overbroad.........................................22

II.    Balance of Equities ............................................................................................24

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
457 U.S. 853 (1982) ....................................................................................................... 14, 15

*Bd. of Trustees of State Univ. of N.Y v. Fox,*
492 U.S. 469 (1989) ........................................................................................................... 12

*Boring v. Buncombe Cty. Bd. of Educ.,*
136 F.3d 364 (4th Cir. 1998) ............................................................................................. 15

*Boys Markets, Inc. v. Retail Clerks Union, Loc. 770,*
398 U.S. 235 (1970) ........................................................................................................... 17

*Bradley v. Pittsburgh Bd. of Educ.,*
910 F.2d 1172 (3rd Cir. 1990) ........................................................................................... 15

*Brnovich v. Democratic Nat'l Comm.,*
141 S. Ct. 2321 (2021) ......................................................................................................... 5

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ........................................................................................................... 23

*Chiras v. Miller,*
432 F.3d 606 (5th Cir. 2005) ............................................................................................. 15

*Colo. Right to Life Comm., Inc. v. Coffman,*
468 F.3d 1137 (10th Cir. 2007) ......................................................................................... 12

*Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.,*
473 U.S. 788 (1985) ........................................................................................................... 13

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
269 F.3d 1149 (10th Cir. 2001) ......................................................................................... 11

*Edwards v. Cal. Univ. of Penn.,*
156 F.3d 488 (3rd Cir. 1998) ............................................................................................. 15

*Epperson v. Arkansas,*
393 U.S. 97 (1968) ............................................................................................................. 14

*Evans v. Sandy City,*
944 F.3d 847 (10th Cir. 2019) ........................................................................................... 13

*Faustin v. City & Cty. of Denver, Colo.*,
    423 F.3d 1192 (10th Cir. 2005) ................................................................11, 23

*Fleming v. Jefferson Cty. Sch. Dist. R-1*,
    298 F.3d 918 (10th Cir. 2002) ............................................................... 15

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ............................................................... 16

*Goldammer v. Fay*,
    326 F.2d 268 (10th Cir. 1964) ............................................................... 10

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................... 18

*GTE Corp. v. Williams*,
    731 F.2d 676 (10th Cir. 1984) ............................................................... 10

*Harmon v. City of Norman*,
    981 F.3d 1141 (10th Cir. 2020) ................................................................12, 24

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ............................................................... 13

*Hunt v. Wash. Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ............................................................... 17

*iMatter Utah v. Njord*,
    774 F.3d 1258 (10th Cir. 2014) ............................................................... 12

*Jordan v. Pugh*,
    425 F.3d 820 (10th Cir. 2005) ............................................................... 17

*Kirkland v. Northside Indep. Sch. Dist.*,
    890 F.2d 794 (5th Cir. 1989) ............................................................... 15

*Maryland v. King*,
    133 S. Ct. 1 (2012) ............................................................... 25

*Members of City Council of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ............................................................... 23

*Miles v. Denver Pub. Sch.*,
    944 F.2d 773 (10th Cir. 1991) ................................................................2, 15

iii

*N.Y. State Club Assn., Inc. v. City of N.Y.,*
 487 U.S. 1 (1988) ................................................................................................ 22

*Nken v. Holder,*
 556 U.S. 418 (2009) ...................................................................................... 11, 24

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
 389 F.3d 973 (10th Cir. 2004) ..................................................................... 10, 11

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
 551 U.S. 701 (2007) ............................................................................................. 2

*Payless Shoesource, Inc. v. Travelers Cos., Inc.,*
 585 F.3d 1366 (10th Cir. 2009) ......................................................................... 18

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois,*
 391 U.S. 563 (1968) ........................................................................................... 16

*Plessy v. Ferguson,*
 163 U.S. 537 (1896) ..................................................................................... 20, 25

*Robinson v. Shell Oil Co.,*
 519 U.S. 337 (1997) ........................................................................................... 17

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
 508 F. Supp. 3d 521 (N.D. Cal. 2020) ................................................................. 6

*Schrier v. Univ. Of Colo.,*
 427 F.3d 1253 (10th Cir. 2005) ......................................................................... 10

*Seyfried v. Walton,*
 668 F.2d 214 (3d Cir. 1981) .............................................................................. 13

*Stanley v. Georgia,*
 394 U.S. 557 (1969) ........................................................................................... 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
 393 U.S. 503 (1969) ........................................................................................... 14

*United States v. Stevens,*
 559 U.S. 460 (2010) ........................................................................................... 12

*Vanderhurst v. Colo. Mountain Coll. Dist.,*
 208 F.3d 908 (10th Cir. 2000) ........................................................................... 16

iv

*Virginia v. Hicks,*
539 U.S. 113 (2003) ...................................................................................22, 23

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ........................................................................................ 18

*Ward v. Utah,*
398 F.3d 1239 (10th Cir. 2005) ...................................................................... 24

*Winters v. New York,*
333 U.S. 507 (1948) ........................................................................................ 13

**Statutes**

Okla. Stat. tit. 70, § 24-157 ....................................................................................1, 2, 9

**Other Authorities**

Christopher Rufo, *Embracing critical theory, teacher's union says they—not the parents—
control what kids learn*, NEW YORK POST (July 5, 2021) ...................................... 3

Felder et al., *We fact checked the debate over a new law on what Oklahoma students learn about race,*
THE FRONTIER (June 3, 2021) ............................................................................. 10

Jon Brown, *Superintendent says Detroit schools 'deeply using critical race theory,'*
FOX NEWS (Nov. 30, 2021) .................................................................................. 3

Martin Luther King, Jr., I Have A Dream: Address to the March on Washington for Jobs
and Freedom (Aug. 28, 1963) ............................................................................... 1

