# Exhibit 1



STATE OF ARKANSAS
ATTORNEY GENERAL
LESLIE RUTLEDGE

Opinion No. 2021-042

August 16, 2021

The Honorable Mark Lowery
State Representative
229 Summit Valley Circle
Maumelle, AR  72113-5934

Dear Representative Lowery:

This letter is in response to your request for an opinion regarding the legality of introducing critical race theory and professed "antiracism" in Arkansas public schools and universities. In this regard, you have asked the following question:

> Does the introduction of practices based on "antiracism" and critical race theory in Arkansas public schools and universities violate Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment, Article II of the Arkansas Constitution, or other applicable nondiscrimination laws?

**RESPONSE**

The answer to your question is yes. With certain qualifications set forth below, instituting practices based on critical race theory, professed "antiracism," or associated ideas can violate Title VI, the Equal Protection Clause, and Article II of the Arkansas Constitution.

**DISCUSSION**

*Question 1: Does the introduction of practices based on "antiracism" and critical race theory in Arkansas public schools and universities violate Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment, Article II of the Arkansas Constitution, or other applicable nondiscrimination laws?*

323 CENTER STREET, SUITE 200 · LITTLE ROCK, ARKANSAS 72201
TELEPHONE (501) 682-2007 · FAX (501) 682-8084
ARKANSASAG.GOV

The Honorable Mark Lowery
State Representative
Opinion No. 2021-042
Page 2

### a. Critical Race Theory, "Antiracism," and Associated Ideas

Critical race theory emerged at the end of the twentieth century as a radical approach to the study of law with a focus on racial inequalities and a conviction that racist oppression is inherent to American society.[1] In a formative article, the intellectual father of critical race theory, Derrick A. Bell, Jr., contended that racism is so engrained in the institutions (social, political, and legal) of our Nation that even the civil-rights triumph of *Brown v. Board of Education* was a mere consequence of a temporary convergence of elite whites' material self-interest with the interests of blacks.[2] According to contemporary advocates, "critical race theory questions the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and neutral principles of constitutional law."[3] Thus, critical race theorists typically reject the civil-rights movement's ideal of a "colorblind" society, contending that "[o]nly aggressive, color-conscious efforts" can effectively address what they conceive as American society's endemic racist oppression.[4]

In 1991, Kimberlé Crenshaw introduced the idea of intersectionality,[5] which theorizes that a full account must be taken of the converging categories (race, sex, class, etc.) to which one belongs in order to adequately understand how a person experiences privilege or oppression.[6] In succeeding decades, others have advocated ideas that draw inspiration from Bell, Crenshaw, and other critical race theorists. This includes Ibram X. Kendi's professed "antiracism," which rejects the very possibility of race-neutral policies and expressly maintains that the only remedy to past and present racial discrimination is present and future racial discrimination.[7] The U.S. Department of Education approvingly cited Kendi in a recent proposed

---

[1] Critical race theory is not a stable, monolithic movement, and everything to which that label is applied cannot be captured in this opinion.

[2] Derrick A. Bell, Jr., *Brown v. Board of Education and the Interest-Convergence Dilemma*, 93 Harv. L. Rev. 518, 523 (1980).

[3] Richard Delgado and Jean Stefancic, *Critical Race Theory: An Introduction* 3 (3d. ed. 2017).

[4] *Id.* at 27.

[5] Kimberlé Crenshaw, *Mapping the Margins: Intersectionality, Identity Politics, and Violence against Women of Color*, 43 Stan. L. Rev. 1241 (1991).

[6] Delgado and Stefancic, *supra*, at 58.

[7] Ibram X. Kendi, *How to Be an Antiracist* (2019).

rule that establishes priorities for grants in American History and Civics Education.[8] The proposed rule also cited the much-criticized New York Times' 1619 Project[9] and the controversial resources of the Smithsonian's National Museum of African American History.[10] The Museum's resources explain, in part, that "[b]eing an antiracist is much different from just being 'nonracist.'"[11] That is, "antiracism" requires affirmative adherence to certain tenets depending on one's "racial identity" as "white" or a "[person] of color":

> Being antiracist is different for white people than it is for people of color. For white people, being antiracist evolves with their racial identity development. They must acknowledge and understand their privilege, work to change their internalized racism, and interrupt racism when they see it. For people of color, it means recognizing

---

[8] Proposed Priorities—American History and Civics Education, 86 Fed. Reg. 20348, 20349 (April 19, 2021). The Department of Education subsequently issued a statement that the established priorities are merely "invitational" and that applicants "gain no competitive advantage in the grant competition for addressing" them. Miguel Cardona, *American History and Civics in Our Schools*, Homeroom: The Official Blog of the U.S. Dep't of Education (July 16, 2021), https://blog.ed.gov/2021/07/american-history-and-civics-in-our-schools/.

