# Exhibit 2



**AUSTIN KNUDSEN**                    STATE OF MONTANA

**VOLUME NO. 58**                                          **OPINION NO. 1**

May 27, 2021

Hon. Elsie Arntzen
Superintendent of Public Instruction
Office of Public Instruction
P.O. Box 202501
Helena, MT 59620

**HELD**: In many instances, the use of "Critical Race Theory" and "antiracism" programming discriminates on the basis of race, color, or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, Article II, Section 4 of the Montana Constitution, and the Montana Human Rights Act.

Dear Superintendent Arntzen:

You have requested an Attorney General Opinion on a question I have restated as follows:

> Whether the teaching of Critical Race Theory or so-called "antiracism" in Montana schools violates the U.S. Constitution, Title VI of the Civil Rights Act of 1964, Article II, Section 4 of the Montana Constitution, or the Montana Human Rights Act.

I have determined that this matter is appropriate for a legal opinion and I am pleased to respond. *See* MONT. CODE ANN. 2-15-501(7).

## INTRODUCTION

Before addressing the specifics of your question, I want to note the importance of this topic to my role as Attorney General. The events of the past year have generated enormous debate and discussion about the foundations of our country, our national character, and the legacy of our mistakes.

The United States is an exceptional nation founded on exceptional principles. Beyond a simple political revolt, the Founders waged an ideological revolution—one that ushered in a new epoch and reordered American society around timeless truths.

DEPARTMENT OF JUSTICE

215 North Sanders          (406) 444-2026
PO Box 201401          Contactdoj@mt.gov
Helena, MT 59620-1401          mtdoj.gov

Montana Attorney General's Opinion
Vol. 58, Op. 1
May 27, 2021

Those truths found voice in the Declaration of Independence, when the Founders proclaimed that "all men are created equal" and "that they are endowed by their Creator with certain unalienable rights." That generation constructed our great Constitution around those same principles. Indeed, the Framers considered the Declaration's assertion of human equality to be *the* self-evident truth—the absolute truth—upon which our republican form of government necessarily hinges. Hadley Arkes, First Things: An Inquiry Into the First Principles of Morals and Justice 29 (1986) (quoting Speech of J. Madison (Jun. 8, 1789)). Government by consent "emerged because it is the only arrangement compatible with the premise of natural equality." *Id.* at 42. The Declaration therefore infused into our national character and institutions a timeless truth rooted in nature—that all humans are created equal.

We are, however, an imperfect nation and have struggled from the beginning to live up to our ideals. In his famous *I Have a Dream* speech, Martin Luther King, Jr. declared that when the "architects of our great republic wrote the magnificent words of the Constitution and the Declaration of Independence, they were signing a promissory note to which every American was to fall heir." It is our duty, as elected officials and citizens, to move ever closer to those fundamental principles. Only by steadfastly adhering to that commitment will future generations continue to enjoy the blessings of liberty. For me, the principles undergirding the Constitution are non-negotiable. And it is in that spirit and under that duty that I provide this opinion. As Justice Antonin Scalia wrote, "[i]n the eyes of government, we are just one race here. It is American." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring).

## A. The Constitution of the United States

Justice John Marshall Harlan—known as the "Great Dissenter"—famously proclaimed, "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). Because "[t]he law regards man as man," he asserted, it must "take[] no account of his surroundings or of his color." *Id.* It would take almost another 60 years, but Justice Harlan's lone pronouncement would eventually become the rule ending segregation in *Brown v. Board of Education*, 347 U.S. 483 (1954).

The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.[1] The "central purpose" of the Equal Protection Clause "is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). "Purchased at the price of

---

[1] The Equal Protection Clause of the Fourteenth Amendment has been incorporated against the Federal government through the Fifth Amendment's Due Process Clause. *See Adarand*, 515 U.S. at 215.

immeasurable human suffering, the equal protection principle reflects our Nation's understanding that [racial] classifications ultimately have a destructive impact on the individual and our society." *Adarand*, 515 U.S. at 240 (Thomas, J., concurring). As a result, the Supreme Court's jurisprudence recognizes that "[c]lassifications of citizens solely on the basis of race 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Shaw*, 509 U.S. at 643 (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)); *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 518 (1989) (Kennedy, J., concurring) ("The moral imperative of racial neutrality is the driving force of the Equal Protection Clause."). Therefore, "the Equal Protection Clause demands that racial classifications … be subjected to the 'most rigid scrutiny.'" *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (*Fisher I*) (quoting *Loving v. Virginia*, 388 U.S. 1, 11 (1967)).

The Supreme Court has permitted the use of race in very narrow circumstances. Because "[r]acial and ethnic distinctions of any sort are inherently suspect," they "call for the most exacting judicial examination." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291 (1978) (opinion of Powell, J.); *Croson*, 488 U.S. at 493 (the use of race is "highly suspect"). Any classification based on race is, therefore, presumptively invalid. *See Shaw*, 509 U.S. at 643-44 (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979)); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). Whether imposed by federal, state, or local governments, the use of race must survive "strict scrutiny." *Adarand*, 515 U.S. at 227. The consideration of race only survives strict scrutiny if it is narrowly tailored to further a compelling governmental interest that has been recognized by the U.S. Supreme Court. *See Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2208 (2016) (*Fisher II*). And the Supreme Court has recognized only two such compelling interests. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720, 722 (2007) (majority opinion) (noting that in evaluating the use of racial classifications the Court has recognized two interests that qualify as compelling: "remedying the effects of past intentional discrimination" and "diversity in higher education").

The Supreme Court has permitted entities to employ remedial measures to rectify the effects of identified discrimination within their jurisdiction. Any program using race, however, must "tailor remedial relief to those who truly have suffered the effects of prior discrimination." *Croson,* 488 U.S. at 508. The government must show "a strong basis in evidence for [a] conclusion that remedial action [is] necessary." *Id.* at 510 (quoting *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277 (1986)); *see also id.* at 499 ("amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota"). Importantly, the Supreme Court has rejected "societal discrimination" as a legitimate basis for race-conscious classifications. *Croson*, 488 U.S. at 505 (citing *Bakke,* 438 U.S. at 296-97).

3

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

The Supreme Court has also decided that—for the time being[2]—student body diversity is a compelling interest that can justify the use of race in higher-education admissions. *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003).[3] Schools still bear the "ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher I*, 570 U.S. at 312. Still, the "entire gist of the analysis in *Grutter* was that the admissions program … focused on each applicant as an *individual*, and not simply as a member of a particular racial group" and "only as part of a 'highly individualized, holistic review.'" *Parents Involved*, 551 U.S. at 722-23 (emphasis added) (quoting *Grutter*, 539 U.S. at 337). *Grutter* was importantly limited to higher education and only as one factor to be used in attainment of a diverse student body. *See* 539 U.S. at 329-30.[4]

## B. TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

Title VI of the 1964 Civil Rights Act protects all students who attend institutions receiving federal funding from being treated differently based on their actual or perceived race, color, or national origin. 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). Title VI bans all discrimination that would violate the Equal Protection Clause. *See Gratz*, 539 U.S. at 276 n.23. The Office of Public Instruction (OPI), all Montana school districts, and the Montana University System are all "recipients" of federal financial assistance.[5] Recipients must provide, as a condition to approval and extension of any Federal financial assistance, an assurance that the program will be conducted in compliance with all requirements imposed by Title VI. *See* 34 C.F.R. § 100.4(a).

The Title VI implementing regulations, codified at 34 C.F.R. Part 100, provide that a recipient "may not, directly or through contractual or other arrangements, on ground of race, color, or national origin":

---

[2] The *Grutter* Court, 18 years ago, recognized that the legal justification for the use of race in admissions would dissipate with time. *See* 539 U.S. at 343 ("We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today.").

