# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| _____ ) | |
| [1] BLACK EMERGENCY RESPONSE ) TEAM, et al., ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| ) | |
| v. ) | Case No. 5:21-cv-01022-G |
| ) | |
| ) | Hon. Charles B. Goodwin |
| [l] JOHN O'CONNOR, in his official ) capacity as Oklahoma Attorney ) General, et al., ) | |
| ) | |
| *Defendants*. ) | |
| ) | |
| _____ ) | |

## PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

Genevieve Bonadies Torres
David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
  UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005

Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian Tabrizi
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022

Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

I.    PRELIMINARY STATEMENT ...........................................................1

II.   PLAINTIFFS HAVE DEMONSTRATED A CLEAR LIKELIHOOD OF
      SUCCESS ON THE MERITS ...............................................................2

      A.    The Act's Vagueness Violates the Due Process Rights of Educators ..........2

            1.    The plain text of the Act is ambiguous. ...........................................2

            2.    Defendants' affidavits and evidence do not make the plain text
                  of the law less vague. .....................................................8

      B.    H.B. 1775's Overbroad Terms Reach into the College Classroom ...........10

      C.    H.B. 1775 Violates Students' First Amendment Right to Receive
            Information and Ideas .....................................................12

III.  PLAINTIFFS HAVE SATISFIED ALL THE CRITERIA FOR
      PRELIMINARY INJUNCTIVE RELIEF ...........................................20

      A.    Plaintiffs' Requested Relief is Not "Disfavored" and No Heightened
            Standard Applies ..........................................................20

      B.    Under Any Standard, Plaintiffs Are Entitled to Relief..............................22

IV.   CONCLUSION ...................................................................................25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Praeger,*
   815 F. Supp.2d 1204 (D. Kan. 2011)..........................................................................21

*Arce v. Douglas,*
   793 F.3d 968 (9th Cir. 2015)............................................................................. 14, 15

*Awad v. Ziriax,*
   670 F.3d 1111 (10th Cir. 2012)........................................................................ 17, 25

*Axson-Flynn v. Johnson,*
   356 F.3d 1277 (10th Cir. 2004).............................................................................14

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
   457 U.S. 853 (1982).......................................................................... 13, 14, 15, 17

*BNSF Ry. Co. v. City of Edmond, Oklahoma,*
   No. CIV-19-769-G, 2019 WL 5608680 (W.D. Okla. Oct. 30, 2019).......................21

*Citizens for Responsible Gov't State Political Action Comm. v. Davidson,*
   236 F.3d 1174 (10th Cir. 2000)...............................................................................2

*City of Chicago v. Fulton,*
   141 S. Ct. 585 (2021)............................................................................................11

*Connally v. Gen. Constr. Co.,*
   269 U.S. 385 (1926)................................................................................................9

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
   269 F.3d 1149 (10th Cir. 2001)..............................................................................23

*Elrod v. Burns,*
   427 U.S. 347 (1976)..............................................................................................23

*Ent. Software Ass'n v. Swanson,*
   519 F.3d 768 (8th Cir. 2008)..................................................................................17

*Epperson v. State of Arkansas,*
   393 U.S. 97 (1968) ...............................................................................................13

*Fish v. Kobach,*
    840 F.3d 710 (10th Cir 2016)..........................................................................23, 24

*Free the Nipple-Fort Collins v. City of Fort Collins,*
    916 F.3d 792 (10th Cir. 2019)..........................................................................22, 23

*Gonzalez v. Douglas,*
    269 F. Supp. 948 (D. Ariz. 2017).....................................................................15, 17

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)................................................................................................8

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988)......................................................................................*passim*

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. Rehab. Servs.,*
    31 F.3d 1536 (10th Cir. 1994)...............................................................................24

*Mahanoy Area Sch. Dist. v. B.L.,*
    141 S. Ct. 2038 (2021)............................................................................................4

*Navajo Nation v. Dalley,*
    896 F.3d 1196 (10th Cir. 2018)............................................................................11

*Nova Records, Inc. v. Sendak,*
    706 F.2d 782 (7th Cir. 1983)..................................................................................7

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004)...............................................................................20

*Pac Frontier v. Pleasant Grove City,*
    414 F.3d 1221 (10th Cir. 2005).............................................................................25

*Planned Parenthood of Rocky Mountains Servs. Corp. v. Owens,*
    287 F.3d 910 (10th Cir. 2002).................................................................................3

*Prairie Band of Potawatomi Indians v. Pierce,*
    253 F.3d 1234 (10th Cir. 2001)..............................................................................22

*R.I. Med. Soc'y v. Whitehouse,*
    66 F. Supp. 2d 288 (D.R.I. 1999)............................................................................7

*RoDa Drilling Co. v. Siegal,*
    552 F.3d 1203 (10th Cir. 2009).......................................................................20, 24

*S. Wind Women's Ctr. LLC v. Stitt,*
    455 F. Supp. 3d 1219 (W.D. Okla. 2020) .................................................................23

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
    508 F. Supp. 3d 521 (N.D. Cal. 2020) .....................................................................4

*Schrier v. Univ. of Colorado,*
    427 F.3d 1253 (10th Cir. 2005) ....................................................................21, 23

*Stenberg v. Carhart,*
    530 U.S. 914 (2000) ..................................................................................3

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ..................................................................................4

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454 (1995) .................................................................................14

*United States v. Reese,*
    92 U.S. 214 (1875) ...................................................................................6

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ..................................................................................8

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) ..................................................................................2

*Wilson v. Stocker,*
    819 F.2d 943 (10th Cir. 1987) .................................................................3, 12

**STATUTES**

70 O.S. § 24-157 ...................................................................................*passim*

**OTHER AUTHORITIES**

Aris Folley, *Bernice King Hits GOP: 'Beyond Insulting' to Misuse MLK's
    Teachings to Oppose Critical Race Theory*, The Hill (July 14, 2021) ........................5

