21-CV-1022-G

---

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

---

BLACK EMERGENCY
RESPONSE TEAM, *et al.*

*Plaintiffs,*

v.

JOHN M. O'CONNOR,
*in his official capacity, et al.*

*Defendants.*

---

SUPPLEMENTAL RESPONSE OF DEFENDANTS [1-18]

---

# <u>TABLE OF CONTENTS</u>

Table of Contents.................................................................................................................i

Table of Authorities...........................................................................................................ii

ARGUMENT........................................................................................................................2

    I.  Plaintiffs' supplemental submission is largely irrelevant to their as-applied and facial challenges. .......................................................................................................2

    II. Plaintiffs have not met their burden of showing the Tulsa and Mustang enforcement actions conflict with the Constitution............................................5

        *a.*  *Mustang's "Privilege Walk" for children violated HB 1775.* ...............................6

        *b.*  *Tulsa telling teachers they are unconsciously racist violated HB 1775.* ................8

    III. Plaintiffs' additional arguments do not demonstrate unconstitutionality. ...................10

    CONCLUSION ..........................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010)..................................................................................................4

*City of Chicago v. Morales,*
527 U.S. 41 (1999)....................................................................................................4

*Doctor John's, Inc. v. City of Roy,*
465 F.3d 1150 (10th Cir. 2006) ...............................................................................4

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
269 F.3d 1149 (10th Cir. 2001) ...............................................................................2

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
528 U.S. 167 (2000)..................................................................................................3

*Johnson v. United States,*
576 U.S. 591 (2015).............................................................................................1, 9

*Kane v. De Blasio,*
19 F.4th 152 (2d. Cir 2021)......................................................................................4

*McCullen v. Coakley,*
573 U.S. 464 (2014)..................................................................................................2

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
389 F.3d 973 (10th Cir. 2014)..................................................................................2

*Republican Party of Minn., Third Cong. Dist. v. Klobuchar,*
381 F.3d 785 (8th Cir. 2004).....................................................................................5

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009)..................................................................................................3

*United States v. Dillard,*
795 F.3d 1191 (10th Cir. 2015) ..............................................................................13

*United States v. Henry,*
468 F.2d 892 (10th Cir. 1972) ................................................................................14

*United States v. Streett,*
434 F. Supp. 3d 1125 (D.N.M. 2020)........................................................................4

*United States v. Williams*,
 553 U.S. 285 (2008)............................................................................................ 4, 9

*Village of Hoffman Estates v. Flipside, Hoffman Estates*,
 455 U.S. 489 (1982)...............................................................................................9

*Ward v. Utah*,
 398 F.3d 1239 (10th Cir. 2005) ............................................................................4

*Washington State Grange v. Washington State Republican Party*,
 552 U.S. 442 (2008)...............................................................................................4

**Other Authorities**

Frederick L. Oswald et al., *Predicting Ethnic and Racial Discrimination. A Meta-Analysis of IAT
 Criterion Studies*,
 105 J. PERSONALITY & SOC. PSYCHOL. 171 (2013) ........................................12

Jesse Singal, *Psychology's Favorite Tool for Measuring Racism Isn't Up to the Job*,
 THE CUT, NEW YORK MAGAZINE, https://www.thecut.com/2017/01/psychologys-
 racism-measuring-tool-isnt-up-to-the-job.html ..............................................12

Michael R. Andreychik & Michael J. Gill, *Do Negative Implicit Associations Indicate Negative
 Attitudes? Social Explanations Moderate Whether Ostensible "Negative" Associations are
 Prejudice-Based or Empathy-Based*,
 48 J. EXPERIMENTAL SOC. PSYCHOL. 1082 (2012) ........................................12

Yoav Bar-Anan & Brian A. Nosek, *A Comparative Investigation of Seven Indirect Attitude
 Measures*,
 46 BEHAV. RES. METHODS 668, 676 (2014) ....................................................12

House Bill 1775 (HB 1775), which prohibits certain racist and sexist concepts from being taught to Oklahoma schoolchildren, has been the law in Oklahoma for 14 months. That means it has now governed an entire school year for roughly 500 Oklahoma school districts, 1,750 schools, and 700,000 students. So far, throughout all those schools and districts, the State has found two violations of the law: one in Tulsa and one in Mustang. The State Department of Education agreed with the State Board of Education on the existence of those violations, although the appropriate level of response was disputed.

