UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BLACK EMERGENCY RESPONSE TEAM, et al.,<br>    *Plaintiffs*,<br><br>v.<br><br>JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, et al.,<br><br>    *Defendants*. | Case No. 5:21-cv-1022-G<br><br>Hon. Charles B. Goodwin |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO
PLAINTIFFS' SUPPLEMENTAL SUBMISSION IN SUPPORT
OF THE MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Black Emergency Response Team (BERT), *et al.*, respectfully submit this Reply to Defendants' Response to Plaintiffs' Supplemental Submission in Support of their Motion for Preliminary Injunction (Dkt. 27) to further address the recent enforcement action taken by the Board,[1] pursuant to H.B. 1775.

## INTRODUCTION

The State's Response wholly fails to rebut Plaintiffs' argument that OSDE's and the Board's finding that a training program for Tulsa K-12 teachers violated the Act (the "Tulsa Enforcement Action") is powerful additional evidence that supports Plaintiffs' vagueness and overbreadth arguments. Tellingly, much of the State's Response

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in Plaintiffs' Supplemental Submission. (Dkt. 83.)

addresses arguments that Plaintiffs do *not* make.  Plaintiffs are not seeking to "challenge" the Tulsa accreditation downgrade and, thus, the State's arguments that Plaintiffs lack "standing" to do so are irrelevant.  (*See* Dkt. 90 at 6-9.)  Similarly, despite the State's focus on the downgrade for Mustang Public Schools (Dkt. 90 at 10-12), Plaintiffs' submission merely mentioned Mustang in a footnote.  (Dkt. 83 at 6. n. 7.)

Rather, Plaintiffs brought the Tulsa Enforcement Action to the Court's attention because it is an important real-life example of the Act's application that further elucidates the Act's unconstitutional vagueness and overbreadth.  As demonstrated in Plaintiff's supplemental submission, in finding a violation of the Act, OSDE relied on its subjective understanding of the purported "spirit" of the Tulsa training and its underlying intent—a result made possible by the Act's indecipherable meaning.  OSDE's application of the Act wholly contradicts the State's arguments in prior briefing on this motion that the Act would be interpreted narrowly to prohibit only the concepts and ideas specifically mentioned or banned.  (*See, e.g.*, Dkt. 61 at 25-27.)

Far from showing otherwise, the State's Response actually reinforces Plaintiffs' arguments.  The State's Response unabashedly takes advantage of the expansive and undefined enforcement authority created by the terms of the Act, and goes significantly beyond the Act's actual text.  In so doing, the State not only backtracks from its own prior arguments in defense of the Act, but even disagrees with OSDE's own findings in the Tulsa Enforcement Action, leaving no doubt that the Act's commands are hopelessly vague and uncertain and plainly invalid under the Constitution.

## ARGUMENT

I.    **The Tulsa Enforcement Action Confirms That H.B. 1775 Is Unconstitutionally Vague**

The State argues that the Tulsa training slides violated section 1(B)(1)(b) of the Act, which prohibits any teaching that "[a]n individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously." (Dkt. 90 at 13.) Yet the State's argument about why the Tulsa training materials violate the Act directly contradicts OSDE's own finding. OSDE stated plainly that viewing the training slides themselves, "there was *no violation* of the [Act]." (Dkt. 83, Ex.1 at 3; emphasis added.) The State, by contrast, states just as plainly: "the slides *do constitute a violation* of HB 1775." (Dkt. 90 at 15 (emphasis added).)

In short, the *same* slides produced opposing outcomes from the two State institutions principally charged with enforcing the Act. If two government actors are unable to reach a consensus, how can teachers and administrators do anything but guess at the Act's meaning—with severe and now documented adverse consequences if they guess wrong? The obvious result is an untenable chilling effect on educators across the state of Oklahoma.

The State's expansive reading of subsection (b) further highlights the Act's inherent malleability and subjectivity. The State does not, and cannot, show that the training contained any statements that anyone is "inherently racist." The training discusses implicit bias, and, in fact, specifically disclaims the idea that being implicitly biased is the same as being racist. In a slide omitted from the State's exhibit (*see* Dkt.

