## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| BLACK EMERGENCY RESPONSE TEAM, *et al*., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 5:21-cv-1022-G |
| GENTNER DRUMMOND, *et al.,* | ) ) | Hon. Charles B. Goodwin |
| *Defendants 1–18*. | ) ) ) | |

## PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs Black Emergency Response Team (BERT), *et al*., respectfully submit this Response to the State Defendants' ("Defendants") Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. 106). For the reasons stated below, Defendants' Motion should be denied in its entirety.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

SUMMARY OF ALLEGATIONS ..................................................................................... 2

I.  LEGAL STANDARD ................................................................................... 5

II.  DEFENDANTS' MOTION IMPROPERLY DISREGARDS THE
APPLICABLE STANDARD OF REVIEW UNDER RULE 12(C) ............. 6

III.  PLAINTIFFS PLAUSIBLY ALLEGE THAT H.B. 1775 IS
UNCONSTITUTIONALLY VAGUE ........................................................ 8

IV.  PLAINTIFFS PLAUSIBLY ALLEGE THAT H.B. 1775 VIOLATES
STUDENTS' FIRST AMENDMENT RIGHTS ....................................... 11

V.  PLAINTIFFS PLAUSIBLY ALLEGE THAT H.B. 1775 IS AN
OVERBROAD RESTRICTION ON ACADEMIC FREEDOM ................ 15

VI.  PLAINTIFFS PLAUSIBLY ALLEGE THAT H.B. 1775 VIOLATES
THE EQUAL PROTECTION CLAUSE ..................................................... 17

A.  The Historical Background and Sequence of Events Leading to
the Decision .................................................................................. 19

B.  Departures from the Normal Procedure and Substantive Norms ..... 20

C.  Legislative History ........................................................................ 21

D.  Disparate Impact ........................................................................... 22

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ................................................................. 12, 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................... 5, 19

*Atl. Richfield Co. v. Farm Credit Bank of Wichita*,
    226 F.3d 1138 (10th Cir. 2000) .................................................................. 5

*Axson-Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) ............................................................ 12, 13

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982).......................................................................... 11, 12, 16

*Bd. Of Regents of Univ. of Wis. Sys. v. Southworth*,
    529 U.S. 217 (2000) (Stevens, J., concurring)........................................... 16

*Burnett v. Mortg. Elec. Regis. Sys., Inc.*,
    706 F.3d 1231 (10th Cir. 2013) ................................................................ 20

*City of Chicago v. Fulton*,
    141 S. Ct. 585 (2021)............................................................................... 16

*Colony Ins. Co. v. Burke*,
    698 F.3d 1222 (10th Cir. 2012) .................................................................. 5

*Colo. Christian Univ. v. Weaver*,
    534 F.3d 1245 (10th Cir. 2008) ................................................................ 18

*Cooper v. Coil Chem, LLC*,
    2016 WL 7168235 (W.D. Okla. Dec. 8, 2016)........................................... 7

*Cory v. Newfield Expl. Mid-Continent, Inc.*,
    2020 WL 981718 (W.D. Okla. Feb. 28, 2020) ........................................... 5

*Dow Chem. Co. v. Allen*,
    672 F.2d 1262 (7th Cir. 1982) .................................................................. 15

*Dr. John's, Inc. v. City of Roy*,
    465 F.3d 1150 (10th Cir. 2006) .................................................................. 8

*Falls v. DeSantis*,
No. 22-cv-00166-MW-MJF (N.D. Fla. filed April 22, 2022) ................................... 13

*González v. Douglas*,
269 F. Supp. 3d 948 (D. Ariz. 2017) ......................................................... 15

*Gray v. Bd. of Higher Educ.*,
692 F.2d 901 (2d Cir. 1982)..................................................................... 15

*Grayeyes v. Cox*,
2018 WL 3730866 (D. Utah Aug. 6, 2018) ............................................... 20

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)................................................................................. 8

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)..................................................................... 11, 12, 13

*Hill v. Colorado*,
530 U.S. 703 (2000)................................................................................. 8

*Honeyfund.com, Inc. v. Desantis*,
2022 WL 3486962 (N.D. Fla. Aug. 18, 2022) ........................................... 11

*Hunt v. Cromartie*,
526 U.S. 541 (1999)................................................................................. 18

*Hunter v. Underwood*,
471 U.S. 222 (1985)................................................................................. 19

*Jackson v. Integra Inc.*,
952 F.2d 1260 (10th Cir. 1991) ................................................................. 6

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967)................................................................................. 15

*Local 8027, AFT-N.H., AFL-CIO v. Edelblut*,
2023 WL 171392 (D.N.H. Jan. 12, 2023).................................................. 10

*Martin v. Mendez Jacobo*,
2021 WL 2828722 (W.D. Okla. July 7, 2021)............................................. 8

*McDonald v. Gore Nitrogen Pumping Serv., LLC*,
2019 WL 611627 (W.D. Okla. Feb. 13, 2019) ............................................. 5

*Navajo Nation v. Dalley,*
  896 F.3d 1196 (10th Cir. 2018) ................................................................ 17

*Navajo Nation v. State of N.M.,*
  975 F.2d 741 (10th Cir. 1992) .................................................................. 18

*Novoa v. Fla. Bd. of Governors,*
  No. 22-cv-00324 (N.D. Fla. filed Sept. 6, 2022) ...................................... 13

*Pac. Shores Props., LLC v. City of Newport Beach,*
  730 F.3d 1142 (9th Cir. 2013) .................................................................. 18

*Pernell v. Fla. Bd. of Governors,*
  No. 4:22-cv-00304-MW-MAF (N.D. Fla. filed Aug. 18, 2022) ........................... 13, 24

*Regents of Univ. of Cal. v. Bakke,*
  438 U.S. 265 (1978) ................................................................................. 15

