21-CV-1022-G

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BLACK EMERGENCY
RESPONSE TEAM, *et al.*

*Plaintiffs,*

v.

GENTNER DRUMMOND,
*in his official capacity, et al.*

*Defendants 1–18.*

## STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Submitted by:

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

ZACH WEST, OBA #30768
  *Director of Special Litigation*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Zach.West@oag.ok.gov

WILL FLANAGAN, OBA #35110
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
William.Flanagan@oag.ok.gov

**COUNSEL FOR DEFENDANTS 1-18**             **March 3, 2023**

In attacking House Bill 1775's limited and commonsense prohibitions on racist and sexist concepts being taught in public schools, Plaintiffs have made four claims: (1) the law is vague, (2) the law violates students' right to receive information, (3) the law constitutes an overbroad restriction on professors' academic freedom, and (4) the law was enacted with a racially discriminatory purpose. Doc. 50 at 66–74, ¶¶ 156–189. The first three claims are facial challenges that are legal in nature, Doc. 107 at 5, and thus well situated for dismissal. As for the fourth claim, Plaintiffs have not even come close to pleading *plausibly* that the Legislature prohibited schools from teaching racism and sexism in certain ways in order to *entrench* racism and sexism. This claim remains utterly incoherent. Therefore, judgment should be entered for State Defendants on all claims.

## ARGUMENT

To survive a motion for judgment on the pleadings, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[1] Although this is ignored by Plaintiffs' response, only factual assertions must be accepted as true, *not* legal conclusions. *Iqbal*, 556 U.S. at 679. This means that when ruling on such a motion, "a court should disregard all conclusory statements of law"—of which there are many here—"and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d

---

[1] Plaintiffs fault State Defendants for "disregard[ing] the applicable standard of review" because State Defendants incorporated their preliminary injunction response. Doc. 110 at 6. This is not so. By expressly incorporating only "the *arguments* made in their response to Plaintiffs' motion for a preliminary injunction," Doc. 106 at 2 (emphasis added), State Defendants did not attempt to incorporate any factual evidence.

1210, 1214 (10th Cir. 2011). Moreover, determining whether a plaintiff's claims are plausible "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A claim for relief is implausible when the pleadings on their face "do not permit the court to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quotation omitted).

## I. State Defendants properly filed for judgment on the pleadings.

As an initial matter, State Defendants' motion was not filed "to serve as a roadblock to Plaintiffs' discovery motion." Doc. 110 at 1. The motion wasn't even the primary aspect of State Defendants' argument against initiating discovery; for that, State Defendants pointed to the pending motions to dismiss and preliminary injunction motion. Doc. 107 at 1, 5. In any event, it has always been State Defendants' intention to seek dismissal of this case prior to discovery. This case primarily presents questions of law and not fact, a view State Defendants have expressed from the beginning. The only reason that such a motion had not yet been filed is that State Defendants originally chose to wait and evaluate the Court's preliminary injunction decision before so moving. This is, presumably, one reason Plaintiffs have waited this long to seek discovery. Like Plaintiffs, State Defendants recently began to re-evaluate their approach. Then, after the recent elections that brought in new State Defendants, Doc. 104, including a new Attorney General, the final decision was made to file the present motion. There is nothing unusual about these litigation decisions, from the former or present Attorney General.

## II. Plaintiffs do not state a plausible claim of unconstitutional vagueness.

To make a facial claim of vagueness, Plaintiffs "must show, at a minimum, that the challenged law would be vague in the vast majority of its applications; that is, that 'vagueness

2

permeates the text of [the] law.'" *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)). When interpreting a statute, "[t]he plainness or ambiguity … is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Thus, whether a law is impermissibly vague is determined primarily by examining the actual text of the statute, *see Harmon v. City of Norman*, 981 F.3d 1141, 1152 (10th Cir. 2020), no matter how many implausible factual allegations and legal conclusions a plaintiff stuffs into a Complaint.

Plaintiffs' feigned inability to understand H.B. 1775 does not make it vague. Plaintiffs complain that the Act does not define terms such as "training," "counseling," "orientation," and "requirement." Doc. 110 at 9. But statutory definitions are not constitutionally required, and those terms are not complex or confusing in the context of this statute. Plaintiffs also assert that professors "have modified their courses to avoid critical inquiry of race-related issues." Doc. 110 at 9. Even the most cursory examination of H.B. 1775, however, reveals that its requirements do not reach post-secondary classroom instruction. The actions of some untethered from the text do not make a statute vague in the vast majority of instances.