Okla. State Dep't of Educ., *Oklahoma Academic Standards: Social Studies* (2021) ................. 21

Ray Carter, *Senate Advances Bill on Critical Race Theory,*
OCPA (Apr. 22, 2021) .......................................................................................... 7

**Regulations**

Okla. Admin. Code 210:10-1-23 ...........................................................................8, 22

**Constitutional Provisions**

OKLA. CONST. art XIII, § 5 ................................................................................... 24

## INTRODUCTION

In one of his most famous moments, Dr. Martin Luther King, Jr. declared that he had a dream that his "four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."[1] Echoing this sentiment, which itself echoes the Declaration of Independence and U.S. Constitution's assurances of equality, the Oklahoma Legislature in May 2021 overwhelmingly passed a short and simple law (HB 1775) to prevent Oklahoma public schools from teaching children that "character is necessarily determined by his or her race or sex," along with seven other racist and sexist concepts. Okla. Stat. tit. 70, § 24-157(B)(1)(e).[2] That law took effect on July 1, 2021.

Plaintiffs ask this Court to upend the status quo and enjoin HB 1775 based on the policy views of those who opposed HB 1775's setting of standards for teaching Oklahoma students. This Court should decline Plaintiffs' invitation to overturn Oklahoma's democratic and representative political process. Contrary to Plaintiffs' allegations of unconstitutional vagueness, HB 1775 is succinct, straightforward, and narrowly phrased. Indeed, on this point the law stands in stark contrast to Plaintiffs' pleadings and affidavits, which are lengthy, internally incoherent, and full of ambiguous terminology, not to mention being replete with unsupported allusions to—as well as utterly implausible allegations of—the drastic harms that HB 1775 has supposedly caused in the past six months.

---

[1] Martin Luther King, Jr., I Have A Dream: Address to the March on Washington for Jobs and Freedom (Aug. 28, 1963).

[2] Statutory references to HB 1775 will point to § 24-157. This was the original number given in HB 1775 and it is reflected on Westlaw; however, the Oklahoma State Courts Network indicates HB 1775 is codified at § 24-158.

HB 1775 does not trample on the First Amendment or academic freedom. For primary and secondary schools, the law has long been clear that States may craft and implement their own curriculum. *See, e.g.*, *Miles v. Denver Pub. Sch.*, 944 F.2d 773, 779 (10th Cir. 1991) ("caselaw does not support [the] position that a secondary school teacher has a constitutional right to academic freedom"). And though Plaintiffs spill copious ink complaining about a chilling effect at the University of Oklahoma, the law doesn't even apply to university classrooms writ large—as the OU Defendants have pointed out. *See* Doc. 51.

Rather, for higher education the law simply holds that gender or sexual diversity training, counseling, or orientations must be optional, rather than mandatory, and must not include "any form of race or sex stereotyping." Okla. Stat. tit. 70, § 24-157(A)(1). Many of Plaintiffs' claims boil down to the charge that the Constitution somehow requires mandatory student training, or mandatory book lists, and so on. But Plaintiffs have not cited a single case indicating that a State making trainings, readings, or certain books optional rather than mandatory is unconstitutional, nor is it plausible that the Constitution requires such judicial micromanagement of core State functions.

Oklahoma has a legitimate pedagogical justification for HB 1775: protecting children from race and sex discrimination in school curriculum. Plaintiffs stake out the contradictory positions that: (1) no one was teaching racist and sexist concepts, and (2) they *were* teaching them and the State is constitutionally required to allow it. Neither position is accurate. The State is well within its right to combat race and sex discrimination in the classroom. *Cf. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality op.) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.").

## BACKGROUND

### A.    Controversy Over Race and Sex-Based Classroom Teaching

In the past several years, a contentious debate has arisen nationwide about the role that ideological doctrines on race and gender can or should play in educating our nation's youth. Plaintiffs, in pleadings and affidavits, embrace many of these academic constructs at one point or another as ones they believe should be taught to students, making a policy judgment about what primary and secondary school curricula should contain. *See, e.g.*, Mot. at 4-5, 11, 14 & n.24, 16; Ex. 4 ¶¶ 11, 18, 24, 31; Ex. 5 ¶ 10, 21, 24, 27; Ex. 9 ¶ 18. Despite criticizing HB 1775 for lacking definitions, however, Plaintiffs do not explain with any particularity what it is they think should be taught to students for each of their preferred concepts.

Some teachers, schools, and school districts across the country have embraced Plaintiffs' preferred curricula. *See, e.g.*, Jon Brown, *Superintendent says Detroit schools 'deeply using critical race theory,'* FOX NEWS (Nov. 30, 2021);[3] Christopher Rufo, *Embracing critical theory, teacher's union says they—not the parents—control what kids learn*, NEW YORK POST (July 5, 2021).[4] But others have expressed the opposite policy preference, with students and parents becoming increasingly alarmed at both the content and application of divisive concepts. The Attorneys General of Montana and Arkansas, in recent official opinions, have documented many examples. *See* Ex. 1, Ark. Atty. Gen. Op. No. 2021-042 (Aug. 16, 2021); Ex. 2, Mon. Atty Gen.

---

[3]   *Available at*   https://www.foxnews.com/us/superintendent-says-detroit-schools-deeply-using-critical-race-theory.

[4]   *Available at*   https://nypost.com/2021/07/05/embracing-critical-theory-teachers-union-says-they-control-what-kids-learn/.