[9] 86 Fed. Reg. at 20349. Among other criticisms of the 1619 Project, see Victoria Bynum, et al., Letter to the Editor re: The 1619 Project, in *We Respond to the Historians Who Critiqued the 1619 Project*, New York Times (updated Jan. 19, 2021), https://www.nytimes.com/2019/12/20/magazine/we-respond-to-the-historians-who-critiqued-the-1619-project.html. *See also* Peter W. Wood, *1620: A Critical Response to the 1619 Project* (2020); Phillip W. Magness, *The 1619 Project: A Critique* (2020).

[10] 86 Fed. Reg. at 20349. In 2020, the National Museum of African American History published guidelines that included a graphic for "talking about race" that described "[t]he nuclear family," "[o]bjective, rational linear thinking," "hard work is the key to success," and "delayed gratification" (among others) as "white values." After controversy understandably erupted, the graphic was removed from the Museum's website, but it remains archived online. *See Some Aspects and Assumptions of White Culture in the United States*, Internet Archive (June 1, 2020), https://web.archive.org/web/20200601153458/https://nmaahc.si.edu/learn/talking-about-race/topics/whiteness. The guidelines, which discuss "whiteness," "white privilege," "white fragility," and other topics, remain on the Museum's website. *See Whiteness*, Smithsonian Nat'l Museum of African Amer. Hist. & Culture, https://nmaahc.si.edu/learn/talking-about-race/topics/whiteness.

[11] Anneliese A. Singh, *Racial Healing Handbook: Practical Activities to Help You Challenge Privilege, Confront Systemic Racism, and Engage in Collective Healing*, https://nmaahc.si.edu/sites/default/files/downloads/resources/racialhealinghandbook_p87to94.pdf (reprinted excerpt).

how race and racism have been internalized, and whether it has been applied to other people of color.[12]

Advocates assert that, "[t]oday, many scholars in the field of education consider themselves critical race theorists who use CRT's ideas to understand issues of school discipline and hierarchy, tracking, affirmative action, high-stakes testing, controversies over curriculum and history, bilingual and multicultural education, and alternative and charter schools."[13]

### b. Title VI of the Civil Rights Act of 1964

Title VI of the Civil Rights Act of 1964[14] and its implementing regulations[15] protect students who are enrolled in institutions receiving federal funding—including Arkansas public schools and universities—from discrimination based on race.[16] Accordingly, these educational institutions may not use race as a basis to:

- deny a benefit;
- provide a different benefit, or provide a benefit in a different manner;
- subject one to segregation or separate treatment in relation to a benefit;
- restrict the enjoyment of a benefit;
- treat one differently in determining whether any requirement or condition for a benefit is met; or
- deny one an opportunity to participate, or afford one an opportunity to participate that is different.[17]

---

[12] *Being Antiracist*, Smithsonian Nat'l Museum of African Amer. Hist. & Culture, https://nmaahc.si.edu/learn/talking-about-race/topics/being-antiracist.

[13] Delgado and Stefancic, *supra*, at 7.

[14] 42 U.S.C. 2000d *et seq.*

[15] 34 C.F.R. 100.1 *et seq.*

[16] The term "race" is used herein to refer to all forms of discrimination prohibited by Title VI, including race, color, and national origin. *See* 42 U.S.C. 2000d.

[17] 34 C.F.R. 100.3(b)(1)(i)-(vii).

The Honorable Mark Lowery
State Representative
Opinion No. 2021-042
Page 5

Additionally, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."[18]

The Department of Education further recognizes that "[t]he type of environment that is tolerated or encouraged by or at school can ... send a particularly strong signal to, and serve as an influential lesson for, its students."[19] Therefore, since 1994, it has interpreted Title VI as prohibiting educational institutions from subjecting students to a racially hostile environment.[20] That includes any race-based harassment that is sufficiently severe, pervasive, or persistent as to interfere with one's participation in or benefit from services, activities, or privileges that an educational institution provides.[21] Such harassment "need not be targeted" at any particular person and "need not result in tangible injury or detriment to the victims" to create a racially hostile environment.[22]

### c. Federal and State Equal Protection Provisions

The Arkansas Constitution provides that "[t]he equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity; nor exempted from any burden or duty, on account of race, color or previous condition."[23] Further, it provides that "the State . . . shall adopt all suitable means to secure to the people the advantages and opportunities of education."[24] Applying constitutional provisions concerning equal treatment, the Arkansas Supreme Court has said that "[e]quality of educational opportunity must include ... substantially equal curricula ... for obtaining an

---

[18] *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003).