[3] The Court found it significant that "[t]he attainment of a diverse student body, by contrast, serves values beyond race alone, including enhanced classroom dialogue and the lessening of racial isolation and stereotypes." *Fisher I*, 570 U.S. at 308.

[4] *But see Fisher II*, 136 S. Ct. at 2208 ("A university cannot impose a fixed quota or otherwise define diversity as some specified percentage of a particular group merely because of its race or ethnic origin.").

[5] Federal assistance to education includes direct grants to State Education Agencies (SEAs), Local Education Agencies (LEAs), universities, and students, and a variety of student loans and loan guarantees. Private colleges and universities accepting federal student loans are also indirect recipients of Federal funding. *See Grove City Coll. v. Bell*, 465 U.S. 555 (1984).

- "Deny an individual any service, financial aid, or other benefit provided under the program" 34 C.F.R. § 100.3(b)(1)(i).
- "Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program" 34 C.F.R. § 100.3(b)(1)(ii).
- "Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program" 34 C.F.R. § 100.3(b)(1)(iii).
- "Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program" 34 C.F.R. § 100.3(b)(1)(iv).
- "Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership or other requirement or condition which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program" 34 C.F.R. § 100.3(b)(1)(v).
- "Deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program …." 34 C.F.R. § 100.3(b)(1)(vi).

Title VI addresses a number of discriminatory actions, including harassment. Racial and national origin harassment is defined as unwelcome conduct based on a student's actual or perceived race or national origin. *See Racial Incidents and Harassment Against Students: Investigative Guidance*, 59 Fed. Reg. 11448, 11452 (Mar. 10, 1994). Harassers can be students, school staff, or even a visitor to the school, such as a guest speaker, employee of another school, or a parent. *Id.* at 11449. Racial and national origin harassment can take many forms, including slurs, taunts, stereotypes, or name-calling, as well as racially motivated physical threats, attacks, or other hateful conduct.

Title VI is violated if a school fails to respond to racial harassment so severe, pervasive, or persistent, that it constitutes a hostile or abusive educational environment. *See* 59 Fed. Reg. at 11452; *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986) (setting a similar standard for sexual harassment under Title IX) (relying on *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971) (race discrimination can consist of an "environment heavily charged with ethnic or racial discrimination"), *cert. denied*, 406 U.S. 957 (1972); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) (reiterating *Meritor* standard); *see also Gray v. Greyhound Lines, East*, 545 F.2d 169, 176 (D.C. Cir. 1976) (noting with approval that EEOC has consistently held that Title VII gives employees the right to a working environment free of racial intimidation). If the harassment would have adversely affected the enjoyment of some aspect of the recipient's

educational program by a reasonable person of the same age and race as the victim under similar circumstances, then it created a hostile environment.  59 Fed. Reg. at 11449.  Whether conduct constitutes a hostile environment must be determined from the totality of the circumstances.  *See id*. at 11452 (citing *Harris*, 510 U.S. at 23).

Although Title VI's hostile environment framework draws many of its principles from Title VII of the Civil Rights Act, it should be noted that there are differences between the education and workplace contexts.[6]  When evaluating the severity of racial harassment, for example, the law must account for the unique setting and mission of an educational institution.  *See id*. at 11449.  This is because an educational institution has a duty to provide a nondiscriminatory environment that is conducive to learning.  *Id*.  The type of environment that is tolerated or encouraged by or at a school can therefore send a particularly strong signal to, and serve as an influential lesson for, its students.  *Id*.  Younger, less mature children are generally more impressionable than older students or adults.  *Id*.  "Particularly for young children in their formative years of development, therefore, severe, pervasive or persistent harassment must be understood in light of the age and impressionability of the students involved and with the special nature and purposes of the educational setting in mind."  *Id*.

A school unlawfully discriminates on the basis of race if it has effectively caused, encouraged, accepted, tolerated or failed to correct a racially hostile environment.  *Id*.  Notably, racial acts need not be targeted at any particular individual in order to create a racially hostile environment.  *Id*.; *see also Walker v. Ford Motor Co.*, 684 F.2d 1355, 1358-59 (11th Cir. 1982) (hostile environment established where racial harassment made plaintiff "feel unwanted and uncomfortable in his surroundings," even though it was not directed at him).  The harassment also need not result in tangible physical injury or detriment to the victims of the harassment.  59 Fed. Reg. at 11450.

Title VI is enforced in several ways.  It is enforced by the U.S. Department of Education's Office for Civil Rights (OCR), which accepts complaints and investigates possible violations.  Because Title VI is a spending clause statute, a violating recipient of funds usually enters into an agreement with OCR to remedy the discrimination and avoid the loss of federal funding.  Title VI is also enforced by the U.S. Department of Justice Civil Rights Division.  Finally, Title VI contains a private right of action, which permits victims of discrimination to seek relief, including monetary damages, in court.  *Alexander v. Sandoval*, 532 U.S. 275 (2001) (citing *Cannon v. University of Chicago*, 441 U.S. 677 (1979)).

---

[6] Educational settings also have special First Amendment implications.  *See, e.g., Healy v. James*, 408 U.S. 169, 180-81 (1972).  Part E of this opinion, *infra*, discusses First Amendment concerns as applied to nondiscrimination laws in education.

## C. MONTANA LAW

Article II, § 4 of the Montana Constitution provides:

> No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.

MONT. CONST. art. II, § 4. Known as the Individual Dignity Clause, Article II, § 4 "guarantees equal protection of the law to all persons." *Snetsinger v. Mont. Univ. Sys.*, 104 P.3d 445, 449, 325 Mont. 148, 153 (2004). It "embod[ies] a fundamental principle of fairness: that the law must treat similarly-situated individuals in a similar manner." *McDermott v. Montana Dep't of Corr.*, 29 P.3d 992, 998, 305 Mont. 462, 470 (2001); *see also Oberg v. Billings,* 674 P.2d 494, 495, 207 Mont. 277, 280 (1983) (strict scrutiny applies to suspect classifications such as race, color, or national origin).

Montana's Individual Dignity Clause "provides even more individual protection than the Equal Protection Clause in the Fourteenth Amendment of the United States Constitution." *Snetsinger,* 104 P.3d at 449 (quoting *Cottrill v. Cottrill Sodding Serv.,* 744 P.2d 895, 897, 229 Mont. 40, 42 (1987) (contrasting language with categories protected by the Fourteenth Amendment)). Notably, the Clause prohibits even *private* actors from discriminating on the basis of race, color, culture, social origin, religion or political ideas. MONT. CONST. art. II, § 4. Montana courts thus "cannot and will not condone the consideration of race or national origin." *See In re Marriage of Olson*, 194 P.3d 619, 624, 344 Mont. 385, 391 (2008).

The Montana Human Rights Act (MHRA) prevents discrimination on the basis of race, color, or national origin and implements the Individual Dignity Clause. *See Dupuis v. Bd. of Trs.*, 128 P.3d 1010, 1013, 330 Mont. 232, 237 (2006); MONT. CODE. ANN. § 49-2-101, *et seq.* The MHRA forbids race discrimination in employment, *id.* § 49-2-101; public accommodations, *id.* § 49-2-304; and housing, *id.* § 49-2-305. The MHRA recognizes hostile work environment claims and closely mirrors federal caselaw. *See Snell v. Mont.-Dakota Utils. Co.*, 643 P.2d 841, 844 198 Mont. 56, 62 (1982) ("The Montana Human Rights Act … is closely modeled after Title VII, and reference to pertinent federal case law is both useful and appropriate."); *see also Johnson v. Bozeman Sch. Dist.*, 734 P.2d 209, 213, 226 Mont. 134, 140 (1987) (adopting the Title VII framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in MHRA employment claims).