Letter from Robin E. Steenman, Chair, Williamson Cty. Moms for Liberty, to
    Dr. Penny Schwinn, Comm'r, Tenn. Dep't of Educ., Against Wit & Wisdom
    Curriculum Pursuant to TCA 49-6-10 (June 30, 2021) ................................................6

Lindsay Schnell, *'Laws in Search of Problems that Don't Exist': Republicans Try to Ban Critical Race Theory in Colleges*, USA Today (June 14, 2021)..............12

Martin Luther King Jr., *A Testament of Hope: The Essential Writings of Martin Luther King Jr.* (1986)..................................................................................................5

Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 29, 2021)...................................................5

Okla. S. 44, 58th Leg., 1st Reg. Sess. (April 21, 2021).......................................................5

Press Release, Sen. Standridge Issues Statement Thanking Fellow Members for Supporting H.B. 1775, Okla. S., (Apr. 22, 2021)........................................................5

## I.      PRELIMINARY STATEMENT

Defendants grossly mischaracterize the fundamental issue before the Court on this motion. Plaintiffs do not claim an affirmative constitutional right to dictate what can be taught in public schools or to supersede the curricular decision-making of education officials. They seek only to ensure that laws enacted by the state governing teachers and students conform with constitutional guarantees of fair notice under the due process clause and freedom of speech under the First Amendment.

Rather, it is the *state legislature* that through H.B. 1775 claims the power to banish certain ideas from the classroom, override local educators' curricular decisions, and further an avowedly political and ideological agenda without serving a legitimate pedagogical interest. The issue on this motion is whether such state-sponsored restrictions on speech are constitutionally permissible.

The answer to that question is plainly "no," and nothing in Defendants' opposition papers suggests otherwise. Defendants do not, because they cannot, point to a single precedent sanctioning such an extraordinary attempt by a state legislature to control the expression of ideas in public schools or university classrooms. As to each of Plaintiffs' three distinct claims, the clear likelihood of success demonstrated in Plaintiffs' moving papers stands unrebutted:

*First*, multiple provisions of H.B. 1775 are vague on their face. In their briefs, Defendants rewrite the law's plain text, inserting words and clarifications where none exist, in order to argue that the law is constitutional. But the actual language of the law contradicts Defendants' strained attempts to clarify and narrow its scope. *Second*, the

law, plainly read, applies to required courses at public universities and prevents the mere presentation of certain views and ideas, whether to support them or refute them. Defendants' focus on voluntary trainings is misplaced; Plaintiffs complain of the widespread chilling effect the law is having on college classrooms across the state. *Third*, the application of the Act is depriving students of their First Amendment right, so vital to the health and proper functioning of a democracy, to receive age-appropriate instruction covering a broad range of information and ideas without partisan political interference. Defendants' contrary arguments distort or simply disregard the factual record before the Court and are flatly inconsistent with controlling precedent.

In sum, H.B. 1775 infringes upon educators' due process rights and the First Amendment rights of students and professors. In addition to showing a clear likelihood of success on the merits of each claim, Plaintiffs have shown that H.B. 1775 causes immediate and irreparable harm, contravenes the public interest, and must be enjoined.

## II.     PLAINTIFFS HAVE DEMONSTRATED A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

### A.     The Act's Vagueness Violates the Due Process Rights of Educators

#### 1.     *The plain text of the Act is ambiguous.*

The Act's vagueness is obvious on its face, so Defendants attempt to read additional words or limitations into the text where none exist. But a federal court cannot "rewrite a state law to conform it to constitutional requirements." *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1194 (10th Cir. 2000) (emphases omitted) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383,

397 (1988)); *see also Wilson v. Stocker*, 819 F.2d 943, 948 (10th Cir. 1987) ("we decline the [Oklahoma] Attorney General's invitation to give the statute a construction more restrictive than that provided by its plain language").[1]

Section (1)(B)(1) states that teachers cannot "require or make part of a course" eight banned concepts. It is unclear whether a teacher violates the law by merely discussing or mentioning the banned concepts, even to criticize them, or whether the law only applies when they require students to agree with those concepts. The State contends that the language is clear because "denouncing something is not the same thing as requiring it or positively making it a part of a course." State Br. at 18, ECF No. 61. But the word "positively" does not appear in the statute. Nor does the statute contain any other language that limits its scope to the *promotion* of the concepts. A reasonable teacher would rationally conclude that they are at risk if they make one of the concepts "part of [their] course" in any way—for example, by introducing them for class debate— as that is precisely what the statute says.

Defendants fare no better in attempting to eliminate the vagueness inherent in the list of banned concepts, which the Oklahoma legislature copied from a law that had already been partially enjoined on vagueness grounds. *See Santa Cruz Lesbian & Gay*

---

[1] Importantly, the Oklahoma AG's purported interpretation of H.B. 1775 is not binding on state courts or school boards charged with enforcing the Act and thus carries no authoritative weight on this motion. *Stenberg v. Carhart*, 530 U.S. 914, 940 (2000); *Planned Parenthood of Rocky Mountains Servs. Corp. v. Owens*, 287 F.3d 910, 925 n.16 (10th Cir. 2002).

*Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543–44 (N.D. Cal. 2020).[2] For example,

Section (1)(B)(1)(d) bans the concept that "members of one race or sex cannot and should

not attempt to treat others without respect to race or sex." This sentence is, at best,

ungrammatical. The triple negative is confusing to the point that teachers have no

guidance as to what they are prohibited from teaching—for example, whether students

can consider how boys', girls', and gender nonconforming children's experiences might

differ—and their licenses are potentially at stake. As Edmond Public Schools ("EPS")

frankly admitted in its guidance to teachers, "no one truly knows what this [provision]

means," Guidance from Edmond Written at 2, ECF No. 1-1—clear proof of the text's

vagueness which Defendants simply ignore.