Before the administrative process was over for Tulsa and Mustang, Plaintiffs ran to this Court claiming that the situation validated everything Plaintiffs argued in the first place. But neither Tulsa Public Schools nor Mustang Public Schools are plaintiffs here, nor are any individual named Plaintiffs located in those school districts. Thus, the supplement is all but irrelevant to the purported "as-applied" challenges brought by Plaintiffs. The supplement is similarly irrelevant to Plaintiffs' facial challenge, as individual enforcement actions, no matter how hotly disputed, cannot show that the law is incapable of proper application more broadly.

In any event, Tulsa did violate the law by instructing teachers that they are unconsciously racist. And even if this was a close call, "clear laws [can] produce close cases," *Johnson v. United States*, 576 U.S. 591, 601 (2015). Moreover, the Mustang violation was not particularly close: children were led by a teacher to participate in a "white privilege" walk, an "intens[e]" exercise the objective of which was to raise the children's "awareness" of their white privilege and other privileges. Ex. 1, Mustang Privilege Walk at 1.

For those reasons and more, this Court should decline Plaintiffs' invitation to, on a rolling basis, investigate and micromanage the State's reasonable enforcement of HB 1775.

## ARGUMENT

To reiterate: A preliminary injunction that upsets the status quo is an "extraordinary" and "disfavored" remedy. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975-76; *see also* Doc. 61 at 10-11. Moreover, when the status quo is threatened as it is here, the party seeking an injunction has the "heightened burden of showing that the traditional four factors weigh heavily and compellingly in its favor." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001). Plaintiffs' supplemental submission does little to help Plaintiffs clear this enormous hurdle.

## I.   Plaintiffs' supplemental submission is largely irrelevant to their as-applied and facial challenges.

The first problem with Plaintiffs' supplemental submission is its general lack of relevance either to their alleged as-applied challenges or to their facial challenge.

**As-applied Challenge:** Plaintiffs' supplement focuses on a single application of HB 1775, which resulted in the State Board of Education issuing an accreditation warning to Tulsa Public Schools. But Tulsa Public Schools is not a plaintiff here. Thus, even putting other justiciability issues aside,[1] it would not appear likely that any named Plaintiff has standing to challenge this single accreditation warning on an as-applied basis for the simple reason that the law has not been applied to them. *See McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014) ("[A] plaintiff generally cannot prevail on an as-applied challenge without showing that the

---

[1] It is doubtful, for instance, whether an "Accredited with Warning" designation would even count as an injury-in-fact. School districts do not have a legally protected interest in a specific level of accreditation. Additionally, the extremely remote "possibility" that a district's accreditation status would continue to be downgraded to the point of losing accreditation is not a a concrete harm.

law has in fact been (or is sufficiently likely to be) unconstitutionally applied to him."); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (for standing, a plaintiff must establish an injury in fact, a causal connection, and a likelihood of redress).

Plaintiffs do argue that the State's "enforcement action directly implicates" Plaintiffs such as the NAACP and AIM Indian Territory because those "organizations have members that are students, parents, and educators within Tulsa Public Schools." Suppl. Br. at 11. But none of the *named* individual Plaintiffs are in the Tulsa Public Schools. *See, e.g.*, Doc. 50 at 12, ¶ 18 (placing two Plaintiffs at Millwood High School.). And Plaintiffs cite no precedent to support the proposition that an *unnamed* member of a third-party advocacy group could provide standing to support an as-applied challenge in a circumstance like this. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (the Article III "requirement of naming the affected members" can be dispensed with "only where *all* the members of the organization are affected by the challenged activity" (emphasis added)). Nor, indeed, do Plaintiffs explain how even Tulsa teachers or students could have as-applied standing when the State's warning was only applied to the Tulsa Public Schools as an entity, rather than to any individual.