3

91-1), the training states: "Whenever two people who have differences interact, they may bring inherent stereotypes or biases to those interactions. *This doesn't mean everyone is guilty of racism or ill will*; it's most often a matter of psychology and our history that leads us to form and hold these biases."[2]  (Emphasis added.)

Ignoring this clear distinction, the State conflates the concept of bias with racism by arguing that "teachers were told that they were all unconsciously racist, that such racism harmed minorities, and that they needed to unlearn their subconscious racism to be better teachers." (Dkt. 90 at 15.)  None of this is anywhere in the training.  To the contrary, the training's *only* use of the word "racism" or "racist" is to specifically disavow that this training is meant to convey that message.  Implicit bias is not the same as unconscious racism, nor is it expressly named among the prohibited concepts in the Act.  The State's subjective interpretation thus directly contradicts its arguments that the Act will be narrowly construed and limited to specific itemized concepts and ideas.

The State fails to identify any clear standard of what does—and does not—violate the law.  This lack of a clear, objective standard governing when speech will be punished is exactly what makes the law vague and overbroad.  Educators are left to guess at how the law will be enforced and engage in self-censorship to avoid punishment.

Similarly, the State asserts that the Tulsa training violated subsection (g) of the Act, which prohibits the concept that "any individual should feel discomfort, guilt,

---

[2] A full set of the training slides is accessible via the information provided in Ex. 1.  The statement quoted above may be found in the course section labeled "Strategies for Developing Cultural Competence" at 1:26-1:43, slide 14.

4

anguish or any other form of psychological distress on account of his or her race or sex." (Dkt. 90 at 13 n.5.)  Such a statement, again, appears nowhere in the training.  Indeed, OSDE expressly found "there were no direct statements in the training that an individual should feel discomfort or guilt because of their race. . . ."  (Dkt. 83, Ex.1 at 5.)  The State nonetheless argues that the training ran afoul of subsection (g) because it could be interpreted to have been "designed to *cause* discomfort, guilty, or anguish."  (Dkt. 90 at 13 n.5 (emphasis in original).)  This, however, is directly contrary to the State's prior assurance to this Court that subsection (g) "doesn't prohibit teaching lessons that might *cause* discomfort or psychological distress," but only "prohibits teaching that a student 'should' feel discomfort or psychological distress."  (Dkt. 61 at 27 (emphasis in original).)

As the State's Response confirms, the Act unquestionably forces educators in Oklahoma to worry about whether any lesson that touches on race or racism—even one presenting statistics on racial disparities, as the Tulsa training did—will be perceived as designed to *cause* some students to feel discomfort.  The self-censorship that inevitably follows from this amorphous command establishes the Act's unconstitutional vagueness.

The State likewise fails to rebut Plaintiffs' showing that the Tulsa Enforcement Action confirms that subsection (f) is much broader than the State contends.  Subsection (f) states that "an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex."  In its opposition to Plaintiffs' Motion, the State maintained that subsection (f) is "straightforward," barring only exactly what the language states.  (Dkt. 61 at 25.)  Yet

here, OSDE identified a violation, despite the fact that the training makes no mention of anyone bearing responsibility for past actions. (Dkt. 83, Ex. 1 at 4-5.) And now the State acknowledges that even presenting information about racial disparities in American society can violate subsection (f) if it "indicates" that such disparities "are the fault of the teacher or students." (Dkt. 90 at 18.) But since the information in the Tulsa training about nationwide racial disparities in school discipline inexplicably was found to have "indicate[d]" that Tulsa teachers were to blame for such disparities, how can educators have any confidence that they will accurately discern the line between permissible presentations of racial disparities and impermissible ones?

      The State repeatedly tries to downplay the Tulsa Enforcement Action by arguing that "close cases" do not render a statute vague since "even clear laws produce close cases." (Dkt. 90 at 5, 13 (citations omitted).) But that argument carries no force here, because as Plaintiffs have demonstrated, the Act—on its face—is the antithesis of a "clear law." OSDE's and the State's inability to articulate a coherent or consistent explanation of why the Tulsa training violated the Act, and their reliance on subjective inferences about the "spirit" of the training and its purported hidden "design," only confirm that fact. The Tulsa Enforcement Action thus highlights not the difficulty of determining "whether the incriminating fact [the Act] establishes has been proven"—which is when the "close cases" doctrine comes into play—"but rather *the indeterminacy of precisely what that fact is*"—which is "[w]hat renders a statute vague." *United States v. Williams*, 553 U.S. 285, 306 (2008) (emphasis added).