*In re SandRidge Energy Inc. Secs. Litig.,*
  2021 WL 4471606 (W.D. Okla. Sept. 29, 2021) ...................................... 5, 8

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
  508 F. Supp. 3d 521 (N.D. Cal. 2020) ...................................................... 11

*SECSYS, LLC v. Vigil,*
  666 F.3d 678 (10th Cir. 2012) .................................................................. 22

*Seyfried v. Walton,*
  668 F.2d 214 (3d Cir. 1981) ..................................................................... 13

*Shelton v. Tucker,*
  364 U.S. 479 (1960) ................................................................................. 15

*S. Wind Women's Ctr., LLC v. Stitt,*
  455 F. Supp. 3d 1219 (W.D. Okla. 2020) ................................................... 6

*Sweezy v. New Hampshire,*
  354 U.S. 234 (1957) ................................................................................. 16

*Tele-Commc'ns of Key West, Inc. v. United States,*
  757 F.2d 1330 (D.C. Cir. 1985) ................................................................. 6

*Thomas v. Washington Cnty. Sch. Bd.,*
  915 F.2d 922 (4th Cir. 1990) .................................................................... 23

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ................................................................. 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ...................................................................... 18–21

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*,
   862 F.2d 1517 (11th Cir. 1989) ............................................................ 12

*Washington v. Davis*,
   426 U.S. 229 (1976) ............................................................................ 19

## Rules and Statutes

70 O.S. § 24-157 (2021) ......................................................................... 1

   § 24-157(1)(A)(1) .......................................................................... 9, 16

   § 24-157 (1)(B)(1) ............................................................................. 9

Fed. R. Civ. P. 12(c) ............................................................................... 5

Okla. Admin. Code § 210: 10-1-23 ........................................................ 3

## Other Authorities

Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 28, 2020) ............... 2, 11, 21

## INTRODUCTION

In a 75-page, 189-paragraph Amended Complaint, Plaintiffs allege in detail how Oklahoma House Bill 1775 (codified as 70 O.S. § 24-157 (2021)) ("H.B. 1775" or "the Act") unconstitutionally restricts discussions about race and sex in Oklahoma schools without any legitimate pedagogical justification, using language that is simultaneously sweeping and unclear. More than a year after filing an Answer to Plaintiffs' Amended Complaint, Defendants now seek to dismiss Plaintiffs' entire action for failure to state a claim. Nothing prevented Defendants from filing such a motion either in lieu of an Answer or at any point in the last year, yet it comes on the *same day* as Defendants' opposition to Plaintiffs' motion seeking discovery and is a central argument in that opposition. (Dkt. 107; Dkt. 108). The timing of this motion—and the perfunctory arguments made therein—belie its true purpose: to serve as a roadblock to Plaintiffs' discovery motion.

Indeed, Defendants do not even attempt to analyze Plaintiffs' allegations under the proper standard of review. On a motion for judgment on the pleadings, Plaintiffs' allegations must be taken as true. Ignoring this standard, Defendants dispute Plaintiffs' factual contentions and incorporate their preliminary injunction arguments and evidentiary materials cited therein. However, Plaintiffs are not tasked with proving their claims at the pleading stage—rendering Defendants' arguments defective on their face.

Plaintiffs' Amended Complaint more than sufficiently pleads each of Plaintiffs' constitutional claims, describing in detail, *inter alia*: how the specific sections of H.B. 1775 are vague, overbroad, and viewpoint discriminatory; how the law has chilled

protected speech and deprived students and educators of their First Amendment rights; how the harms inflicted by H.B. 1775 fall disproportionately on students of color; and how a legislative majority enacted the law to suppress speech for narrowly partisan and racially animated reasons without any legitimate pedagogical purpose. Defendants do not, and cannot, seriously dispute that these allegations and the many others described further below—if taken as true, as they must be—plausibly state claims for relief.

## SUMMARY OF ALLEGATIONS

As detailed in the Amended Complaint ("Complaint" or "Compl."), H.B. 1775 constitutes an extraordinary intrusion into the classroom by the state legislature with the avowed purpose and effect of censoring speech about race and gender with which a legislative majority disagrees. (Dkt. 50, Compl. ¶ 1).

The Act was passed in 2021 against the backdrop of a history of suppressing the perspectives of Black, Indigenous and other marginalized Oklahomans in schools (Compl. ¶¶ 6, 148–50) and in direct response to efforts by local educators to adopt more diverse and inclusive curricula in the wake of the killings of George Floyd and other Black people (*id.* ¶¶ 7, 78–89, 108, 117, 121). The core of the Act is a prohibition on the teaching of eight broadly and vaguely worded "concepts" related to race and gender in Oklahoma K-12 public schools. (*Id.* ¶¶ 2, 45–55). These banned concepts were copied verbatim from former President Trump's Executive Order 13950 ("E.O. 13950")—an order that had already been partially enjoined as unconstitutionally vague. (*Id.* ¶¶ 2, 102–07). In similarly vague and overbroad language, the Act also prohibits mandatory gender or sexual diversity "training or counseling" in public higher education institutions, and

2

"[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex." (*Id*. ¶¶ 40–43). Emergency Rules issued by the State Board of Education ("SBE") (codified as Okla. Admin. Code § 210: 10-1-23) ("the Rules") exacerbate H.B. 1775's sweeping impact, subjecting teachers and schools to punitive enforcement actions that can be initiated by *any* private citizen. (*Id*. ¶¶ 57–65).

Bypassing the normal legislative process and acting on an "emergency" basis without an evidentiary record, the Oklahoma legislature enacted H.B. 1775, on strictly partisan lines, to override the choices of professional educators and in contravention of Oklahoma's own Academic Standards, which recognize the values of diversity and inclusiveness. (Compl. ¶¶ 8, 94, 108–15). Proponents of the Act openly sought to impose their own political and racial views upon the state's public school students, declaring that the Act's purpose was to prohibit conversations related to "implicit bias" and "systemic racism" (*id*. ¶ 44)—concepts that innumerable studies show are innate to human experience—and disparaging the Black Lives Matter movement as akin to the Ku Klux Klan. (*Id*. ¶¶ 8, 116–27).