Plaintiffs also complain that the provision that teachers may not "require or make part of a course" the specific concepts listed is vague. Doc. 110 at 9. Plaintiffs strip this phrase from its context and abuse common sense to argue that it could "includ[e] mere reference to certain concepts without endorsement." *Id.* As State Defendants—represented by the State's chief legal officer—have already explained, the prohibited provisions do not ban mention of the prohibited concepts, and they certainly do not ban refutation of them. *See* Doc. 61 at 18.

3

Instead, this phrase merely forbids requiring or teaching those concepts *as true* in courses. The phrase must be interpreted in light of the statute in its entirety. *See U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (quotation omitted); *Vroom, LLC v. Driver & Motor Vehicle Servs. Div. (DMV)*, 388 P.3d 379, 381 (2016) ("In light of the statute's text and context, both of those statements are implausible."). An examination of the entire statute reveals that the purpose was to prohibit the *inculcation* of certain discriminatory concepts, not the mere mention of them. (Plaintiffs' Amended Complaint even contains several quotations indicating that the purpose of the Act was to minimize "indoctrination" and "propaganda." Doc. 50 at 46, ¶ 103, 53, ¶ 119.) Any other interpretation would be absurd and clash with the Oklahoma Academic Standards—something expressly barred by H.B. 1775, which states that "[t]he provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards."[2] *See also Calif. Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1233 (N.D. Cal. 2017), *aff'd sub nom.*, 973 F.3d 1010 (9th Cir. 2020) ("[T]his claim is implausible in light of the actual text of the Framework….").

None of this would be even remotely controversial if the prohibited concepts were, say, that "2+2=5" or "the world is flat." No one would read the phrase "require or make part of a course'" in that context to mean that a teacher could not discuss Orwell's warning about totalitarian governments requiring citizens to affirm that "2+2=5." Rather, they would

---

[2] This provision explicitly contradicts Plaintiffs' meritless claim that the Act "contraven[es] [] Oklahoma's own Academic Standards." Doc. 110 at 3.

4

understand that a teacher simply could not teach students to do math incorrectly. Nor would anyone contest that this prohibition meant a teacher was precluded from informing students about Galileo and his opponents. Rather, they would know not to tell students that if they walk far enough, they will fall off the edge of the world. What Plaintiffs truly object to here is not this phrase, but the banning of racist concepts they apparently support.

Those individual concepts are quite clear, as well. Nevertheless, Plaintiffs complain most fiercely that subsection (d) is "indecipherable." Doc. 110 at 9. That provision states that teachers shall not require or make part of a course that "members of one race or sex cannot and should not attempt to treat others without respect to race or sex." 70 O.S. § 24-157(B)(1)(d). As State Defendants have already explained, this provision is obviously targeted against any teachings designed to discourage students from believing in racial colorblindness or equal treatment as an ideal. In their Amended Complaint, Plaintiffs even cite to a legislator's stated desire to curb "teachings related to critiques of 'colorblindness,'" Doc. 50 at 54, so their supposed bewilderment here is hard to take seriously. And, once again, Plaintiffs' reference to one school district's stated confusion with one provision cannot demonstrate that the Act "would be vague in the vast majority of its applications." *Doctor John's, Inc.*, 465 F.3d at 1157.

### III. Plaintiffs do not state a plausible claim under the First Amendment right to receive information.

The First Amendment rights of students must be construed "in light of the special characteristics of the school environment . . .." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). There is no First Amendment right to receive instruction on a specific topic. *See Seyfried v. Walton*, 668 F.2d 214, 216 (3d. Cir. 1981). Courts have consistently affirmed the importance of allowing representative bodies to control the instruction in local schools.

5

*See e.g.*, *Cary v. Bd. of Educ.*, 598 F.2d 535, 543 (10th Cir. 1979) ("It is legitimate for the curriculum of the school district to reflect the value system and educational emphasis which are the collective will of those whose children are being educated and who are paying the costs."); *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005) ("students have no constitutional right to compel the Board to select materials of their choosing").