Vol. No. 58 Op. No. 1 (May 27, 2021). These include, but are not limited to, the following:

- Per one critical race theory textbook, "critical race theory questions the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and neutral principles of constitutional law." Ex. 1 at 2 (citing Richard Delgado and Jean Stefancic, *Critical Race Theory: An Introduction* 3 (3d. ed. 2017)). That same textbook says critical race theory rejects the ideal of a "colorblind" society, because that "[o]nly aggressive, color-conscious efforts" can address racism in America. *Id.*

- Utilizing "antiracist" curriculum, an Illinois school district segregated white and non-white administrators, students, parents, and community members in training programs, school "affinity groups," disciplinary policies and even a "Colorism Privilege Walk." Ex. 2 at 12-13 (citing Carl Campanile, *US Dept. of Education curbs decision on race-based 'affinity groups'*, N.Y. POST (Mar. 7, 2021), https://nypost.com/2021/03/07/education-dept-curbs-decision-on-race-based-affinity-groups/).

- Similarly, other school districts and universities have proposed separate housing and advisors based on race, as well as segregated grading policies and professional development and training. Ex. 2 at 13 (collecting citations).

- A North Carolina school district launched a campaign against "whiteness in educational spaces." Ex. 2 at 14 (citing Christopher F. Rufo, *Subversive Education*, CITY JOURNAL (Mar. 17, 2021), https://www.city-journal.org/critical-race-theory-in-wake-county-nc-schools.).

- A public school in San Diego accused white teachers of being "colonizers" on land stolen from Native Americans, told them they are racists upholding racist ideas, structures, and policies, and recommended that they undergo "antiracist therapy." Ex. 2 at 15 (citing Christopher F. Rufo, *Radicals in the Classroom*, CITY JOURNAL (Jan. 5, 2021), https://www.city-journal.org/radicalism-in-san-diego-schools).

- Another California elementary school apparently forced third-graders to deconstruct their own racial and sexual identities, rank themselves according to their own "power and privilege," and then separate themselves into "oppressors and oppressed." Ex. 2 at 15-16 (citing Christopher F. Rufo, *Woke Elementary*, CITY JOURNAL (Jan. 13, 2021) https://www.city-journal.org/identity-politics-in-cupertino-california-elementary-school).

- A student in a Nevada charter school sued in federal court after he was allegedly given a failing grade in his "Sociology of Change" course (which threatened his graduation) because he refused to confess his privilege as demanded. Ex. 2 at 16 (citing Joshua Dunn, *Critical Race Theory Collides with the Law*, ED. NEXT (May 19, 2021), https://www.ed-ucationnext.org/critical-race-theory-collides-with-law/). The course also "allegedly

obligated students to label white, male, Christian, and heterosexual identities as inherently oppressive and privileged." *Id.*

After reviewing these facts and the relevant law, the Montana Attorney General held that "[i]n many instances, the use of 'Critical Race Theory' and 'antiracism' programming discriminates on the basis of race, color, or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964," and various Montana laws. Ex. 2 at 1. Several months later, the Arkansas Attorney General similarly held in an opinion that "instituting practices based on critical race theory, professed 'antiracism,' or associated ideas can violate Title VI, the Equal Protection Clause, and Article II of the Arkansas Constitution." Ex. 1 at 1.

 Policymakers in Oklahoma are fully entitled to take notice about what is occurring in other states to prophylactically craft their own policies. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021). That said, Oklahoma has not been immune from this trend. Plaintiffs' own affiant admits that OU students have complained when teachers have taught racialized concepts such as "white privilege." Pls' Ex. 4 at ¶ 15. Similarly, a long-time Oklahoma City schoolteacher and minister who is black, testifies that he and his colleagues were told in a mandatory training that they must publicly acknowledge and confess their white privilege and racism.  Ex. 3, Affidavit of James Taylor, ¶ 7.  And former State Superintendent of Education Janet Barresi testifies that she has heard concerns from numerous parents from all over the State about the increasing amount of racialized and sexualized teaching being introduced into classrooms, and that these parents are scared to speak up for fear of retaliation against them or their children. Ex. 4, Affidavit of Janet Barresi, ¶¶ 4-7.

In the midst of all this, on September 22, 2020, the Trump Administration issued an "Executive Order on Combating Race and Sex Stereotyping."[5] That EO declared that it "shall be the policy of the United States not to promote race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services, and not to allow grant funds to be used for these purposes. In addition, Federal contractors will not be permitted to inculcate such views in their employees." Among other things, the EO identified nine "divisive concepts" that should not be promoted, such as the belief that "one race or sex is inherently superior to another race or sex," or that "an individual, by virtue of his race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously." The EO instructed the U.S. Attorney General to "continue to assess the extent to which workplace training that teaches the divisive concepts … may contribute to a hostile work environment and give rise to potential liability under Title VII of the Civil Rights Act of 1964."

As Plaintiffs repeatedly point out, this EO was challenged and partially enjoined by a federal district court in the final weeks of the Trump Administration. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020). What Plaintiffs omit, however, is that the district court only enjoined Sections 4 and 5 of the EO, which imposed restrictions on independent federal contractors and federal grantees. The district court expressly *declined* to enjoin Sections 3 (the military) and 6 (government agencies) of the EO, which covered the government's "own workforce." *Id.* at 546. Similarly, HB 1775 is simply clarifying the content

---

[5] *Available at* https://trumpwhitehouse.archives.gov/presidential-actions/executive-order-combating-race-sex-stereotyping/.

of Oklahoma's own curriculum, which affects only the state government's "own workforce." In any event, the district court's decision evaded appellate review because the EO was withdrawn by the Biden Administration on January 20, 2021, just weeks after the district court's decision issued.