[19] Racial Incidents and Harassment against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11448, 11449 (March 10, 1994).

[20] *Id.*

[21] *Id.*

[22] *Id.* at 11449-50.

[23] Ark. Const. art. 2, § 3; *see id.* §§ 2, 18. Additionally, the Arkansas Civil Rights Act recognizes the "civil right" to "be free from discrimination because of race." Ark. Code Ann. § 16-123-107(a).

[24] Ark. Const. art. 14, § 1.

The Honorable Mark Lowery
State Representative
Opinion No. 2021-042
Page 6

adequate education."[25] The Arkansas Supreme Court has traditionally interpreted Arkansas's constitutional provisions bearing on equal protection consistently with federal courts' interpretation of the federal Equal Protection Clause.[26]

Associate Justice John Marshall Harlan famously dissented in *Plessy v. Ferguson*, declaring what the full Court would in time come to recognize: that the federal Constitution "is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law."[27] Indeed, section one of the Fourteenth Amendment provides in part that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." The "central purpose" of that provision "is to prevent the States from purposefully discriminating between individuals on the basis of race."[28] "Classifications of citizens solely on the basis of race ... threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility."[29] Therefore, any State action that distinguishes based on race is "presumptively invalid,"[30] and "the Equal Protection Clause demands that [it] ... be subjected to the 'most rigid scrutiny.'"[31]

"[R]acial 'classifications are constitutional only if they are narrowly tailored to further compelling governmental interests.'"[32] The Supreme Court has recognized only two compelling interests that could justify racial distinctions in the school

---

[25] *Lake View Sch. Dist. No. 25 of Phillips Cty. v. Huckabee*, 351 Ark. 31, 79 (2004).

[26] *See Maiden v. State*, 2014 Ark. 294, at 17 (2014).

[27] *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting).

[28] *Shaw v. Reno*, 509 U.S. 630, 642 (1993).

[29] *Id.* at 643; *see Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 240 (1995) (Thomas, J., concurring in part and concurring in the judgment) ("Purchased at the price of immeasurable human suffering, the equal protection principle reflects our Nation's understanding that such classifications ultimately have a destructive impact on the individual and our society."); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in the judgment, and dissenting in part) ("It is a sordid business, this divvying us up by race.").

[30] *Shaw*, 509 U.S. at 643 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)).

[31] *Fisher v. Univ. of Texas*, 570 U.S. 297, 310 (2013) (quoting *Loving v. Virginia*, 388 U.S. 1, 11 (1967)).

[32] *Id.* (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)).

The Honorable Mark Lowery
State Representative
Opinion No. 2021-042
Page 7

context.[33] These include "remedying the effects of past intentional discrimination" and creating "student body diversity" in higher education.[34] Any State that undertook race-based remedial measures would bear the burden to both 1) show "a strong basis in evidence for its conclusion that remedial action was necessary,"[35] and 2) "tailor remedial relief to those who truly have suffered the effects of prior discrimination."[36] "Societal discrimination alone" cannot justify race-based remedial efforts.[37]

### d. Analysis

Any effort to take account of race in a way that differently accords benefits or opportunities or creates a hostile environment in an educational institution is almost certainly unlawful under the Equal Protection Clause and Title VI. This includes overt racial segregation or other discrimination, however well intended,[38] as well as any form of racial stereotyping or scapegoating.[39] A racially hostile environment could also be created through curricula, instruction, or other programs or activities that communicate the following ideas:[40]

---

[33] *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721-22 (2007).

[34] *Id.*

[35] *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 510 (1989) (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986)).

[36] *Id.* at 508.

[37] *Id.* at 505; *see id.* at 499 ("[A]n amorphous claim that there has been past discrimination in a particular industry cannot justify" present racial discrimination.).

[38] *See Parents Involved*, 551 U.S. at 743 (plurality) ("Simply because the school districts may seek a worthy goal does not mean they are free to discriminate on the basis of race to achieve it, or that their racial classifications should be subject to less exacting scrutiny."); *id.* at 748 (plurality) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.").

[39] *See* 58 Mont. Att'y Gen. Op. No. 1, at 19-21 (May 27, 2021) (discussing the unlawfulness of racial segregation, stereotyping, and scapegoating).