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

Especially relevant here, the MHRA also prohibits discrimination in education. MONT. CODE. ANN. § 49-2-307. Educational institutions may not "exclude, expel, limit, or otherwise discriminate against an individual seeking admission as a student or an individual enrolled as a student in the terms, conditions, or privileges of the institution" because of race, color, or national origin. *Id.* § 49-2-307(1). They may not "print, publish, or cause to be printed or published a catalog or other notice or advertisement indicating a limitation, specification, or discrimination based on" the race, color, or national origin of an applicant for admission. *Id.* § 49-2-307(3). They also may not "announce or follow a policy of denial or limitation of educational opportunities of a group or its members, through a quota or otherwise, because of race, color … or national origin." *Id.* § 49-2-307(4).

Finally, the MHRA prevents the State or any of its political subdivisions from discriminating on the basis of race. *Id.* § 49-2-308(1). The state may not "refuse, withhold from, or deny to a person any local, state, or federal funds, services, goods, facilities, advantages, or privileges" because of race, color, or national origin "unless based on reasonable grounds." *Id.* § 49-2-308(1)(a). It also may not "publish, circulate, issue, display, post, or mail a written or printed communication, notice, or advertisement which states or implies that any local, state, or federal funds, services, goods, facilities, advantages, or privileges of the office or agency will be refused, withheld from, or denied to a person" on the basis of race, color, or national origin "or that the patronage of a person of a particular race … color … or national origin … is unwelcome or not desired or solicited, unless based on reasonable grounds." *Id.* § 49-2-308(1)(b).

## D. CRITICAL RACE THEORY AND "ANTIRACISM"

Critical Race Theory ("CRT") began as an academic movement "interested in studying and transforming the relationship among race, racism, and power."[7] Its proponents claim that "[i]t's an approach to grappling with a history of white supremacy[8] that rejects the belief that what's in the past is in the past, and that the laws and systems that grow from that past are detached from it."[9] CRT "has been used to

---

[7] RICHARD DELGADO & JEAN STEFANIC, CRITICAL RACE THEORY: AN INTRODUCTION 2 (2001).

[8] The term "white supremacy" has been broadened by CRT and Antiracism. *See, e.g., Robin DiAngelo on Educators' 'White Fragility'*, 76 EDUCATIONAL LEADERSHIP, no. 7, Apr. 2019 ("The term white supremacy certainly includes what we would think of as neo-Nazism or outright racism. But it is also a highly descriptive sociological term for the society we live in, in which all institutions—languages, norms, policies—reflect and affirm white people at the expense of others. It's the water we've been swimming in and we've all been shaped by it, consciously or not.").

[9] Cady Lang, *President Trump Has Attacked Critical Race Theory. Here's What to Know About the Intellectual Movement*, TIME MAGAZINE (Sept. 29, 2020) (quoting CRT co-founder Kimberlé Crenshaw). https://time.com/5891138/critical-race-theory-explained/. One of CRT's founders also coined the term "intersectionality." Katy Steinmetz, *She Coined the Term 'Intersectionality' Over 30 Years Ago. Here's*

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

examine how institutional racism manifests in instances like housing segregation, bank lending, discriminatory labor practices and access to education."[10] It has also "helped to develop themes and language to address racism and inequality, such as white privilege, intersectionality and microaggressions, among others."[11] "Critical race theorists attack the very foundations of the liberal legal order, including equality theory, legal reasoning, Enlightenment rationalism and neutral principles of constitutional law."[12]

A related concept, "antiracism," has also recently entered the lexicon. The Smithsonian National Museum of African-American History and Culture (NMAAHC) defines "[b]eing antiracist" as "fighting against racism."[13] Antiracism's proponents make clear, however, that "[b]eing an antiracist is much different from just being 'nonracist.'"[14] The NMAAHC explains:

> Being antiracist is different for white people than it is for people of color. For white people, being antiracist evolves with their racial identity development. They must acknowledge and understand their privilege, work to change their internalized racism, and interrupt racism when they see it. For people of color, it means recognizing how race and racism have been internalized, and whether it has been applied to other people of color.[15]

This means, according to NMAAHC and others, that "[i]n the absence of making antiracist choices, we (un)consciously uphold aspects of white supremacy, white-dominant culture, and unequal institutions and society."[16] In other words, an

---

*What It Means to Her Today*, TIME MAGAZINE (Feb. 20, 2020), https://time.com/5786710/kimberle-crenshaw-intersectionality/ (last visited May 24, 2021).

[10] Lang, *supra* note 9.

[11] *Id.*

[12] Jeffrey J. Pyle, Race, *Equality and the Rule of Law: Critical Race Theory's Attack on the Promises of Liberalism*, 40 B.C. L. REV. 787, 788 (1999).

[13] *Being Antiracist*, SMITHSONIAN NAT'L MUSEUM OF AFRICAN AMER. HIST. & CULTURE, https://nmaahc.si.edu/learn/talking-about-race/topics/being-antiracist (last visited May 24, 2021).

[14] ANNELIESE A. SINGH, RACIAL HEALING HANDBOOK: PRACTICAL ACTIVITIES TO HELP YOU CHALLENGE PRIVILEGE, CONFRONT SYSTEMIC RACISM, AND ENGAGE IN COLLECTIVE HEALING (2019), https://nmaahc.si.edu/sites/default/files/downloads/resources/racialhealinghandbook_p87to94.pdf. ("For White people, becoming an antiracist is a journey that evolves alongside your White racial identity. For instance, once you have moved out of obliviousness about your White privilege, you can move toward integrative awareness of what it means to be White and how to use your White privilege.").

[15] *Being Antiracist*, SMITHSONIAN NAT'L MUSEUM OF AFRICAN AMER. HIST. & CULTURE, *supra* note 13 (quoting SINGH, *supra* note 14).

[16] *Id.*

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

individual must accept the premise that—because of race—he or she suffers from internalized racism or its effects *and then* zealously pursue antiracism's deconstructionist ends, or that person is a racist.

One prominent "antiracist" proponent is Ibram X. Kendi, the Director of Boston University's Center for Antiracist Research, and the author of *How to Be an Antiracist.* Kendi was named one of Time Magazine's "100 Most Influential People of 2020."[17]

Another proponent, Robin DiAngelo, the author of another *New York Times* bestseller, *White Fragility: Why It's So Hard for White People to Talk About Racism,* has been described as "perhaps the country's most visible expert in anti-bias training."[18]  The book's publisher describes it as "a must-read for all educators because racial disparities in access and opportunity continue to be an urgent issue in our schools."[19]  DiAngelo asserts that "[w]hite fragility is the defensive reaction that so many white people have when their positions or perspectives around race are questioned."[20]  She elaborates:

> For a lot of white people, the mere suggestion that being white has meaning will cause great umbrage.  Certainly generalizing about white people will.  Right now, me saying "white people," as if our race had meaning, and as if I could know anything about somebody just because they're white, will cause a lot of white people to erupt in defensiveness.  And I think of it as a kind of weaponized defensiveness.  Weaponized tears. Weaponized hurt feelings.  And in that way, I think white fragility actually functions as a kind of white racial bullying.[21]

Antiracism therefore assigns immutable negative characteristics to individuals solely based upon their race or ethnicity.  And it manages to frame any philosophical disagreement or objection to this assignment as—you guessed it—racism.

---

[17] Al Sharpton, *Time 100: Most Influential People 2020: Ibram X. Kendi*, TIME MAGAZINE, https://time.com/collection/100-most-influential-people-2020/ (last visited May 24, 2021).

[18] Kelefa Sanneh, *The Fight to Redefine Racism*, THE NEW YORKER (Aug. 12, 2019), https://www.newyorker.com/magazine/2019/08/19/the-fight-to-redefine-racism.

[19] Valeria Brown, *Discussion Guide for Educators:* White Fragility *by Robin Diangelo*, BEACON PRESS, http://beacon.org/assets/pdfs/DiAngelo-EducatorsProfDevGuide.pdf.