According to the state, Subsection (d) "prohibits teaching students to reject the

ideal of colorblindness." State Br. at 20. But, aside from ignoring entirely the reference to

"sex" in the subsection, the only explanation the State offers for its interpretation is that

---

[2] Unable to explain how the same provisions are any less vague when found in H.B. 1775, the state argues that *Santa Cruz* "declined" to invalidate the provisions as applied to the federal workforce and analogizes a school classroom to the federal workplace for First Amendment purposes. State Br. at 6–7. But the state fails to note that the *Santa Cruz* court never reached the constitutionality of the Executive Order's workplace provisions because the plaintiffs lacked standing to challenge them. *Santa Cruz*, 508 F. Supp. 3d at 535. Moreover, the state's analogy is entirely inapt: vague laws that chill protected speech have surpassingly greater First Amendment implications when applied to public schools, America's "nurseries of democracy," *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021), where "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding," *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

"Martin Luther King Jr., and others, taught that we should be colorblind." *Id.* [3] This assertion is entirely untethered from the text of the law.

Moreover, the State's argument is inconsistent with statements made by Oklahoma legislators, who disparaged Black Lives Matter,[4] opined that "Police brutality is a lie,"[5] and expressed their desire to eliminate school trainings that discussed  "institutionalized racism."[6] Legislators did not hide their political motivations or their ambition to silence certain viewpoints. And by targeting such a wide range of issues in their statements, legislators highlighted the extent of the ambiguity in what Subsection (d) prohibits.

Likewise, Section (1)(B)(1)(g) prohibits the concept that "any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex." According to the State, this provision does not prohibit a teacher from saying that "slavery was an evil perpetrated mostly by white people." State Br. at 21. While a person might choose to interpret the law in this way, they would have no

---

[3] Plaintiffs dispute Defendants' suggestion that H.B. 1775 is consistent with the teachings of Martin Luther King, Jr. Indeed, Dr. King believed that "[t]he concept of supremacy is so imbedded in the white society that it will take many years for color to cease to be a judgment factor," Martin Luther King Jr., *A Testament of Hope: The Essential Writings of Martin Luther King Jr.* 375 (1986)—the very kind of teaching that the proponents of H.B. 1775 railed against and sought to ban. *See also* Aris Folley, *Bernice King Hits GOP: 'Beyond Insulting' to Misuse MLK's Teachings to Oppose Critical Race Theory*, The Hill (July 14, 2021), https://tinyurl.com/2p8p34xf.
[4] Okla. H.R. 50, 58th Leg., 1st Reg. Sess. (April 29, 2021, 11:09:59–11:10:48 AM), https://www.okhouse.gov/video/default.aspx [hereinafter "April 29th House Session"].
[5] April 29th House Session at 12:08:20–12:08:38 PM.
[6] Okla. S. 44, 58th Leg., 1st Reg. Sess. (April 21, 2021, 11:10:20 - 11:11:40 PM), https://oksenate.gov/live-chamber [hereinafter "April 21st Senate Session"]; Press Release, Sen. Standridge Issues Statement Thanking Fellow Members for Supporting H.B. 1775, Okla. S., (Apr. 22, 2021), https://tinyurl.com/4c6y3s7f.

assurance that those charged with enforcement would agree. Defendants point to nothing in the statutory text that would provide such guidance. *See United States v. Reese*, 92 U.S. 214, 221 (1875) (characterizing a vague law as one which impermissibly sets "a net large enough to catch all possible offenders, and leave[s] it to the courts to step inside and say who could be [found liable]"). Indeed, some parents have interpreted any depiction of segregation as demonstrating anti-White teaching and violating laws that are nearly identical to H.B. 1775.[7]

Teachers who wish to present an honest, age-appropriate portrayal of slavery and racism in history and the present-day justly fear being accused of teaching that White children "should" feel discomfort or guilt. *See* Crawford Decl. ¶¶ 12, 15–16, ECF No. 27-8; NAACP Decl. ¶¶ 15, 17, 19–20, ECF No. 27-5; *see also* AIM Decl. ¶ 26, ECF No. 27-6. A teacher who, for example, discusses notable current events in Oklahoma such as allegations of racial bias in Julius Jones's trial would likely cause exactly the type of discomfort for White students—as well as anguish or other psychological distress for Black students—that H.B. 1775 was designed to outlaw. *See* Compl. ¶¶ 11, 119 & n.46,

---

[7] *See generally* Letter from Robin E. Steenman, Chair, Williamson Cty. Moms for Liberty, to Dr. Penny Schwinn, Comm'r, Tenn. Dep't of Educ., Against Wit & Wisdom Curriculum Pursuant to TCA 49-6-10 (June 30, 2021), https://tinyurl.com/4yf56p74 (alleging violations of a state law that mirrors H.B. 1775's list of banned concepts, for presenting, for example, "photographs of white and colored drinking fountains, asking 'Which of these fountains looks nicer to you?'" and a lesson that has students write a "narrative from the point of view of Ruby Bridges").

124 & n.54, ECF No. 50. H.B. 1775's terms allow and even invite such broad interpretations, chilling First Amendment rights.[8]

In addition to rewriting the text of the law, the State's brief mischaracterizes the promulgated rules. The State suggests that teachers face professional consequences only if found in "willful violation" of H.B. 1775. State Br. at 22. While license *revocation* requires a willful violation*,* the preceding subsection of the Emergency Rules provides that the Education Department can *suspend* the license of any teacher "who is found to have violated 70 O.S. § 24-157(B)." H.B. 1775 Emergency Rules at 5, ECF No. 27-2. There is no willfulness requirement for a suspension, so the State's argument—that the text's vagueness is mitigated because only intentional violations of the law will be punished—holds no water.[9]

Likewise, the State's contention that to suffer a chilling effect, teachers "would have to willfully violate" the law, State Br. at 22, is nonsensical. Speech that is chilled is speech that is never spoken, and by definition entails no violation of the law, willful or otherwise. That is the primary constitutional vice of a vague law. *Grayned v. City of*

---

[8] The State appears to argue that Subsection (g) can apply only where a teacher expressly tells students that they "should" feel discomfort or guilt because of their race, and that teachers should not worry they might be accused of implying to students that they should have such feelings. But nothing in the statute requires such an explicit statement, and the background to the law contradicts any such requirement. *See* Compl., Part IV.c.