Plaintiffs, in short, do not really try to argue that this Court should enjoin the State from classifying Tulsa Public Schools as accredited with warning. Nor do they expressly argue that the Tulsa situation somehow bolsters their existing as-applied challenges. (And how could it? The law hasn't been applied to any Plaintiff.)  Rather, they just want to point to the Tulsa situation as an example of why this Court should enjoin the State from enforcing the law in its entirety, against any school district. *See, e.g.*, Suppl. Br. at 11 (complaining that the Tulsa enforcement "stifle[s] constitutionally protected speech far beyond Tulsa Public Schools by

3

sending a clear directive to educators and districts throughout Oklahoma …"); *id.* at 12 ("Plaintiffs … respectfully urge the Court to grant their motion for a preliminary injunction."). That, of course, is a remedy that follows a facial challenge, not an as-applied challenge.

**Facial Challenge:** As Defendants 1-18 have already detailed, *see* Doc. 61 at 12, 17-18, 22-23, courts must exercise caution in "applying a most exacting analysis" to facial challenges because these lawsuits "push the judiciary towards the edge of its traditional purview and expertise." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). A plaintiff "must show, at a minimum, that the challenged law would be vague in the vast majority of its applications; that is, that 'vagueness permeates the text of [the] law.'" *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)). A facial challenge based on First Amendment overbreadth claims, similarly, will only be successful if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n.6 (2008) (citations and internal marks omitted). The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial." *United States v. Williams*, 553 U.S. 285, 292 (2008).

The distinction between facial and as-applied challenges "is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court…." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Therefore, even a "successful as-applied challenge" is "not sufficient" to make out a "successful facial challenge." *United States v. Streett*, 434 F. Supp. 3d 1125, 1172 (D.N.M. 2020); *see also Kane v. De Blasio*, 19 F.4th 152 (2d. Cir 2021) (holding that plaintiffs did not show a likelihood of success on facial challenge, but plaintiffs

did demonstrate a likelihood of success on as-applied challenge); *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004) ("If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable."). For example, a criminal conviction being overturned on appeal does not mean that the entire underlying statute is impermissibly vague or overbroad.

Plaintiffs argue that the State's enforcement action against Tulsa confirms that HB 1775 is vague and overbroad. But as just shown, one example of an invalid application (which Plaintiffs cannot demonstrate in this case) does not and cannot prove a facial challenge. Rather, the law's purported overbreadth must be "substantial," and the law must be vague in the "vast majority" of cases. Setting aside Tulsa, the Mustang situation involved a straightforward violation of HB 1775. *See* infra 6-8. This directly undermines any argument from Plaintiffs that HB 1775 is vague in the "vast majority" of cases. In the end, this Court should not give weight to Plaintiffs' attempt to cherry-pick examples when analyzing whether HB 1775 survives a facial challenge.[2]

## II.   Plaintiffs have not met their burden of showing the Tulsa and Mustang enforcement actions conflict with the Constitution.

It is Plaintiffs' burden to demonstrate unconstitutionality, or the likelihood thereof, and Plaintiffs cannot meet their burden with respect to Tulsa and Mustang. Plaintiffs largely rely on secondary documents to make their case, rather than the core underlying materials. In response, Defendants provide, under seal, the Tulsa slide show that led to the Board of

---

[2] If anything, the fact that there were only two violations in an entire year's enforcement of the statute would tend to show that the law is not unconstitutionally overbroad.

Education's warning, as well as the document underlying the Mustang "white privilege" walk. *See* Exhibit 1, Mustang Privilege Walk; Exhibit 2, Tulsa Slide Show. Defendants 1-18 do not yet have access to the disputed audio, although this is insignificant for reasons to be explained.