Similarly unavailing is the State's argument that the Act is not vague or overbroad because in the 14 months since its inception, the SBE has found only two violations. (Dkt. 90 at 8-9.) The number of enforcement actions is irrelevant to whether a law is vague on its face. The chief vice of a vague law is its chilling effect, as individuals censor themselves in response to its unclear directives. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"). The Act has such an inherent chilling effect, and the Tulsa Enforcement Action will exacerbate that impact by giving educators across the State an example of the arbitrary and subjective way the Act can be enforced.

## II. The Tulsa Enforcement Action Confirms That H.B. 1775 Is Unconstitutionally Overbroad

The State's sweeping argument in its Response that the Act prohibits teaching about implicit bias also confirms that the Act is overbroad and impermissibly restricts access to important ideas in violation of the First Amendment.

The State's Response shows that subsection (b) is so elastic that it can apply even to ideas that, like the Tulsa training, do not single out any particular racial group. As the State concedes, the Tulsa training said only that "everyone" has implicit racial biases. (Dkt. 90 at 14; Dkt. 91-1 at 3.) Regardless, the State makes the puzzling argument that because "everyone" includes "white people" it "cannot be denied that if you are white, the [training] is telling you that you and every other white person are implicitly biased against those of other races." (Dkt. 90 at 14.) "Everyone" does include White people.

7

But it also includes Black people, Hispanic people, and people of every other race. According to the State, even an idea that treats people of all races the same amounts to a form of "racist . . .teaching[] prohibited by HB 1775." (Dkt. 90 at 19.)[3]

The State does not seriously dispute Plaintiffs' showing that the existence of implicit bias has been widely documented for decades and is widely accepted throughout American society. (Dkt. 83 at 9-10.) Nonetheless, the State argues that the Tulsa Enforcement Action is justified because there is "disagreement about the concept of implicit bias." (Dkt. 90 at 16; *id.* n.6.) Setting aside the fact that the State's cited articles predominantly critique the implicit association test ("IAT") as a measurement tool and not implicit bias itself, the State's argument evinces a fundamental misunderstanding of the First Amendment. Disagreement with an idea does not justify censoring speech about that idea. Yet that is the State's position here—under the Act, Oklahoma's students are not allowed to learn about the concept of implicit bias.

As Plaintiffs also outlined, "the line delineating when a discussion about historical racism will be deemed to imply white people 'bear responsibility' for such past actions, and when it will not, is impossible to discern." (Dkt. 90 at 18-19.) The State contests this point, arguing that schools are not barred from teaching about past actions, merely that "such [unconscious] racism and bias has led to horrific past actions." (Dkt. 90 at 19.)

---

[3] The implications of the State's position are staggering. Thousands of corporations, public agencies and other institutions conduct implicit bias training. Earlier this year (to take one example), the Iowa Supreme Court made implicit bias training mandatory for judicial officers and staff. *See In the Matter of Mandatory Education for Judicial Officers and Judicial Branch Staff*, Order (Jan. 12, 2022), https://tinyurl.com/3wuz4vx5.

The overbreadth here is clear.  Subsection (f), on which the State presumably relies, only prohibits the concept that an individual bears responsibility for past actions, not that unconscious racism and bias played a role in causing those past actions.  Taking the State's position to its logical conclusion, teachers could be prohibited from exposing students to information and ideas about (by way of example) how racism and bias—both unconscious and explicit—affected the expansion of slavery, separate but equal policies and opposition to the civil rights movement.  This is an untenable result and confirms that the Act's broad reach restricts access to information in violation of the First Amendment.

### III.    The State's Arguments Concerning The Mustang Public School Downgrade Are Misleading And Further Underscore The Act's Vagueness

Although Plaintiffs had not made any arguments in their supplemental submission about the enforcement action against Mustang Public Schools, the State's extended "response" warrants a brief response, since the State's arguments are misleading and further underscore the Act's vagueness.