As intended, H.B. 1775 has chilled and censored protected speech and expression in Oklahoma schools. (Compl. ¶¶ 3, 66–77). Since the Act's passage, school districts have struck books by Black and women authors from their reading lists (*id*. ¶¶ 3, 67) and Oklahoma educators, including some Plaintiffs, have been forced to self-censor and change their pedagogical approaches to avoid potentially violating H.B. 1775's ambiguous and vague language, or risk losing their education licenses or certificates; even their schools may lose accreditation. For example, Plaintiff Regan Killackey was

3

instructed to avoid phrases like "diversity" and "white privilege" and remove Black and women authors from his reading list (*id.* ¶¶ 20, 69); Plaintiff NAACP-Oklahoma includes educators who now avoid lessons and trainings related to racism and implicit bias— material that pushes students to engage in higher levels of thinking (*id.* ¶¶ 16, 70); and Plaintiff AAUP-Oklahoma includes educators who are "amending their courses to avoid critical inquiry into issues related to racism, oppression, and colonialism" (*id.* ¶ 75).[1]

Based on the allegations set forth in the Complaint, Plaintiffs assert four causes of action—that H.B. 1775 is unconstitutionally vague in violation of the Due Process Clause (Compl. ¶¶ 156–63), violates the First Amendment rights of students to receive information (*id.* ¶¶ 164–70), is an overbroad and viewpoint-based restriction on speech in violation of the First Amendment (*id.* ¶¶ 171–76), and is racially discriminatory in violation of the Equal Protection Clause (*id.* ¶¶ 177–89).

## <u>ARGUMENT</u>

To secure judgment on the pleadings, Defendants must show that Plaintiffs' alleged facts, taken as true, are insufficient to state a plausible claim for relief as a matter

---

[1] Plaintiffs' fears are well-grounded, as discovery of additional factual evidence will further elucidate. As outlined in Plaintiffs' Supplemental Submission in Support of their Motion for Preliminary Injunction, on July 28, 2022, the SBE penalized the Tulsa Public Schools district by downgrading its accreditation status. (Dkt. 83 at 1). This vote was predicated upon a finding that a training program for Tulsa K-12 teachers that aimed, in part, to address potential implicit bias violated several of the "prohibited concepts" set forth in Section 1(B)(1) of the Act. (*Id.* at 2). Notably, none of the prohibited concepts were explicitly included or referenced in the training, yet the Oklahoma State Department of Education felt that the "spirit" of the training was "contradictory" to H.B. 1775. (*Id.*).

of law. Defendants fail to meet that heavy burden as to any of Plaintiffs' four claims and thus their motion should be denied in its entirety.

## I.   LEGAL STANDARD

Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "A motion for judgment on the pleadings should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (citation omitted); *see also In re SandRidge Energy Inc. Secs. Litig.*, 2021 WL 4471606, at *1 (W.D. Okla. Sept. 29, 2021).

A motion for judgment on the pleadings is treated as a Rule 12(b)(6) motion to dismiss, *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000), and evaluated "under the familiar standard applied to Rule 12(b)(6) motions," *Cory v. Newfield Expl. Mid-Continent, Inc.*, 2020 WL 981718, at *3 (W.D. Okla. Feb. 28, 2020). To survive dismissal, the complaint need only "'contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" *McDonald v. Gore Nitrogen Pumping Serv., LLC*, 2019 WL 611627, at *2 (W.D. Okla. Feb. 13, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible when the well-pled factual allegations, accepted as true and viewed in the plaintiff's favor, 'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678, 679).

## II.    DEFENDANTS' MOTION IMPROPERLY DISREGARDS THE APPLICABLE STANDARD OF REVIEW UNDER RULE 12(C)

Defendants' motion ("Mot.") largely recycles their opposition to Plaintiffs' motion for a preliminary injunction. For their first three arguments, Defendants do nothing more than "incorporate" and briefly summarize the arguments made in their preliminary injunction response. (Mot. at 2–4). But the standard governing a preliminary injunction differs markedly from the standard under Rule 12(c).[2] Defendants' preliminary injunction response purports to dispute Plaintiffs' factual assertions and explicitly relies on affidavits and exhibits submitted by Defendants. (Dkt. 61 at 3–5, 9–10, 16, 18–19). Such materials cannot be considered on a motion for judgment on the pleadings, which is limited to evaluating the sufficiency of the Complaint's allegations. *See, e.g.*, *Jackson v. Integra Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991); *Tele-Commc'ns of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985) (district court's consideration of external materials submitted in connection with contemporaneously filed preliminary injunction motion "is improper under a Rule 12(b)(6) motion to dismiss"). These arguments thus should be excluded from the Court's consideration.[3]

---

[2] In deciding a preliminary injunction motion, the Court ascertains whether plaintiffs have established a "likelihood of success" on the merits and the other prerequisites for relief. *S. Wind Women's Ctr., LLC v. Stitt*, 455 F. Supp. 3d 1219, 1228 (W.D. Okla. 2020). Plaintiffs face a lower bar on a motion to dismiss, as discussed herein.

[3] If the Court wishes to consider the legal arguments contained in the preliminary injunction briefing, this consideration is most appropriate and feasible within the context of that motion, where the full factual and legal considerations are before the Court. To the extent that these legal arguments are considered here, Plaintiffs incorporate their own legal arguments as contained in the preliminary injunction briefing. (Dkt. 27, 66, 83, 96).