Here, the Act does not prevent students from accessing information pertaining to the eight prohibited concepts. It merely restricts those provisions from being taught—as government speech—in the classroom. Students are still free to access information about those eight concepts outside of class. Moreover, the Act does not limit student expression, as a student is free to argue in favor of any of the eight concepts during class discussion. The Act only prohibits a teacher from teaching those concepts, several of which are arguably prohibited by existing federal and state civil rights law if put into practice. *See* Doc. 61 at 5.

Plaintiffs quote *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), for the proposition that "[t]he First Amendment mandates that restrictions on students' access to information must be 'reasonably related to a legitimate pedagogical purpose[.]'" Doc. 110 at 11. But *Hazelwood* did not address a restriction on access to information. Rather, the case involves a restriction on students' *speech* in a newspaper. *Hazelwood*, 484 U.S. at 273. There is an enormous distinction between speech restrictions and a state's decisions over what its employees can and cannot teach in schools. Plaintiffs again ignore the distinction between student speech, government speech, and state curricular decisions with their citation to *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004). *See* Doc. 110 at 12. *Axson-Flynn* applied *Hazelwood's* pedagogical purpose test to a situation where a school sought to force a student to

6

speak in a way that violated her religious beliefs. 356 F.3d at 1280. Neither *Hazelwood* nor *Axson-Flynn* grant students a right to be taught only information they believe appropriate. Such a right would turn public schools on their head.[3]

Plaintiffs also rely on *Board of Education v. Pico*, 457 U.S. 853 (1982), for the claim that the Act's "restrictions are unconstitutionally designed to promote a narrowly partisan, political, or racially biased agenda." Doc. 50 at 68, ¶ 166. *Pico* involved the decision of a school board to remove books from school libraries, *not* the setting of in-class curriculum. 457 U.S. at 855–56. A plurality did conclude that students have a right to receive information, *id.* at 867–68, but this decision was limited. The fractured court "reached no binding holding … on the critical constitutional issue presented." *Id.* at 886 n.2 (Burger, J., dissenting). And the plurality stressed the narrowness of its opinion by noting that "it does not involve textbooks." *Id.* at 861. The plurality even stated that its "adjudication of the present case thus does not intrude *into the classroom*, or into the compulsory courses taught there." *Id.* at 862 (emphasis added). As such, the Fifth Circuit properly rejected *Pico's* relevance to curriculum. *Chiras*, 432 F.3d at 619.

Plaintiffs' citations to non-binding opinions that misapply *Hazelwood* to decisions surrounding the content of curriculum, *see* Doc. 110 at 12, are unavailing—particularly in light of other courts that have upheld discretionary curricular decisions. *See, e.g.*, *Chiras*, 432 F.3d at 619; *Cary*, 598 F.2d at 544; *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1306 (7th Cir. 1982). Finally, even if *Hazelwood* or *Pico* applied in this context, Plaintiffs have failed to plead facts that establish that there was no legitimate pedagogical motive behind H.B. 1775, nor

---

[3] Indeed, the implications of Plaintiffs' arguments, if accepted, are staggering. Such a right would seemingly forbid a state legislature from prohibiting the teaching of any concept, no matter how discriminatory or despicable. Plaintiffs certainly don't point to a limiting principle.

could they. The legitimacy of combating racism and sexism is deeply ingrained in the Constitution and civil rights laws of our country. Moreover, the Tenth Circuit does not require viewpoint neutrality under *Hazelwood. See Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 926 (10th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Aug. 16, 2002). Plaintiffs' disagreement with the Legislature's educational judgment does not change the fact that the Act was motivated to ensure equality and a quality education in Oklahoma. Therefore, judgment on this claim should be granted to Defendants.