### B. Oklahoma House Bill 1775 and Emergency Rules

The Oklahoma Legislature was clearly concerned with these disturbing developments, including from inside Oklahoma. *See, e.g.*, Ray Carter, *Senate Advances Bill on Critical Race Theory*, OCPA (Apr. 22, 2021) (Sen. Bullard: "Since … the bill has become public, I have had many, many different emails from parents and teachers alike who have seen this in their schools and were thankful that we were running the bill.").[6] Rather than attempt to ban or prohibit often ephemeral concepts, the Legislature took a narrowly tailored approach in constructing HB 1775, specifying eight racist and sexist concepts that should not be taught to public schoolchildren. These prohibited concepts largely mirror the "divisive concepts" found in President Trump's Executive Order. *See supra*.

In spring of 2021, the Legislature overwhelmingly passed HB 1775—38-9 in the Senate (April 21) and 77-18 in the House (May 3). *See* Ex. 5, House and Senate Votes. It was then signed into law by Governor Stitt on May 7, 2021. The Legislature also decided that HB 1775 would become effective on July 1, 2021. *See* Pls' Ex. 1.  Subsection A applies to higher education and states that such institutions cannot require students "to engage in any form of mandatory gender or sexual diversity training or counseling; provided, voluntary counseling

---

[6] *Available at* https://www.ocpathink.org/post/senate-advances-ban-on-critical-race-theory.

shall not be prohibited. Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited." Subsection B applies to public schools and says they and their employees shall not "require or make part of a course the following concepts":

> a. one race or sex is inherently superior to another race or sex,
>
> b. an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,
>
> c. an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,
>
> d. members of one race or sex cannot and should not attempt to treat others without respect to race or sex,
>
> e. an individual's moral character is necessarily determined by his or her race or sex,
>
> f. an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,
>
> g. any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or
>
> h. meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.

Subsection B then also contains a limiting construction: "The provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." Pursuant to this law, the State Board of Education issued emergency rules on July 12. *See* Okla. Admin. Code 210:10-1-23. Among other things, these rules put in place a system and structure for filing complaints about potential violations of the law. A number of other states have enacted laws addressing similar curricular issues, *see, e.g.*, Ex. 1 at 8 n.41, and as far as Defendants are aware, none have been enjoined by any court.

Thus while Plaintiffs claim that HB 1775 "ban[s] inclusive education," Mot. at 5, but the plain text of HB 1775 shows the opposite. Teaching children that their moral character is

"necessarily determined by his or her race or sex" is not inclusive.  Neither is the teaching that individuals "should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex." HB 1775 attempts to make education in Oklahoma more inclusive, by prohibiting the inculcation of concepts that exclude and demonize persons purely based on their race and sex.  Regardless, whether or not these concepts are "inclusive" is a policy judgment for the Legislature, and HB 1775 is the expression of that judgment.

### C.    Procedural History

HB 1775 took effect on July 1, 2021, *see* Okla. Stat. tit. 70, § 157, nearly two months after the law was enacted with great public debate. Plaintiffs then waited over three months, until October 19, to file their complaint and ask for a preliminary injunction that would upend the status quo. Although Plaintiffs have produced affidavits from persons alleging to be confused and chilled by HB 1775, other educators support the law and believe it does not— and should not—affect or chill their teaching and have no trouble interpreting its provisions. *See* Ex. 3, Taylor Aff. ¶¶ 8-11; Ex. 6, Affidavit of Calvin Jones ¶¶ 5-8.

Plaintiffs' brief and affidavits make incredibly hyperbolic claims of the harms that HB 1775 has allegedly caused, claiming that the law "puts students of color in danger," requires only the teaching of "the White male perspective," and risks their very lives. *See, e.g.,* Pls' Ex. 3 at 6; Pls' Ex. 4 at 10; Pls' Ex. 9 at 5-6. None of these claims are remotely connected to the law's text. That Plaintiffs' and their affiants' characterizations of HB 1775 are overblown is widely recognized. One media publication's "fact check," for instance, called "mostly false" the claim that "HB 1775 will change the history is taught in public schools." Felder et al., *We fact checked the debate over a new law on what Oklahoma students learn about race*, THE FRONTIER (June

9

3, 2021).[7] Similarly, although critical of HB 1775, the National Education Association and its state-affiliate Oklahoma Education Association admit the law "does not prevent the teaching of history and social studies or any other subject matter area that is in compliance with the Oklahoma Academic Standards." Ex. 7, Know Your Rights, NEA/OEA, at 5. The same guide also concedes that teachers should "never teach that any sex or race is inherently superior or inferior. The new state law prohibits such instruction, as do many other state and federal laws as well." *Id.* Even in the materials Plaintiffs provide, the school district echoed most of these statements. *See, e.g.*, Doc. 1-1 (observing that Okla. Stat. tit. 70, § 24-157(B)(1)(c) "aligns with" Title VI and Title IX's prohibitions on discrimination). And the Edmond Defendants deftly rebut Plaintiffs' wild allegations about what has occurred in that municipality. *See* Doc. 60.

## ARGUMENT

A preliminary injunction has long been recognized as an extraordinary remedy that is only to be granted when the right to such requested relief is clearly established. *See. e.g., Schrier v. Univ. Of Co.,* 427 F.3d 1253, 1258 (10th Cir. 2005); *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984); *Goldammer v. Fay*, 326 F.2d 268, 270 (10th Cir. 1964). This is especially true when the injunction disturbs, rather than preserves, the status quo. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (preliminary injunctions that alter the status quo are disfavored). An injunction that upends the status quo "must be more closely scrutinized to assure that the exigencies of the case support the granting

---

[7] *Available at* https://www.readfrontier.org/stories/we-fact-checked-the-debate-over-a-new-law-on-what-oklahoma-students-learn-about-race/.

of a remedy that is extraordinary even in the normal course." *Id.* at 975; *see also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001) (for a disfavored motion, the movant has a heightened burden and must show that the traditional four factors weigh "heavily and compellingly" in favor of the motion). Here, HB 1775 went into effect on July 1, 2021, which was more than three months before this suit was filed. In other words, the last uncontested position between the adverse parties here was when HB 1775 was in effect, prior to the beginning of 2021 school year.