[40] *See* 59 Fed. Reg. at 11453 (citing *Gilbert v. City of Little Rock, Ark.*, 722 F.2d 1390, 1394 (8th Cir. 1983) (environment "which significantly and adversely affects the psychological well-being of an employee because of his or her race" violates Title VII)).

- that an individual, by virtue of race, deserves praise or criticism for taking or failing to take some action or stand, or for supporting, opposing, or failing to support or oppose some cause;

- that certain character traits or beliefs are proper to individuals of some races but not others;

- that an individual, simply by virtue of race, is oppressive or oppressed, privileged or victimized, whether consciously or unconsciously;

- that an individual, simply by virtue of race, should feel discomfort, resentment, guilt, or distress;

- that an individual's moral character, standing, status, or worth depends on one's race;

- that an individual is personally accountable for actions committed in the past by other individuals of the same race; or

- that an individual, simply by virtue of race, should be discriminated against or adversely treated.[41]

The existence of a racially hostile environment "must be determined from the totality of the circumstances."[42] In many instances, instituting pedagogical practices based on critical race theory, "antiracism," or associated ideas will violate the law.

But it is important to note that the unlawfulness of such practices does not preclude teaching the history of racial injustice or our Nation's longstanding and continuing efforts to realize what Dr. Martin Luther King, Jr. recognized as the dream expressed in our founding creed: We hold these truths to be self-evident, that all men are created equal.[43] Thus, the law does not prohibit teaching about the history of slavery, Jim Crow laws, the eugenics movement, and the Ku Klux Klan. Nor does it prohibit teaching about the Constitution and the abolition of the slave trade, the abolitionist movement, the Civil War, Abraham Lincoln and the Emancipation

---

[41] At least eight states have enacted legislation prohibiting training or instruction promoting these or related ideas, with 20 more states considering similar legislation. Rashawn Ray and Alexandria Gibbons, *Why are States Banning Critical Race Theory*, The Brookings Institution (July 2021), https://www.brookings.edu/blog/fixgov/2021/07/02/why-are-states-banning-critical-race-theory/.

[42] 59 Fed. Reg. at 11449.

[43] Dr. Martin Luther King, Jr., I Have A Dream (Aug. 28, 1963), transcript and audio available at *"I Have A Dream" Speech, In Its Entirety*, National Public Radio, https://www.npr.org/2010/01/18/122701268/i-have-a-dream-speech-in-its-entirety.

The Honorable Mark Lowery
State Representative
Opinion No. 2021-042
Page 9

Proclamation, the Civil War Amendments, and the civil-rights movement. These are indispensable topics for history and civics education.

Critical race theory and "antiracism," as recent developments, have very little to do with this history. That said, there may be some legitimate pedagogical uses of these ideas in the university setting. At a high level, for example, greater clarity might be gained by contrasting the civil-rights movement's grounding in the Founders' classically liberal vision of individual natural rights[44] with critical race theory's grounding in a broadly socialist vision of conflict based on group interest and identity.[45] Further, because a theory need not be accepted as an integrated whole, it is possible that critical race theory could generate discrete insights that may be useful for certain limited purposes.

The Supreme Court has recognized that "the classroom is peculiarly the 'marketplace of ideas,'" and "wide exposure to that robust exchange of ideas" is ideal.[46] Therefore, "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned."[47] At the same time, statements that public employees make pursuant to their official duties are not protected by the First Amendment.[48] And although the First Amendment protects the right "to receive information and ideas,"[49] that right is restricted in the case of children.[50]

Consequently, although the First Amendment protects individual expression, it does not immunize a person or educational institution from violating others' rights under Title VI, the Equal Protection Clause, or the Arkansas Constitution by engaging in prohibited race-based practices. For these reasons, and with the qualifications set forth above, instituting practices based on critical race theory, professed

---

[44] *See, e.g.*, Dr. Martin Luther King, Jr., Letter From Birmingham Jail (reprint by the Martin Luther King, Jr. Anniversary Committee, licensed by the King Center).

[45] *See generally* Delgado and Stefancic, *supra*.

[46] *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (1945)).

[47] *Id.*

[48] *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

[49] *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

[50] *See, e.g., Ginsberg v. State of N.Y.*, 390 U.S. 629, 645 (1968).

The Honorable Mark Lowery
State Representative
Opinion No. 2021-042
Page 10

"antiracism," or associated ideas can violate Title VI, the Equal Protection Clause, and Article II of the Arkansas Constitution.

Sincerely,

LESLIE RUTLEDGE
Attorney General