[20] Mary Jo Madda, *White Fragility in Teaching and Education: An Interview With Dr. Robin DiAngelo*, EDSURGE (Aug. 23, 2018), https://www.edsurge.com/news/2018-08-23-white-fragility-in-teaching-and-education-an-interview-with-dr-robin-diangelo.

[21] Adrienne Van Der Valk & Anya Malley, *What's My Complicity? Talking White Fragility With Robin DiAngelo*, 62 LEARNING FOR JUST, Summer 2019, https://www.learningforjustice.org/magazine/summer-2019/whats-my-complicity-talking-white-fragility-with-robin-diangelo.

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

But accepting antiracism's premises is only half the program.  To avoid being racist, one must also affirmatively participate in antiracism's prescribed social action:

> We can be led to believe that racism is only about individual mindsets and actions, yet racist policies also contribute to our polarization. While individual choices are damaging, racist ideas in policy have a wide-spread impact by threatening the equity of our systems and the fairness of our institutions.  To create an equal society, we must commit to making unbiased choices and being antiracist in all aspects of our lives.[22]

The driving force behind CRT and antiracism is the complete and total acceptance of a specific worldview—one that encompasses very specific notions about history, philosophy, sociology, and public policy.  Being a so-called "antiracist" requires individuals to accept these premises and advocate for specific policy proposals.  Individuals who do not comply cannot truly be "antiracist," and are, therefore, considered racist.

By its own terms, antiracism excludes individuals who merely advocate for the neutral legal principles of the Constitution, or who deny or question the extent to which white supremacy continues to shape our institutions.  To that end, no one can be antiracist who does not act to eliminate the vestiges of white supremacy, i.e., embrace the specific public policy proposals of CRT and antiracism.  For example, critics have suggested that there is one, and only one, correct stance on standardized testing, drug legalization, Medicare for All, and even the capital gains tax rate.[23]

This paradigm is conveniently constructed "like a mousetrap."[24]  Disagreement with any aspect becomes irrefutable evidence of its premises of systemic racism, bias, fragility, or white supremacy.  In short, it is a conclusion in search of a methodology—one that eschews the bedrock principles of natural justice and abdicates fundamental concepts such as individual agency and autonomy.

CRT and antiracism are not merely academic ideas confined to university critical studies courses.  These ideologies have begun to infiltrate mainstream American dialogue and permeate our institutions.  It has been embraced by corporations,[25]

---

[22] *Being Antiracist*, SMITHSONIAN NAT'L MUSEUM OF AFRICAN AMER. HIST. & CULTURE, *supra* note 13.

[23] Max Eden, *'Anti-Racist' education is anything but*, AMER. ENTERP. INST. (Sept. 1, 2020) (citing IBRAM KENDI, HOW TO BE AN ANTIRACIST (2019)), https://www.aei.org/op-eds/anti-racist-education-is-any-thing-but/.

[24] Christopher F. Rufo, *Critical Race Theory: What It Is and How to Fight It*, 50 IMPRIMIS, vol. 3, Mar. 2021, https://imprimis.hillsdale.edu/critical-race-theory-fight/.

[25] Daniel Bergner, *'White Fragility' Is Everywhere. But Does Antiracism Training Work?*, N.Y. TIMES (July 15, 2020), https://www.nytimes.com/2020/07/15/magazine/white-fragility-robin-diangelo.html.

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

government organizations, classrooms,[26] and even late-night television.[27]    Public schools have used taxpayer dollars to pay for "antiracism" programming.[28]    Cornell, UC Berkeley, and a large contingent of major universities featured antiracism work on their summer reading lists.  Even the National Park Service offers lesson plans and discussion guides for teachers on *How to Be an Antiracist*.[29]  *White Fragility* has a "Discussion Guide for Educators."[30]

One major aspect of antiracism programming involves activities which separate students, teachers, or employees by race.  For example, the Evanston/Skokie, IL school district instituted antiracist curriculum and education, which resulted in (1) separating administrators in a professional development training program into two groups based on race—white and non-white; (2) offering various "racially exclusive affinity groups" that separated students, parents and community members by race; (3) implementing a disciplinary policy that included "explicit direction" to staffers to consider a student's race when meting out discipline; and (4) carrying out a "Colorism Privilege Walk" that separated seventh and eighth grade students into different

---

("DiAngelo's inbox was flooded with … requests to deliver … workshops and keynotes at Amazon, Nike, Under Armour, Goldman Sachs. The entreaties went on: Facebook, CVS, American Express, Netflix.").

[26] *See, e.g.*, *For Faculty and Staff:* White Fragility *Discussion Group*, UNIVERSITY OF MASSACHUSETTS-AMHERST (Jan. 19, 2021), https://www.umass.edu/sphhs/news-events/events-calendar/faculty-and-staff-white-fragility-discussion-group; *The novel "*White Fragility*" is pulled from a Choctawhatchee High English class*, NW FLA. DAILY NEWS (Oct.    8, 2020), https://www.*nwfdailynews*.com/story/news/2020/10/08/okaloosa-school-district-pulls-novel-white-fragility-out-class/5929349002/; *Millard principals will read 'White Fragility' as district has conversations on race*, OMAHA WORLD-HERALD (July 13, 2020), https://omaha.com/news/education/millard-principals-will-read-white-fragility-as-district-has-conversations-on-race/article_0925f605-4528-5be5-a4a2-725ba022596b.html; *White Fragility. What it Looks Like in Schools*, NATIONAL EDUCATION POLICY CENTER    NEWSLETTER    (Oct.    1,    2019), https://nepc.colorado.edu/sites/default/files/publications/Newsletter%20thomas_0.pdf.

[27] THE   TONIGHT   SHOW   WITH   JIMMY   FALLON   (June   17,   2020),   *available   at* https://www.youtube.com/watch?v=rZfiSjTHVqA (Interview with Robin DiAngelo).

[28] *See, e.g.*, *Fairfax County schools defending $20K presentation from anti-racism scholar*, FOX5DC.COM (Sept.   20,   2020),   https://www.fox5dc.com/news/fairfax-county-schools-defending-20k-presentation-from-anti-racism-scholar ("The Fairfax County school district is defending its decision to pay $20,000 for an author who spoke to its administration and school leaders about racism for one hour…. The district says it was a timely topic selected by the staff – but it comes at a time when people are scrambling for funds to address how to navigate distance learning and in-person learning for students.").

[29] *"*How to Be an Antiracist*" Book Club*, NATIONAL PARK SERVICE: EDUCATION MATERIALS, https://www.nps.gov/teachers/classrooms/-how-to-be-an-antiracist-book-club.htm (last visited May 24, 2021).

[30] Brown, *Discussion Guide for Educators, supra* note 19.

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

groups based on race.[31]  Schools have even proposed separate housing and advisors based on race,[32] separate grading policies,[33] and separate professional development training.[34]

This programming also focuses on the concepts of "whiteness" and "white identity."[35]  DiAngelo's *White Fragility* claims a positive white identity is an impossible goal.  Corporate diversity trainings reportedly now instruct employees to "be less white."[36]  Seattle's Office of Civil Rights—ironically—conducted a race and social justice training for employees that required white employees to examine their

---

[31] Carl Campanile, *US Dept. of Education curbs decision on race-based 'affinity groups'*, N.Y. POST (Mar. 7, 2021), https://nypost.com/2021/03/07/education-dept-curbs-decision-on-race-based-affinity-groups/; *see also* Ben Zeisloft, *Tulane hosts anti-racism teach-in with profs divided by race*, CAMPUS REFORM (May 3, 2021), https://campusreform.org/article?id=17344; Benjamin Fearnow, *Minnesota College Sparks Backlash With Anti-Racist 'Struggle Sessions' Segregated by Race*, NEWSWEEK (Apr. 19, 2021), https://www.newsweek.com/minnesota-college-sparks-backlash-anti-racist-struggle-sessions-segregated-race-1584776.