[9] In any event, the State's argument that a vague law cannot be held unconstitutional if violations require scienter is simply wrong. *See, e.g., Nova Records, Inc. v. Sendak*, 706 F.2d 782, 789 (7th Cir. 1983) ("[a] scienter requirement cannot eliminate vagueness" if "it is satisfied by an 'intent' to do something that is itself ambiguous"); *R.I. Med. Soc'y v. Whitehouse*, 66 F. Supp. 2d 288, 311 (D.R.I. 1999) (where "scienter requirement modifies a vague term," it "cannot save the Act").

*Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up). In recognition of the unique harm of First Amendment chilling effects, the Supreme Court has held that where a "law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). H.B. 1775 clearly fails that test.

Defendants' argument that H.B. 1775's reference to the Oklahoma Academic Standards somehow cures its infirmities also fails. While the State rattles off a number of topics mentioned in the Academic Standards and notes that the "mere teaching" of those topics would not violate the Act, State Br. at 20–21, it wholly ignores Plaintiffs' showing that teachers in Oklahoma are hopelessly and understandably confused about *how* they can teach those topics in light of H.B. 1775's potentially career-jeopardizing prohibitions. *See, e.g.,* Crawford Decl. ¶¶ 17–19. Similarly, the State offers no response to Plaintiffs' showing that the Act has caused Oklahoma teachers to shy away from historical figures and topics that are *not* expressly mentioned in the Academic Standards. *See, e.g.,* NAACP Decl. ¶ 17.

> 2.   *Defendants' affidavits and evidence do not make the plain text of the law less vague.*

State Defendants submitted affidavits from a pastor, a volunteer for the STOP Critical Race Theory Coalition, and an Oklahoma City high school teacher. Pastor Taylor "read House Bill 1775 several times" and thinks it is constitutional. Taylor Decl. ¶ 8,

ECF No. 61-3. He also thinks that the law would be "very easy to comply with" if he were still an educator. *See id.* at ¶¶ 11, 4. Meanwhile, the STOP Critical Race Theory Coalition seems primarily concerned that "[p]eople are scared of being called a racist." Barresi Decl. ¶ 7, ECF No. 61-4. And Mr. Jones, a teacher and coach writing in his "own personal capacity," used his affidavit to express his belief that the Act was well-written. Jones Decl. ¶¶ 4–5, ECF No. 61-6.

But where a vague law like H.B. 1775 is open to many interpretations, the fact that people may disagree on its meaning is no assurance of the law's constitutionality; indeed, it shows the opposite, since what matters is whether people of reasonable intelligence *agree* on its meaning. *See Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) (a law must be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties," as opposed to being "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."). Defendants' witnesses cannot negate Plaintiffs' experiences of not understanding what conduct could lead to penalties, or the material consequences that the law's vagueness has already had, including removing course materials that engage with race and sex. *See, e.g.,* Killackey Decl. ¶¶ 11–21, ECF No. 27-9; NAACP Decl. ¶¶ 15–24; Crawford Decl. ¶¶ 14–20; AAUP Decl. ¶¶ 10–21, ECF No. 27-4.

Similarly, Defendants cite guidance from advocacy organizations like the NEA, but that guidance actually undermines Defendants' position. *See* State Br. at 16. Indeed, the NEA characterizes H.B. 1775 as "legislation that seeks to stifle discussions on racism,

sexism and inequity in public school classrooms," and as a "dangerous attempt[] to stoke fears and rewrite history [which] not only diminish[es] the injustices experienced by generations of Americans [but also] [] prevent[s] educators from challenging our students to achieve a more equitable future." NEA Guide at 3, ECF No. 61-7. The guidance also suggests that teachers should get approval from school administrators before discussing racial issues that are likely to "generate controversy"—a clear by-product of the law's vagueness and a vivid example of the law's chilling effect. *Id.* at 5–6.[10]

Meanwhile, Defendants do not dispute that EPS provided teachers with a slide telling them to avoid using the word "diversity," because "'[d]iversity' is not a stand-alone standard of the Oklahoma Academic Standards"—confirming Plaintiffs' allegation that H.B. 1775 forces educators to refrain from addressing any topics not explicitly mentioned in the standards. *See* Rasnic Decl. ¶ 8, ECF No. 60-2. EPS's witnesses say that they later revised this guidance, discouraging teachers only from "titl[ing] lessons with words like 'diversity'," while permitting them to teach about "diversity and related topics . . . as appropriate given the specific content of a particular lesson." *Id.* But EPS's arbitrary line-drawing between discussing diversity (permissible) and using the word in a lesson title (prohibited) in a tortured attempt to apply H.B. 1775 only further illustrates the Act's vagueness and the confusion it is engendering for educators across the state.

### B.   H.B. 1775's Overbroad Terms Reach into the College Classroom

---

[10] Defendants tout the NEA's purported "admi[ssion]" that H.B. 1775 "does not prevent the teaching . . . [of a topic] 'that is in compliance with the Oklahoma Academic Standards.'" State Br. at 10 (quoting NEA Guide at 5). But that statement does no more than echo Section (B) of H.B. 1775, which does not cure the Act's vagueness.