### a.   Mustang's "Privilege Walk" for children violated HB 1775.

What happened in Mustang is this: In January 2022, a teacher led students in a middle school leadership class in a "Privilege Walk" exercise based on "Peggy McIntosh's concept of White Privilege." Ex. 1, at 1. The teacher instructed students to stand in a line with their eyes closed while the instructor read certain sentences out loud. If the child believed a sentence applied to him or her, the child was told to take a step forward or a step back depending on the instruction. *Id.* So, to give an example, these children were supposed to step <u>forward</u> if their "sex or race [was] widely represented in the U.S. Congress," and step <u>back</u> if they had "difficulty finding hair products [or] make-up for your skin complexion." *Id.*

Similarly, the children were told to take more steps <u>forward</u> if they "studied the history and culture of your ethnic ancestors," if they "almost always see members of your race, sexual orientation, religion, and class widely represented on television, in the newspaper, and the media in a POSITIVE manner," and if they "were to walk into a business and asked to speak to the person 'in charge' you will see a person of your race." *Id.* They were told to take steps <u>back</u> if they "started school speaking a language other than English," if they "have ever been the only person of your race/ethnicity in a classroom or place of work," if they "were ever discouraged from any personal goal or dream because of your race, socioeconomic class, gender, sexual orientation, or physical/learning disability," if they "have ever been called names regarding your race, socioeconomic class, gender, sexual orientation, or

physical/learning disability and felt uncomfortable," or if they "have been mistreated or served less fairly in a place of business because of your race or ethnicity." *Id.* at 2.

At the end of the exercise, the students were instructed to open their eyes and compare themselves to their fellow students. *Id.* The accompanying sheet discusses the "intensity of the exercise" and acknowledges it "could provoke certain emotions." *Id.* at 1. It also says the objective of the exercise is to "[r]aise awareness of various forms of privilege" in children and help them "understand the intersectionality of race," among other things. *Id.*

After the exercise was completed, a parent complained to the school. This eventually led to an internal investigation where Mustang found that a serious mistake had been made that violated the instruction in HB 1775 that "[n]o teacher … shall require or make party of any Course offered in a public school" the concept that "[a]ny individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex." This was eventually reported to the Department of Education, which agreed that a violation had occurred and recommended that Mustang be accredited with deficiency. At its July 28, 2022 meeting, the Board assessed accreditation with warning, instead. Mustang then petitioned the Board for reconsideration of this status. After Mustang was allowed to submit additional documents, the Board denied reconsideration on August 25, 2022.[3]

In sum, this "white privilege" exercise violated HB 1775, and it is not a particularly close call. The structure *and* text of the "Privilege Walk" are plainly designed to elicit feelings of discomfort, guilt, and anguish from children on account of their race and sex. The exercise

---

[3] Plaintiffs here filed their supplemental materials before the administrative process had fully concluded in the Tulsa and Mustang cases.

sheet itself indicates the goal is to raise awareness of various privileges, with the only privilege spelled out by name being "white privilege." *Id.* That is, the express goal is to teach white children that they are privileged in a way that their non-white peers are not, and the exercise is admittedly intense and likely to elicit emotional reactions. There is little room for argument, in other words, that the intent of the exercise was to teach children concepts without causing them any discomfort, guilt, or anguish. Rather, the entire point of the exercise set-up—group setting, eyes closed, step forward, step backward, and then compare yourself to other children—appears designed to elicit discomfort, and particularly racial discomfort.[4] Although there was disagreement at the Department and Board about the level of penalty that should be assessed to Mustang, there was no disagreement that this constituted a violation.

### b. Tulsa telling teachers they are unconsciously racist violated HB 1775.

The Tulsa controversy centered on a training for teachers that included a slide show and an audible speaker. Plaintiffs make much hay about the audio, and whether it is different from the slides, but the slides *themselves* appear to violate HB 1775. Among other things, the slides state that "[e]veryone has implicit racial biases" that are "built and shaped unconsciously through our history and cultures," that "school professionals need to examine … their own implicit racial biases" and "societal and systemic biases against minority students," that "[e]ven people who are staunch in their desire to be impartial, such as judges or teachers, are subject

---

[4] This is not to say that the scheme was designed only to cause discomfort on the part of white or "privileged" children. One can readily imagine and anticipate that it would cause discomfort or anguish for those who took various steps backward, as well, and then compared themselves to their peers.

to implicit biases," and that implicit biases "generally lead people to favor those in their own racial group, and hold biases against those who aren't."  Ex. 2, at 2.