The State argues that the Mustang accreditation warning was justified because a classroom exercise in the District violated the Act, citing to a document that the exercise in question was allegedly "based on." (Dkt. 90 at 10; *id.* at Ex. 1.)  The State makes several conjectural arguments about the intent and impact of the instruction.[4]  But whether one agrees with the value of the instructional approach is not at issue here.

---

[4] While this Court need not resolve the value of the Mustang teacher's approach, it is notable that the State omits evidence about how the teacher conducted the exercise at issue.  The "Teacher Statement" provided by Mustang Public Schools to Plaintiffs on August 18, 2022, in response to Plaintiffs' open records request, describes how the exercise was "100% voluntary."  The activity sought to "show that each of us have

9

The State argues that the instruction violated subsection (g)'s prohibition on teaching that an individual "should feel discomfort," etc. on account of his or her race or sex. (Dkt. 90 at 11.) In support, the State points to the materials' note that the exercise "could provoke certain emotions." (Dkt. 90 at 11 (citing Ex. 1 at 1).) But the materials do not instruct that students "should" feel "discomfort, guilt" or any other specific emotion. Additionally, while the materials discuss race and gender—along with socioeconomic class, sexual orientation, and disability (Dkt. 90 at 10-11 (citing Ex. 1 at 2))—nothing in the materials directs that a particular emotional response "should" be felt "on account of [a student's] race or sex." Further, the State's argument that the emotions elicited by the instruction are "plainly . . . feelings of discomfort, guilt, and anguish . . . on account of [ ] race and sex" is wholly dependent on a subjective interpretation of the materials. (Dkt. 90 at 11; *see id.* at 8 (claiming that the exercise "appears designed to elicit discomfort").)

These arguments demonstrate the inherent vagueness in a law that prohibits speech based upon feelings that may be elicited in a listener. In this way, the Act's prohibitions are similar to the law considered in *Coates v. City of Cincinnati*, 402 U.S. 611 (1971), which prohibited conduct "annoying to persons passing by." *Id.* at 611. As the Supreme Court said then, "[c]onduct that annoys some people does not annoy others," and, thus, "the ordinance is vague . . . in the sense that no standard of conduct is specified at all." *Id.* at 614. The same is true of H.B. 1775.

---

different experiences in our life" and how it is important to "treat others with kindness and respect since we never really know what other people are going through." Ex. 2 at 2.

| | |
|---|---|
| Dated: September 14, 2022 | Respectfully submitted, |
| Genevieve Bonadies Torres<br>David Hinojosa<br>Taylor Dumpson<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS<br>  UNDER LAW<br>1500 K Street NW, Suite 900<br>Washington, DC 20005<br>gbonadies@lawyerscommittee.org<br>dhinojosa@lawyerscommittee.org<br>tdumpson@lawyerscommittee.org | */s/ Megan Lambert*<br>Megan Lambert<br>Johanna Roberts<br>AMERICAN CIVIL LIBERTIES UNION<br>  FOUNDATION OF OKLAHOMA<br>P.O. Box 13327<br>Oklahoma City, OK 73113<br>Tel.: 405-524-8511<br>mlambert@acluok.org |
| Gary Stein<br>Sara Solfanelli<br>Ramya Sundaram<br>SCHULTE ROTH & ZABEL LLP<br>919 Third Avenue<br>New York, NY  10022<br>gary.stein@srz.com<br>sara.solfanelli@srz.com<br>ramya.sundaram@srz.com | Emerson Sykes<br>Leah Watson<br>Sarah Hinger<br>AMERICAN CIVIL LIBERTIES<br>  UNION FOUNDATION<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>esykes@aclu.org<br>lwatson@aclu.org<br>shinger@aclu.org |
| | *Counsel for Plaintiffs* |

## CERTIFICATION OF SERVICE

I hereby certify that on September 14, 2022, I electronically filed the foregoing Plaintiffs' Reply to Defendants' Response to Plaintiffs' Supplemental Submission in Support of the Motion for Preliminary Injunction with the Clerk of Court via the Court's CM/ECF system, which effects service upon all counsel of record.

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@aclu.ok.org

*Counsel for Plaintiffs*