Although Defendants pay lip service to the deferential standard applicable to a motion for judgment on the pleadings (Mot. at 1), their subsequent analysis ignores it. At no point do Defendants explain *how* Plaintiffs' facts—taken as true—fail to plead a plausible cause of action. Instead, echoing their preliminary injunction response, Defendants improperly present their version of the facts—that H.B. 1775 merely prohibits "racist and sexist concepts" and is "narrowly phrased"—and argue that Plaintiffs fail to "show" or "demonstrate" a violation of their due process or First Amendment rights. (Mot. at 2–4). But these factual arguments are wholly misplaced; at this stage, Plaintiffs need only *allege* facts that, accepted as true, give rise to a *plausible* claim for relief. *See Cooper v. Coil Chem, LLC*, 2016 WL 7168235, at *1–2 (W.D. Okla. Dec. 8, 2016) ("a plaintiff is not required to prove his case at the pleading stage").[4]

The same is true of Defendants' challenge to Plaintiffs' Equal Protection claim. Defendants attack the veracity of Plaintiffs' allegations, arguing that the Equal Protection claim "rests on a series of faulty assumptions" and that Plaintiffs' central factual allegation—that H.B. 1775 was enacted with a discriminatory purpose—"is false." (Mot. at 4–5). These fact-intensive arguments are a non-starter on a Rule 12(c) motion.

If Defendants had truly believed that the Complaint failed to state a claim as a matter of law, they could have moved to dismiss more than a year ago. Nothing has changed in the interim—except Defendants' desire to oppose Plaintiffs' motion for

---

[4] Notably, not one decision cited in Defendants' first three arguments addresses claims at the pleading stage. Defendants instead cite decisions on summary judgment and following trial, which have no bearing on this motion. (Mot. at 2–4).

discovery. As this Court has recognized, where, as here, a defendant "asks the Court to endorse its factual position, which is contested," "this is not a proper basis for a Rule 12(c) motion for judgment on the pleadings." *In re SandRidge Energy Inc. Secs. Litig.*, 2021 WL 4471606, at *1; *see also Martin v. Mendez Jacobo*, 2021 WL 2828722, at *2 (W.D. Okla. July 7, 2021) (striking post-answer motion for judgment on the pleadings where defendant did not "present[] any reason it did not file a Rule 12(c) motion at the outset" and motion raised factual disputes "not conducive to resolution under Rule 12(c)"). For these reasons alone, Defendants' motion should be denied.

### III.   PLAINTIFFS PLAUSIBLY ALLEGE THAT H.B. 1775 IS UNCONSTITUTIONALLY VAGUE

Plaintiffs' Complaint sufficiently alleges that H.B. 1775 is unconstitutionally vague, both on its face and as applied to Plaintiffs. A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And where, as here, First Amendment rights are at stake, "[s]tricter standards of permissible statutory vagueness may be applied." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (citation omitted). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

The Complaint plausibly alleges that the Act's ambiguous directives run afoul of both prongs of the vagueness doctrine. For example, Section (1)(A)(1) prohibits "any form of mandatory gender or sexual diversity training or counseling" and "[a]ny

orientation or requirements that presents any form of race or sex stereotyping or bias on the basis of race of sex." (Compl. ¶ 40 (citing 70 O.S. § 24-157(1)(A)(1)). Plaintiffs explain in detail why this provision is unclear. Plaintiffs note that the law does not define key terms such as "training," "counseling," "orientation," or "requirement" and give examples of how these terms are open to competing interpretations. (*Id.* ¶¶ 41–44). Moreover, the Complaint alleges that professors, unsure of the law's scope, have modified their courses to avoid critical inquiry of race-related issues. (*Id.* ¶¶ 75–77).

The Complaint likewise alleges that Section (1)(B)(1) is vague because it lists eight vaguely worded concepts that teachers may not "require or *make part* of a course." (Compl. ¶ 45–46 (citing 70 O.S. § 24-157 (1)(B)(1)) (emphasis added). As an initial matter, Plaintiffs explain that "require or make part of a course" is not defined by the law and could thus encompass an unlimited scope of classroom discussion, including mere reference to certain concepts without endorsement—leaving educators to guess at what conduct is actually prohibited. (*Id.* ¶ 46). Moreover, the Complaint explains why the banned concepts themselves are ambiguous and unclear. For example, Section (1)(B)(1)(d) forbids making part of a course the concept that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." 70 O.S. § 24-157(1)(B)(1)(d). This language is not just unclear, but indecipherable. It is entirely plausible that an educator would fail to understand what conduct is prohibited. (*Id.* ¶ 51).[5]

---

[5] Defendants make a cursory argument that H.B. 1775's broad restrictions are mitigated by Section 1(B), which provides that the Act "shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards." (Mot. at 2 (citing § 24-157(1)(B)). But, as alleged, this carve-out does not cure the law's vagueness but rather compounds

In fact, the very individuals tasked with adopting guidance for teachers in the Edmond Public Schools opined that "[u]nfortunately, no one truly knows what [the law] means or can come to an agreement on its meaning." (*Id.* ¶ 66).

Case law confirms that Plaintiffs' vagueness claim is well-pled. In *Local 8027, AFT-N.H., AFL-CIO v. Edelbut*, 2023 WL 171392 (D.N.H. Jan. 12, 2023), a federal district court recently denied a motion to dismiss a vagueness challenge to a New Hampshire law substantially similar to H.B. 1775. The court noted that the banned concepts at issue are "viewpoint-based speech limitations" that affect the "speech of public primary and secondary school teachers," and thus are subject to "a rigorous vagueness review." *Id.* at *12. Plaintiffs, the court held, properly alleged that the banned concepts "do not give either teachers or enforcers the guidance they need to find the line between what the amendments prohibit and what they permit," especially because the law "allow[s] teachers to be sanctioned for speech that advocates a banned concept only by implication." *Id.* at *13. As one example, the court found that the fourth banned concept—which, similar to Section (1)(B)(1)(d) of H.B. 1775, prohibits "teaching or advocating that white people cannot treat Black people 'without regard to' their race"—is constitutionally problematic because "there is a real risk that a teacher could face sanctions for discussing the concept of implicit bias with a student," and the language does "not give teachers fair notice of what they can and cannot teach." *Id*. at *13–14.