## IV. Plaintiffs do not state a plausible claim that the Act is an overbroad restriction on academic freedom.

The Act is not an overbroad restriction on professors. Plaintiffs' legal conclusion that Section (A) of the Act applies to classroom instruction at a university is erroneous. *See* Doc. 110 at 17. Section (A)(1) consists of two sentences. The first states that "No enrolled student of an institution of higher education … shall be required to engage in any form of mandatory gender or sexual diversity training or counseling; provided, voluntary counseling shall not be prohibited." 70 O.S. § 24-157(A)(1). This sentence unambiguously bans mandatory *training* in higher education. The next sentence provides that "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited." *Id.* Plaintiffs claim the latter "requirement" includes "'required' courses, readings, and assignments." Doc. 110 at 17. Once again, Plaintiffs strip this term from its context. The entire paragraph is plainly targeted at mandatory trainings and orientation activities. It defies all logic for Plaintiffs to suggest that the Legislature intended a sweeping regulation of academic instruction by including "or requirement" when nothing else in the section addresses classroom content. Plaintiffs' argument that State Defendants' reading of the statute negates

8

the word "requirement" is unavailing. By including "or requirement[,]" the Legislature intended to ensure that an institution would not be able to sidestep the Act by changing its racial diversity program from an "orientation" activity to a "required" first-year activity. As a result, Plaintiffs' pleaded facts about the actions of university professors—even accepted as true—do not negate the plain meaning of the statutory provision.

### V.     Plaintiffs do not state a plausible claim that the Act was enacted with a racially discriminatory purpose.

Finally, Plaintiffs have not alleged sufficient facts to support the inference that a discriminatory purpose played a "motivating" role in the Act. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). While this Court must accept Plaintiffs' factual assertions as true, it does not need to accept the legal or implausible conclusions that Plaintiffs draw from those assertions. *See Iqbal*, 556 U.S. at 678; *Kansas Penn Gaming*, 656 F.3d at 1214.

To begin, Plaintiffs' equal protection claim is based on their erroneous theories about the legal scope of the Act. For example, Plaintiffs allege that the Act "inflicts disproportionate injury on students of color" by, among other hyperbolic injuries, curtailing the "perspectives of people of color" and leading to the "remov[al] [of] books written by Black authors." Doc. 110 at 23. Nothing in the text even comes close to suggesting this outcome. Plaintiffs claim that discrimination in this context requires "merely the intent to treat differently[,]" Doc. 110 at 18 (citation omitted), but the Act treats everyone the same; indeed, the plain import of the text is to *prevent* unequal treatment. Plaintiffs are wrong that State Defendants' counterarguments create questions of fact, as "[s]tatutory interpretation presents a question of law" and the "facts of an individual case will not affect a court's interpretation of a statute." *United Rentals Nw. v. Yearout Mech.*, 573 F.3d 997, 1001 (10th Cir. 2009).

As to legislative history, even though the Court must take allegations about statements of individual legislators as true, it must only "draw all *reasonable* inferences therefrom in the light most favorable to the plaintiffs." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (emphasis added). None of the pleaded statements lead to a reasonable inference that the Legislature as a whole passed the Act with discriminatory intent. Individualized criticisms of critical race theory, the Black Lives Matter movement, and the concept of systemic racism do not lead to a reasonable inference that the Act was enacted for racist reasons—especially not in light of anti-discriminatory text itself. Nor does merely "evok[ing] race … raise an inference of racial motive." Doc. 110 at 21. This standard, if applied broadly, would improperly undermine numerous laws and chill speech, as well as cast doubt on the motives of Plaintiffs themselves. In the end, Plaintiffs have failed to refute that their equal protection claim is based on a series of entirely unreasonable and incoherent inferences.

The historical background and legislative procedure similarly do not give rise to a reasonable inference of racial discrimination. Plaintiffs' citation to an out-of-state Indian boarding school that has been closed for over a hundred years, the Tulsa Race Massacre of 1921, Doc. 50 at 4, ¶ 6, and land run reenactments, *id.* at 63, ¶ 148, are all irrelevant to this Act. Moreover, the legislative "departures" alleged by Plaintiffs are legal conclusions. *See* Doc. 110 at 20–21. The law proceeded through committee, was debated on the floor, was passed by both chambers of the Legislature, and duly signed by the Governor. The fact that it replaced another bill does not lead to a reasonable inference that the Act was enacted with a discriminatory intent, and Plaintiffs cite no precedent holding otherwise.

Respectfully Submitted,

s/ *Will Flanagan*

GARRY M. GASKINS, II, OBA NO. 20212
   *Solicitor General*
ZACH WEST, OBA NO. 30768
   *Director of Special Litigation*
WILL FLANAGAN, OBA NO. 35110
   *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov

*Counsel for State Defendants*