To upset the State and its citizens' settled expectations by enjoining a duly enacted law, a movant must demonstrate a clear and unequivocal right to relief and that there is (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest. *Dominion,* 269 F.3d at 1154. The third and fourth preliminary injunction factors merge when the government opposes an injunction. This is because the State's interest and the public's interest are one and the same. *See Nken v. Holde*r, 556 U.S. 418, 435-36 (2009).

## I.    Plaintiffs are unlikely to succeed on the merits.

Plaintiffs are unlikely to succeed on the merits, and therefore the extraordinary remedy of a preliminary injunction should be denied. Without establishing any constitutional right of any plaintiff to dictate school curricula, Plaintiffs cannot upset the status quo let alone meet a movant's burden under either an as-applied or a facial challenge. *Faustin v. City & Cty. of Denver, Colo.*, 423 F.3d 1192, 1196 (10th Cir. 2005).

An as-applied constitutional challenge turns on the facts of a plaintiff's concrete case, whereas, in a typical facial challenge, the statute must be found unconstitutional in its application to all conceivable parties. *iMatter Utah v. Njord*, 774 F.3d 1258, 1264 (10th Cir. 2014). Here, Plaintiffs allege a First Amendment violation. To succeed on a facial challenge in the First Amendment context, they must at least demonstrate that a substantial number of HB 1775's applications are unconstitutional as judged in relation to its plainly legitimate sweep. *See United States v. Stevens*, 559 U.S. 460, 472 (2010). When challenges under both the facial and as-applied doctrines are brought before the court, it is appropriate to address the narrower, as-applied challenge first. *See, e.g., Bd. of Trustees of State Univ. of N.Y v. Fox*, 492 U.S. 469, 484 (1989) ("the lawfulness of the particular application of the law should ordinarily be decided first."); *iMatter*, 774 F.3d at 1264; *Colo. Right to Life Comm., Inc. v. Coffman*, 468 F.3d 1137, 1146 (10th Cir. 2007). Under either doctrine, plaintiffs must establish standing, whether it is the concrete and particularized standard or the slightly relaxed First Amendment "chilling effect" of pre-enforcement.

## A.    HB 1775 does not violate the First Amendment

Plaintiffs are unlikely to succeed on the merits of their claims because they fail to demonstrate the First Amendment protects the conduct prohibited by HB 1775. To find a likelihood of success that a statute runs afoul of the Constitution as applied to a particular plaintiff, a plaintiff has "the initial burden of showing that the First Amendment applies to their conduct." *Harmon v. City of Norman*, 981 F.3d 1141, 1147 (10th Cir. 2020). Plaintiffs fail to do so because they cannot establish that mandatory instruction of the concepts covered by HB 1775 are a constitutional right of any Plaintiff at any level of education: primary, secondary,

or even higher education. Simply put, Plaintiffs have pointed to no case law establishing a First Amendment right for a student to be taught any specific concept or a teacher to teach any specific concept, let alone concepts that violate principles of equality enshrined in federal law. "As a threshold matter, we must first consider whether the activity in question constitutes protected speech under the First Amendment." *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019). "[I]f [the speech] is not [protected], we need go no further." *Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.*, 473 U.S. 788, 797 (1985).

To begin, Plaintiffs in this case are not similarly situated and instead comprise of a collection of students, teachers, professors, and organizations. The First Amendment applies differently to each, and each must be evaluated separately *See, e.g.*, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) ("the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment.") (cleaned up).

First, for student Plaintiffs, there is no First Amendment right to receive instruction on any given subject. *See Seyfried v. Walton*, 668 F.2d 214, 216 (3d Cir. 1981) ("Just as a student has no First Amendment right to study a particular aspect or period of history in his or her senior history course . . ."). To be sure, "[i]t is now well established that the Constitution protects the right to receive information and ideas" for the general public, Mot. at 19 (*citing* Stanley v. Georgia, 394 U.S. 557, 564 (1969)); however, that precedent rests upon the rationale that citizens have a right to receive information, regardless of its worth. *See Winters v. New York*, 333 U.S. 507, 510 (1948) ("Though we can see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature.").

13

The facts of *Stanley*, relied upon by plaintiffs, turn on the right of a Jehovah's Witness to attempt door-to-door leafletting, which is hardly relevant, let alone a controlling, precedent to in-class curricula requirements. Moreover, Plaintiffs' reliance on *Pico* is similarly misplaced. Mot. at 19. In that case, the school board did not dictate classroom curriculum but actively removed books from the school library. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 862 (1982) ("Respondents do not seek in this Court to impose limitations upon their school Board's discretion to prescribe the curricula of the Island Trees schools. On the contrary, the only books at issue in this case are library books, books that by their nature are optional rather than required reading."). In fact, the Supreme Court has elsewhere indicated that a State has the "undoubted right to prescribe the curriculum for its public schools." *Epperson v. Arkansas*, 393 U.S. 97, 107 (1968).

The oft-quoted maxim that students do not "shed their constitutional rights to freedom of speech at the schoolhouse gate" is correct so far as it goes. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). That pithy quote protects freedom of speech when the speaker is the student. It does not, however, extend to the novel theory purported here—that a student has the constitutional right to receive instruction on any subject so desired. For any court to hold so would create an untenable and unworkable standard—no educational standards could be set because states could never tell schools what they should and should not teach. If each and every student has a constitutional right to shape the school's curriculum, the whims of teenagers would transform public instruction.