[32] Ben Zeisloft, *U Kentucky creates two RA groups: 'One for RAs who identify as Black...one for RAs who identify as White'*, CAMPUS REFORM (Oct. 29, 2020), https://www.campusreform.org/article?id=16034.

[33] *"Antiracist" Grading Starts with You*, Vol. 78 EDUCATIONAL LEADERSHIP, no. 1, Sept. 2020, at 12-13, http://www.ascd.org/publications/educational-leadership/sept20/vol78/num01/%C2%A3Antiracist%C2%A3-Grading-Starts-with-You.aspx ("The idea of what is successful at school is still very much constructed through an able-bodied, monied, aggressively competitive white male lens."); *UCLA Removes Lecturer for Questioning Proposal to Give Black Students Preferential Grading*, THE COLLEGE FIX (June 5, 2020), www.thecollegefix.com/ucla-removes-lecturer-for-questioning-proposal-to-give-black-students-preferential-grading/.

[34] Kathianne Boniello and Susan Edelman, *NYC teachers segregated by race for 'affinity groups' amid protests*, N.Y. POST (June 20, 2020), https://nypost.com/2020/06/20/nyc-teachers-segregated-by-race-for-affinity-groups-amid-protests/ (the New York Department of Education's Early Childhood Division reportedly sponsored an "anti-racist Community Meeting" where teachers were segregated into discussion groups based on skin color, race and ethnicity); Bettina Love, *White Teachers Need Anti-Racist Therapy*, EDUCATION WEEK, (Feb. 6, 2020).

[35] SINGH, *supra* note 14 ("For White people, becoming an antiracist is a journey that evolves alongside your White racial identity. For instance, once you have moved out of obliviousness about your White privilege, you can move toward integrative awareness of what it means to be White and how to use your White privilege."), https://nmaahc.si.edu/sites/default/files/downloads/resources/racialhealinghandbook_p87to94.pdf; Bettina Love, *White Teachers Need Anti-Racist Therapy*, EDUCATION WEEK, (Feb. 6, 2020), https://www.edweek.org/teaching-learning/opinion-white-teachers-need-anti-racist-therapy/2020/02 ("White teachers need a particular type of therapy. They must learn how to deal with what Cheryl E. Matias calls 'White emotionalities' and what Robin DiAngelo has termed 'White fragility.'").

[36] *See, e.g.*, Lia Eustachewich, *Coca-Cola slammed for diversity training that urged workers to be 'less white'*, N.Y. POST (Feb. 23, 2021), https://nypost.com/2021/02/23/coca-cola-diversity-training-urged-workers-to-be-less-white/.

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

"relationships with white supremacy, racism, and white-ness."[37]

In education, op-eds in major publications assert that schools "need therapists who specialize in the healing of teachers and the undoing of Whiteness in education."[38] One North Carolina school district reportedly launched a campaign against "whiteness in educational spaces."[39] The Evanston/Skokie school district reportedly assigned the book, *Not My Idea: A Book About Whiteness*, where parents are asked to quiz their children on whiteness and give them approachable examples of "how whiteness shows up in school or in the community."[40] Schools have told parents to "reflect on their whiteness."[41] Some schools have set up "whiteness accountability" spaces on campus.[42] Campus lectures on antiracism focus on recovering from being white[43] or changing what it means to be white.[44] And some universities have even allegedly forced employees to apologize for being white.[45]

---

[37] Christopher F. Rufo, *Seattle Office of Civil Rights Training on "Internalized Racial Superiority for White People,"* CHRISTOPHERRUFO.COM (Jul. 29, 2020), https://christopherrufo.com/separate-but-equal/.

[38] Love, *supra* note 35.

[39] Christopher F. Rufo, *Subversive Education*, CITY JOURNAL (Mar. 17, 2021), https://www.city-journal.org/critical-race-theory-in-wake-county-nc-schools.

[40] Conor Friedersdorf, *What Happens When a Slogan Becomes the Curriculum,* THE ATLANTIC (Mar. 14, 2021), https://www.theatlantic.com/ideas/archive/2021/03/should-black-lives-matter-agenda-be-taught-school/618277/.

[41] Selim Algar and Kate Sheehy, *NYC public school asks parents to 'reflect' on their 'whiteness'*, N.Y. POST (Feb. 16, 2021), https://nypost.com/2021/02/16/nyc-public-school-asks-parents-to-reflect-on-their-whiteness/.

[42] *See, e.g.*, Dion J. Perry, *Humboldt State hosts 'Whiteness Accountability Space' so 'White folks' can address their 'anti-Blackness'*, CAMPUS REFORM (Mar. 25. 2021), https://www.campusreform.org/article?id=17128; Anti-racism and White Accountability, COUNSELING CENTER, LOYOLA UNIVERSITY MARYLAND, https://www.loyola.edu/department/counseling-center/social-justice/anti-racism-white-accountability (last visited May 20, 2021) (establishing "white accountability spaces" on campus and stating "[w]e feel it is important to highlight the need for white individuals to take an anti-racist stand and hold each other accountable.").

[43] *University of Minnesota Offers Lecture to 'Recover' From Being White*, THE COLLEGE POST (Oct. 21, 2020), https://thecollegepost.com/university-of-minnesota-whiteness/.

[44] Chrstopher F. Rufo, *Racism in the Cradle*, CITY JOURNAL (Mar. 2, 2021), https://christopherrufo.com/racism-in-the-cradle/ (Arizona Education Department recommended reading claims that "all white people are white in the context of a society that continues to disadvantage people of color based on race" and teaches schools how to "change what it means to be white" and inculcate an "antiracist white identity.").

[45] Mike Brake, *Does OU diversity training violate federal labor law?*, OKLAHOMA COUNCIL OF PUB. AFFAIRS (Feb. 4, 2021), https://www.ocpathink.org/post/does-ou-diversity-training-violate-federal-labor-law (noting "some universities have already faced lawsuits for diversity programs where "they make people get down on the floor and apologize for being white").

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

On the Smithsonian NMAAHC's page dealing with "Whiteness," it asserted at one point that traits such as "individualism," "hard work," "objectivity," "progress," "politeness," "decision-making," and "delayed gratification" as hallmarks of "white culture."[46]  Training materials from Argonne National Laboratories, a Federal entity, stated that racism "is interwoven into every fabric of America" and described statements like "color blindness" and the "meritocracy" as "actions of bias."[47]

I would like to note that all of these traits identified above, far from being hallmarks of merely "white culture," are in fact important hallmarks of a virtuous and productive colorblind society.  None of them, however, have any connection to "whiteness" or "white identity."  They are self-evident virtues—universally applicable to and shared by people of all races, colors, creeds, and national origins.  Because men and women are created equal, they can all equally appreciate and adopt those values.

One popular trope revolves around the idea that all white people are inherently racist or share collective culpability for the past transgressions against non-whites. *White Fragility* contains assertions such as "White identity is inherently racist."[48] The Arizona Department of Education created an "equity" toolkit claiming that babies show the first signs of racism at only three months old, and that white children soon after become full racists—"strongly biased in favor of whiteness."[49]  Buffalo, NY Public Schools reportedly teaches students that "all white people" perpetuate systemic racism.[50]  San Diego Public Schools accused white teachers of being "colonizers" on stolen Native American land, instructed them that they are racist and upholding racist ideas, structures, and policies, and recommended that the teachers undergo "antiracist therapy."[51]  A Cupertino, CA elementary school forces third-graders to deconstruct their racial and sexual identities, rank themselves according to their "power and privilege," and then separate the children into "oppressors and

---

[46] Frederick M. Hess & RJ Martin, *Smithsonian Institution Explains that 'Rationality' & 'Hard Work' are Racist*, REALCLEARPOLICY (July 20, 2020), https://www.realclearpolicy.com/articles/2020/07/20/smithsonian_institute_explains_that_rationality_and_hard_work_are_racist_499425.html.