Defendants agree that "university professors have a unique First Amendment right to academic freedom" and that H.B. 1775 would exceed constitutional bounds if its prohibitions applied to university classroom study or academic research. State Br. at 22; OU Br. at 9, ECF No. 58.[11] To save the law, Defendants ignore its plainly overbroad text, which prohibits "any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex" at colleges and universities. 70 O.S. § 24-157(1)(A)(1). OU Defendants argue that "Section (1)(A)(1) applies to trainings and orientations, not to classroom study or academic research," OU MTD. at 9, ECF No. 51; State Br. at 23, but they reach this conclusion by reading "[a]ny orientation *or* requirement" to mean "required orientations." OU Br. at 5. That violates the most basic canon of statutory construction, *i.e.*, that every word in the statute has meaning and none are superfluous. *See City of Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018). The indisputable plain meaning of the second sentence of Section (1)(A)(1) is that the prohibition applies to (1) any orientation, whether required or not; and (2) any requirement, whether included in an orientation or not.

Indeed, university administrators have already modified academic content at OU based on their reasonable belief that H.B. 1775 applies to classroom teaching. A department chair, acting on guidance from the Office of the Dean of the Arts and

---

[11] Contrary to Defendants' misapprehension, State Br. at 18–19; EPS Br. at 9–10, Plaintiffs do not make a First Amendment academic freedom claim on behalf of K-12 teachers. *See* Compl. ¶ 175.

Sciences College, told a Human Relations instructor that they can no longer test students on Critical Race Theory, which is a key concept in their course. Exhibit 2, Doe Decl. ¶ 6. *See also* Compl. ¶ 3. And professors have reasonably read the law's broad terms to prohibit required readings that could raise discussions about race- and sex-based bias. Compl. ¶ 75; AAUP Decl. ¶ 14. Modifications to university curricula—including cancellations of entire courses[12] and lessons alike—have shown that reasonable people interpret the Act as restricting speech in college classes.

Given the text's plain meaning and the undisputed record evidence demonstrating that the Act is chilling speech in college classrooms, the OU Regents' assurance they do not interpret the Act to affect classroom instruction is entitled to no weight on this motion. *See Wilson*, 819 F.2d at 948 ("In determining the scope of a statute, a court must begin with the statutory language itself. . . . When the terms of the statute are clear and unambiguous, that language is controlling absent rare and exceptional circumstances") (citations omitted).

### C.    H.B. 1775 Violates Students' First Amendment Right to Receive Information and Ideas

Defendants misconstrue Plaintiffs' right to information claim and the prevailing case law. Plaintiffs do not claim a right to "dictate school curricula" or to "be taught a

---

[12] Lindsay Schnell, *'Laws in Search of Problems that Don't Exist': Republicans Try to Ban Critical Race Theory in Colleges*, USA Today (June 14, 2021), https://tinyurl.com/3w6zjdht (describing an Oklahoma City Community College course on Race and Ethnicity put on hold because of H.B. 1775. The course was later re-instated after public outcry.).

specific concept." State Br. at 16, 18. To the contrary, Plaintiffs argue—supported by applicable case law—that the state is not able to *constrict* students' access to information when its restrictions are not related to a legitimate pedagogical basis or when an it acts on the basis of an illicit motive. *See* PI Mot. 19–20, ECF No. 27; *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) ("*Hazelwood*"); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982). Defendants have failed to proffer any evidence showing a legitimate purpose for H.B. 1775's censorship of classroom discussions, much less how its restrictions are "reasonably related to legitimate pedagogical concerns," *Hazelwood*, 484 U.S. at 273, and have failed to rebut the evidence demonstrating H.B. 1775's suppression of ideas and information.

The cases cited by Defendants actually bolster Plaintiffs' argument. For example, Defendants cite *Epperson v. State of Arkansas*, 393 U.S. 97 (1968), to support the proposition that states enjoy an unrestricted right to "prescribe the curriculum for its public schools." *See* State Br. at 14. But in the very passage cited by the State, the Supreme Court explicitly *rejected* that position. *Epperson,* 393 U.S. at 107. In *Epperson*, the Court struck down under the First Amendment an Arkansas statute that prohibited the teaching of human evolution in public schools. In so doing, *Epperson* held that a state cannot "impose upon the teachers in its schools any conditions that it chooses" and cannot prohibit teaching a "theory or doctrine where that prohibition is based upon reasons that violate the First Amendment." *Id*. That is precisely what the evidence shows H.B. 1775 does here.

The State wrongly suggests that no constitutional violation has occurred because banning "divisive concepts about race and sex" is "related to pedagogical concerns, almost by definition." State Br. at 20. That is not the governing standard. To avoid violating the First Amendment, governmental actors can restrict in-class, school-sponsored speech only if such restrictions are "*reasonably* related to *legitimate* pedagogical concerns." *Hazelwood*, 484 U.S. at 273 (emphasis added); *see also Axson-Flynn v. Johnson,* 356 F.3d 1277, 1290 (10th Cir. 2004). Even if a state articulates a legitimate interest, a plaintiff may establish a First Amendment violation by proving that the reasons offered by the state mask other illicit motivations. *See Pico*, 457 U.S. at 853; *see also Axson-Flynn v. Johnson,* 356 F.3d at 1290. At all times, the state must show "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995) (citation omitted). Defendants fail to contend with *Hazelwood, Pico,* and controlling First Amendment standards.

While the Tenth Circuit has not yet addressed the curricular context, sister circuits have applied the *Hazelwood* standard to students' right to information claims because it strikes the right balance "between a student's First Amendment rights and a state's authority in educational matters." *Arce v. Douglas*, 793 F.3d 968, 982–83 (9th Cir. 2015). In *Arce*, the Ninth Circuit examined remarkably similar restrictions on students' access to ideas. There, Arizona had enacted a law that sought to censor ethnic studies programs, and high school students enrolled in Tucson's Mexican American Studies ("MAS") program brought First and Fourteenth Amendment challenges. The Ninth Circuit rejected

14

the state's argument that curricular restrictions were entirely "immune" from challenge, because students had a cognizable First Amendment right to information. *Arce,* 793 F.3d at 982. The court applied *Hazelwood* and held defendants' limitations on school curricula would only pass constitutional muster if "reasonably related to legitimate pedagogical concerns." *Id.* at 983.