These instructions to teachers violate HB 1775 subsection (b), which prohibits any teaching that "[a]n individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously."[5] Even if this was a close call, though, "the mere fact that close cases can be envisioned" does not "render[] a statute vague" since "[c]lose cases can be imagined under virtually any statute." *United States v. Williams*, 553 U.S. 285, 305–06 (2008). As observed above, "even clear laws produce close cases." *Johnson*, 576 U.S. at 601. And in the overbreadth context, the Court has stated that the fact that one can conceive of some impermissible applications of a statute is not enough for an overbreadth challenge. *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 (1982).

In the end, much like what happened with Mustang, at its July 28, 2022 meeting the Board assessed Tulsa Public Schools' accreditation with warning instead of just a deficiency. Tulsa then petitioned the Board for reconsideration of this accreditation status, and the Board denied reconsideration on August 25, 2022.

---

[5] The Department of Education indicated that Tulsa's presentation to teachers violated subsections (f) and (g) of HB 1775, as well. Defendants 1-18 agree. For example, telling teachers that they are racially biased and that this bias "can lead to very serious, life-altering consequences" for minority students such as expulsions, arrests, and the like is designed to *cause* discomfort, guilt, or anguish, rather than those reactions being just a byproduct of the training. *Id.* at 3.

**III.    Plaintiffs' additional arguments do not demonstrate unconstitutionality.**

In  their  supplemental  submission,  Plaintiffs  make  various  scattershot  arguments
attacking the Board, the Department, and Defendants 1-18 in this case, among others.  None
of those arguments holds water.

For one thing, Plaintiffs incorrectly characterize the Tulsa training materials, claiming
that they merely "discuss the ideas of examining implicit biases" and promote the "mere
awareness of one's own potential biases." Suppl. Br. at 9. But the slides say nothing about
"potential"; instead they state that "[e]veryone has implicit racial biases" that need to be
examined. Ex. 2, at 2. Similarly, Plaintiffs claim that the Department "did not find any evidence
to substantiate the allegation that the training included 'statements that specifically … state
that  all  [white  people]  are  implicitly  racially  biased  in  nature.'"  Suppl.  Br.  at  3.  This  is
misleading. The slides may not specifically state that white people are implicitly racially biased,
but they do clearly state that "everyone" is implicitly racially biased—a statement that would
obviously include all white people. Ex. 2, at 2. It cannot be denied that, if you are white, the
slide is telling you that you and every other white person are implicitly biased against those of
other races.

Plaintiffs also claim that the Tulsa violation "was based entirely on strained inferences
OSDE drew about the supposed 'spirit' and 'design' of the training rather than the actual
content of the training materials." Suppl. Br. at 2.  But this is a false dichotomy, as the
Department's findings related to the spirit and design were quite obviously based on the
"actual content of the training materials." Plaintiffs complain that the Department concluded
that "there was no violation" of the law in the slides themselves (as opposed to the audio),

Supp. Br. at 3-4, but as Defendants have shown, the slides do constitute a violation of HB 1775. If anything, the Department was being cautious in its evaluation of the law's reach, and the Department's role is to make a recommendation, which is not binding on the Board. It was within the Board's discretion to determine that a violation occurred.

In addition, Plaintiffs claim that the Tulsa "action shows that, under the Act, even a discussion of the idea that all people hold implicit or unconscious biases has now been outlawed in Oklahoma schools." Supp. Br. at 2. But little about the Tulsa training appears to have been a "discussion" at all.  Rather, teachers were told that they were all unconsciously racist, that such racism harmed minorities, and that they needed to unlearn their subconscious racism to be better teachers. Ex. 2, at 1–3. These concepts were presented as closed issues, not topics for discussion. Nevertheless, going further Plaintiffs claim that the Act "suppresses information or discussion about the science of implicit and unconscious bias—and other race-related topics and data—based purely on the political ideology of a majority of legislators and runs contrary to any legitimate pedagogical purpose." Supp. Br. at 10-11. Plaintiffs provide virtually nothing to back these accusations about "political ideology," nor could they.