---

educators' confusion since the standards "'[d]o not dictate how teachers should teach," nor "prescribe all that can and should be taught." (Compl. ¶¶ 54, 131). Understandably, educators are at a loss about how to teach certain race-related topics in light of H.B. 1775's career-jeopardizing prohibitions. (*See id.* ¶¶ 19, 71, 159).

Indeed, federal courts have *preliminarily enjoined* the operation of statutes similar to H.B. 1775 due to the same vagueness concerns alleged by Plaintiffs here. *See Honeyfund.com, Inc. v. Desantis*, 2022 WL 3486962, *13–17 (N.D. Fla. Aug. 18, 2022) (preliminarily enjoining as "impermissibly vague" Florida's "Stop W.O.K.E Act," which prohibits employment practices promoting any of eight forbidden concepts that largely track those in H.B. 1775; court found that Concept 1 (which parallels Section (1)(B)(1)(a) of H.B. 1775) is "mired in obscurity" and that Concept 4 (which parallels Section (1)(B)(1)(d))  "border[s] on unintelligible" and is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application") (citation omitted); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) (preliminarily enjoining certain parts of E.O. 13950, on which H.B. 1775 was modeled, based on finding that plaintiffs were likely to succeed on the merits of their vagueness claim). *A fortiori*, Plaintiffs satisfy the lower standard that applies here.

## IV.    PLAINTIFFS PLAUSIBLY ALLEGE THAT H.B. 1775 VIOLATES STUDENTS' FIRST AMENDMENT RIGHTS

Plaintiffs plausibly allege a violation of students' right to receive information under the First Amendment. The First Amendment mandates that restrictions on students' access to information must be "reasonably related to a legitimate pedagogical purpose," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), and may not be based on an illicit motive. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457

U.S. 853, 870 (1982).[6] Illegitimate motivations include: "narrowly partisan or political"

interests, "racial animus," or a desire to "deny [students] access to ideas with which [the

governmental actor] disagree[s]." *Id.* at 870–72; *see also Axson-Flynn v. Johnson*, 356

F.3d 1277, 1290 (10th Cir. 2004).

The Tenth Circuit has applied the *Hazelwood* standard in recognizing that college

students have a First Amendment interest in their coursework, *Axson-Flynn*, 356 F. 3d at

1290, and that courts must examine whether the state's purported educational goal is

simply a "sham pretext for an impermissible ulterior motive," *id.* at 1293. The same

principles apply to the K-12 claims here, as sister circuits have held. For example, in *Arce

v. Douglas*, 793 F.3d 968 (9th Cir. 2015), the Ninth Circuit examined a remarkably

similar attempt by the Arizona legislature to ban certain ideas about race and racism in

the curricula and held that "the state may not remove materials otherwise available in a

local classroom unless its actions are reasonably related to legitimate pedagogical

concerns." *Id*. at 983; *see also Virgil v. Sch. Bd. of Columbia Cnty., Fla*., 862 F.2d 1517,

1522–23 (11th Cir. 1989) (rejecting proposition that school officials have an unfettered

right to control curriculum and citing *Hazelwood* to hold that a removal decision must be

reasonably related to a legitimate pedagogical concern). More recently, a federal district

court denied defendants' motions to dismiss on 12(b)(6) grounds and found that a pre-

school student and college students could proceed on their right to information claims

---

[6] In *Pico*, a majority of the Supreme Court recognized that school boards could not
remove library books based on "narrowly partisan or political" interests or "racial
animus." 457 U.S. at 870, 871 (plurality opinion); *id.* at 907 (Rehnquist, J. dissenting).

against Florida's Stop W.O.K.E. Act, which, as described above, contains nearly the same list of prohibited concepts as H.B. 1775. *See Falls v. DeSantis*, No. 22-cv-00166-MW-MJF (N.D. Fla. filed April 22, 2022), Dkt. 68 at 13–14, 21; *Pernell v. Fla. Bd. of Governors*, No. 4:22-cv-00304-MW-MAF (N.D. Fla. filed Aug. 18, 2022), Dkt. 64 at 1, 3–4, 8; *Novoa v. Fla. Bd. of Governors*, No. 22-cv-00324 (N.D. Fla. filed Sept. 6, 2022), Dkt. 45 at 1, 3, 9.

Against this ample authority, Defendants rely on a single, out-of-circuit case to suggest that students have "no First Amendment right" to receive information in the classroom and that such a right would mean "no educational standards could be set." (Mot. at 3) (citing *Seyfried v. Walton*, 668 F.2d 214, 216 (3d Cir. 1981)). But Defendants' hyperbole is unfounded. *Seyfried precedes* the Supreme Court's and Tenth Circuit's holdings in *Hazelwood* and *Axson-Flynn* making clear that the First Amendment imposes restrictions on government officials in fashioning school curricula. Moreover, far from giving officials *carte blanche*, *Seyfried* reaffirmed that administrators "may not so chill . . . student and teacher expression that they cast a 'a pall of orthodoxy' over the school community." 668 F.2d at 216. On the facts there (developed *after a trial*), the court found no such danger existed because the restriction at issue "d[id] not 'directly and sharply implicate' the first amendment rights of the students" and "no one was punished or reprimanded for any expression of ideas." *Id*. at 216–17 (quoting opinion below). Here, by contrast, Plaintiffs clearly allege that H.B. 1775 imposes partisan orthodoxy over the classroom and severely punishes those who violate the Act. (Compl. ¶¶ 2, 9, 62).

13

Contrary to Defendants' claim, Plaintiffs do not assert an affirmative right to "be taught any specific concept." (Mot. at 3). Rather, Plaintiffs assert that the state may not *constrict* students' access to information when those restrictions are not reasonably related to a legitimate pedagogical interest or are based on illicit motives. (Compl. ¶ 166). And Plaintiffs amply allege facts supporting that claim.