The secondary school teacher Plaintiffs, meanwhile, claim HB 1775 intrudes upon a First Amendment right to academic freedom; however, "caselaw does not support [the]

14

position that a secondary school teacher has a constitutional right to academic freedom." *Miles*, 944 F.2d at 779 (*citing Pico*, 457 U.S. at 920 (Rehnquist, J., dissenting)) (state as an educator is subject to fewer strictures when regulating speech in primary and secondary schools than a university); *see also Epperson v. Arkansas*, 393 U.S. 97, 107 (1968) ("The State's undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit [such prescriptions based upon religious grounds]"). The First Amendment does not grant a teacher constitutional protection to determine the classroom curriculum. *See Edwards v. Cal. Univ. of Penn.,* 156 F.3d 488, 491 (3rd Cir. 1998); *Kirkland v. Northside Indep. Sch. Dist.,*890 F.2d 794, 795 (5th Cir. 1989); *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005) ("[S]tates enjoy broad discretionary powers in the field of public education. Central among these discretionary powers is the authority to establish public school curricula . . ."). This is especially true when the teacher attempts to contravene a school policy. *See Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1176 (3rd Cir. 1990). Teachers do not have a constitutional right to be free from following a curriculum. *See Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991).

Even if this Court were to delve into assessing the pedagogical concerns behind HB 1775, "such as the emotional maturity of the audience and the sensitivity of the topic", these concerns "focus on who is listening, rather than who is speaking." *Fleming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 931 (10th Cir. 2002) (cleaned up). Moreover, "[t]he makeup of the curriculum . . . is by definition a legitimate pedagogical concern." *Boring v. Buncombe Cty. Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998). And regardless of what standard is applied, the choice to prohibit certain divisive concepts about race and sex from primary and secondary education curricula is undeniably related to pedagogical concerns, almost by definition. It simply cannot

15

be said, for example, that the state has no legitimate interest in ensuring that students are not taught that "one race or sex is inherently superior to another race or sex." Beyond just legitimate, there is a compelling state interest in stopping such invidious discrimination at its source. *Cf.* Ex. 1 and Ex. 2 (explaining how the teaching of certain racialized doctrines in "many instances" can violate the Constitution and civil rights laws). It is true that public school teachers do not lose all of their First Amendment protections when they accept employment. *See Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). For example, a teacher maintains the right to speak out on matters of public concern when speaking as a private citizen. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 568 (1968). But when teachers, as state employees, produce speech as a part of their official classroom duties, that speech is not protected by the First Amendment. *Garcetti*, 547 U.S. at 424.

With respect to the higher education Plaintiffs, it is true that university professors have a unique First Amendment right to academic freedom. *See Vanderhurst v. Colo. Mountain Coll. Dist.*, 208 F.3d 908, 913 (10th Cir. 2000). But, HB 1775 in no way impairs their academic freedom as alleged. Mot. at 16. Only Section 1(A)(1) of HB 1775 addresses higher education and that subsection prohibits two very specific actions: "mandatory gender or sexual diversity training or counseling" and "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex . . . ." These prohibitions do not reach into the traditional university classroom—far from it. *See, e.g.*, Doc. 51 at 10-11 ("The law simply makes certain training optional rather than mandatory."). These are prohibitions on the types of mandatory training, counseling, orientation, or similar "requirements" for students enrolled in an institution of higher learning.

Again, Plaintiffs point to no authority that demands an institution offer any specific type of instruction. Nothing in HB 1775 precludes a university professor from research, scholarship, or publication on any of the topics proscribed as mandatory. Quite the opposite. Students wishing to explore these topics will turn to these professors or select their classes in order to receive the instruction they desire instead of having those topics forced on them through mandatory "training," "counseling," or "orientation."

Finally, if individual students, teachers, and professors lack a constitutional right to enjoin HB 1775, it is impossible for any civil rights organization to identify a member whose rights they can vindicate. *See Hunt v. Wash. Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Moreover, nothing in HB 1775 precludes any organization from speaking on these topics or even offering instruction on a voluntary (or even a fee for service) basis. Accordingly, none of the Plaintiffs advance a First Amendment claim that is likely to succeed on the merits.

### B.  HB 1775 is not facially vague

To maintain a facial challenge for vagueness, Plaintiffs "must show that the potential chilling effect on protected expression is both real and substantial. *Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005). Isolating single words or cherry picking and deliberately truncating phrases cannot transform an otherwise clear statute into an unconstitutionally vague one. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also Boys Markets, Inc. v. Retail Clerks Union, Loc. 770*, 398 U.S. 235, 250 (1970) ("Statutory interpretation requires more than concentration upon isolated words"); *Payless Shoesource, Inc. v. Travelers Cos., Inc.*, 585 F.3d 1366,

1374 (10th Cir. 2009) ("we derive meaning not just from abstract words in isolation, but from their context and from the document as a whole").

Plaintiffs' motion challenges as vague isolated words or phrases—"required", "part of a course", "bear responsibility", "any individual", "discomfort", "align", "diversity,"—without attempting to define them or interpret them in their broader context. That is not how statutory interpretation works, and Plaintiffs' failure to put in the linguistic legwork alone should defeat their attempt at a preliminary injunction, given the high burdens they face in this context. In any event, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("[W]e can never expect mathematical certainty from our language.").