[47] Exec. Order No. 13950, 85 Fed. Reg. 60683, 60684 (Sept. 28, 2020).

[48] ROBIN DIANGELO, WHITE FRAGILITY: WHY IT'S SO HARD FOR WHITE PEOPLE TO TALK ABOUT RACISM (2018).

[49] Rufo, *Racism in the Cradle*, *supra* note 44.

[50] Christopher F. Rufo, *Fail Factor*, CITY JOURNAL (Feb. 23, 2021), https://www.city-journal.org/buffalo-public-schools-critical-race-theory-curriculum.

[51] Christopher F. Rufo, *Radicals in the Classroom*, CITY JOURNAL (Jan. 5, 2021), https://www.city-journal.org/radicalism-in-san-diego-schools.

Montana Attorney General's Opinion
Vol. 58, Op. 1
May 27, 2021

oppressed.[52]  Seattle's Office for Civil Rights training reported required white employees explain how their "[families] benefit economically from the system of white supremacy even as it directly and violently harms Black people."[53]  The U.S. Department of the Treasury held a seminar that promoted arguments that "virtually all White people, regardless of how 'woke' they are, contribute to racism."[54]

Another major theme of antiracism programming revolves around the concept of "privilege," and specifically "white privilege." [55]  Training materials from Sandia National Laboratories, a Federal entity, stated that an emphasis on "rationality over emotionality" was a characteristic of "white male[s]," and asked those present to "acknowledge" their "privilege" to each other.[56]  A lawsuit in Nevada alleges that a public school gave a student a failing grade in his "Sociology of Change" course and threatened to prevent him from graduating because he refused to confess his privilege openly as demanded by the school, the course curriculum, and the teacher.[57]  (The federal judge announced that the student was likely to succeed in his lawsuit.)  One public school course allegedly obligated students to label white, male, Christian, and heterosexual identities as inherently oppressive and privileged because of their social dominance.[58]

Before turning to the legal analysis, I note the challenge of dealing with terms like "antiracism"—which are susceptible to different and evolving meanings.  For example, the CRT and "antiracism" movements demonstrate that although "racism" is widely understood and accepted as an epithet, it encompasses vastly different meanings for different people.[59]  The gravamen of CRT and antiracism's theories, however,

---

[52] Chrstopher F. Rufo, *Woke Elementary*, City Journal (Jan. 13, 2021)  https://www.city-journal.org/identity-politics-in-cupertino-california-elementary-school.

[53] Christopher F. Rufo, *Seattle Office of Civil Rights Training on "Internalized Racial Superiority for White People,"* ChristopherRufo.com (July 29, 2020),  https://christopherrufo.com/separate-but-equal/.

[54] Exec. Order No. 13950, 85 Fed. Reg. at 60684.

[55] *See, e.g., Talking About Race: Whiteness*, Smithsonian Nat'l Museum of African Amer. Hist. & Culture, https://nmaahc.si.edu/learn/talking-about-race/topics/whiteness (last visited May 19, 2021) ("Since white people in America hold most of the political, institutional, and economic power, they receive advantages that nonwhite groups do not. These benefits and advantages, of varying degrees, are known as white privilege. For many white people, this can be hard to hear, understand, or accept - but it is true. If you are white in America, you have benefited from the color of your skin.").

[56] Exec. Order No. 13950, 85 Fed. Reg. at 60684.

[57] Joshua Dunn, *Critical Race Theory Collides with the Law*, Ed. Next (May 19, 2021), https://www.educationnext.org/critical-race-theory-collides-with-law/.

[58] *Id.*

[59] *See also* Fabiola Cineas, *Merriam-Webster has a new definition of "racism"*, Vox (June 11, 2020), https://www.vox.com/identities/2020/6/10/21286656/merriam-webster-racism-definition.

rely on the popular shibboleths of "systemic," "institutional," or "structural" racism. A minimal investigation into these claims exposes them as hollow rhetorical devices devoid of any legally sufficient rationale for purposes of civil rights law, as well as a threat to stability of our institutions.

There is no better example of this than the September 2020 open letter from Christopher Eisgruber, President of Princeton University, admitting that his institution is and for decades has been "racist."[60]  He notoriously alleged "[r]acism and the damage it does to people of color persist at Princeton as in our society, sometimes by conscious intention but more often through unexamined assumptions and stereotypes, ignorance or insensitivity, and the systemic legacy of past decisions and policies."[61]  He further admitted that "[r]acist assumptions … remain embedded in structures of the University itself."[62]  The U.S. Department of Education was rightly alarmed by these serious revelations and immediately opened an investigation into the racism at Princeton.[63]  Particularly concerning was that Princeton might have repeatedly made knowingly false assurances regarding nondiscrimination and equal opportunity to the Department in exchange for federal monies, not to mention similar statements to students, parents, and consumers.[64]

In the face of this investigation, however, Princeton responded that—although it is systemically, institutionally, and structurally racist—it does not actually commit discrimination in violation of federal law.[65]  Despite its claims that widespread racism permeated throughout every aspect of campus, it asserted that no one employed by the University had engaged in or was engaging in any discrimination on the basis of race, color, or national origin.  The Department concluded its investigation by stating that President Eisgruber "knowingly and intentionally spoke falsely, making a

---

[60] Princeton Univ. Office of Commc'ns, Letter from President Eisgruber on the University's efforts to combat systemic racism (Sept. 2, 2020) ("Eisgruber Letter"), https://www.princeton.edu/news/2020/09/02/letter-president-eisgruber-universitys-efforts-combat-systemic-racism.  *See also Northwestern University's interim dean admits to being a 'racist' during digital town hall*, WASH. EXAMINER (Sept. 1, 2020) (Northwestern University Law School's Dean and other faculty members admitting to being racists during a townhall meeting), https://www.washingtonexaminer.com/news/northwestern-universitys-interim-dean-admits-to-being-a-racist-during-digital-town-hall.

[61] Eisgruber Letter, *supra* note 60.

[62] *Id.*

[63] Letter from Robert King, Assistant Secretary for Postsecondary Education to Christopher Eisgruber, President, Princeton University (Sept. 16, 2020), https://www.princeton.edu/sites/default/files/documents/2020/09/Princeton-Letter-9-16-20-Signed.pdf.

[64] *Id.*

[65] Letter from Thomas Perrelli, Counsel for Princeton University, to U.S. Dep't of Educ. at 1 (Oct. 21, 2020).

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

factually baseless ritual confession and not an empirically grounded description of campus reality."[66]

Admissions such as these may be good faith efforts—albeit misguided ones—to address societal problems or respond to students' concerns. But in practice, they are used as a pretext to justify intentional discrimination against individuals on the basis of race. By conceding antiracism's threshold propositions, institutions obtain cover to discriminate in the service of particular public policy goals. Tempting as that may be for some institutions, our legal order functions as a bulwark against such actions.

## E.  ANALYSIS AND CONCLUSIONS OF LAW

Eradicating race discrimination is a legitimate and worthy goal. All Montana governmental entities can and must work to prevent discrimination prohibited by the Equal Protection Clause, Title VI, the Montana Constitution, the MHRA, and (where applicable) Title VII. These laws protect everyone from unlawful discrimination and symbolize our nation's serious commitment to its ideals. It should be no surprise therefore that these legal safeguards cannot allow race-based discrimination, even when it comes disguised as antiracist remedial measures. *See Adarand*, 515 U.S. at 240 (Thomas, J., concurring) ("[T]here is a moral [and] constitutional equivalence between laws designed to subjugate a race and those that distribute benefits on the basis of race in order to foster some current notion of equality. Government cannot make us equal; it can only recognize, respect, and protect us as equal before the law.") (quotations omitted). I conclude, therefore, that key elements of Critical Race Theory and so-called "antiracism" education and training, when used to classify students or other Montanans by race, violate the Equal Protection Clause, Title VI, Montana's Individual Dignity Clause, and the MHRA.