Defendants have offered no reason, nor any case law, that argues against applying the *Hazelwood* test to evaluate students' right to information claim. Instead, they attempt to distinguish *Pico* because that case involved "actively remov[ing] books from the school library." State Br. at 19; EPS Br. at 11. But this distinction does not undercut *Pico*'s core holding that the "Constitution does not permit the official suppression of ideas" based upon "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the governmental actor] disagree[s]." *Pico*, 457 U.S. at 870-72. Indeed, in *Arce,* the Ninth Circuit applied *Hazelwood* but also recognized *Pico*'s guiding principle that governmental actors are circumscribed by students' "rights of speech, press, and political freedom." 793 F.3d at 983 (citing *Pico,* 457 U.S. at 867). And, on remand, the district court invoked *Pico* to scrutinize, and ultimately strike down, the law's provisions for illegitimate partisan and racial motives. *Gonzalez v. Douglas*, 269 F. Supp. 948, 972–74 (D. Ariz. 2017). In any event, Defendants' arguments against *Pico* cannot rebut their obligation under *Hazelwood* to demonstrate that H.B. 1775's speech restrictions are "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273.

The State's brief asserts H.B. 1775 seeks to "protect[] children from race and sex discrimination." State Br. at 7. But the State's ostensible interest fails the *Hazelwood* standard on several grounds. The Act bans *speech about* discrimination, not discrimination itself. The Act's vague and overbroad language chills a broad swath of speech that merely discusses racism and sexism, thereby preventing students from learning about discrimination and acquiring tools to address it. *See* Sections II.B., II.C.

Moreover, the State's attempt to characterize H.B. 1775 as an "anti-discrimination" law cannot camouflage the legislature's true illegitimate motive: silencing particular ideas based on narrowly partisan interests. *See* PI Mot. 8–9. Defendants never refute that legislators openly declared the express purpose of the Act was to "stop the use of words like 'diversity' instead of 'excellence,'" prohibit discussions of "the theory of implicit bias," and suppress discussion of "police brutality," among other concepts that address inequities facing communities of color. *Id*; *see, e.g.,* Compl. ¶¶ 117, 120, 123. Nor do Defendants deny the racially and ideologically charged rhetoric of H.B. 1775's proponents, Compl. ¶¶ 116–17, 119–24, the highly unusual decision of the legislature to override the curricular decisions made by local educators, Compl. ¶¶ 127–28, and the strictly partisan vote that bypassed normal legislative procedure, Compl. ¶¶ 109–113. Nor do Defendants deny the absence of any mention in the legislative record of specific instances of discrimination in *Oklahoma* that needed fixing by H.B. 1775. *See id.* at ¶ 6. These unrebutted facts demonstrate the Act's true, illicit aim: to stifle the exchange of ideas with which legislators disagree in order "to

prescribe what shall be orthodox in politics nationalism, religion, and other matters of public opinion." *Pico,* 457 U.S. at 872 (citation omitted).

The existence of other anti-discrimination laws further corroborates the fact that state legislators did not pass H.B. 1775 to prohibit harmful and illegal conduct, but to silence speech with which it disagrees. As Defendants acknowledge, the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964 address acts of racial or sexual discrimination in schools. *See* State Br. at 10. Oklahoma lawmakers did not need to pass H.B. 1775 to reach purported discriminatory conduct, further indicating other illicit motives were at play. *See, e.g., Gonzalez,* 269 F. Supp. 3d. 948, 966 (existence of other state laws addressing purported issues evidences discriminatory intent).

Defendants' laundry list of alleged classroom conduct in other states is similarly irrelevant to the *Hazelwood* test. *See* State Br. at 9–10. It is telling that Defendants, in attempting to justify H.B. 1775, are forced to rely on politicized media reports of purported practices in Illinois, North Carolina, and elsewhere. *See Awad v. Ziriax,* 670 F.3d 1111, 1130 (10th Cir. 2012) (state officials "did not know of even a single instance where an Oklahoma court had applied Sharia law or used the legal precepts of other nations or cultures, let alone that such applications or uses had resulted in concrete problems in Oklahoma."); *Ent. Software Ass'n v. Swanson,* 519 F.3d 768, 772 (8th Cir. 2008) ("Where first amendment rights are at stake, 'the Government must present more than anecdote and supposition.'"). This only confirms what Plaintiffs' evidence has

17

amply shown: H.B. 1775 is a politically driven effort to override the judgment of local educators and chill a broad swath of classroom speech disliked by a partisan majority.

H.B. 1775 has had its intended effect: the law has restricted students' access to ideas by causing educators to remove from their courses diverse perspectives, historical figures, and theories that they otherwise would have offered to fulfill the state's educational goals of "reflect[ing] the richness and diversity of the human experience" and encouraging "multiple points of view." *See* PI Mot. at 9 n.22; Killackey Decl. ¶¶ 16–17; NAACP Decl. ¶¶ 17, 19–23; AAUP Decl. ¶¶ 13, 18–19, 21. Defendants do not directly dispute that university students have at least as much of a right to information as younger students, but rather contend H.B. 1775 does not reach into university classrooms. *See* State Br. at 7, OU Br. at 7-8. But as described above, H.B. 1775 has chilled in-class speech as many professors are now refraining from presenting material on race, gender, and sexual orientation. AAUP Decl. ¶¶ 13, 18–19, 21. In so doing, H.B. 1775 denies students access to information that is integral to their fields of study. *Id.* ¶¶ 9–22; BERT Decl. ¶¶ 12, 16–17; Exhibit 1, Second BERT Decl. ¶ 11.