There is no constitutional right to teach or learn about implicit bias or subconscious racism in public schools. Plaintiffs point out that the Department "does not contend that any of the statements in the training materials are untrue," Supp. Br. at 5, but it is not the Department's role to determine truth or untruth but rather to determine whether the statements conflict with the law. The State is allowed to define the curriculum to be taught in

11

schools, and there is hearty disagreement about the concept of implicit bias.[6] Where the Department made any finding about the "truth" of the training materials is irrelevant.

Switching gears, Plaintiffs cite the Department of Education's spokesperson for the proposition that the language in HB 1775 is "vague" and has a "chilling effect." Suppl. Br. at 11. But a random executive branch employee does not get to declare a duly enacted and understandable law passed by the Oklahoma Legislature unconstitutional, any more than a random school administrator gets to do so. The Legislature passes the laws, and the executive branch enforces them. To hold that individual executive branch officials could torpedo legislation through their remarks would be to upend our system of government and the separation of powers and undermine the Legislature and the People.

Plaintiffs also repeatedly return to the issue of the Tulsa audio file, and whether it matches the information on the slides. They criticize the Board, for instance, for reaching their "determination even though they did not have access to, and thus never listened to, the audio portion of the training." Suppl. Br. at 6. But Plaintiffs have not provided this Court with the audio, either, nor is it readily available, and yet they are asking this Court to make a definitive determination without it. Plaintiffs cannot have it both ways. In any event, as Defendants 1-

---

[6] *See, e.g.*, Jesse Singal, *Psychology's Favorite Tool for Measuring Racism Isn't Up to the Job*, THE CUT, NEW YORK MAGAZINE, https://psychologys-racism-measuring-tool-isnt-up-to-the-job.html; Yoav Bar-Anan & Brian A. Nosek, *A Comparative Investigation of Seven Indirect Attitude Measures*, 46 BEHAV. RES. METHODS 668, 676 (2014); Michael R. Andreychik & Michael J. Gill, *Do Negative Implicit Associations Indicate Negative Attitudes? Social Explanations Moderate Whether Ostensible "Negative" Associations are Prejudice-Based or Empathy-Based*, 48 J. EXPERIMENTAL SOC. PSYCHOL. 1082 (2012) (questioning whether implicit bias tests are measuring bias or just knowledge of stereotypes and injustice); Frederick L. Oswald et al., *Predicting Ethnic and Racial Discrimination. A Meta-Analysis of IAT Criterion Studies*, 105 J. PERSONALITY & SOC. PSYCHOL. 171 (2013) (questioning the existence of a link of implicit bias to external behavior).

18 have already pointed out, the slides themselves violate the law. As such, the audio discussion, and whether reporting about the audio is accurate or not, is nearly meaningless.

Plaintiffs accuse Defendants 1-18 of being "wrong" in arguing that the eight concepts covered by HB 1775 are straightforward and relatively narrow. "Plainly the Board and OSDE are applying the law in the manner they believe the Legislature intended and not according to the narrow construction the Attorney General has tried to place on it," Plaintiffs so claim. Suppl. Br. at 9.  Plaintiffs complain about subsection (g), for instance, arguing that the Tulsa situation shows that it doesn't merely prohibit "telling students they *should* feel guilty for being of a certain race." Suppl. Br. at 7. But "should feel guilty" is exactly what subsection (g) requires. No amount of caterwauling by Plaintiffs can change HB 1775's requirement of "should" rather than just "could." As such, Defendants' interpretation is not "narrow" so much as it is accurate and plain.