For example, the Complaint alleges that H.B. 1775 deprives Plaintiff students' access to diverse texts and discussions about race and gender. Plaintiffs aver that they attend schools and classes where H.B. 1775 has caused professors and K-12 teachers to change their teaching in ways that reduce discussions and reading materials about race, sex, and gender (Compl. ¶¶ 13-14, 20); districts have removed books by Black and female authors, and instructed teachers not to use the terms "diversity" and "white privilege" (*id*. ¶¶ 16a, 67); college instructors have been directed that they cannot include critical race theory on exams (*id.* ¶ 14); and teachers are uncertain and fearful that they will run afoul of the law if they teach about topics ranging from the racial wealth gap to detention at the border (*id.* ¶¶ 16b, 18-19, 70-71).

The Complaint also alleges that H.B. 1775's restrictions on speech are not reasonably related to a legitimate educational interest, but rather contravene the learning objectives articulated by state and local educators. (Compl. ¶¶ 5, 36-37). Specifically, the state's own professed learning goals encourage exposure to diverse viewpoints and higher-level analysis (*id.* ¶¶ 91-97), but H.B. 1775 chills speech that broadens access to differing perspectives and promotes "higher levels of thinking, including analysis and evaluation." (*See, e.g.*, *id.* ¶¶ 5, 16b, 98).

Finally, Plaintiffs allege in detail how H.B. 1775 was motivated by partisan interests and racial animus, as detailed in Section VI below. Taken together, these facts surpass a "plausibility" standard in alleging that political and racial motives underlie H.B. 1775.[7] *See González v. Douglas*, 269 F. Supp. 3d 948, 973 (D. Ariz. 2017) (considering similar criteria to invalidate Arizona's ban on ethnic studies).

Altogether, Plaintiffs plausibly allege H.B. 1775 violates students' First Amendment rights and Defendants' arguments otherwise are both incorrect and insufficient to warrant dismissal.

## V.   PLAINTIFFS PLAUSIBLY ALLEGE THAT H.B. 1775 IS AN OVERBROAD RESTRICTION ON ACADEMIC FREEDOM

Plaintiffs properly allege that H.B. 1775's overbroad prohibition of the presentation of "any form of race or sex stereotyping" or "bias" in higher education violates professors' First Amendment rights. The Supreme Court has long held that academic freedom is a "special concern of the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978); *see also Shelton v. Tucker*, 364 U.S. 479, 487 (1960); *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1274–76 (7th Cir. 1982); *Gray v. Bd. of Higher Educ.*, 692 F.2d 901, 909 (2d Cir. 1982).

Students and teachers engage in a "robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). Academic

---

[7] While Defendants suggest that H.B. 1775 promotes anti-discrimination (*see* Mot. at 3), Plaintiffs firmly disagree with this contention and, at the very least, allege sufficient facts to place the motive behind H.B. 1775 in dispute. *See also infra* Section VI.

freedom includes "not merely liberty from restraints on thought, expression, and association in the academy" but also the "freedom to make decisions about how and what to teach." *Bd. Of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 237 (2000) (Souter, J., concurring). Access to diversity of ideas, theories, and analytical frameworks "prepares students for active and effective participation" in our "pluralistic, often contentious society." *Pico*, 457 U.S. at 868. In this context, overbroad and viewpoint discriminatory restrictions on instructors' speech raise constitutional concerns.

Contrary to Defendants' arguments, Plaintiffs have not alleged the right to make teaching certain concepts "mandatory rather than optional," (Mot. at 4), but rather assert the right to teach free from prohibitions that are not narrowly tailored to a compelling interest and instead impose a "strait jacket upon the intellectual leaders in our colleges and universities." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Section (1)(A)(1)'s prohibition of politically disfavored discussions of race, gender, and sexual orientation imposes such an unconstitutional constraint. (*See* Compl. ¶¶ 34, 173–174).[8]

Specifically, the Act prohibits "any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex." 70 O.S. § 24-157(1)(A)(1). Defendants again attempt to read "any orientation or requirement" as "any required orientation." (Mot. at 4; *see also* Dkt. 61 at 23). However, the basic canon of statutory construction that no word of a statute is superfluous requires that "orientation" and "requirement" have distinct meanings. *See City of Chicago v. Fulton*, 141 S. Ct. 585,

---

[8] Nor have Plaintiffs alleged a First Amendment claim on behalf of K-12 teachers. (Compl. ¶ 175).

591 (2021); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018). At a minimum, a plausible meaning for Section (1)(A)(1) is that H.B. 1775 imposes a prohibition on (1) any orientation, whether required or not, and (2) any requirement, whether part of an orientation or not.

The Complaint sufficiently alleges that H.B. 1775 is overbroad by detailing how the Act restricts protected academic speech and significantly chills discussions of race, gender, and sexual orientation in university classrooms. First, Plaintiffs allege a variety of academic requirements reasonably fall within the law's purview, including "required" courses, readings, and assignments. (Compl. ¶ 41). Plaintiffs further allege that university administrators and professors are modifying core academic content based on the reasonable belief that H.B. 1775 applies to classroom curricula. (*Id*. ¶¶ 14, 75). An AAUP-Oklahoma member was instructed to not test on critical race theory. (*Id*. ¶ 14). Other members have removed texts that address race, gender, and sexual orientation from their courses; are amending course curriculum to avoid nuanced discussion of race and oppression; and are no longer employing analytical frameworks that implicate issues related to race, gender, and sexual orientation. (*Id*. ¶¶ 14, 75).

Thus, Plaintiffs plausibly allege that H.B. 1775 constitutes an overbroad prohibition of protected academic speech in violation of the First Amendment.