Perhaps most prominently, Plaintiffs claim that it is somehow ambiguous to say that schools and teachers cannot "require or make part of a course" the eight specific racist and sexist concepts found in HB 1775. They claim confusion, for example, about whether teachers would be permitted to expose students to such concepts in order to denounce them. But denouncing something is not the same thing as requiring it or positively making it a part of a course—it is very nearly the opposite. *See, e.g.*, Webster's Third New Int'l Dictionary (1993) (defining "require," among other things, as "to call for as suitable or appropriate in a particular case" and "to demand as necessary or essential"). Thus, read accurately and as a whole, the law does not in any way ban refutation of these concepts, or even the mention of these concepts. *See* Ex. 3 ¶ 9 ("As an educator, I do not find HB 1775 ambiguous or vague, or broad."); Ex. 4 ¶ 6 ("HB 1775 … is narrowly constructed"); Ex. 6 ¶ 6 ("If you can't teach a

history class without labeling kids in the narrow ways that are barred by HB 1775, you're probably in the wrong profession."). If anything, the law would appear to encourage the opposite. By barring teachers from requiring these racist and sexist concepts, in other words, the law does much to encourage teachers to refute them and denounce them in class.

As to the eight concepts themselves, Plaintiffs do not appear in their brief to challenge the ambiguity or vagueness of Subsections (b), (c), (e), or (h). Thus, those provisions should be upheld without question. Plaintiffs do challenge Subsections (a) and (f), in passing, but those challenges are difficult to take seriously. Subsection (a) simply states that schools cannot teach that "one race or sex is inherently superior to another race or sex"—which is about as straightforward as the English language gets. Plaintiffs' claim that this somehow "bans discussions of Nazi rhetoric that portrayed 'Aryans' as an inherently superior race" and other similar discussions, Mot. at 15, is flatly incorrect, as pointing out what despicable beliefs were taught in the past in no way requires one to require or endorse those views in the present. Subsection (f) is similarly straightforward, barring the teaching that an individual "bears responsibility for actions committed in the past by other members of the same race or sex." Plaintiffs' claim that "bears responsibility" is vague is fatuous, Mot. at 14, and their ensuing discussion comes awfully close to indicating that Plaintiffs *do* want to teach this concept in some manner. In any event, Plaintiffs' concerns about teaching about reparations and a wealth gap are unfounded—those ideas are nowhere mentioned or banned in HB 1775.

Plaintiffs spend most of their time on Subsections (d) and (g). Subsection (d) prohibits the concept that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." This is not "incomprehensible on its face" or "indecipherable."

19

Mot. at 2, 13. Rather, it prohibits teaching students to reject the ideal of colorblindness. Martin Luther King Jr., and others, taught that we should be colorblind, and treat people with respect to their character and not with respect to of their color of skin. *See also Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting) (arguing that the Constitution "is color-blind, and neither knows nor tolerates classes among citizens"). Recently, however, this laudable ideal has become frowned upon in the teachings discussed above. *See supra* p.4; *see also* Ex. 4 ¶ 5. The Oklahoma Legislature addressed that trend here, by requiring that students should not be taught that "treat[ing] others without respect to race or sex" is impossible or undesirable. That is not complicated or confusing.  In support of their vagueness challenge to this specific provision, Plaintiffs cite to one district's guidelines saying "no one truly knows what this means or can come to agreement on its meaning," Mot. at 13, while neglecting to mention that these same guidelines indicate that the rest of the eight provisions are plain and understandable. In any event, surely a provision cannot be found unconstitutionally vague simply because of the opinion of a single school district in a state with over 500 school districts. Plaintiffs must actually interact with the text and context, and they have not done so.

To the extent there is any ambiguity, subsection B of HB 1775 contains a narrowing construction: "The provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." Contrary to Plaintiffs' claim, Mot. 14-15, this does not create vagueness but instead helps answer any questions regarding how the rest of the statute is to be interpreted. Thus, for example, the Academic Standards for History encourage the teaching of the Indian Removal, examining "multiple points of view regarding the evolution of race relations in Oklahoma," Jim Crow, the KKK, Black Wall Street, the Tulsa

20

Race Riot, "the progress of race relations," Clara Luper, and "the contributions of major cultural and ethnic groups … to the State of Oklahoma." Okla. State Dep't of Educ., *Oklahoma Academic Standards: Social Studies*, 43-47 (2021).[8] Thus, Plaintiffs' hand-wringing notwithstanding, HB 1775 is clear that the mere teaching of any of these topics do not violate its proscriptions.

Finally, Plaintiffs complaint that Subsection (g) is ambiguous—that subsection barring the teaching that "any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex." In attacking this provision, however, Plaintiffs entirely ignore the key term: "should."  That is, Plaintiffs protest that it "is impossible for teachers to accurately predict how" an individual will react to a given topic, "much less guarantee that lessons" will cause them discomfort.  Mot. 14. But that is beside the point.  The provision doesn't prohibit teaching lessons that might *cause* discomfort or psychological distress—it prohibits teaching that a student "should" feel discomfort or psychological distress "on account of his or her race or sex." That is it. In other words, it condemns telling students they *should* feel guilty for being of a certain race. There is an enormous gap between teaching, say, that slavery was an evil perpetrated mostly by white people (permissible) and saying that a young child who is white "should" feel distressed about slavery solely because she is white. Such basic distinctions are not difficult or confusing.

---

[8]https://sde.ok.gov/sites/default/files/documents/files/Oklahoma%20Academic%20Standards%20for%20Social%20Studies%208.26.19.pdf

In regard to the university prohibition, although plaintiffs complain that "gender or sexual diversity" is not a commonly used phrase, a simple internet search of the explicit phrase reveals more than 23,000 results. The top ones spanning LGBTQ advocacy groups, the Department of Education of South America, Statistics Canada (the government's central statistics office), Counseling services in the United Kingdom, and National Institutes of Health research publications. Searching for "gender diversity" and "sexual diversity" separately yields millions more.