The term "antiracism" appears reasonable and innocuous on its face. After all, our Constitution, our laws, and nearly all our citizens are "antiracism." But "antiracism," as a name for Kendi's and DiAngelo's all-encompassing worldview, is an Orwellian rhetorical weapon.[67] It does not simply mean the opposition of differential treatment based on race. According to Kendi's *How to Be an Antiracist*, "[t]he only remedy to racist discrimination is antiracist discrimination. The only remedy to past

---

[66] Letter from Reed Rubinstein, U.S. Dep't of Ed. General Counsel to Christopher Eisgruber, President, Princeton University (Jan. 13, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stake-holders/20210113-investigation-of-princeton-university.pdf.

[67] "At times, anti-racist excess shades over into the literally Orwellian, such as when Brooklyn College professor of math education Laurie Rubel insists that declaring '2 + 2 = 4' is nothing more than 'white supremacist patriarchy.'" Frederick Hess, '*Anti-racist' education is neither*, THE AMERICAN MIND (Dec. 18, 2020), https://www.aei.org/articles/anti-racist-education-is-neither/.

discrimination is present discrimination … The only remedy to present discrimination is future discrimination." As I discuss in greater detail below, Kendi's description is correct: antiracism demands race-based discrimination.

But first let me state the obvious. Committing racial discrimination in the name of ending racial discrimination is both illogical and illegal. *See Parents Involved*, 551 U.S. at 748 (plurality opinion) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."); *Fisher I*, 570 U.S. at 330 (Thomas, J. concurring) ("[T]he lesson of history is clear enough: Racial discrimination is never benign."); *see also Metro Broad. v. FCC*, 497 U.S. 547, 610 (1990) (O'Connor, J., dissenting) ("'[B]enign' carries with it no independent meaning, but reflects only acceptance of the current generation's conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable.").

To assist schools and other governmental entities with compliance, what follows is a list of widely reported "antiracist" and CRT-related activities that I conclude violate federal and state law. Though hostile environment claims are based on the totality of the circumstances and will likely depend on a particular case's facts, I have identified several bright line rules. They fall under three prohibited categories (which often overlap): racial segregation, race stereotyping, and race scapegoating. These concepts violate civil rights laws because they constitute racial harassment and/or require authority figures to engage in activities that result in different treatment on the basis of race.

As discussed, *infra*, there are legitimate pedagogical uses for elements of the CRT/antiracism curricula that do not violate state or federal law. Some aspects raise no legal concerns. Some only raise legal concerns when mandated or applied in a way that is discriminatory. And some may not be discriminatory without other elements contributing to a hostile environment under the circumstances. There are also aspects of the curricula that may be expressly protected by the First Amendment. This opinion, therefore, should not be construed to limit a school or government entity's ability to use, present, or discuss these materials, where appropriate. But the law will not tolerate schools, other government entities, or employers implementing CRT and antiracist programing in a way that treats individuals differently on the basis of race or that creates a hostile environment.

It should go without saying that segregating students in any capacity on the basis of race blatantly violates the Equal Protection Clause and Title VI. *See Brown*, 347 U.S. at 495; *Parents Involved*, 551 U.S. at 778 (Thomas, J., concurring) ("What was wrong in 1954 cannot be right today."). A school's programs and activities must be open to all students, regardless of race. This extends to every aspect of a school's program or activity, including classes, seminars, lectures, trainings, athletics, clubs, orientations, award ceremonies, graduations, or other meetings. This includes

segregation that occurs in a virtual or online format.  Schools also may not offer housing, counseling, mentoring, liaisons, or networking in a way that favors or excludes individuals on the basis of race.  Schools may not discourage members of any race from participating in any particular program or activity, or allow students or staff to be excluded on the basis of race.  Schools also may not create "safe spaces" that admit or exclude individuals on the basis of race.  This includes segregating students or administrators in a professional development training into groups on the basis of race.

Schools may not use race when administering their academic programs.  This includes grading students differently or apply different grading criteria to students based on race.  Neither schools nor instructors nor guest speakers may have students participate in class or complete assignments on the basis of their race.  Schools also may not discipline students differently on the basis of race.  Other government entities and employers, similarly, may not segregate employees on the basis of race or treat them differently on the basis of race.

Government entities may not engage in racial stereotyping, which means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or to an individual because of his or her race.  *See Parents Involved*, 551 U.S. at 797 (Kennedy, J., concurring) ("Under our Constitution the individual, child or adult, can find his own identity, can define her own persona, without state intervention that classifies on the basis of his race or the color of her skin."); *Miller v. Johnson*, 515 U.S. 900, 927 (1995) ("If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury.") (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630-631 (1991)); *Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("We may not accept as a defense to racial discrimination the very stereotype the law condemns"); *cf. Miller*, 515 U.S. at 912 ("When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls.") (quotations omitted); *Fisher I*, 570 U.S. at 308 (noting that one purpose of encouraging student body diversity was the "lessening of racial isolation and stereotypes.").

Prohibited race stereotyping includes all exercises that ascribe specific characteristics or qualities to all members of a racial group, particularly when participation in such exercises is compulsory or acceptance of certain stereotypes is required as part of the grading criteria.  Schools, other government, entities, and employers may not use materials that assert that one race is inherently superior or inferior to another.  Individuals may not be forced participate in "privilege walks" that treat students differently based on race.  Individuals may not be forced to admit privilege or punished for failing to do so.  Members of certain races cannot be forced to "reflect,"

"deconstruct," or "confront" their racial identities or be instructed to be "less white" (or less of any other race, ethnicity, or national origin).

Schools are similarly not permitted to ask that certain students engage, or not engage, with the class in a specific manner based on race.  Public employers may not use similar tactics for mandatory trainings.

Government entities also may not engage in "race scapegoating," which means assigning fault, blame, or bias to a race or to members of a race because of their race. *See Miller*, 515 U.S. at 911 ("At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.") (quotations omitted).  This encompasses any claim that, consciously or unconsciously, and by virtue of his or her race, members of any race are inherently racist or are inherently inclined to oppress others, including separating students into "oppressors" and "oppressed" based on race.  Examples consist of instructing students that all white people perpetuate systemic racism or that all white people are born racist.  This also includes asserting that an individual's moral character is necessarily determined by his or her race or that individuals need to be "accountable" due solely to their race, or that they are "culpable" solely due to their race.  Individuals may not be instructed or compelled to apologize for their race or forced to admit privilege based on their race.  It is illegal, likewise, to advocate that a particular race is negative or evil.  It is also illegal for curricula to instruct student that members of a particular race or racial identity pose specific dangers to other individuals.

Additionally, a school that permits, promotes, or endorses curricula or pedagogical methods that tell an individual that he or she should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race, almost certainly creates a racially hostile environment.  *See* 59 Fed. Reg. at 11453 (citing *Gilbert v. Little Rock*, 722 F.2d 1390, 1394 (8th Cir. 1983) (environment "which significantly and adversely affects the psychological well-being of an employee because of his or her race" is enough to constitute title VII violation); *Bundy v. Jackson*, 641 F.2d 934, 943-45 (D.C. Cir. 1981) (protection against race and sex discrimination extends to "psychological and emotional work environment")).

A school may not advocate that students adopt specific beliefs based on their race, such as urging that white students be white without signing on to whiteness.  Schools may not attempt to purge the idea of "whiteness" (or any other race) from schools.  Any curricula or activity that pressures members of a certain race to repudiate or "recover from" their race is illegal as well.  This includes instructing members of a particular race or races that they must "re-wire" or change themselves.