Primary and secondary school students have also lost access to diverse viewpoints for no legitimate purpose. Because of the Act, Teacher B.B.'s students are no longer learning about Black women who are not named in Oklahoma's state standards. NAACP Decl. ¶ 17. And many EPS students will no longer read books by Black and female authors, or engage in robust discussions about racism, because of the law's chilling effects. Killackey Decl. ¶¶ 13, 16. EPS claims that H.B. 1775 did not play a role in changing its curricula. EPS Br. at 6. But this contention is not credible. EPS's

declarations reflect the District changed its reading list over the same period that the District discussed implementing H.B. 1775 and prepared guidance telling teachers to avoid the terms "diversity" and "white privilege." Rasnic Decl. ¶¶ 3, 4, 12. It strains credulity to conclude that H.B. 1775 did not influence the District's decision to remove every non-White author from its required, on-level high school English reading list.[13]

But even taking all of EPS's alleged facts as true, H.B. 1775 has created a reasonable fear of enforcement such that teachers are left with little choice but to restrict students' access to information. EPS readily admits that its PowerPoint presentation regarding H.B. 1775 told teachers to avoid the terms "diversity" and "white privilege," Rasnic Decl. ¶ 4; and as discussed above, EPS's subsequent guidance compounded the murkiness of the prohibitions. *See supra Section* II.A. Indeed, EPS's opaque directives have prevented Regan Killackey, and likely other teachers, from teaching texts such as *To Kill a Mockingbird* through lenses that push students to engage in inquiry related to race and racism. Killackey Decl. ¶ 16. EPS does not dispute that such chilling effects have occurred, and the District has even acknowledged H.B. 1775 presents "very real societal concerns." EPS MTD at 15, ECF No. 52. Ultimately, the threat of H.B. 1775 causes Mr. Killackey and other teachers to offer a "whitewashed version of English literature" which infringes on NAACP member Student A.A's right to information and

---

[13] *Compare* Exhibit 3, 2019 Reading List (requiring 11th graders to read *I Know Why the Caged Bird Sings* by Maya Angelou *or The House on Mango Street* by Sandra Cisneros) *with* ECF No. 60-2, Rasnic Decl. at 8–10 (attaching 2021 Reading list that removes authors of color from the required books for on-level, high school English).

"is detrimental to all [] students but especially students of color." NAACP Decl. ¶ 13; Killackey Decl. ¶ 16; Dr. Lynn Decl. ¶¶ 6–8.

## III.   PLAINTIFFS HAVE SATISFIED ALL THE CRITERIA FOR PRELIMINARY INJUNCTIVE RELIEF

Defendants' arguments that Plaintiffs have failed to meet the standard for a preliminary injunction are likewise unavailing. Defendants each urge that a heightened standard should apply because Plaintiffs are seeking relief that is "disfavored." *See* State Br. at 10–11; OU Br. at 3; EPS Br. at 5–7). But the preliminary injunctive relief requested here does not fall into any of the three disfavored categories. And even if it did, the accompanying heightened standard is satisfied.

### A.   Plaintiffs' Requested Relief is Not "Disfavored" and No Heightened Standard Applies

As Defendants note, preliminary injunctions seeking to (1) alter the status quo, (2) mandate some action to be taken by the defendant, or (3) afford plaintiff all of the relief it could recover following a full trial on the merits are "disfavored," and thus "should be even more closely scrutinized to assure that the exigencies of the case support" the requested relief. *See, e.g., O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975–76, 979 (10th Cir. 2004) (*en banc*); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208–09 (10th Cir. 2009). Plaintiffs' requested relief falls into none of these disfavored categories.

The State and OU argue for a heightened standard because Plaintiffs purportedly are seeking to upend the status quo because H.B. 1775 was already "in effect" when this

lawsuit was filed. *See* State Br. at 9–11; OU Br. at 3. They are wrong.[14] In *BNSF Ry. Co. v. City of Edmond, Oklahoma*, No. CIV-19-769-G, 2019 WL 5608680, at *2 & n.1 (W.D. Okla. Oct. 30, 2019), this Court rejected the same argument, holding that the status quo for a newly enacted statute is the time period "prior to the Statute's enactment" and that the plaintiffs' request for preliminary injunctive relief therefore "does not seek to disturb the status quo and is not subject to heightened scrutiny" even though the statute had been in effect for several months. *See also ACLU v. Praeger*, 815 F. Supp.2d 1204, 1208–09 (D. Kan. 2011) (also rejecting this argument, and holding that "the last uncontested status between the parties before the dispute arose would be that which existed prior to the challenged statute taking effect").

OU and EPS also argue that the requested injunction is disfavored because it would mandate action by Defendants, and simultaneously provides Plaintiffs with all of the relief they could obtain at trial. OU Br. at 3; EPS Br. at 7. Those arguments effectively would subject *all* requests for preliminary injunctive relief pertaining to newly enacted statutes to a heightened standard. That is not the law, and for good reason. Plaintiffs seek only to enjoin Defendants from taking steps to enforce H.B. 1775 until their constitutional challenges are fully resolved on the merits. That is quintessentially prohibitory—not mandatory—relief. *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1261 (10th Cir. 2005) (an "injunction is mandatory if the requested relief 'affirmatively

---

[14] EPS appears to agree with Plaintiffs, recognizing that "[h]ere, the status quo is arguably the relationship between the parties *prior to* the passage of, and District's attempt to comply with, H.B. 1775." (EPS Br. at 7 (emphasis added).)

require[s] the nonmovant to act in a particular way'") (citations omitted). Ordering Defendants to take no further action to enforce H.B. 1775 pending trial is *not* the same as requiring schools to rework class schedules or affirmatively change classroom curricula.

Defendants' assertions that the requested injunction seeks all of the relief Plaintiffs could obtain at trial are also baseless. OU Br. at 3; EPS Br. at 7. As the Tenth Circuit has explained, this category is not interpreted to "describe any injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001) (internal quotations and citations omitted). Rather, "'all the relief to which a plaintiff may be entitled' must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone." *Id.* Here, Defendants do not even argue that a preliminary injunction could not be "undone" after trial. Nor could they. *See, e.g., Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797–98 & n.3 (10th Cir. 2019) (explaining that the district court's application of the heightened standard applicable to disfavored injunctions "was likely in error" because "if the plaintiffs lose on the merits after a trial, then Fort Collins may fully enforce its public-nudity ordinance").