Moreover, nothing Defendants 1-18 said in their original response indicated that close calls will not exist, nor did Defendants indicate that HB 1775 could only be violated by someone expressly or directly copying the exact words of the statute, and nothing more. Indeed, although Plaintiffs make much ado about the Tulsa materials not containing "direct" statements violating HB 1775, *e.g.*, Suppl. Br. at 7-8, it is obviously true that a statute can still be violated by persons utilizing differing language to teach the prohibited "concepts." *See, e.g.*, *United States v. Dillard*, 795 F.3d 1191, 1209 (10th Cir. 2015) (Baldock, J., dissenting) ("I will also concede [to the majority that] there are likely situations where a jury could find that a conditional, non-imminent, *and* impersonal statement was a disguised true threat."). Judging these violations may be more difficult, to be sure, but people cannot escape complying with

straightforward laws merely by avoiding a statute's express terms as if they are magic words. *Cf. United States v. Henry*, 468 F.2d 892, 894 (10th Cir. 1972) ("Circumstantial evidence may be accorded the same weight as direct evidence.").

Similarly, Plaintiffs argue that subsection (f) is broader than Defendants have admitted because the Tulsa situation indicates that "someone can be punished for violating subsection (f) for purportedly suggesting or implying that educators should at last be aware of 'historical biases against minorities' or presenting the idea that 'stereotypes 'built over time by history and culture' 'can still be found in the classroom.'" Suppl. Br. at 8. But Plaintiffs are again understating the slides here, which do more than just "suggest" or "imply" that educators should be aware of "historical biases against minorities." Rather, they flat-out state that all educators are implicitly racially biased and that racial biases can lead and have led "to very serious, life-altering consequences" for minority students. Ex. 2, at 1–3. This goes beyond awareness to indicate that the teachers are responsible for the consequences of their racial bias.

Plaintiffs likewise argue that the Tulsa situation "illustrates that sharing information about racial disparities as part of a class discussion or debate may constitute a violation of the Act, thereby denying students exposure to information that can develop critical-thinking and analysis." Suppl. Br. at 10. But sharing information about racial disparities "may" constitute a violation only if it is done in a way that states or indicates that such disparities are the fault of the teacher or students, or in some other way that matches the eight prohibited concepts. Otherwise, racial disparities can be discussed ad nauseum.

Nevertheless, Plaintiffs complain that "[t]he line delineating when a discussion about historical racism will be deemed to imply that white people 'bear responsibility' for such past

14

actions, and when it will not, is impossible to discern." Suppl. Br. at 8-9. Defendants 1-18 disagree. Again, judging close calls may be difficult, but it is by no means impossible. And States are not limited to passing laws in instances where interpretations will always be easy. Here, schools are not prohibited from teaching *any* history or past actions; what they are barred from is teaching students and teachers that they are unconsciously racist on account of their race and that such racism and bias has led to horrific past actions.

Finally, Plaintiffs argue that the message to school districts and teacher is "[s]teer clear of any discussion of race or bias that could possibly be interpreted as causing offense, or risk losing your accreditation status or your teaching license." Suppl. Br. at 9. This is fantastical. The law has been in effect an entire year, for nearly 2,000 schools, and only two violations have been found, neither resulting in a loss of accreditation. Are Plaintiffs contending that the thousands of teachers or administrators in those schools *not* sanctioned have entirely declined to discuss race or bias during that time?

Teachers should not steer clear of discussions of race and bias; rather, what they should steer clear of are the eight racist and sexist teachings prohibited by HB 1775. That is the message that has been sent—that racism and sexism are not welcome in Oklahoma schools.

## CONCLUSION

In the end, what Plaintiffs apparently want is for this Court to oversee the minutiae of every Board action involving HB 1775. This Court should decline to do so, especially since Plaintiffs can only rely on their facial challenge at this point.

Respectfully submitted,

_s/_
_____

ZACH WEST
   *Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct: (405) 521-3921
Zach.west@oag.ok.gov

   *Counsel for Defendants John M.
O'Connor; Joy Hofmeister; members of the
Oklahoma State Board of Education; Kevin
Stitt; & the Oklahoma State Regents for
Higher Education*

16