## VI.     PLAINTIFFS PLAUSIBLY ALLEGE THAT H.B. 1775 VIOLATES THE EQUAL PROTECTION CLAUSE

Plaintiffs also allege sufficient facts to support the inference that H.B. 1775 was enacted with a discriminatory purpose and has a discriminatory effect on students of

color, with compounded harms for LGBTQ+ students and women. Defendants'
arguments ignore key allegations in the Complaint and misconstrue applicable law.

An Equal Protection Clause violation is adequately pled when plaintiffs allege a
discriminatory purpose plays a "motivating" factor in the law's enactment; Plaintiffs need
not allege "a particular purpose was the 'dominant' or 'primary' one." *Vill. of Arlington
Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *see also Navajo
Nation v. State of N.M.*, 975 F.2d 741, 743–44 (10th Cir. 1992). Moreover, discriminatory
intent does not require racial animus, hatred, or bigotry but "merely the intent to treat
differently." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).

Determining discriminatory purpose "demands a sensitive inquiry" into all
available "circumstantial and direct evidence of intent." *Arlington Heights*, 429 U.S. at
266. For this reason, intentional discrimination claims are rarely decided before trial. *See,
e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Pac. Shores Props., LLC v. City of
Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) (when relying on *Arlington Heights*
to establish intent, "the plaintiff need provide 'very little such evidence … to raise a
genuine issue of fact …; any indication of discriminatory motive … may suffice'").

To engage in the fact-based inquiry of intentional discrimination, courts are guided
by a list of non-exhaustive factors, including: (i) the historical background and specific
sequence of events leading to the decision; (ii) departures from the normal procedure and
substantive norms; (iii) legislative history; and (iv) evidence that defendants' decision
bears more heavily on one race than another (i.e., disparate impact). *See Navajo Nation*,
975 F.2d at 743–44 (citing *Arlington Heights*, 429 U.S. at 267–68). Courts examine such

factors based on "the totality of the relevant facts," *see Washington v. Davis*, 426 U.S. 229, 242 (1976), and no one factor is dispositive. *See Arlington Heights*, 429 U.S. at 268.

Defendants implicitly concede that Plaintiffs plead facts supporting each *Arlington Heights* factor, arguing instead that Plaintiffs' allegations and inferences are not "plausible." (Mot. at 5). But Defendants fatally ignore the requirement to assume "all the allegations in the complaint are true (even if doubtful in fact)," drawing all reasonable inferences in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678–79 (citation omitted). Plaintiffs more than satisfy this standard and address each *Arlington Heights* factor in turn.

### A.      The Historical Background and Sequence of Events Leading to the Decision

The historical background and sequence of events leading to the passage of H.B. 1775 support an inference of discriminatory motive. Although Defendants suggest otherwise (*see* Mot. at 8), the particular context of Oklahoma's history of systemic racism against Black and Indigenous people, including suppressing their participation in education, constitutes relevant circumstantial evidence of intentional discrimination. *See Arlington Heights*, 429 U.S. at 267; *Hunter v. Underwood*, 471 U.S. 222, 229 (1985). Defendants grossly oversimplify these historical allegations as "generic." (Mot. at 8). To the contrary, Plaintiffs plead specific facts that not only detail prior discrimination against Black and Indigenous people, but also show how H.B. 1775 seeks to suppress honest discussions about that very history of discrimination. (*E.g.*, Compl. ¶¶ 6, 148, 155).

Plaintiffs' allegations also draw a clear throughline from the calls for racial justice in 2020 and educators' corresponding embrace of speech addressing the experiences and

inequities faced by historically marginalized groups ("Inclusive Speech") (Compl. ¶¶ 78–99), to the legislature's racially-motivated attempt to suppress those efforts through the passage of H.B. 1775 (*id*. ¶¶ 100, 116–27). These allegations support a plausible inference that H.B. 1775 was precipitated by a racialized backlash to recent events.

Defendants ask this Court to ignore the weight of these allegations and infer that the legislature was instead interested in combatting discrimination. (Mot. at 8). Such a reading strains the obvious import of the pleaded facts, and at best, creates a question of fact that cannot support dismissal. None of Defendants' post hoc narratives undermine the facial plausibility of Plaintiffs' allegations, which must be accepted as true. *See Burnett v. Mortg. Elec. Regis. Sys., Inc*., 706 F.3d 1231, 1235 (10th Cir. 2013).

### B.   Departures from the Normal Procedure and Substantive Norms

Courts look to "[d]epartures from the normal procedural sequence" as "evidence that improper purposes were playing a role." *Arlington Heights*, 429 U.S. at 267; *see also Grayeyes v. Cox*, 2018 WL 3730866, at *3 (D. Utah Aug. 6, 2018). Plaintiffs allege many procedural departures including: (1) H.B. 1775 was wholly re-written in violation of the legislature's germaneness rule, necessitating the suspension of normal rules (Compl. ¶¶ 109–110, 112); (2) H.B. 1775 was passed on an emergency basis (*id*. ¶ 114); and (3) the SBE adopted emergency rules through a non-transparent process that then-Superintendent Hofmeister described as "rushed and unorthodox" (*id*. ¶¶ 135–43).

Plaintiffs also allege several substantive departures including: (1) H.B. 1775 conflicts with Oklahoma's instructional goals, such as ensuring classes "reflect the racial, ethnic, religious, and cultural diversity" of the country (*id*. ¶ 92; ¶¶ 90–98); (2) H.B. 1775

deviates from the substantial deference normally afforded to local educators (*id.* ¶¶ 128–32); (3) H.B. 1775 excludes certain viewpoints, while no other provision in Oklahoma's school code requires excising entire points of view related to race or similar categories (*id.* ¶ 133); and (4) the legislature patterned H.B. 1775 off of E.O. 13950 without curing the provisions enjoined by a federal court as unconstitutional (*id.* ¶¶106–07).