Plaintiffs' vagueness challenge must also fail from an enforcement point of view. Under the current promulgated rules, the State Department of Education has stated that revocation of a license shall only proceed if the employee is found in "willful violation." Okla. Admin Code 210:10-1-23(j). Therefore, Plaintiffs' false specter of professional ruin is quashed through this scienter requirement. Teachers cannot be chilled from instructing students on concepts unless they know those concepts are prohibited. This means that even if HB 1775 is arguably ambiguous, in any way, to suffer a concrete and particularized harm—or even a chilling effect—offenders would have to willfully violate what they already understand as a prohibition. Somewhat paradoxical to Plaintiffs' argument, the statute must be clear enough for someone to violate in order to be disciplined for violating it. The presence of willful violation requirement mitigates any chilling effect from unexpected or arbitrary enforcement.

## C.    HB 1775 is not unconstitutionally overbroad

Plaintiffs have not met their initial burden to show that "from the text of the law and from actual fact that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up); *N.Y. State Club Assn., Inc. v. City of N.Y.*, 487 U.S. 1, 14 (1988). The doctrine of

overbreadth has a slightly different standard when applied to First Amendment challenges. *Hicks*, 539 U.S. at 118 ("The First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges."); *See Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984). Specifically, the overbreadth doctrine is "strong medicine, and courts employ it with hesitation, and then, only as a last resort." *Faustin*, 423 F.3d at 1199 (cleaned up). Egg-shell teachers and professors cannot enjoin a statute out of fear alone. Moreover, to prevail a plaintiff must demonstrate *substantial* overbreadth. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *Faustin*, 423 F.3d at 1199. Plaintiffs pontificate that educators can no longer teach the history of slavery, Jim Crow, or the musical "Oklahoma!" Nothing in the text of the law says this—and indeed almost all of these are explicitly encourage by the Academic Standards and therefore explicitly permitted by HB 1775. *See supra* n.10; *see also Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute.").

Plaintiffs do not explain, let alone demonstrate a likelihood of success on the merits, why HB 1775 chills a professor's speech from "directly addressing race, gender and sexual orientation," a quoted phrase that does not appear in statute. Again, only mandatory orientation and the like are prohibited at institutions of higher learning. *See* University Regent's Motion to Dismiss at 9) ("it is obvious that Section (1)(A)(1) applies to trainings and orientations, not to classroom study or academic research"). Without a reasonable fear of enforcement, a university-affiliated Plaintiff's facial challenge would lack an immediate threat,

absent conjecture, that could satisfy standing requirements. Professor Plaintiffs are not precluded by HB 1775 from teaching anything.

When facial challenges are "wide-ranging, conclusory, and unfocused," a district court is permitted to deny a preliminary injunction. *Harmon*, 981 F.3d at 1150 (plaintiffs facial challenges were "not yet adequately teed up for the court's resolution"). "Because facial challenges push the judiciary towards the edge of its traditional purview and expertise, courts must be vigilant in applying a most exacting analysis to such claims." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005)

## II.     Balance of Equities

Plaintiffs claim a risk of irreparable harm based on its federal constitutional claims, Mot. at 23, but as explained above, those claims are unlikely to succeed. Even if Plaintiffs' novel claims had merit as a matter of public policy, "[t]he supervision of instruction in the public schools shall be vested in a Board of Education, whose powers and duties shall be prescribed by law," OKLA. CONST. art XIII, § 5, and the Legislature has spoken. Plaintiffs give no explanation as to why students will not learn about Black women or read books by Black or women authors simply because HB 1775 is in effect. For one thing, HB 1775 does not prohibit these topics or authors. For another, there is nothing preventing these students from proactively engaging their curiosity and accessing these materials at the school's library.

Addressing the merged third and fourth preliminary injunction factors, *Nken*, 556 U.S. at 435-36, a facial injunction of Oklahoma's amendments to its public education laws threaten the public welfare because it deprives Oklahomans and their children from a public education crafted out of the state's democratic process and policy judgments. It is axiomatic that "[a]ny

24

time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Robert, C.J., in chambers). The status quo remains that HB 1775 is the law of the state and it is affecting the current school curricula. *See* Mot. at 23. And even if HB 1775 is enjoined, schools and teachers may choose to not inflict Plaintiffs' preferred racial theories on students. Plaintiffs do not, and rightfully so, request a mandamus order defining the education curriculum for every grade in every school across the state. Therefore, the relief sought will not alleviate the harms alleged and a preliminary injunction is inappropriate.

## CONCLUSION

Justice John Marshall Harlan famously dissented in *Plessy v. Ferguson*, declaring what the full U.S. Supreme Court would in time come to recognize: that the federal Constitution "is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law." 163 U.S. at 559. Such a color-blind Constitution in no way bars the State of Oklahoma from insuring, in a narrow and circumspect manner, that schoolchildren are not taught to embrace racist and sexist stereotypes.

Plaintiffs, in sum, fail to demonstrate that they have a First Amendment right to demand a particular curriculum, nor that the law is unconstitutionally vague. Additionally, Plaintiffs have not shown that a preliminary injunction will prevent any harm let alone irreparable harm. For those threshold reasons, and with the balance of equities tilting toward Defendants, a preliminary injunction should not issue. The motion should be denied.

Respectfully submitted,

*s/ Andy N. Ferguson*

ZACH WEST
ANDY N. FERGUSON
  *Assistant Solicitors General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct: (405) 521-3921
andy.ferguson@oag.ok.gov

  *Counsel for Defendants John M. O'Connor; Joy Hofmeister; members of the Oklahoma State Board of Education; Kevin Stitt; & the Oklahoma State Regents for Higher Education*

26