These actions are discriminatory.  *See Missouri v. Jenkins*, 515 U.S. 70, 120-

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

121 (1995) (Thomas, J., concurring) ("At the heart of [Equal Protection] lies the principle that the government must treat citizens as individuals, and not as members of racial, ethnic, or religious groups."). They are equally insidious when applied to any race. *Parents Involved*, 551 U.S. at 797 (Kennedy, J., concurring) (Racial labels, whether state-mandated or state-sponsored, are "inconsistent with the dignity of individuals in our society."); *see also* Letter from Peter Kirsanow, Comm'r, U.S. Civil Rights Comm'n, to Jenny A. Durkan, Mayor of Seattle, Washington, regarding "Internalized Racial Superiority for White People" (Aug. 31, 2020) ("Kirsanow Letter") ("[w]hen in doubt whether a statement is racist [or just plain dumb] try substituting a race different from that in your original sentence."). Trainings and programming like that discussed above perpetuate and glorify racial stereotypes and division. This upside-down ideology may be fashionable with the armchair revolutionaries in academia, but its compulsions have no place in our governmental, educational, and employment settings.

It is constitutionally insufficient that proponents of CRT and "antiracism" may possess the laudable goal of ending racism and its effects. *See Parents Involved*, 551 U.S. at 743 (plurality opinion) ("Simply because the school districts may seek a worthy goal does not mean they are free to discriminate on the basis of race to achieve it, or that their racial classifications should be subject to less exacting scrutiny."); *Fisher I*, 570 U.S. at 328 (Thomas, J., concurring) ("The worst forms of racial discrimination in this Nation have always been accompanied by straight-faced representations that discrimination helped minorities."); *see also* Kirsanow Letter, *supra* ("There's no exception in Title VII that says, 'unless you have good intentions' … Segregation is still prohibited in 2020."). The Supreme Court, as discussed, has only recognized the use of race in two narrow circumstances—neither of which make room for the compulsions of CRT and antiracism theories. These assertions, moreover, may not be used as a pretext to discriminate against individuals based on race.

Finally, I would like to briefly discuss one important aspect of this issue in the educational context. Federal and state civil rights laws protect students from prohibited discrimination, but they are not intended to restrict expressive activities or speech protected under the First Amendment. There are numerous bad ideas[68] and fraudulent curricula[69] that do not violate civil rights laws. Nothing in this opinion

---

[68] *E.g.*, KARL MARX, THE COMMUNIST MANIFESTO (1848).

[69] For example, the *New York Times*' 1619 Project has been debunked by historians across the spectrum. *See Letter to the Editor: We Respond to the Historians Who Critiqued The 1619 Project*, N.Y. TIMES (Dec. 29, 2019) ("[W]e are dismayed at some of the factual errors in the project and the closed process behind it. These errors, which concern major events, cannot be described as interpretation or 'framing.' They are matters of verifiable fact, which are the foundation of both honest scholarship and honest journalism. They suggest a displacement of historical understanding by ideology."). This curriculum is nonetheless protected by the First Amendment and it is reserved for policymakers to decide if it belongs in classrooms.

shall be construed to restrict any expressive activities protected under the U.S. Constitution, including academic freedom or student political speech. *See, e.g.*, *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967).[70] Thus, when evaluating whether antidiscrimination protections threaten to chill the teaching of curricula that may offer great value to students, First Amendment caselaw takes into account a school's legitimate pedagogical interest in explaining and effectively and lawfully addressing racism. *See Arce v. Douglas*, 793 F.3d 968, 985 (9th Cir. 2015). Hostile environment caselaw, similarly, takes the totality of the circumstances into account, including the age of the student. *See* 59 Fed. Reg. at 11449, 11452; *Harris*, 510 U.S. at 23. CRT and antiracist *ideas* may be bandied about like any others. Let the marketplace of ideas be the judge. I predict it will not be kind. This opinion concerns race-based treatment, classifications, and compulsions that arise from CRT and antiracism theory.

Finally, government entities such as public schools, public colleges and universities, and government agencies are subject to the First Amendment. The First Amendment prevents the government from restricting protected speech, but it also prevents compelled speech. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). "[F]reedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *Wooley v. Maynard*, 430 U. S. 705, 714 (1977) (invalidating state requirement that motorists display passenger vehicle license plates bearing motto "Live Free or Die")). As the Court famously said in *Barnette*, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642 (holding that schools could not require children to salute the American flag).

Trainings, exercises, or assignments which force students or employees to admit, accept, affirm, or support controversial concepts such as privilege, culpability, identity, or status, constitute compelled speech. *See Janus*, 138 S. Ct. at 2464 ("Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence.") (quoting *Barnette*, 319 U.S. at 633)). It is obvious that CRT and antiracism programming take strident positions on some of the most controversial political, societal, and philosophical issues of our time. Compelling students, trainees, or anyone else to mouth support for those same positions not only assaults individual dignity, it undermines the search for truth, our institutions, and our democratic system. *See Janus*, 138 S. at 2464; *cf. Barnette*, 319 U.S. at 637 ("Free public education, if faithful to the ideal

---

[70] U.S. Dep't. of Education, Office for Civil Rights, Dear Colleague Letter: First Amendment (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html.

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction.").

## F. ENFORCEMENT

The Office of the Attorney General stands ready to assist OPI, as well as parents, students, employees, and other individuals with complaints of unlawful race-based discrimination. Schools or other entities that violate state or federal civil rights laws jeopardize their funding and may be liable for damages. There are a variety of legal avenues available for victims of discrimination. For violations of the Individual Dignity Clause and the MHRA, individuals should file complaints with the Montana Human Rights Bureau.[71] For violations of Title VI and the Equal Protection Clause, students and parents may either file a lawsuit directly against their school or file a complaint with the U.S. Department of Education. For violations of Title VII, employees should file a complaint with the U.S. Equal Employment Opportunity Commission.[72]

---

[71] *See Filing a Complaint*, MONTANA DEP'T. LABOR & INDUST., https://erd.dli.mt.gov/human-rights/filing-a-complaint/#:~:text=Filing%20a%20Complaint,-How%20To%20File&text=A%20person%20who%20believes%20that,%2D800%2D542%2D0807.&text=A%20formal%20complaint%20must%20be,of%20the%20alleged%20discriminatory%20action.

[72] *See Filing a Lawsuit*, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, https://www.eeoc.gov/filing-lawsuit.

MONTANA ATTORNEY GENERAL'S OPINION
Vol. 58, Op. 1
May 27, 2021

## CONCLUSION

According to Lincoln, the Declaration's central proposition that all men are created equal was the "standard maxim for a free society." Abraham Lincoln, Springfield Speech (June 26, 1857), *in* 2 COLLECTED WORKS OF ABRAHAM LINCOLN 406 (Roy P. Basler ed. 1953). Even today, it remains our true north—"familiar to all … revered by all; constantly looked to, constantly labored for, and even though never perfectly attained, constantly approximated, and thereby constantly spreading and deepening its influence, and augmenting the happiness and value of life to all people of all colors everywhere." *Id.* Frederick Douglass called these "saving principles." Frederick Douglas, Speech, What to the Slave Is the Fourth of July? (July 5, 1852).

These same principles guide us today. And they stand athwart any attempt to return to and glorify the sins of the past, however well-intentioned they may now appear. The Founders, as Lincoln said, "meant [these principles] to be … a stumbling block to those who in after times might seek to turn a free people back into the hateful paths of despotism." Lincoln, Springfield Speech, *supra*. The only viable path to a more just future and a more perfect union is to live up to our creed, not to abandon it.

Sincerely,

Austin Knudsen
ATTORNEY GENERAL