## B.    Under Any Standard, Plaintiffs Are Entitled to Relief

Even if Plaintiffs were seeking a disfavored injunction, they still would be able to satisfy the heightened standard applicable to such injunctions. "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a 'strong showing' that these tilt in her favor." *Free the Nipple-Fort Collins*, 916 F.3d at 797 (citations omitted); *see also*

22

*Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir 2016). That standard (as well as, *a fortiori*, the traditional standard) is amply met here.[15]

*First*, for all the reasons discussed above, Plaintiffs have not merely established a substantial likelihood of success on the merits, but have made a strong showing that H.B. 1775 violates Plaintiffs' constitutional rights to due process and free speech.

*Second*, Plaintiffs have sufficiently demonstrated irreparable harm to support injunctive relief. Not only does OU cite no authority for saying enforcement rules are a required predicate for harm (OU Br. at 8), but the argument rests on a fundamental misunderstanding of the nature of the harms caused by an unconstitutional law directed at speech. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (ongoing violation of Plaintiff's First Amendment freedoms and due process rights "unquestionably constitutes irreparable injury"). For this reason alone the irreparable injury requirement is satisfied. *S. Wind Women's Ctr. LLC v. Stitt*, 455 F. Supp. 3d 1219, 1231 (W.D. Okla. 2020) (Goodwin, J.) ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury.") (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 805).

---

[15] Citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001), the State suggests that "for a disfavored motion, the movant has a heightened burden and must show that the traditional four factors weigh *'heavily and compellingly'* in favor of the motion." State Br. at 11 (emphasis added). That is untrue. "Simply stated, the requirement that a movant requesting a disfavored injunction must make a showing that the traditional four factors weigh heavily and compellingly in his favor is no longer the law of the circuit." *Schrier*, 427 F.3d at 1261; *see also Free the Nipple-Fort Collins*, 916 F.3d at 797 (noting that "we 'jettison[ed]' the heavily-and-compellingly requirement over a decade ago").

Defendants also contend that Plaintiffs have not explained why H.B. 1775 will restrict students from learning about Black authors in class or accessing those works in the school library, and "[n]o one is being harmed by District's Guidance." State Br. at 24; EPS Br. at 12. Those arguments are equally specious. The sole issue is whether the state can prohibit discussion *in the classroom* of topics and ideas with which it disagrees—it can't. Yet H.B. 1775 does just that, suppressing the mere mention of certain ideas and concepts in classrooms across the state. And as discussed above, the evidence shows that the law is having precisely that effect. *See supra Section* II.C.

Nor is Plaintiffs' showing of irreparable harm negated by the purported delay between the time when H.B. 1775 became effective in July 2021 and Plaintiffs' request to enjoin its enforcement in October 2021. OU Br. at 9–10. The key is "whether the delay was reasonable, was not a decision by a party to 'sit on its rights,' and did not prejudice the opposing party." *Fish*, 840 F.3d at 753. Here, it was entirely reasonable for Plaintiffs to file this lawsuit three months after H.B. 1775 became effective, once the chilling effect it was having on First Amendment rights became evident and documented. *RoDa Drilling*, 552 F.3d at 1211 ("we [have] have held that a three-month delay in filing did not defeat a claim of irreparable injury" when it was attributable in part to "the need for further documentation of the harm") (citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. Rehab. Servs.*, 31 F.3d 1536, 1544 (10th Cir. 1994) ("We are reluctant to criticize plaintiffs for awaiting specific and concrete documentation" of their alleged harms, and noting that "[w]ithout such documentation, they run the risk of having their claimed injury be deemed speculative.")). Any suggestion that Plaintiffs sat on their rights is

24

simply untrue. In fact, OU itself argues the exact opposite elsewhere. OU Br. at 8

(criticizing Plaintiffs for purportedly prematurely seeking injunctive relief).

*Finally*, the balance-of-harms and public policy factors strongly weigh in favor of

granting the preliminary injunction. *Pac Frontier v. Pleasant Grove City*, 414 F.3d 1221,

1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public

interest."). Juxtaposed against the ongoing First Amendment violations, Defendants raise

various concerns that are beyond reason. They do not (and cannot) explain why enjoining

H.B. 1775 would require *any* adjustment to existing curricula or schedules, *see* OU Br. at

3; how *any* EPS personnel could possibly still be at risk of discipline under a law the state

and school district are expressly enjoined from enforcing, *see* EPS Br., at 12–13; or how

an injunction would interfere with combatting "race and sex discrimination" when there

is no concrete evidence that instruction promoting "racist or sexist concepts" was

occurring in Oklahoma prior to H.B. 1775. State Br. at 1–2. *See also Awad*, 670 F.3d at

1132 (Delayed implementation "that does not appear to address any immediate problem

will generally not cause material harm, even if … eventually found to be constitutional").

Plaintiffs have met the requirements for preliminary injunctive relief. The state

legislature's misguided attempt to usurp local officials' authority to set public classroom

curricula by trampling First Amendment freedoms should be enjoined pending trial.

## IV.    CONCLUSION

For the above reasons, Plaintiffs respectfully ask this Court to preliminarily enjoin

Defendants from enforcing this vague, overbroad, and viewpoint discriminatory Act.

Dated: January 13, 2022

Genevieve Bonadies Torres
David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
   UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005


Gary Stein
Michael Cutini
Sara Solfanelli
Elahe Hosseini
Amir Shakoorian Tabrizi
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org


Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004


*Counsel for Plaintiffs*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2022, I electronically filed the foregoing Plaintiffs' Consolidated Reply in Support of Their Motion for a Preliminary Injunction with the Clerk of Court via the Court's CM/ECF system, which effects service upon all counsel of record.


Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@aclu.ok.org


*Counsel for Plaintiffs*