Defendants try to brush aside these departures by suggesting the legislature merely used "convenient available method[s]" to pass the law and districts still enjoy "latitude" in educating students. (Mot. at 9). But Defendants do not deny that departures from general norms occurred—nor could they, since Plaintiffs' allegations must be taken as true. *Arlington Heights* establishes that departures similar to those alleged by Plaintiffs can, along with other circumstantial evidence, support an inference of discrimination. 429 U.S. at 267; *see also Veasey v. Abbott*, 830 F.3d 216, 238–39 (5th Cir. 2016).

### C.    Legislative History

Plaintiffs' allegations pertaining to H.B. 1775's legislative history further support a reasonable inference that racial motivation underlies the Act. Plaintiffs' Complaint includes numerous statements by legislators from both chambers that evoke race, which raise an inference of racial motive. (Compl. ¶¶ 116–26). Defendants cite several cases for the general proposition that statements from legislators cannot establish discriminatory intent. (Mot. at 6–7). But these cases are inapposite—none involve a racial discrimination claim brought under the Fourteenth Amendment. Under the *Arlington Heights* framework, it is well-established that state legislators' use of racially-coded language bears relevance and weight as part of the totality of the circumstances test. 429 U.S. at

21

268 ("contemporary statements by members of the decision-making body, minutes of its meetings, or reports" are relevant to determining intent); *see also Arce*, 793 F.3d at 978 (finding legislators' racially-coded statements, when coupled with other circumstantial factors, raised an inference of racial motive).

Defendants are similarly misguided in suggesting Plaintiffs must include an explicit statement that "the motivation [behind H.B. 1775 is] to hinder the educational outcomes of minority students." (Mot. at 7). To the contrary, "few are anxious to own up to a discriminatory intent and direct evidence of discrimination is hard to come by. Instead, courts often must draw inferences about a law's intent or purpose from circumstantial evidence." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012) (opinion of Gorsuch, J., with Brorby, J., and Murphy, J., concurring in the result).

Finally, while Defendants may wish to recharacterize certain legislators' statements as merely evincing opposition to "racist and sexist" concepts (*see, e.g.,* Mot. at 6–7), such assertions are inappropriate for consideration on a motion for judgment on the pleadings. Plaintiffs allege the exact opposite: that such statements target and chill Inclusive Speech and educational practices that combat racism and sexism. (*See, e.g.*, Compl. ¶¶ 116, 152–53). Plaintiffs' allegations regarding H.B. 1775's legislative history must be construed in Plaintiffs' favor and, especially when viewed in tandem with the other factors described herein, sufficiently support an inference of racial discrimination.

### D.   Disparate Impact

Plaintiffs also sufficiently allege that H.B. 1775 disparately harms students of color. *See SECSYS*, 666 F.3d at 686. Plaintiffs may raise an inference of disparate impact

through a series of incidents, testimony, or other circumstantial evidence indicating the challenged practice bears more heavily on a protected group. *See, e.g.*, *Thomas v. Washington Cnty. Sch. Bd.*, 915 F.2d 922, 926 (4th Cir. 1990) (finding plausible inference of disparate impact based on examples of past practices paired with testimony from Black applicants that such practices excluded them). Here, Plaintiffs allege that the law was motivated by an intent to target and chill "speech by and supporting students of color." (Compl. ¶¶ 77, 100, 111, 117–118, 121, 123, 126). During the legislative debates, legislators singled out as disfavored speech that addresses the experiences of Black people and other marginalized groups, including speech related to diversity and equity (*id.* at ¶ 117), culturally responsive curricula (*id.* at ¶ 123), discussions of implicit bias (*id.* at ¶ 120), police brutality (*id.* at ¶ 123), the Black Lives Matter movement (*id.* at ¶ 121), and trainings intended to combat anti-Black racism (*id.* at ¶ 126).

Plaintiffs further allege that the Inclusive Speech chilled by H.B. 1775 seeks to "enhance the educational and civic experiences of Black people and other historically marginalized groups." (Compl. ¶ 134). The Complaint details how such censorship thereby inflicts disproportionate injury on students of color by: restricting the perspectives of people of color (*id.* ¶¶ 148, 154), removing books written by Black authors (*id.* ¶ 3), reducing the engagement of students of color in class discussions (*id.* at ¶¶ 148, 153), exacerbating racial disparities in educational outcomes (*id.* ¶¶ 147–48), and

blocking the ability of educators and students to break down stereotypes that disproportionately inflict harm on students of color (*id*. ¶¶ 149, 155), among other harms.

Failing to contend with these allegations, Defendants summarily assert that H.B. 1775 does not block access to instructional materials that reflect the experiences of people of color. (Mot. at 5–6). At best, Defendants' counterarguments create a question of fact to be resolved at a later stage in this litigation; they do not overcome Plaintiffs' well-pled allegations that H.B. 1775 disparately harms students of color.

Plaintiffs more than satisfy their burden to allege a plausible Equal Protection violation. *See also Pernell*, No. 22-cv-304, Dkt. 64 at 7 (finding plaintiffs plausibly pled an Equal Protection violation by including facts addressing every *Arlington Heights* factor in complaint challenging Florida's censorship law).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.

Dated: February 24, 2023

Genevieve Bonadies Torres
David Hinojosa
Taylor Dumpson
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
   UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
gbonadies@lawyerscommittee.org
dhinojosa@lawyerscommittee.org
tdumpson@lawyerscommittee.org

Gary Stein
Sara Solfanelli
Ramya Sundaram
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022
gary.stein@srz.com
sara.solfanelli@srz.com
ramya.sundaram@srz.com

Respectfully submitted,

*/s/Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

Emerson Sykes
Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2023, I electronically filed the foregoing Plaintiffs' Response to Defendants' Motion for Judgment on the Pleadings with the Clerk of Court via the Court's CM/ECF system, which effects service upon all counsel of record.

Respectfully submitted,

*/s/Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@aclu.ok.org

*Counsel for Plaintiffs*