1                   IN THE UNITED STATES DISTRICT COURT

2                   FOR THE WESTERN DISTRICT OF OKLAHOMA

3

     BLACK EMERGENCY RESPONSE TEAM,      )
4    ET AL.,                             )
                                         )
5                                        )
               Plaintiffs,               )
6                                        )      CASE NO. CIV-21-1022-G
     vs.                                 )
7                                        )
                                         )
8    JOHN O'CONNOR, IN HIS OFFICIAL      )
     CAPACITY AS OKLAHOMA ATTORNEY       )
9    GENERAL, ET AL.,                    )
                                         )
10                                       )
                                         )
11             Defendants.               )

12

13                  TRANSCRIPT OF MOTION HEARING

14          BEFORE THE HONORABLE CHARLES B. GOODWIN

15               UNITED STATES DISTRICT JUDGE

16                     DECEMBER 4, 2023

17

18

19

20

21

22

23

24

25   **Proceedings recorded by mechanical stenography; transcript**
     **produced by computer-aided transcription.**

1                          **APPEARANCES**

2    FOR THE PLAINTIFF(S):

3      Emerson Sykes
       Sarah A. Hinger
4      American Civil Liberties Union Foundation
       125 Broad Street
5      New York, NY 10004

6      Megan E. Lambert
       ACLU of Oklahoma Foundation
7      P.O. Box 13327
       Oklahoma City, Oklahoma
8
       David Hinojosa
9      Maya Brodziak
       Lawyers' Committee for Civil Rights Under Law
10     1500 K Street NW, Suite 900
       Washington, D.C. 20005
11

12   FOR THE DEFENDANT(S):

13

14     Garry M. Gaskins, II
       William P. Flanagan
15     Oklahoma Office of the Attorney General
       313 NE 21st Street
16     Oklahoma City, Oklahoma 73105

17     W. Daniel Weitman
       Tina S. Ikpa
18     University of Oklahoma Office of Legal Counsel
       600 Parrington Oval, Suite 213
19     Norman, Oklahoma 73019

20     F. Andrew Fugitt
       The Center for Education Law
21     900 N. Broadway Avenue, Suite 300
       Oklahoma City, Oklahoma 73102

22

23

24

25

1          (Proceedings held December 4, 2023.)

2                THE COURT:  Good morning, everyone.

3      The Court calls the case of the Black Emergency Response

4  Team, et al., vs. Gentner Drummond in his official capacity as

5  Oklahoma attorney general, et al., it's Case No. CIV-21-1022.

6      The matter comes here before the Court for a hearing on

7  plaintiffs' motion for a preliminary injunction, asking that

8  the Court enjoin various government officials and Oklahoma's

9  largest school district from enforcing what was designated as

10  House Bill 1775 and its implementing regulations, which I will

11  refer to generally as just "the Act" in the course of this

12  hearing.

13      I'll have counsel make their appearances.

14                MR. SYKES:  Emerson Sykes for the plaintiffs.

15                MS. BRODZIAK:  Maya Brodziak for the plaintiffs.

16                MS. LAMBERT:  Meagan Lambert for the plaintiffs.

17                MR. HINOJOSA:  David Hinojosa for the plaintiffs.

18                MS. HINGER:  Sarah Hinger for plaintiffs.

19                THE COURT:  Thank you.

20                MR. GASKINS:  I'm Garry Gaskins, and I have Will

21  Flanagan from my office.  We represent the state defendants,

22  which I think are defendants 1 through 18.

23                MR. FUGITT:  Andy Fugitt for Edmond Public Schools

24  and the Edmond defendants.

25                MS. IKPA:  Tina Ikpa for the University of

1    Oklahoma.

2              MR. WEITMAN:  Dan Weitman for the University of

3    Oklahoma and the board of the University of Oklahoma.

4              THE COURT:  Thank you.

5        All right.  I want to start the hearing by, in general,

6    allowing you to make the arguments that you want to make, and

7    to the extent I can, without interruption by me.

8        I have read all the materials that you have submitted.  I

9    certainly have lots of questions.  I have given you some of

10   those questions in advance, the ones that I thought would

11   benefit from at least a little bit of advance notice.  But I

12   want to hear in general what you think are the central reasons

13   for why the Act should be enjoined or why it should not be

14   enjoined.

15       My general intent then would be to give each side 15, 20

16   minutes of time to present your arguments and then we'll turn

17   to my questions.  I'll say that in doing that I have lumped the

18   defendants together in general.  I don't know how you have --

19   how you have -- or what you would request as far as how you

20   would present your argument.

21       Tell me, are you going to have a central speaker for all

22   of the defendants or is everybody presenting their own

23   argument?

24              MR. GASKINS:  I think I will primarily be making

25   the arguments for the defendants, although there may be a

1    couple of issues that are unique to the university or to the

2    Edmond Public Schools that they may weigh in on after me, but I

3    will primarily be addressing all issues.

4            THE COURT:  Okay.  Then we'll just handle that as

5    it comes along.  I'm going to take it from that that it's not

6    going to be a central issue and we are not going to need to

7    have each group argue on each point.

8        So let me start with the plaintiffs then, and I'll give

9    you 15 minutes or so.  Tell me what you think I need to know.

10           MR. SYKES:  Thank you very much, Your Honor.  And

11   I'm not sure we'll need the whole 15 minutes, but I'll start

12   with my opening and we'll get into it.

13       Thank you so much, Your Honor.  We're here before you

14   today because plaintiffs are seeking to enjoin the further

15   enforcement of Oklahoma's HB 1775.  This is a law in which the

16   legislature used language that's vague, overbroad, and

17   viewpoint discriminatory to restrict teaching about racism and

18   sexism in Oklahoma's public colleges, universities, and public

19   schools.

20       As you know, plaintiffs bring four claims.  We've moved

21   for a preliminary injunction on the first three, and I'll just

22   walk through them very briefly.

23       First, the law is unconstitutionally vague because

24   teachers, many of whom are here with us in the courtroom, can't

25   understand what content can be taught and what can't, and they

1    risk losing their livelihoods if they get it wrong.

2        A statute can be vague for two independent reasons; one,

3    as I mentioned, is because of notice.  Those who are subject to

4    the law don't know what conduct is proscribed and what is

5    permitted.  Laws can also be vague because they open the door

6    to arbitrary and discriminatory enforcement, and here we have

7    seen exactly that with HB 1775.  The state has continued to

8    enforce the Act in the intervening time since we brought this

9    case, and we've seen from their enforcement actions that it

10   does, in fact, open the door to arbitrary and discriminatory

11   enforcement.

12       As Edmond Public Schools itself has admitted,

13   unfortunately, quote, no one truly knows what the law means.

14   And even lieutenant governor of the state of Oklahoma recently

15   stated publicly that the law is need of clarification.

16       Your Honor, three federal courts have already looked at

17   similar laws, and all three held that the law and the language

18   within it is unconstitutionally vague at the PI and motion to

19   dismiss stage.

20       Our second claim is that the law violates public school

21   students' First Amendment right to receive information.  They

22   have a right to receive an education free from partisan and

23   political censorship.  Teachers are being forced by the

24   legislature to withhold information from students with no

25   reasonable relationship to any legitimate pedagogical purpose.

As you saw in Exhibit 1 to our complaint, Edmond Public Schools has explicitly told teachers that when confronted by questions like "what is CRT," they can offer only the most anodyne and sanitized language that doesn't truly respond to students' questions and shuts the door to further inquiry instead of creating what the standards at the Oklahoma Academic Standards encourage, which is an open learning environment where students are encouraged to ask questions, encouraged to evaluate various viewpoints, and to build their critical thinking skills.

Our third claim is that the law violates the First Amendment because it is overbroad and a viewpoint-based restriction on academic freedom in higher education. Instructors are modifying their syllabi, and the university is changing the curriculum to comply with HB 1775.

This kind of intrusion into academic inquiry by the political branches is an affront to academic freedom unlike any we've seen since *Keyishian* and *Sweezy*. And I'll just note here, Your Honor, that as we look at the case law on academic freedom, the vast majority of those cases involve disputes between teachers or students and the universities themselves.

What we have is something much more dangerous for our democracy. We have the political branches, the legislature, reaching straight into the university classroom and telling teachers what they can and cannot teach, the specific views that they can and cannot express. And this type of viewpoint

discrimination in a college classroom by the political branches
is beyond the pale.

For our first claim we have alleged in our complaint and
will further prove through discovery that the law violates the
Equal Protection Clause of the 14th Amendment.  All of the
Arlington Heights factors indicate discrimination, including
historical and political context, the dramatic departures from
both procedural and substantive norms, legislature's
inflammatory racialized statements while the law was being
considered, and the disparate impact the law is having on black
and indigenous students whose stories are being erased from the
curriculum.

Your Honor, I'm happy to dive into the questions that you
sent, but we can also go back and think more about exactly how
vague this law is.  We have pointed to a number of different
provisions within the law that raise our concerns, and we think
that the law is riddled with these concerns such that it should
be enjoined in its entirety.

Section 1(A), as you noted, applies to higher education.
It prohibits mandatory gender and sexual diversity trainings,
whatever those are, as well as any orientation or requirement
that merely presents any form of race or sex stereotyping or
bias on the basis of race or sex.

This small sentence has multiple problems in it.
Defendants want to interpret orientation or requirement to mean

1    required orientation, but this is the kind of rewriting of the

2    statute that is simply not allowed in this kind of proceeding.

3    Your Honor, if requirement means anything in the college

4    context, it must mean required courses, and probably also

5    required readings.

6        And it's not just us who have read the law this way.  The

7    University of Oklahoma changed a required course from mandatory

8    to voluntary because of HB 1775.  And I want to make clear our

9    First Amendment claim is not rooted in the change of this

10   course in particular.  I cite this example to underline the

11   fact that the University of Oklahoma believed that the Gateway

12   to Belonging course -- which is not a training, it is a

13   course -- was subject to HB 1775.

14       Our best reading is that requirement covers the classroom.

15   OU's reading, apparently, is that it covers the classroom,

16   despite what they have said in their briefing.  And if the law

17   intervenes into the college classroom, it is a direct affront

18   to academic freedom and Your Honor can look no further than

19   related litigation in the Northern District of Florida which

20   struck down a very similar law.

21       Merely presenting any form of race or sex stereotyping or

22   bias we think gets into the viewpoint-based discrimination.

23   The overbreadth is reaching into the college classroom, and the

24   viewpoint-based discrimination is because you're not even

25   allowed to discuss these ideas.  Merely presenting these ideas,

1   even to criticize them, seems to be proscribed by the law.

2       Moving to Section B, which covers the K through 12

3   context.

4       This set of eight divisive concepts was directly cut and

5   pasted from former President Trump's executive order 13950,

6   which before we even filed was enjoined on the grounds of

7   vagueness.  Not deterred, the Oklahoma legislature, and I have

8   to admit a few other legislatures, adopted very similar or

9   identical language.

10       As I mentioned, in the Santa Cruz Diversity Center, the

11  Northern District of California enjoined Executive Order 13950

12  because it said that this list of eight divisive concepts was

13  hopelessly vague and provided -- did not provide notice for

14  contractors, grantees, and other government workers to

15  understand what would be prescribed and what would not by the

16  plain language of these eight concepts.

17       Your Honor, when we get into the eight concepts, there are

18  two other directly relevant pieces of precedent.  One is the --

19  a case out of the District of New Hampshire called *Mejia*.  And

20  in that case a judge looked at an almost identical set of the

21  first four concepts.  New Hampshire, instead of eight concepts,

22  used four, but they are substantively identical to the ones we

23  have here.

24       And what the judge said there was, again, the language was

25  hopelessly vague.  He applied a heightened standard because the

law implicates First Amendment values and held that the law was unconstitutionally vague.

A third case out of the Northern District of Florida looked at the application of these eight principles almost identical to the college setting specifically.  There were some companion cases.  One, *Honeyfund* ruled that the Stop Woke Act, Florida's version HB 1775, was unconstitutionally vague as it applies to private employers.  But more directly relevant to the case at hand, in *Pernell vs. Lamb*, the Court looked at the provision of the Stop Woke Act, again that's Florida's version of HB 1775, as it applied to higher education and specifically held that the law was vague with regard to higher education by any standard, whatever -- there was some back and forth about what standard was appropriate in the higher education context and the judge looked at various standards and said, look, this law, especially provision four, which prohibits anyone from teaching that anyone cannot or should not attempt to treat others without respect to race or sex.  This, the Court said, achieved the rare triple negative and was completely incomprehensible to those who are subject to it.

Likewise, if you want to look at the -- the specific language, there's a provision -- I think that the -- the HB 1775 is actually more vague than -- than Executive Order 13950, the Stop Woke Act, or SB1 in New Hampshire for two particular reasons, and we highlight them in our briefing.

1        One is the formulation "make part of a course."  So this
2   comes in Section B with regard to the eight -- the eight banned
3   concepts.  And as we have argued and as plaintiffs have shown,
4   what does it mean to make something part of a course?  It is
5   completely unclear.  Again, it seems to indicate that even
6   raising issues around racism and sexism to criticize those
7   ideas -- for example, the first concept is that one race or sex
8   is inherently superior to another.  None of our plaintiffs are
9   actually teaching that, but they are teaching about that.  They
10  are teaching about racism.  They are teaching about sexism.
11  How can you teach American history, Oklahoma history, current
12  affairs, almost anything without at least having the
13  opportunity to discuss the types of hard truths that we have
14  dealt with as a society.  So we have -- "make part of a course"
15  is something that was not in any of the other statutes and we
16  think that it makes it, in fact, much worse.

17       Another provision that doesn't appear in the other two
18  statutes but has been cut and pasted elsewhere is subsection G,
19  which says that it's prohibited to teach -- or to make part of
20  a course, I should say, that anyone should feel any anxiety or
21  any -- discomfort, anguish, or any other form of psychological
22  distress on account of race or sex.

23       On first read, it might make sense.  None of the teachers
24  that we represent are purposefully trying to make their
25  students feel bad in their classrooms.  But by the plain letter

1    of the law, it seems to indicate that teachers should somehow

2    teach that African-American students should not feel discomfort

3    when learning about slavery, that Jewish students should not

4    feel discomfort when learning about the Holocaust, that

5    American Indian students should not feel discomfort when

6    learning about the Trail of Tears.

7         When you think about how this law is supposed to be

8    implemented and interpreted by the teachers who are at the

9    front lines, it's clear, if you put yourself in their shoes,

10   you have an impossible choice.  They avoid these topics

11   altogether or they risk losing their jobs.

12        Your Honor, the vagueness is further emphasized -- this

13   "make part of a course" vagueness is further emphasized by the

14   enforcement actions that have been taken by the state.  The

15   state -- complaints have been made under HB 1775 since we

16   filed.  Multiple investigations have been undertaken, which

17   we've provided notice of to the Court and there's briefing on.

18   And what I want the Court to specifically note is in these

19   enforcement actions, none of these were around curricular

20   speech.  Well, the Tulsa -- the Tulsa enforcement action and

21   the Boismier enforcement action were not about curricular

22   speech.  One was about professional development for teachers

23   which was found to have violated HB 1775, and the other one was

24   a QR code that was supplied by a teacher to their students.

25        So these enforcement actions show that even if we were to

1    read the language "make part of a course" as defendants do,

2    that is not, in fact, what the state is doing and that is not

3    how the state is interpreting and enforcing the law.

4        Your Honor, I'll just say another word about our right to

5    receive information claim.  As much as we talk about the

6    teachers and the instructors and the impossible position that

7    they are in, at the end of the day the folks who suffer the

8    most under HB 1775 are probably the students.  There is a

9    recognized right of students not only to speak -- of people in

10   general not only to speak, but to receive information.  And we

11   cite to multiple cases that, in fact, recognize students' right

12   to receive information in public schools.

13       Far from what defendants characterize as a right to

14   dictate what's in the curriculum, it's a very specific right

15   based in the *Hazelwood Pico* line of cases, which says that if a

16   government is going to restrict access to information, if

17   they're going to withhold information from students, it must be

18   reasonably related to a legitimate pedagogical concern.

19       And we think this is the appropriate test in the K-12

20   context.  It recognizes and defers in large part to the state

21   to create its own curriculum.  Of course, the state creates

22   public school curriculum, but it says it has to at least have

23   some reasonable relationship to some legitimate pedagogical

24   concern.  And here, HB 1775 falls short of even that low bar.

25       There was no legitimate pedagogical concern raised by the

1  legislature.  They were talking about their distaste for Black

2  Lives Matter, they were talking about the broader political

3  context and the racial reckoning that we saw in the summer of

4  2020.

5      These are not educators making reasoned decisions about

6  what should and should not be in the curriculum.  In fact,

7  those decisions were made by Oklahoma educators through the

8  Oklahoma Academic Standards, which tell a very different story

9  and paint a very different picture than HB 1775.

10     The stated interests of the defendants,

11 antidiscrimination, is, in principle, potentially a legitimate

12 interest, but we have reason to believe that that is not their

13 actual interest here.  But even if we take their word for it

14 that they do have a legitimate interest in preventing

15 discrimination in schools, the provisions of HB 1775 do nothing

16 to achieve that goal.

17     There is existing anti-discrimination law.  You are

18 already prohibited from discriminating against students or

19 teachers based on their race or any other protected category.

20 That is well enshrined in anti-discrimination law.

21     What this law does is something quite different and

22 unique.  It picks specific ideas that are politically

23 incorrect, according to the Oklahoma legislature, and prohibits

24 the mere discussion of these ideas in public schools, and by

25 extension, discussion about race and sex in college classrooms.

1    And we ask Your Honor to recognize the problems on the

2    face of this law, the problems so far with the implementation

3    of this law, and to not allow this law to continue to wreak

4    havoc on Oklahomans for another day.

5        I think when we look at what has happened since we filed,

6    on the one hand we have the official enforcement actions which

7    make clear that Oklahoma has every intention of enforcing this

8    law, not just narrowly, but to the broadest extent possible,

9    extending even beyond the broad language that is in the text of

10   the law.

11       But that doesn't even capture all of it because what

12   really is happening in Oklahoma schools -- and this has been

13   covered in our declarations, it has been covered in the media

14   coverage -- but the chilling effect that has settled over

15   education in Oklahoma is dramatic and it can directly be traced

16   to HB 1775.  Teachers, and even districts, as EPS admitted,

17   can't know what is allowed and what is not allowed, and so they

18   live in fear.

19       And so we ask you, Your Honor, today to try to help us

20   alleviate that fear and make clear to these teachers and to

21   these students that their best interests are at heart and that

22   we will not let the state continue to negatively impact their

23   educations to score partisan and political points.

24       Thank you, Your Honor.

25               THE COURT:  Thank you.

1      I'll hear argument from the defendants.

2           MR. GASKINS:  Thank you, Your Honor, and may it

3  please the Court.

4      Your Honor, Oklahoma has a legitimate pedagogical

5  justification for House Bill 1775, that is protecting children

6  from race and sex discrimination in school curriculum.

7  Further, despite the arguments by plaintiffs, House Bill 1775

8  does not interfere with classroom study or academic research in

9  a university setting.  And there is no authority that I'm aware

10  of supporting the novel proposition that a K-12 student has a

11  constitutional right to dictate the curriculum they receive on

12  any given topic in the classroom.

13      Further, unlike university professors, secondary school

14  teachers do not have a constitutional right to academic freedom

15  on the curriculum they teach.  Therefore, the state defendants

16  do not believe that there is any basis for this Court to

17  invalidate House Bill 1775.

18      I'm going to dig into the various questions the Court

19  asked on Friday.  Before I do that, I want to discuss a couple

20  of cases that the plaintiff mentioned in their opening

21  argument.

22      The first case is this Florida case, Honeyfund.  I think

23  that case is easily distinguishable.  First, I will say the --

24  compare Florida's law and Oklahoma's law, some of the terms

25  that the Court was confused -- confused with were slightly

1    different.  For example, the Florida law says "morally
2    superior."  But I think the big distinction, though, is the
3    Florida law doesn't have the Safe Harbor Provision that
4    Oklahoma's law has.  Oklahoma's law says that the Oklahoma
5    Academic Standards control to the extent that there is a
6    conflict with the remaining terms.  There's no such language in
7    the Florida law.

8        So I think that -- that that's a big distinction, and I
9    think that is one of the specific questions the Court had,
10   which I'll address here in a second.

11       I would also point out that that case was appealed, the
12   Honeyfund case.  It was orally argued in front of the Eleventh
13   Circuit in August.  So a decision on that Honeyfund case,
14   appellate decision could be issued any day.  But regardless, I
15   believe it's distinguishable because there is no safe harbor.

16       And this New Hampshire case that plaintiffs mentioned in
17   their opening argument, I believe that's also distinguishable
18   because Oklahoma -- and as the Court pointed out in one of its
19   questions -- to punish a teacher under House Bill 1775 there is
20   the scienter requirement, and I don't believe that there was
21   this willful violation in the New Hampshire case.

22       Finally, that Northern District of California case that
23   plaintiffs mentioned, that was an order that was entered right
24   before there was a change in the administration.  It obviously
25   was not appealed by the -- by the Biden administration.  I --

1    there is no appellate authority examining that decision and

2    determining whether it was correct, and it was also limited

3    to -- to certain groups, federal contractors.  There wasn't any

4    plaintiffs that had standing to challenge some of the other

5    provisions, so I'm not sure that that really provides much help

6    in this case.

7        So as to the specific questions the Court asked, I think

8    the first one is -- is an important one, it's the applicable

9    standard for evaluating plaintiffs' facial vagueness, viewpoint

10   discrimination, and information right claims.

11             THE COURT:  And let me say, if we're going to get

12   into the questions, then I want to do those in a manner where

13   I'm going to ask each side to talk about each question

14   specifically.

15       As far as your introductory statements, I mean, if there's

16   anything, whether it relates to my questions or not, that you

17   think is broadly applicable or what you think are really the

18   central points, I want you to highlight those for me now.

19             MR. GASKINS:  Well, I will say that we do think,

20   two points is, one, is that there is the Safe Harbor Provision

21   in the law, which I believe is an important distinction from

22   the cases that have been cited by the plaintiff.

23       The -- the fact that the Oklahoma Academic Standards,

24   specifically the Social Study Academic Standards, clearly

25   permit teachers to talk about various issues regarding race

```
 1   relations.  They permit teachers to talk to students about the
 2   Tulsa Race Massacre, Jim Crow laws, the rise of the Ku Klux
 3   Klan.  There's many more issues like that.  So I think it's
 4   clear that teachers have the ability and have the -- have the
 5   means to -- to still discuss important issues of -- of race and
 6   discrimination with their students.
 7        And additionally, as the Court -- one of the other
 8   questions that I think is important, especially with respect to
 9   that New Hampshire case, is the scienter requirement that there
10   has to be a willful violation.  A teacher cannot be punished
11   for instructing students on concepts unless they know those
12   concepts are prohibited.
13        So if -- if a prohibition itself is vague, by definition
14   the teacher cannot willfully violate it.  So I think a lot of
15   the -- the alleged harms that the plaintiff have asserted here
16   are -- are overblown with respect to that scienter requirement.
17        I would also point out, I know that this has been fully
18   briefed, but the -- some of the issues that -- about the Tulsa
19   schools and the Mustang schools, I don't believe that there's
20   anyone that's a plaintiff here today that was affected by those
21   decisions, would have standing to assert those, but I believe
22   those have been fully briefed, regardless.
23        But again, the state defendants, we filed, I think six
24   separate briefs on this issue.  I think there's been 16 briefs
25   filed.  I know the Court is well aware of the issues.
```

1       So outside of answering the Court's questions that it has

2   and any other questions, I think we'll stand by our briefs.

3           THE COURT:  Thank you.

4       Any additional argument as far as the introductory

5   section?

6           MR. WEITMAN:  Your Honor, I'll be very brief for

7   the University of Oklahoma.  OU stands in a very unique

8   constitutional position in that we are created by the

9   Constitution, we are a state constitutional entity, we have a

10  great deal of independence from the legislature.  The

11  legislature cannot reach in and dictate what is taught in our

12  classrooms at the university, what our curriculum is going to

13  be.  The Supreme Court has said so in the Baker case.

14  Recently, in the Franco case that -- that position was

15  reaffirmed.

16      So to that extent, we don't think that OU is a proper

17  party.  We don't think that there's standing against OU, and

18  that's kind of central to our position in this case.  Thank

19  you.

20          THE COURT:  Okay.

21          MR. FUGITT:  Very briefly, Your Honor, on behalf of

22  Edmond Public Schools.  I'm not here to defend 1775.  That's

23  not my job.  My able counsel has done that.  I am here to

24  defend, to the extent necessary, Edmond Public Schools' efforts

25  to comply with the law.

1       One thing I would address is to the extent that

2   plaintiffs' counsel's somehow indicating that Edmond Public

3   Schools has admitted or acknowledged that 1775 is so broad as

4   to be unconstitutional, that's not factually correct based on

5   the record.

6       The record before you contains some information that --

7   some of it was attached, some exhibits that were attached to

8   the complaint purporting to be guidelines the plaintiffs say

9   were adopted by Edmond Public Schools.  Those guidelines

10  weren't adopted by anybody.  Exhibit No. 2 to the complaint,

11  which is a screenshot from a PowerPoint that was done as part

12  of a teacher's meeting, are personal notes created by the

13  director of curriculum at a meeting that she shared with other

14  teachers.  Those weren't adopted by anybody or -- not by the

15  board, not by the administration.  That was just information

16  that was compiled.  Edmond Public Schools hasn't adopted

17  anything.

18      The other point that I would like to make is that in our

19  response, document 60-1, Edmond Public Schools did indicate

20  that what they told their teachers, that the law does not

21  prohibit -- 1775 does not prohibit conversations about race,

22  ethnicity, diversity, or gender.  They told -- Edmond told its

23  teachers, you still have all the tools you had before and, as

24  always, do not interject your opinions.

25      My client, Edmond Public Schools, doesn't get to decide

1    what the curriculum is.  The legislature empowers the State

2    Board of Education to adopt curriculum standards, as they have

3    done.

4        A teacher, as in the individual plaintiffs here, doesn't

5    have a constitutional right to dictate curriculum.  The rights

6    of students to listen is derivative of the rights of the

7    teacher to teach.  If the teacher doesn't have the right to

8    dictate the curriculum, then how have -- have the rights of the

9    students been harmed?  We'd -- for Edmond Public Schools, we

10   stand by the position of the state of Oklahoma.

11       Thank you.

12           THE COURT:  Thank you.

13       Okay.  Let's work through the written questions, and I'm

14   going to ask some additional ones as we go along.

15       But the first one is about just the standards that apply.

16   And you both addressed those to some extent, but I want you to

17   break it down for me because this is a central issue

18   methodologically, and to some extent it's not -- there are

19   issues in flux there.

20       So let me start with plaintiffs.  And tell me, what do you

21   think is the applicable standard for the facial vagueness,

22   information rights viewpoint discrimination claims, and are

23   those different?  How so?

24           MR. SYKES:  Sure, Your Honor.

25       We briefed the sort of basic vagueness test, which comes

1    from *Grayned*, a Supreme Court case, and *Hill v. Colorado*,

2    another Supreme Court case which established, as I mentioned, a

3    two-part inquiry saying that vagueness can be established in

4    two independent ways.  One is if those who are subject to the

5    law cannot be reasonably expected to understand what conduct is

6    prohibited and what is permitted, and the second inquiry is

7    around whether it opens the door to arbitrary and

8    discriminatory enforcement.  What I didn't mention is that we

9    also cited a Tenth Circuit case which encapsulates not only

10   those definitions, but also the additional note that the

11   vagueness standard is especially rigorous in the First

12   Amendment context.  And again, this is sort of settled --

13   settled law.

14        And the New Hampshire case, *Mejia*, in that case, which,

15   again, is in the K-12 context on a -- I think probably on the

16   facts that are most directly similar to this case, the judge in

17   that case spent ten pages in their motion to dismiss ruling

18   going over what is the proper applicable standard to K-12

19   teachers.  And I -- where they landed, essentially -- there was

20   a much more -- much more briefing on the vagueness standard in

21   particular in that case.  And where the judge landed

22   essentially was on a heightened standard because it is a vague

23   law that implicates First Amendment interests.  And so in *Mejia*

24   he adopted this *Hill v. Colorado*, Dr. John's sort of additional

25   rigor that is required in the First Amendment context.

1      In the *Pernell* case, the judge looked at a few different
2  formulations of vagueness and whether there needed to be a
3  different formulation in the context of a public employee.  And
4  what the judge found there was by any standard this is vague.
5  Right?  It doesn't matter exactly what test you're applying,
6  it's vague.

7      And just to highlight that, you know, whether Edmond
8  Public Schools' guidance was adopted or official or not, I
9  think it does stand on its own for the proposition that people
10  of reasonable intelligence have a hard time figuring out what
11  this law means.  The people of reasonable intelligence who have
12  a hard time figuring out what this law means is a long list.

13      Defendants claim that we are pretending not to understand.
14  Perhaps -- that would mean that Edmond Public Schools itself is
15  also pretending not to understand, or whoever it was that
16  drafted that guidance.  The lieutenant governor also doesn't
17  understand what this law means.  And so it -- I think it's not
18  just plaintiffs or counsel pretending not to understand.
19  There's legitimate confusion that is borne by the law.

20      That's what I have on the vagueness standard.  I can move
21  on to the viewpoint discrimination and information rights, but
22  I don't know if you want to take a break there.

23          THE COURT:  Well, let me ask, so suppose that the
24  appropriate standard for a facial vagueness challenge is that
25  there is no clear non-vague application of the law.  If I

1    accept that that's the standard, does your claim survive, or at
2    least your request for an injunction?
3            MR. SYKES:  Your Honor, we think that's the
4    inappropriate standard, but I think even by that standard the
5    language "make part of a course," the triple negative, the
6    discomfort and anguish, there are no plausible narrow, clear
7    readings of that language.  It opens the door up, and no one
8    knows exactly what these things mean based on their own terms
9    or in context.
10       And the *Mejia* court looked in detail.  I don't understand
11   defendants to have put forward such a strict definition of
12   vagueness that was actually submitted by counsel in *Mejia*, but
13   what the Court did was worked through whether or not that's, in
14   fact, still good law.  And *U.S. v. Johnson* says that the law
15   does not need to be vague in all its applications.  And so
16   there is at least an open question about whether that test
17   established by the Supreme Court, sort of vague in all its
18   applications, is still good law.  But even what the *Mejia* court
19   found was that -- probably not good law, but even if it were,
20   it never applied to situations that were related to First
21   Amendment interests.  And so we think that it is probably not
22   good law in general, but especially inapplicable in this -- in
23   this case.
24       That said, by any standard, Your Honor, if a reasonable
25   person, any person from any side of this argument can come

1  forward and explain clearly what these laws mean, I welcome

2  them to do so.  I think what we have heard from counsel are

3  some narrow interpretations.  They have talked about the

4  scienter requirement, the standards, the fact that the Oklahoma

5  Supreme Court can't -- has said that the legislature can't

6  reach into the classroom.

7      These are all well and good to hear from counsel and in

8  their briefing, but, with respect, their actions say something

9  different and show a different interpretation.

10     The scienter requirement was not a safe harbor for someone

11 sharing a QR code or doing a professional development training

12 that said that now the law is implicated as making part of a

13 course one of these prohibited concepts.  The fact that there

14 was a scienter requirement provided no -- no safety for them.

15     Likewise, the standards themselves are completely

16 incompatible with the ideas contained in HB 1775.  And

17 especially, you know, picking up on one of the examples, one of

18 the -- my friend on the other side talked about all of the

19 explicit examples that are mentioned in the Oklahoma Academic

20 Standards, and that's true.  But as we have raised in our

21 declarations, instructors are at a loss for how to square these

22 two completely inconsistent documents.  And what about examples

23 that are not in the Oklahoma Academic Standards?

24     The standards do not provide specificity about lesson

25 plans and which books to teach and those sorts of things.  The

1    standards are broader than that, and they talk about
2    encouraging critical thinking, evaluating a broad variety of
3    perspectives, and looking at how people's personal experiences
4    might inform what they say or do.  How can you talk about that
5    without talking about stereotyping, bias, these types of
6    concerns?

7         So while we, you know, value the Oklahoma Academic
8    Standards and things that they encapsulate, you know, an expert
9    input in terms of what should and can be taught in Oklahoma
10   public schools, HB 1775 completely undercuts all those.  And
11   teachers, like those who are in the room, are left to wonder,
12   well, it said I can teach about this historic incident, but
13   what about this new issue that came up, someone on death row?
14   How am I going to talk about these important issues of current
15   affairs without addressing these issues if these current
16   affairs are not explicitly in the Oklahoma Academic Standards?

17          THE COURT:  Can I consider any of that evidence
18   about how people respond, whether it's the state or whether
19   it's teachers in deciding a facial challenge?  I mean, isn't it
20   just about the statute itself?

21          MR. SYKES:  Your Honor, we are totally comfortable
22   with you staying within the four corners of the statute.  We
23   think on its face it is obviously vague.  We have provided
24   evidence that we think further shows its vagueness, that it is
25   not just us who are confused, but we do not think that you have

1    to look at any of this other information.  The law on its face

2    speaks for itself, however unclearly.

3                THE COURT:  Well, keep going on the -- the other

4    standards.

5                MR. SYKES:  Sure, Your Honor.

6         So the next question was about the viewpoint

7    discrimination standard.  And just to clarify, the viewpoint

8    discrimination claim that we bring is, in some sense, paired

9    with our overbreadth claim, and that is related to higher

10   education.  Right?

11        So we're focusing in primarily on this "or requirement"

12   language.  Again, I agree with counsel for OU that the Oklahoma

13   Supreme Court has said that the legislature can't dictate

14   what's happening in classrooms, but apparently that's exactly

15   what they have done.  And OU itself has interpreted that way by

16   changing classes because of the law.

17        So when we're looking in higher education at what impacts

18   the classroom, we have argued here and elsewhere that this type

19   of viewpoint discrimination from the legislature is entirely

20   inappropriate and an affront to the First Amendment of the

21   highest order, and there are many cases that say that viewpoint

22   discrimination is per se unconstitutional.

23        Now, the Tenth Circuit in *Axson-Flynn* has said that

24   *Hazelwood* -- the *Hazelwood Pico* line of cases is also

25   instructive in higher education -- or is instructive in higher

1    education in terms of what can be in the curriculum.  And

2    *Pernell*, the case in the Northern District of Florida, which is

3    exclusively about higher education, applied a case called

4    *Bishop*, which is an Eleventh Circuit case, which took *Hazelwood*

5    as its polestar, it said, but didn't directly apply *Hazelwood*,

6    and did a balancing test where it looked at the context, the

7    unique context of the university, the government's interest

8    both as an employer and as a maker of curriculum, and the

9    special inquiry around academic freedom.  So it's a three-part

10    balancing test from *Bishop*, which is informed by *Hazelwood*.

11    And I think even if Your Honor were inclined to take the

12    approach of *Axson-Flynn* or even of *Pernell* and applied

13    *Hazelwood* to the higher education context -- in *Axson-Flynn* the

14    Tenth Circuit noted how problematic it might be to apply K-12

15    standards to higher education.  In higher education, all the

16    people involved are adults, they're there voluntarily.  It's a

17    very different kind of mission in higher education than in

18    K-12.

19    But even if Your Honor -- you know, we're not asking you

20    to overturn Tenth Circuit precedent -- if Your Honor wants to

21    adopt a *Hazelwood* framework in order to look at how the law can

22    impact the classroom, again assuming that the law does impact

23    the college classroom, it would still have to go through the

24    analysis of whether these decisions are reasonably related to a

25    legitimate pedagogical purpose.  And the idea of prohibiting

1    college professors from even presenting stereotypes or bias

2    must fail *Hazelwood*.

3        I can move on to --

4            THE COURT:  You can move on.

5            MR. SYKES:  -- informational rights.

6        So, Your Honor, the -- my friend on the other side said

7    there's no cases that say that a student can dictate what's the

8    curriculum.  We haven't made such a claim, but there are

9    multiple courts that have recognized the student's right to

10   receive information as a First Amendment interest.

11       *Arce v. Douglas* in the Ninth Circuit.  There's a case

12   called *Pratt* from the Eighth Circuit.  *Virgil* from the Eleventh

13   Circuit.  And, of course, *Axson-Flynn* in the Tenth Circuit.

14   That was in the higher education context, but did recognize

15   that when a student is speaking -- slow down.  Sorry.  When a

16   student is speaking in the curricular context, there are, in

17   fact, First Amendment issues at play.

18       And, you know, to the extent that this is an issue that

19   also came up in the Florida litigation, I would push back on

20   the idea that a student's right is purely derivative.  It's

21   true that in many cases the teachers' right to speak and the

22   students' right to receive might be one to one, but that is

23   certainly not required by this right.  And one only needs to

24   think about a case like *Pico*, which is sort of in this same

25   line of cases but relates to book restrictions, restricting

1    access to books.

2        And similarly, there was no argument that the librarian

3    themselves had a First Amendment right to have certain books in

4    the library, but students still -- and consumers of the

5    information still have that right.  There doesn't necessarily

6    need to be a First Amendment right on the part of the provider

7    to recognize the First Amendment part -- right on the part of

8    the receiver.  So I want to make that -- that clear.

9        I think, you know, the Tenth Circuit in *Miles v. Denver*

10   adopted *Hazelwood* in the K-12 context in evaluating whether a

11   teacher should get in trouble for making certain statements,

12   but it's clear, I think, Your Honor, that when we look at

13   curricular speech, especially in the K-12 context, that it's

14   the *Hazelwood Pico* line of cases that should cover.  And in

15   applying that to HB 1775, even though it's a relatively

16   deferential test, as we have shown here, there is no reasonable

17   relationship to a legitimate pedagogical concern.

18             THE COURT:  All right.

19       Let me hear from defendants then just on that

20   methodological question about standards.

21             MR. GASKINS:  Sure.  I think it's first important

22   to point out that this is a facial challenge, which I think is

23   what the Court's question was.  And I will say that in June of

24   this year the U.S. Supreme Court in *United States V. Stevens* --

25   strike that -- in *United States v. Hanson* issued on June 23rd,

1    2023, held that litigants mounting a facial challenge to a

2    statute normally must establish that no set of circumstances

3    exists under which the statute would be valid.

4        I would also point the Court to the general rule of

5    statutory construction that says that statutes are interpreted

6    to avoid constitutional conflict and all reasonable doubt is

7    applied in favor of the statute's validity.  I think with those

8    two -- those two citations of law, the facial vagueness claim

9    must fail.

10       The Court is instructed to -- to avoid any sort of

11   constitutional conflict.  To the extent that the Court believes

12   that language needs to be narrowed, which I know we will talk

13   about here in a minute, but I think with those two citations of

14   law, it's virtually impossible for the plaintiffs to prevail on

15   their facial vagueness claim as we sit here today.

16            THE COURT:  What about the *Johnson* case?

17            MR. GASKINS:  The *Johnson* case?

18            THE COURT:  So United States vs. -- or *Johnson vs.*

19   *United States*, anything you want to tell me about that?  2015

20   case.

21            MR. GASKINS:  Give me one second, let me check real

22   quick.

23            THE COURT:  Sure.

24            MR. GASKINS:  I do know that -- I do know that

25   there was the *United States vs. Stevens* case, which I think we

1    had cited in our briefing that talked about -- that had a

2    slightly different standard on a facial vagueness claim, but I

3    think the *United States v. Hanson* case overruled that, at least

4    as to what the standard is for a facial vagueness argument.

5            THE COURT:  So in *Johnson* the Court -- the Supreme

6    Court says, "Although statements in some of our opinions could

7    be read to suggest otherwise, our holdings squarely contradict

8    the theory that a vague provision is constitutional merely

9    because there is some conduct that clearly falls within the

10   provision's grounds."  And so if that's good law, that

11   undercuts your position.

12           MR. GASKINS:  I would say that -- well, I mean,

13   again, talking about how the Court interprets what is vague

14   about whether a reasonable person would not understand it, so I

15   think that that -- that has to play into that as well.

16       So you would have to show that the statute really is vague

17   and there is no reasonable interpretation that -- that would

18   support the constitutional validity of the statute.

19           THE COURT:  But, in any event, you think the *Hanson*

20   decision controls?

21           MR. GASKINS:  We believe the *Hanson* decision from

22   June 23, 2023, controls, which said that litigants mounting a

23   facial challenge to a statute normally must establish that no

24   set of circumstances exist under which the statute would be

25   valid.  Now, I will say, though, that that United States V.

1    *Hanson* case did put a different standard for the First

2    Amendment claims.  And the First Amendment claims, the -- the

3    viewpoint discrimination and the information right claims, that

4    standard, according to the *United States v. Hanson* case, is

5    that the plaintiffs must at least demonstrate that a

6    substantial number of House Bill 1775's applications are

7    unconstitutional as judged in relation to its plainly

8    legitimate sweep.

9         So it's not as a -- it's not as -- the non-First Amendment

10   claims appears to be that if there's any circumstances that

11   would exist in which the statute would be valid on the First

12   Amendment, it is -- they have to show that there is a

13   substantial number of applications that are unconstitutional.

14           THE COURT:  Tell me about the, to the extent you

15   have anything to say, on the viewpoint discrimination and

16   informational rights claims that is different as far as the

17   standard.  Tell me about that.

18           MR. GASKINS:  Sure.  Well, yeah, I just -- the

19   standard is, yeah, must show that there's a substantial number

20   of applications that are unconstitutional.  I would point out

21   that -- that the cases that the counsel cited regarding the

22   students, those are talking about the students' ability to

23   speak.  House Bill 1775 is not -- is aimed toward the classroom

24   curriculum.  It's not discussing the students' ability to speak

25   on any sort of topic.  So I think that -- those are clearly

1  distinguishable.

2    Additionally, I heard plaintiffs appear to admit that the

3  legislature doesn't have any authority to dictate to the

4  University of Oklahoma what it teaches in its classrooms.  The

5  university also has alleged that.  So I think that would make

6  it, at least with respect to the -- to the standard that the

7  Court should -- should avoid an interpretation that results in

8  a constitutional conflict, at least as it relates to this

9  argument that -- that House Bill 1775 prevents things in -- in

10  a classroom at the University of Oklahoma, that's not what --

11  that's not permitted and that's not what House Bill 1775 does.

12          THE COURT:  All right.  Thank you.  Let me have you

13  return to the counsel table.

14    I'll give plaintiffs a chance to respond if there's

15  anything that you have that you want to say.

16          MR. SYKES:  Now or after?

17          THE COURT:  Right now.

18          MR. SYKES:  Thank you, Your Honor.  Just two quick

19  points of clarification.  One is my friend said that all of the

20  student speech cases -- or the student cases we cited were

21  about student speech, not about curriculum.  That's incorrect,

22  Your Honor.  *Arce v. Douglas* was about a Chicano studies

23  curriculum and *Virgil* was about a book that was assigned as a

24  part of the curriculum.  *Axson-Flynn* was about a student

25  speaking, but it was about a student -- whether or not they

wanted to participate in a particular play at the university
and they were required to do so by the professor.

And so while it's true, it's somewhat about the students'
rights and the students' right to speak.  The way that the
Tenth Circuit analyzed it was about what can be required as
part of the curriculum, and so analyzed it under the *Hazelwood*
framework in the curricular context.  So I think that's solidly
where we are in this case.

And *U.S. v. Hanson*, I think at the very end you got the
key piece, which is what is normally applied versus what is
applied in a situation where there are First Amendment
interests at play.  This case was argued by my colleague in the
Supreme Court, and what the Court ended up doing there was
adopting and narrowing interpretation.

So I don't think it necessarily sets an impossible bar for
vagueness, but it was discussed by the Supreme Court in the
course of narrowing a statute to which -- to a legitimate
sweep, which is a part of the overbreadth inquiry.

THE COURT:  Okay.  Let's go to the second question,
and I'll start again with plaintiffs' counsel -- well, let me
start with defense counsel.  This is a good one to have the
defendants' counsel present your first arguments.

And so the question is about Section 1(A) of the Act,
which prohibits any orientation or requirement that presents
race or sex stereotyping or bias.  And so I want to know what

1    "requirement" means in this context and what does "presents"

2    mean, for that matter?

3              MR. GASKINS:  Sure.  So to answer these questions,

4    I think we need to go back to what I just discussed as the fact

5    that statutes are interpreted to avoid constitutional conflict

6    and all reasonable doubt is applied in favor of a statute's

7    validity.  And the basic text in the context of House Bill 1775

8    leads the state defendants to believe that the terms

9    "requirement" and "presents" only apply to orientations,

10   trainings, or counseling activities.  Sentences are not read in

11   isolation, but in conjunction with surrounding sentences, and

12   nothing in this subsection or the preceding sentence indicates

13   that the legislature was referring to in-class teaching in

14   subsection 1(A).  Rather, the context clearly points to a more

15   narrow and reasonable conclusion that "requirement" and

16   "presents" only apply to activities that are the equivalent to

17   orientations, trainings, or counseling activities.

18        House Bill 1775 does not apply to university classroom

19   activities.  And I believe there was also an agreement between

20   the University of Oklahoma and the plaintiffs that the

21   legislature doesn't even have that authority to -- to pass such

22   a law to dictate what -- what professors teach in their

23   classroom and in normal classroom activities.

24        So I believe that -- that the only reasonable

25   interpretation of -- of 1(A) is that it only is talking about

1    these non-classroom activities.

2        Further, "presents" should be contextually and rationally

3    interpreted to mean "endorses" or "promotes."  To interpret

4    "presents" as simply stating or even refuting the racist or

5    sexist concept is patently absurd given the legislature's

6    obvious goal to combat racism and sexism in this bill.  The law

7    simply means that orientations or trainings can not present

8    race or sex stereotyping or bias as acceptable or as a positive

9    good.

10        So those would be -- that is how we have interpreted those

11   provisions based upon the context and the clear intent of the

12   legislature under House Bill 1775.

13            THE COURT:  You're asking me to do a lot of work

14   there, aren't you?  I mean, I'm -- "presents," why did the

15   legislature use the word "presents" rather than "endorse" or

16   "promote" if they meant "endorse" or "promote"?

17            MR. GASKINS:  You know, I cannot get into the heads

18   of the 101 members of the house of representatives, or the 44

19   members of Oklahoma senate.  I can only look at what -- what

20   the language is in the surrounding sentences, and the

21   understanding about what the legislature can and can't do,

22   i.e., cannot get into classroom activities at a university.

23   And based upon those -- the language, the context, and those

24   basic principles of constitutional law, that is how we -- we

25   interpret those provisions.

1          THE COURT:  All right.  Has there been any

2     enforcement as to Section 1(A)?  Is there even an -- an

3     enforcement provision?

4          MR. GASKINS:  Right.  That -- that is a --

5     something that the -- that I believe the University of Oklahoma

6     will speak to, but it's my understanding that there hasn't even

7     been regulations that have been implemented with respect to the

8     section to enforce it.  So I do not believe that there has been

9     any sort of enforcement action, but I will defer to my

10    university colleague on that.  But I know the attorney

11    general's office has not been involved in any sort of

12    enforcement of that.

13         THE COURT:  Anything that the university counsel is

14    aware of?

15         MR. WEITMAN:  Your Honor, the -- I'm sorry.  Let me

16    get to the microphone.

17        Around the time that House Bill 1775 was enacted, a

18    mandatory orientation, Gateway to Belonging, became a voluntary

19    class.  Also, two other classes were added.  Students can now

20    either take Gateway to Belonging or Global Perspectives in

21    Engagement or Ethical Leadership Development.  This is required

22    of all on-campus 1L students.  It is an orientation-type of

23    course.

24        And this was done out of respect to the legislature.  We

25    don't even think the legislature had the authority to require

1    OU to make that change because that is an on-campus educational

2    issue.

3        There has been no other types of enforcement of this --

4            THE COURT:  Nothing beyond that -- I mean, that

5    situation that you described I think everybody agrees is a --

6    there was a voluntary decision, maybe not the university's

7    first choice, but it's certainly the choice that they

8    ultimately made was to change the nature of that orientation --

9            MR. WEITMAN:  I think that's right.  And there has

10   been no other enforcement.  I know that a -- an affidavit was

11   submitted from a John Doe who said that somebody told him that

12   somebody told that person that they couldn't test.  We have

13   refuted that with our own affidavit from the dean of the arts

14   and sciences.  There has been no enforcement of House Bill 1775

15   on campus.

16           THE COURT:  Thank you.

17       Let me turn then to plaintiffs on this question about

18   Section 1(A) of the Act as it applies to universities.

19           MR. SYKES:  Thank you, Your Honor.

20       As we have covered a few times, you know, if the admission

21   that plaintiffs have made is that we think that what the

22   legislature did is unconstitutional, yes, we do think that what

23   they did was unconstitutional.

24       As we said, the clearest reading of the law is that

25   orientation or requirement are two different things.

1    Plaintiffs, as you noted, are -- sorry -- defendants are asking

2    you to rewrite the law substantially, to rearrange the words,

3    ignore words, and have implications that are not there.

4        And as I said, this is our reading.  This is the reading

5    of our plaintiffs.  And getting into the question of what OU

6    did, counsel said it was an orientation, it was a class, it was

7    an orientation-type of class, and that OU did make a change to

8    this class.  And we have reason to believe that that was

9    directly related to HB 1775.  So I will note that OU does have

10   discretion to decide what trainings are mandatory or not, and

11   to direct the content of its own curriculum.

12       As I mentioned, usually these cases, these sort of First

13   Amendment higher education cases are between a teacher or a

14   professor or a student and the university, and the court is in

15   the position of trying to decide what is the limits of the

16   university's authority to do X, Y, or Z vis-a-vis members of

17   its community.

18       We're in a different situation here.  We acknowledge that

19   OU has significant discretion in terms of what it does in its

20   own university, but what we have seen here is that the

21   legislature has passed a law, an unconstitutional law, that has

22   forced OU to make a decision.

23       Now, OU might decide to keep things as they are.  But

24   what's important to us is that in one way, shape, or form our

25   clients understand that whether the law is enjoined, whether

1    this part is excised, as you say, or however we deal with it,
2    it needs to be made perfectly clear, not just in defendants'
3    briefs, because those are nonbinding interpretations, but we
4    need a clear statement, a binding interpretation that says that
5    this HB 1775 cannot reach into the university classroom.  And
6    specifically --

7                THE COURT:  So -- go ahead.  No, I cut you off.  Go
8    ahead.

9                MR. SYKES:  And specifically that the Gateway to
10   Belonging course, which is described as a course, is not
11   implicated by the law.  Again, OU can choose what -- to do what
12   they will, but it's important to us and it's important to our
13   clients that it's clear that coursework is not implicated by
14   the law.

15               THE COURT:  All right.  Well, let me ask, and this
16   makes our way into question three, suppose the words "or
17   requirement" in Section 1(A) are excised by the Court, what do
18   you have left at that point as far as your argument?

19               MR. SYKES:  Your Honor, OU is still a defendant
20   under our vagueness claim as an enforcer of the Act, but I
21   think the meat of Your Honor's question is --

22               THE COURT:  I don't understand that point.  It's as
23   an enforcer of the Act?

24               MR. SYKES:  Yes.  So under *Ex Parte Young*,
25   government entities that are responsible for enforcing the Act

1    can be named as proper defendants in an effort to try to block
2    the law.  So in terms of -- they are named as a part of the
3    vagueness claim, but to the meat of Your Honor's question,
4    substantively the heart of our First Amendment academic freedom
5    claim, as separate from our right to receive or vagueness or
6    equal protection claims, but our First Amendment viewpoint
7    overbreadth academic freedom claim does rest on the fact that
8    requirement covers the classroom.

9        So if requirement either doesn't cover the classroom or is
10   no longer there, that would essentially resolve the meat of our
11   problems with that particular section.  And though, as I
12   mentioned, OU would still be a valid defendant on the vagueness
13   claim, I think Your Honor's right that that would alleviate the
14   vast majority of our concerns for that particular claim.

15          THE COURT:  Thank you.

16       Let me turn to defense counsel and allow you to respond.

17          MR. WEITMAN:  We're going to arm wrestle to see who
18   responds.

19          THE COURT:  If you guys need to talk for a minute,
20   that's fine.

21          MR. GASKINS:  Right.  If "or requirement" were
22   excised, there's no argument that 1(A) applies to a classroom
23   setting, and plaintiffs have not shown a concrete and
24   particularized injury from a lack of a mandatory training or
25   orientation, which I believe resolves that issue.

1       Under the text of House Bill 1775, as now codified in 70

2   O.S. Section 24-157(A)(2), it's the Oklahoma State Regents for

3   Higher Education that's responsible for promulgating rules

4   subject to the approval of the legislature to implement the

5   provisions.  I'm not aware of any such rules that have been

6   implemented as we sit here today, but I'll allow my university

7   colleague to address that further.

8               THE COURT:  Is there anything that you would add?

9               MR. WEITMAN:  Just very quickly, Your Honor.

10      Your Honor, I just wanted to address the *Ex Parte Young*,

11  what I'll call the elephant in the room now.  With the

12  concession that this House Bill 1775 can't reach into our

13  classroom, OU is not an enforcer of this law.  So we're not a

14  proper party to the lawsuit.

15      Now, the state regents have to implement rules regarding

16  1775, perhaps they remain a proper party, but the regents for

17  the University of Oklahoma do not.

18      And to answer counsel's statement just a second ago, the

19  state regents have not implemented rules in regard to 1775.

20              THE COURT:  Thank you.

21      Okay.  Let's turn to question four.  Let me start with

22  plaintiffs' counsel here.  So the question is now turning to

23  Section 1(b) of the Act and asking what does "require" or "make

24  part of a course mean" insofar as the -- the prohibition of the

25  eight forbidden concepts, I've called it, for K to 12

1    education?

2              MR. SYKES:  Your Honor, we're not sure, you will be

3    surprised to know, what it means to make part of a course.  It

4    seems to include any sort of discussion, even to criticize

5    these laws plaintiffs say that that -- or sorry -- defendants

6    say that that is an absurd reading of the law, but that is what

7    the plain text says.  It says "make part of a course."

8         And again, we look at how it's been enforced, or at least

9    how it -- EPS has talked about it in terms of their guidance

10   and adjusting anchor text.  That seems clearly to be part of a

11   course.

12        But also, as I mentioned, the enforcement actions in Tulsa

13   was around a teacher training.  So it's not clear to us how

14   that could be part of a course.  And likewise, the Boismier

15   enforcement action around the QR codes, it's not at all clear

16   to us how that could be make part of a course.  But does it

17   mean any sort of discussion, does it mean any assigned

18   readings, does it mean having a poster on the wall with a

19   message that might implicate some of these ideas?  To be

20   honest, Your Honor, we really just can't make sense of it.

21              THE COURT:  I'm going to have a lot more questions

22   for defense counsel on this one.  I think plaintiffs' position

23   is very simple, they just say it doesn't make sense at all.

24   But tell me what you think this really means.

25              MR. GASKINS:  Sure.  Well, I think we first, just

1  to go to the law, the plaintiffs' -- or ambiguity of statutory

2  language is determined by reference to the language itself, the

3  specific context in which the language is used, and the broader

4  context of a statute as a whole.

5      And then in *Hill v. Colorado*, the U.S. Supreme Court in

6  2000 said that hypertechnical theories as to what the statute

7  might cover and hypothetical cases which conjure up uncertainty

8  in the meaning of words cannot form the basis of a facial

9  attack on a statute.

10     I would also point out that, as we have previously

11 discussed, a law is vague if it fails to provide people of

12 ordinary intelligence a reasonable opportunity to understand

13 what conduct it prohibits.

14     In this instance, the state defendants believe the phrase

15 "require or make a part of a course" simply forbids teaching

16 the specified concepts as being true.  Taken as a whole, House

17 Bill 1775 is clearly aimed at protecting children from race and

18 sex discrimination in school curriculum.

19     In our briefing, the state defendants previously used the

20 George Orwell as an example of teaching two plus two equals

21 five.  So let's assume HB 1775 precluded teaching two plus two

22 equals five.  People of ordinary intelligence would certainly

23 understand the statement to mean that teachers are permitted to

24 teach students that two plus two equals four.  And if a student

25 were asked what is two plus two, what's the answer to that, and

1    they said five, people of ordinary intelligence would certainly
2    understand that a teacher is permitted to tell the student that
3    the answer they gave is incorrect.
4        So precluding teachers from teaching two plus two equals
5    five simply means that teachers are precluded from teaching the
6    students how to do math incorrectly.  Similarly here, teachers
7    are simply precluded from teaching students that certain
8    discriminatory concepts are true or correct.  And people of
9    ordinary intelligence certainly do not believe it prohibits
10   teachers from pointing out that the discriminatory concepts are
11   untrue or incorrect.
12       I would also point out that the Oklahoma Academic
13   Standards contain numerous references, as we have previously
14   discussed, encourage a discussion of issues related to race and
15   sex discrimination.  Therefore, it would be absurd to say that
16   teachers are precluded from even mentioning discrimination or
17   teaching students that it is wrong.
18       So based upon -- on the context of the statute and -- and
19   the obvious intent of the legislature here, we believe the
20   phrase "require or make part of a course" simply forbids
21   teaching the specified concepts as being true or giving them
22   a -- a positive inclusion.
23           THE COURT:  So let's say -- I want to go through
24   some examples and see if what you understand is what I
25   understand.

1      So let's think about a high school social studies class.
2  Could an instructor, in teaching about the history of Jim Crow
3  laws in Oklahoma, criticize -- that is the important part
4  there -- directly criticize racially discriminatory views of
5  early Oklahoma officials?  And there certainly were lots of
6  those.
7           MR. GASKINS:  Well, I mean, I will point out that
8  the Oklahoma Academic Standards permit examining multiple
9  points of view regarding the evolution of race relations in
10  Oklahoma.  Jim Crow laws --
11           THE COURT:  But what about the Act?
12           MR. GASKINS:  What about the Act?
13           THE COURT:  Yes.
14           MR. GASKINS:  Well, the Act incorporates the
15  Oklahoma Academic Standards into it, and it says that to the
16  extent that there is a -- that there is a disagreement, that
17  the Oklahoma Academic Standards control.
18      So on this hypothetical question, I think that under the
19  language of the specific standard, that would be permitted,
20  that that is one of the multiple points of view regarding the
21  evolution of race relations in Oklahoma.
22           THE COURT:  Separating the two, if I don't fully
23  buy that the Act incorporates those high school standards and I
24  look at just the Act itself, could a teacher who criticized
25  racially discriminatory views in discussing the history of

1    Oklahoma have their license suspended?

2              MR. GASKINS:  Well, then you're getting into the

3    scienter requirement, that it's in the regulations, which

4    are --

5              THE COURT:  I don't want to get into that yet.  I

6    want to talk about what it means to require or make part of a

7    course.

8              MR. GASKINS:  Right.

9              THE COURT:  And so that's what I'm trying to get

10   at.

11             MR. GASKINS:  So from looking at the context of the

12   statute, it appears to -- to the state defendants that the

13   purpose of this statute is to -- is to teach -- is to preclude

14   teaching students that discrimination is a good thing.  So that

15   -- that's how we interpret the exact language.  And that is --

16   also appears to be supported by the Oklahoma Academic

17   Standards, which control to the extent that there is a -- that

18   there is a disagreement.

19             THE COURT:  And I suppose you would say the same

20   then as to lesser levels of endorsement, I'll call it.  So an

21   instructor assigns reading material like Huckleberry Finn that

22   -- in the course of that novel the author describes wrong and

23   unjust perceptions about black men and women.  Assigning that

24   reading material is fine, you would say?

25             MR. GASKINS:  As long as it's not an endorsement

1     that the students should be -- should discriminate against

2     others, I think that would be perfectly acceptable.

3               THE COURT:  Do you think it constitutes requiring

4     or making something part of a course?

5               MR. GASKINS:  Again, we take the context of this

6     statute to mean that those terms are -- are reflecting that

7     this is a correct world view, a correct world view that you

8     should be -- you should discriminate against others.  And as

9     long as the teacher is not doing that, we believe that it falls

10    within the parameters of House Bill 1775.

11              THE COURT:  What about something that would

12    directly get into the eight forbidden concepts?  So say in our

13    eleventh grade social security -- pardon me -- eleventh grade

14    social studies class the teacher has a class discussion about,

15    oh, the protestant work ethic and a student voices the opinion

16    that this idea of work ethic and meritocracy has some

17    inherently racist attributes and it's a racist value.  Is that

18    something that falls in the category of requiring or making

19    part of a course?

20              MR. GASKINS:  Well, I mean, I think in that example

21    that's the student that is speaking, it's not necessarily the

22    teacher.  I guess -- I guess the question is how should the

23    teacher respond if -- if a student makes such a statement?

24              THE COURT:  And your answer is?

25              MR. GASKINS:  Well, I think it's what I -- like I

1  said with the two plus two equals five example, I think that

2  there is nothing precluding a teacher under House Bill 1775 to

3  teach the students that they should not be discriminatory and

4  should not be -- should be racist or -- or engage in any sort

5  of sex discrimination.  I think that is what the intent of the

6  legislature was in this statute.  And I think that as long as

7  that's what teacher's response is, I think that would be in

8  line with House Bill 1775.

9          THE COURT:  If the teacher -- or let's start like

10 this, do you think the teacher would be obligated to say no,

11 that's not true?

12         MR. GASKINS:  I think that -- I think, as we talked

13 about, the teacher's speech in a classroom setting, K through

14 12, that's not protected speech.  So I think that they would be

15 required to -- to avoid telling students that they should be

16 racist.

17         THE COURT:  All right.  But you have a student who

18 makes a statement.  Is the teacher obligated to correct the

19 statement?

20         MR. GASKINS:  I don't think that there is any sort

21 of -- I don't think there's any sort of requirement in here

22 that requires a teacher to affirmatively respond to any

23 question that they are presented by a student.  I think that --

24 but if they did respond, then I believe that they would have to

25 respond consistent with House Bill 1775 and the Oklahoma

1    Academic Standards.

2              THE COURT:  So if they were to say "that's a good

3    point, does anybody want to respond," is that enough?

4              MR. GASKINS:  Well, I -- again, we have got

5    multiple other issues here.  You know, we talked about the

6    scienter requirement and all of those.  Just simply saying

7    that's a good point, I don't know if that's necessarily --

8    that's not necessarily endorsing that that value that the

9    student has indicated is correct.

10        If the good point is just to engage the students in

11   constructive discussion, I don't see that that would fall under

12   House Bill 1775.  But regardless, under the regulations the

13   teacher would not suffer any sort of consequences for making

14   such a statement.

15             THE COURT:  All right.  Let's see.

16        Could a high school teacher affirmatively state that

17   racially discriminatory views of previous Oklahoma officials

18   have resulted in increased poverty and reduced political power

19   for persons of color now?

20             MR. GASKINS:  Well, I mean, I will say that 9.3 of

21   the -- of the Academic Standards do prevent teachers to talk

22   about ongoing issues of race relations, religious

23   discrimination, bigotry, perceived biases.  So, I mean, I think

24   that those sort of -- that sort of line of -- line of

25   questioning would be permitted under the Academic Standards.

1    I guess your question would be let's -- let's take away
2  the Oklahoma Academic Standards, does that fall under House
3  Bill 1775, and I think my answer then would be it goes to it
4  really is an issue of intent.  Is the teacher seeking to -- is
5  the teacher intending to tell the students to be racist or be
6  discriminatory?  If that's the case, then I think there could
7  be potential consequences to the extent that that was not
8  covered by the Oklahoma Academic Standards.
9            THE COURT:  Can a teacher implicitly make something
10  part of a course?  So in the Oklahoma Department of Education's
11  enforcement action, just to give you some broader context and
12  try to assist you in understanding the point, in that Oklahoma
13  Department of Education's enforcement action against Tulsa
14  Public Schools in response to a staff training it is stated by
15  the department, "To be clear, while there may not be express
16  statements that an individual is inherently racist because of
17  their race, consciously or unconsciously, there is evidence
18  making it more likely than not that the training incorporated
19  and/or is based on such concepts."
20    And so that seems to me to go beyond, or possibly go
21  beyond what was explicitly stated.  You're looking at something
22  implicitly arising from a statement.
23            MR. GASKINS:  Sure.  And I think someone from the
24  city of Tulsa or the Tulsa Public Schools, if they wanted to
25  bring a claim, they would potentially have an as-applied

1    challenge that they could make in that situation.  My reading

2    of the law -- the state defendants' reading of the law, the

3    Oklahoma attorney general's reading is that it precludes a

4    willful violation.  And to me saying something is implicit is

5    not -- is not breaching the standard of showing that it's a

6    willful violation.  But again, we don't have anyone from the

7    Tulsa Public Schools that are here challenging the law or

8    challenging the application to them.  But I think that would be

9    something that -- that if an as-applied challenge were made in

10   that situation, they could potentially win, but that's still a

11   hypothetical.

12            THE COURT:  I think that's good enough for now.

13   Let me have you sit down.  I'm going to turn to plaintiffs, and

14   then we're going to talk about the safe harbor provision in

15   those Oklahoma Academic Standards.

16            MR. GASKINS:  Thank you.

17            THE COURT:  All right.  I did want to give you the

18   chance to respond and address any of those points made by the

19   defendants.

20            MR. SYKES:  Sure, Your Honor.  I think your series

21   of hypotheticals and hard questions and the difficulty that my

22   friend had with coming up with how a teacher should respond

23   specifically illustrates the chilling effect that we have been

24   discussing.  Teachers don't know what will happen in a

25   discussion in a classroom if they are anywhere near any of

1   these topics, and they may very well at any given moment be put

2   in an impossible position where what they say in response to a

3   particular discussion could put their livelihoods at risk.  And

4   so they're going to avoid these topics altogether, and that's

5   what we're seeing.

6       And I think if you look at the EPS, whether it's guidance,

7   whether it was adopted, whether it was just a slide, I think it

8   illustrates the point exactly.  There's a specific sentence

9   that says if a student asks, along that -- the lines of your

10  hypothetical in terms of how do you respond, if a student asks

11  what is CRT, the proposed response, trying to thread that

12  needle that my friend was trying to thread in responding to

13  your hypotheticals, is you're supposed to respond that it's

14  usually a theory that's used to describe laws.  Which provides

15  no clarity at all and it shows that what teachers are, in fact,

16  encouraged to do is to -- is to step backwards, raise their

17  hands, and stay as far away from these things as possible.

18      And that is exactly why vague laws are so dangerous,

19  because the chilling effect can go far beyond what is actually

20  within the text of the law.  The text of the law is bad enough

21  on its own.  The regulations broaden the sweep of the law, and

22  the implementation of the state, which I understand my friend

23  to now disclaim, is even broader than that, and that is the

24  inevitable result of this vague law.

25      Shall I move now to the Oklahoma Academic Standards?  That

1    was my only response to the previous --

2              THE COURT:  All right.  I want to hear from the

3    defendants first on that point.  I want to hear their argument,

4    and then I'll let you respond to that.

5              MR. SYKES:  Okay.

6              THE COURT:  So turning to the next question then,

7    the Act specifically provides that it shall not prohibit the

8    teaching of concepts that align to the Oklahoma Academic

9    Standards, and so tell me what that really means.

10             MR. GASKINS:  Well, I think it's our -- our

11   position that that means that to the extent that there's a

12   conflict between the Oklahoma Academic Standards and House Bill

13   1775, the Oklahoma Academic Standards control.  And as we have

14   pointed out in our briefing and I've pointed out today, the

15   Oklahoma Academic Standards for social studies that include

16   history encourage teaching students about the negative

17   consequences of racism and discrimination, very specific

18   references about teaching students about the Tulsa Race

19   Massacre, Jim Crow laws, the rise of the Ku Klux Klan.

20        So we think the standards clearly give teachers the

21   freedom to discuss the negative consequences of racism and

22   discrimination.

23             THE COURT:  All right.  Let's look at -- okay.  So

24   forbidden concept B says that a teacher may not present that an

25   individual by virtue of his or her race or sex is inherently

1  racist, whether consciously or unconsciously.  Can a high

2  school teacher teach about implicit bias?

3          MR. GASKINS:  Well, I mean, I will say that the

4  standards include the teaching -- or include examining multiple

5  points of view regarding the evolution of race relations in

6  Oklahoma.  I mean, I think that that would be broad enough to

7  allow such a discussion.

8          THE COURT:  So under the Academic Standards, we

9  have psychology standard 7.2, and I assume that you don't have

10  those memorized.

11          MR. GASKINS:  I don't have -- I have a few of them

12  highlighted in my notes here, but --

13          THE COURT:  Well, this one provides -- and I can

14  read it again if you need me to.  I always hated being read

15  something and then you have to remember it exactly on the spot.

16  So I'm going to try do that in as gentle way as possible.  But

17  that standard says, "Explain how bias, discrimination, and use

18  of stereotypes influence behavior with regard to gender, race,

19  sexual orientation and ethnicity as demonstrated in the studies

20  of the brown-eyed/blue-eyed experiment and the Clark Doll

21  experiment."

22      And so the question gets to, at some level, teaching about

23  unconscious bias.  Is that -- or the standard gets to the

24  teaching of unconscious bias.  Is that -- number one, does that

25  violate the Act?

1          MR. GASKINS:  Well, I mean, the Act says the
2    provisions of this section shall not prohibit the teaching of
3    concepts that align with the Oklahoma Academic Standards.  So
4    if it's in the Oklahoma Academic Standards, and I -- I agree
5    with your interpretation of 7.2, then that doesn't violate the
6    Act.
7          THE COURT:  So you say anything in the Oklahoma
8    standards is an absolute and true safe harbor --
9          MR. GASKINS:  That's the only way I can read the
10   statute, shall not prohibit the teaching of concepts that align
11   to the Oklahoma Academic Standards.  I read that as, to the
12   extent that there's any conflict, the Oklahoma Academic
13   Standards control.
14         THE COURT:  Okay.  Let me turn back to plaintiffs'
15   counsel.
16      I would hear your response on that general point and that
17   question.
18         MR. SYKES:  Sure, Your Honor.
19      The Oklahoma Academic Standards do not cure our concerns.
20   In fact, they compound the confusion.  And just as an initial
21   point of clarification, Your Honor in the -- ahead of time when
22   you circulated the questions, talked about QR overbreadth or
23   vagueness concerns.  Just to clarify, the overbreadth concerns
24   are in higher education, so they would not be in any way
25   affected by the Oklahoma Academic Standards.

1      But focusing in on the vagueness, I think what my friend

2 on the other side has said is that they are inconsistent.

3 Right?  And where they are inconsistent, he argues -- which it

4 doesn't say in the text -- but he argues that the standards

5 must control.  This looks at -- this looks like an exception

6 that swallows the statute whole.  There's nothing left of the

7 statute if the standards trump the forbidden concepts in every

8 instance.

9      So we and our clients and everybody else is left to wonder

10 how are they meant to be reconciled?  If everything in the

11 standards is left untouched and the standards -- and

12 essentially every piece of the law are inconsistent, then what

13 is left of the law?  We would say legitimately nothing, and,

14 therefore, it should all be enjoined.

15      I talked about the --

16           THE COURT:  Well, wait a minute.  Let's -- I mean,

17 if nothing's left of the law and, therefore, it all should be

18 enjoined, the "therefore" seems the important part.  If

19 nothing's left of the law, or certainly very little is left of

20 the law, then at that point you just don't have a claim; isn't

21 that right?

22           MR. SYKES:  Well, Your Honor, if the relationship

23 that my friend describes is true, but that is not how we read

24 the statute and that is not how the statute has been enforced.

25      You -- you highlighted Section B on unconscious bias, and

1    this is something that is -- an identical provision exists in

2    the Executive Order 13950, in the New Hampshire law, and in the

3    Florida law.  And there was extensive discussion exactly to the

4    point that you made, which is how are we meant to address

5    unconscious bias, which is now 30 years old and well-documented

6    with the studies that are mentioned explicitly in the Oklahoma

7    Academic Standards.  They are in direct conflict.  And so it's

8    not at all clear what it means to comply with HB 1775 while

9    also teaching aligned to the Oklahoma Academic Standards.

10         So if Your Honor finds a way to make clear to our

11    plaintiffs and other teachers that they should continue to

12    apply the Oklahoma Academic Standards as they were doing before

13    and they can somehow not worry about HB 1775, that would

14    achieve our aims.  What -- the situation now is that they are

15    somehow trying to square this circle and figure out how to

16    comply with both.

17         And as my friend on the other side admitted, it's

18    impossible to do both, and so he just said comply with the

19    Oklahoma Academic Standards.  Which again raises the question,

20    then what is HB 1775 doing?  And what we are seeing that it

21    does is, as it's being enforced across the state, is it's

22    chilling speech and teaching on race, racism, and sexism.  And

23    we worry that it will continue to do so as long as the law is

24    in effect.  And the fact that there is this safe harbor is

25    doing nothing to alleviate any of those concerns.

```
 1              THE COURT:  Let me ask again just to -- or if I
 2   didn't squarely ask before, let me ask for the first time.  If
 3   it is a true safe harbor, if I accept the state's position that
 4   teaching something that aligns with the Oklahoma Academic
 5   Standards is acceptable regardless of whether it's prohibited
 6   in the forbidden concepts in House Bill 1775, is there anything
 7   left of your claim if that safe harbor is clearly established?
 8              MR. SYKES:  Thanks, Your Honor.  The inquiry is
 9   whether or not teachers will have sufficient notice and whether
10   or not they will be subjected to potentially overbroad --
11   discriminatory and arbitrary enforcement.  And I think no
12   matter how we choose to come out today, the language in section
13   B, Your Honor, on its face is vague.  And as long as the
14   language in section B is enforced as vague, it is a
15   constitutional problem for our clients.
16        And so the -- the Act cannot be allowed to stand as is
17   because no one can make sense of it, and because it is being
18   arbitrarily and discriminatorily enforced.  The only point I
19   wanted to make with regard to the Oklahoma Academic Standards
20   is that we have no qualms with the standards as they are.  We
21   think they encapsulate a -- the expertise of Oklahoma
22   educators, and our clients would like to continue to teach
23   according to their best practices and according to the Oklahoma
24   Academic Standards.
25        HB 1775 says that they must change what they're teaching.
```

1    They're at a loss for how to comply with both.  And the safe
2    harbor does not alleviate their concerns, it compounds them
3    because they don't know how to do both.
4            THE COURT:  All right.  Anything else you want to
5    say on that point?
6            MR. SYKES:  No.  That's it, Your Honor.
7            THE COURT:  All right.  Let's talk about the
8    enforcement provision.  Let me start with counsel for the
9    defendants here.  So you've pointed out -- or the question
10   assumes that a teacher license may only be revoked for a
11   willful violation of the Act, and so we have a scienter
12   requirement.  And so tell me first, how does that affect the
13   vagueness analysis?
14           MR. GASKINS:  Well, I mean, I think I said before a
15   teacher can't be punished for instructing a student on concepts
16   unless they know those concepts are prohibited.  If prohibition
17   itself is vague, then by definition I don't believe a teacher
18   can willfully violate it.
19       So to the extent that there's some sort of -- that would
20   be a defense a teacher would be able to raise, and could be an
21   as-applied challenge to this statute if -- if someone was
22   actually punished and didn't understand the law.
23           THE COURT:  All right.  There are other
24   punishments, though, aren't there, that don't require the
25   willful violation?

1          MR. GASKINS:  And I think you're referring to the

2    suspension, and I think -- I disagree that -- I think it's

3    actually the -- the standard to suspend a teacher's license is

4    actually higher than it is to revoke the license.  If you go to

5    75 O.S. Sections 314(C)(2) and 314.1, those discuss suspending

6    a teacher's license.  And they require a finding, "That public

7    health, safety, or welfare imperatively requires emergency

8    action in order to suspend the teacher's license."  This

9    appears to be a higher standard than what is required to revoke

10   a license.  At a minimum --

11         THE COURT:  And what were those provisions again,

12   314(C)(2)?

13         MR. GASKINS:  And 314.1.

14         THE COURT:  Okay.

15         MR. GASKINS:  Which discuss -- which are the

16   statutes dealing with suspending a teacher's license.

17       So at a minimum, the public health, safety, or welfare are

18   not likely going to be imperatively impacted by a teacher's

19   violation of House Bill 1775 unless the teacher is willfully

20   violating the Act.  I mean, it has -- it has to be a violation

21   that rises to an emergency situation that's impacting the

22   public health, safety, or welfare.  So there's that.

23       And then I'd also point out that under 75 O.S.

24   Section 314(C)(2) and Oklahoma Administrative Code

25   Section 210:1-5-6(e), that requires revocation proceedings to

1    be promptly instituted following a suspension order.  And

2    pursuant to 70 O.S. Sections 6-101(l) and 6-101.29, the teacher

3    is entitled to their full pay and benefits during suspension.

4        So, therefore, even if a violation constitutes an

5    emergency situation warranting an immediate suspension, the

6    state will still have to show a willful violation in a promptly

7    instituted proceeding before the teacher loses any compensation

8    or benefits.

9        So I don't think that the -- the lack of a scienter

10    requirement in the J -- in the (j)1 talking about suspension

11    changes that.  The statutes still require this higher standard

12    to suspend a teacher, and the teacher is not losing any

13    compensation or benefits after they're suspended.  And the

14    revocation proceedings are required to be promptly instituted,

15    which requires the willful violation.

16            THE COURT:  All right.  I understand your position.

17    Let me turn to counsel for the plaintiffs.

18        Anything you want to say on that question or the

19    defendants' argument?

20            MR. SYKES:  Sure, Your Honor.

21        The scienter requirement, it's -- there are many cases,

22    including *Moreland* in the Northern District of Oklahoma, which

23    say that a scienter requirement may mitigate vagueness.  So we

24    think it's a valid inquiry as to whether it might mitigate

25    vagueness, but here it does not.  It doesn't

1    automatically mitigate vagueness.  *Keyishian*, one of the sort
2    of landmark cases in this area had a scienter requirement and
3    was found to be vague.  And if you look at the example that you
4    raised in terms of the Tulsa enforcement action, they were
5    found to have violated HB 1775 by the state of Oklahoma by
6    implying implicit bias in a -- in a professional development
7    training.  Right?  So they surely were not willfully violating
8    the statute in terms of making part of a course, but it's so
9    vague -- I can't say "surely" -- it doesn't seem to be that
10   they were willfully violating the statute, yet this is -- the
11   language is so vague that it was still enforced against them.

12        And so -- as the *Pernell* court found as well, there there
13   was -- even if there is implied intent, there was no scienter
14   requirement in HB 7, the Stop Woke Act in Florida, but the
15   judge said -- in response to defendant's argument that there
16   was a scienter requirement by implication, what he said was
17   even if there were a scienter requirement, that might clarify,
18   you know, who is covered by the law, but it doesn't do anything
19   to alleviate the vagueness within the law itself.

20        You might -- you have to willfully violate the law, but
21   you still don't know where any of those lines are.  So you
22   might willfully undertake the action, but if the rest of it is
23   completely unclear, the scienter requirement doesn't do that
24   much work in the end.

25                THE COURT:  Okay.  All right.

1          MR. GASKINS:  Can I respond to that briefly?

2          THE COURT:  Yes.

3          MR. GASKINS:  Thank you.

4     I just want to reiterate we're here on a facial challenge.

5     Again, if we're going to talk about specific examples of a

6     Tulsa enforcement action and what happened there, whether that

7     was the right decision, that's an as-applied challenge.  We're

8     here for a facial challenge, which is a much heavier burden, as

9     we have discussed before.

10        So I don't want to get -- get caught up in the weeds on

11    these specific examples where those parties certainly could

12    file their own -- their own claim, potentially have standing to

13    assert that their rights were violated there, but we're here on

14    a facial challenge.

15         THE COURT:  Thank you.

16    Okay.  Let's talk about what I can and should do.  And so

17    there's several questions that address that, seven, eight and

18    nine in the written questions submitted, and I think that we

19    can talk about those all together.

20        So let's start with plaintiffs' counsel.  And so you have

21    the questions in general.  I want to know, can I enjoin some

22    but not all of the Act?  And if so, what parts do you think are

23    particularly ripe for harvest?

24         MR. SYKES:  Your Honor, there is a default

25    severability clause in Oklahoma law.  So Your Honor does have

1  the sort of ability to enjoin parts of this law, and not all,

2  if you were to sever them.  So as a starting point.  That is

3  certainly something -- an option that you have.

4      In terms of what parts we find most objectionable, as you

5  might not be surprised to learn, the list is long.  All of it

6  is bad, maybe in some of it in slightly different ways.  But as

7  we have watched through, starting from the very beginning in

8  section A, talking about gender and diversity training --

9  sexual and gender diversity training, we don't know what that

10  means.  "Or requirement" has raised a whole bunch of questions

11  in terms of what it can permissibly implicate and what it has

12  implicated and what we -- what it implicates on its face.

13  Presenting any form of race or sex stereotyping or bias is a

14  problematic formulation.  It's vague.  And then when we go into

15  Section B in terms of "make part of a course" in terms of each

16  of the concepts themselves, they are hopelessly vague.

17      So if Your Honor chooses to start cutting sections, that

18  is certainly within your authority to do, but with respect, we

19  think it works as a whole and it is riddled with problems --

20  constitutional problems throughout.

21          THE COURT:  Can I -- and is there any difference

22  between excising sections of the Act or -- or enjoining

23  enforcement of some provisions of the Act versus adopting a

24  narrowing construction of the Act?

25          MR. SYKES:  There is a difference, Your Honor.  And

1    I understood your questions to raise at least three different

2    possibilities; severability, narrowing construction, and as

3    we'll get to later, certification.  And I think, Your Honor, in

4    terms of "or requirement," again orientation or requirement

5    must mean two different things and, therefore, we don't think

6    it's really susceptible to a narrowing interpretation.  That

7    must be at least plausible, a narrowing interpretation for a

8    readily -- actually, not just plausible, but readily

9    susceptible to that interpretation for a federal court to do

10   so.  And we, as you mentioned, think that it's too much

11   rewriting, it's too much work on your part to rewrite

12   Section 1(A).

13       If, as you proposed as a part of the questions,

14   "or requirement" were found to be severable and were enjoined

15   and found to be unconstitutional, that is an outcome that we

16   would welcome in as much as it vindicates our higher education

17   plaintiffs' concerns.

18       When we get to Section 1(b), I think it is even more

19   difficult to see how you can pick and choose what parts of this

20   can survive.  The "make part of a course" formulation is

21   hopelessly vague, as your back-and-forth with my friend on the

22   other side showed.  And it then implicates the rest of Section

23   B.  If we don't know what make part of a course is, how can we

24   know what is allowed and what is not?

25       And even if we move past that opening phrase and we go one

1    by one through the concepts themselves, they themselves are

2    problematic.  And as you mentioned, Section B talks about

3    unconscious or conscious bias.  We talked about how Section D

4    creates a triple negative.  We talked about how Section G talks

5    about discomfort, anguish, or any other form of psychological

6    distress.

7        So we just don't see that the solution for those is to

8    pick and choose which are the worst, but rather to enjoin the

9    law in its entirety.

10           THE COURT:  What about the question whether I

11   should do anything?  I am a federal judge.  This is a federal

12   court.  We're talking about a state statute.  Is this a matter

13   that should be certified to the Oklahoma Supreme Court to let

14   it take the first look at it?

15           MR. SYKES:  Your Honor, a court can, as you said.

16   The question is whether you should.  And we think here

17   certification is unnecessary.  Given the breadth of the

18   language, there is no narrowing construction that we think is

19   readily available.  And, therefore, we don't expect the

20   Oklahoma Supreme Court to make any more sense of this language

21   than Your Honor might be allowed to -- or might be able to.

22       This is not a situation where we have an interaction with

23   other state laws or there are a few plausible interpretations

24   of the law that the -- that the Oklahoma Supreme Court can

25   adopt, one.  There's a case that's -- there's a -- *City of*

1   *Houston v. Hill* makes clear that while certification may help

2   the judicial process in many cases, it is not an invitation for

3   the state courts to rewrite statutes.  And I think, with

4   respect, Your Honor, there is a risk if you send at least large

5   portions of this law to the Oklahoma Supreme Court, what you

6   might be asking them is to save it from itself and rewrite the

7   statute as a whole.

8       So we think that that type of certification question is

9   inappropriate.  So we think it's unnecessary.  Other courts

10  have not seen fit to certify questions because the laws are so

11  obviously vague on their face.

12      And I -- if, though, Your Honor decides that the most

13  prudent course is to certify one or more questions, we would

14  simply ask that you temporarily enjoin the law in the meantime.

15  We think that the certification question indicates that there's

16  a lack of clarity, and this lack of clarity is a constitutional

17  injury to our clients.  So if we ask another court to weigh in,

18  we would ask that the law be temporarily enjoined in the

19  meantime.

20          THE COURT:  All right.  Thank you.

21      Let me hear from counsel for the defendants on this

22  question of what I can do and what I should do if I find the

23  Act unconstitutional in any respect.

24          MR. GASKINS:  So I think plaintiffs and the state

25  defendants agree that there is a statute, 75 O.S.

1    Section 11(a), that's the general severability statute that

2    applies to laws passed after 1989 in the state of Oklahoma, and

3    it -- it pertains a presumption that if a part of a law is

4    found invalid or unconstitutional, the remaining part of the

5    statute is presumed valid unless the Court makes certain

6    findings.  So that is the applicable provision if the Court

7    were inclined to enjoin certain portions of the law.

8        I will say that -- that I think everyone that has argued

9    today agrees that the legislature was not -- doesn't have

10   authority to tell university professors what they can teach in

11   their classroom.  So I -- I just don't see how the Court can

12   interpret that statute to mean that it applies to classroom

13   settings.

14       We think the requirement -- the requirement language is

15   talking about things that are the equivalent of orientations

16   and -- and counseling.  We think the Court should -- should

17   attempt to interpret the statute not to violate the Oklahoma

18   constitution.  We don't believe that the legislature could tell

19   university professors what they can teach, so I think that one

20   is an easy one.

21       I think we have talked about the (B)(1) language about

22   require or make part of a course.  We believe that's readily

23   susceptible to being limited to teaching the specified concepts

24   as being true.

25       I would also point out that in the briefing, and maybe I

1    have missed something, but it didn't appear that there were any

2    arguments on Subsections B, C, E, or H in the briefing that

3    those were ambiguous or vague.

4         I would also point out that, while in passing, the

5    plaintiffs did challenge Subsections A and F.  There really

6    isn't much argument that those are really ambiguous.  So I -- I

7    think at a minimum A, B, C, E, F, H -- and H should -- there

8    should be no modifications needed on those.

9         And I will say that the state defendants have no issue if

10   the Court is confused as to -- as to the interpretation of this

11   statute, to certifying the question to the Oklahoma Supreme

12   Court.  We would just -- we just think it would be important to

13   only certify the specific -- or the very specific questions

14   that the Court has so we don't get into a quagmire on that, but

15   we have no issue with the Court certifying that type of

16   question to the Oklahoma Supreme Court.

17             THE COURT:  The oral request by plaintiffs was that

18   if I were to certify some portion of the questions before the

19   Court to the Oklahoma Supreme Court then I should temporarily

20   enjoin enforcement of the Act during that time period.

21             MR. GASKINS:  Right.  I don't think that the --

22   that the plaintiffs have met their burden on an injunction.  I

23   mean, one would -- having to show that they were actually

24   injured by these -- by these actual -- the enforcement of this

25   law, which they have not been able to show.

1     You know, we still have the Oklahoma Academic Standards

2 issue that I think is pretty clear that it doesn't prohibit

3 teaching things that are in those.

4     You know, to the extent that some -- one of these teachers

5 was actually punished or, you know, they were -- they were

6 facing some sort of imminent threat, I think that potentially

7 an injunction in an as-applied fashion would -- would be

8 appropriate, but I don't think that an across-the-board

9 injunction would be appropriate, especially with the heavy

10 burden on a facial challenge.

11          THE COURT:  Let's go back to the narrowing

12 construction.  You referenced it, I think you addressed it in

13 general, but I want to hear from you specifically on, I mean,

14 is there anything there that you think that I cannot do?

15          MR. GASKINS:  I mean, it has to be readily

16 susceptible, right, to the -- the narrowing construction.  I

17 think the -- the 1(A) one is very easy.  Right?  I mean, we all

18 agree that the -- we all agree that the legislature can't tell

19 a university professor what they can and can't teach.  So I

20 think that's an easy one.

21     And everyone, I think, agrees that "or requirement" should

22 not mean something that's in a classroom setting.  So I think

23 that -- that one is readily susceptible to a narrowing

24 construction by this Court.  And I think that the "require or

25 make part of a course" is also readily susceptible to a

narrowing construction to mean that it's limited to teaching

the specified concepts as being true.  I think that -- we have

talked a lot today.  That is -- that appears to be the intent

of the legislature, if you read the statute as a whole, is to

try and -- and stop racism and sexism in public education.  So

I think that that is -- that is the readily susceptible and

reasonable interpretation of that phrase.

THE COURT:  All right.  What about the safe harbor?

Your view is that that -- a safe harbor of teaching that aligns

with the Oklahoma Academic Standards is a true and absolute

safe harbor?

MR. GASKINS:  Yeah.  I mean, the -- I have got the

statute here.  It says the provisions of this subsection shall

not prohibit the teaching of concepts that align to the

Oklahoma Academic Standards.  I -- "shall not prohibit," I take

that to mean what it says.  It doesn't prohibit teachers from

teaching what is in the Oklahoma Academic Standards.

THE COURT:  At least if I accept the plaintiffs'

views on a variety of the eight forbidden concepts, or all of

the eight forbidden concepts, the way that they would interpret

those, there are lots of differences between the Oklahoma

Academic Standards and those eight forbidden concepts.

If I, either as a narrowing construction or just a

construction, state that the Oklahoma Academic Standards

absolutely control and there's no leeway or interpretation that

1  can be argued otherwise, do you have any objection to that?

2        MR. GASKINS:  Well, I would say that the -- that I

3  have no problem with the Court quoting the language in the

4  statute that says that these are not prohibited.  So, I mean, I

5  think it's already in the language.  And if the Court wants to

6  reiterate what is already clearly in the statute, we have no

7  objection to that.  And that is our position, is that the -- to

8  the extent that there's a conflict, the Oklahoma Academic

9  Standards control.

10        THE COURT:  Let me turn then to plaintiffs' counsel

11  and let you respond to anything in there that you need to

12  respond to or want to.

13        MR. SYKES:  Sure, Your Honor.  Just one point on

14  the Tulsa enforcement and this being a facial challenge.  Your

15  Honor, we are fully happy, as I mentioned, to stay within the

16  four corners of the law.  But to the extent that when we ask

17  questions about narrowing constructions and scienter

18  requirements, we're trying to figure out is there clarity, is

19  there notice for how this law will be enforced.  And we think

20  bringing up these examples, the reason why we provided notice

21  to the Court of these examples is not because it's not a --

22  it's an as-applied challenge to those particular actions, but,

23  rather, it shows that our concerns are not unfounded and are

24  being borne out in the enforcement of the law.  So I just

25  wanted to make that clarification.

1           THE COURT:  All right.  Thank you.

2       I want to take a brief recess.  As far as the written

3   questions, is there anything else that anyone wants to address?

4   I see counsel for Edmond Public Schools.

5           MR. FUGITT:  Very briefly, Your Honor.

6           THE COURT:  Yes.

7           MR. FUGITT:  Thirty seconds, hopefully.

8       This goes back to, I think question number four.  And I --

9   it really wasn't a question that was directed at me, but one

10  that I looked into.  On the language in 1(B), no employee of a

11  school district shall require, there was some discussion.  I

12  was waiting for somebody else to address this point.

13      The administrative -- the statute provides, in the very

14  last section, two, "The State Board of Education shall

15  promulgate rules subject to approval by the legislature to

16  implement the provisions of this subsection."

17      The State Board of Education, again, not my client, but

18  they have done that in Oklahoma Administrative Code

19  210:10-1-23.  In subsection (D)(3), that's 210:10-1-23(D)(3),

20  that rule provides "public schools in this state shall be

21  prohibited from adopting programs or utilizing textbooks,

22  instructional materials, curriculum, classroom assignments,

23  orientation, interventions or counseling that include,

24  incorporate, or are based on the discriminatory concepts

25  identified in Subsection C" of that rule, which are the same

1    prohibitions in the statute.

2         And my point for mentioning that is, is that, as opposed

3    to there being this sort of bare language in the statute, the

4    State Board of Education has come in behind and given some --

5    put a little bit of meat on the bones.  Again, I'm not here to

6    defend the State Board of Education, but I wanted the Court to

7    be aware that that rule did exist.

8              THE COURT:  Thank you.

9         Okay.  I do -- we have been going for a long time, and

10   amongst other things, particularly when we have counsel arguing

11   throughout, that's tough on the reporter.  So I do want to take

12   a brief recess.  Let's stop for, I'm going to call it ten

13   minutes, let everybody take a quick break.

14        And then I'm just going to ask you for general concluding

15   remarks.  And if there was anything that you really wanted to

16   say that you didn't get the chance to say or anything that you

17   have said that you think matters in a way that you haven't

18   driven home, then I'll let you do that.  And I'm going to think

19   about whether I have any other questions that we didn't get to.

20        So we are in recess.

21        (Break taken.)

22              THE COURT:  We're back on the record in Case No.

23   CIV-21-1022, Black Emergency Response Team vs. Drummond.

24        Let me give both sides the chance to present anything else

25   you want to.

1      I'll start with plaintiffs' counsel.  As I say, you can

2  talk about things that you wanted to talk about that we didn't

3  get to or things that we might have covered but you just want

4  to emphasize the importance of, or whatever else you think I

5  need to know.

6          MR. SYKES:  Thank you, Your Honor.

7      I just wanted to revisit for a moment the choice that this

8  law puts in front of teachers.  Teachers Regan Killackey and

9  Anthony Crawford are here today, and also we have Teacher BB

10  from the NAACP, who in their declaration spoke specifically to

11  this issue of how to navigate this so-called safe harbor around

12  aligning to the Oklahoma Academic Standards.  And what teacher

13  BB and our other plaintiffs have said is this -- the standards

14  are not granular.  They do not prescribe every single thing

15  that a teacher should teach.  And, therefore, the idea that

16  they can easily figure out what aligns to the Oklahoma

17  standards in relation to what is prohibited by HB 1775 is

18  simply an impossible place for them to be.  And it ensures that

19  there's a chilling effect, because even if there are the state

20  standards there, they still don't know how HB 1775 will be

21  interpreted or enforced.  And this is further magnified by the

22  fact that the regulations create a private right of action.

23      So teachers face discipline, not just from their schools,

24  not just from their students, but any private citizen can raise

25  these types of complaints.  So this type of vague law, which

1    makes it so hard for teachers to do their job according to

2    their best practices and to the guidance that they have gotten

3    from the state, is simply too much for the First Amendment and

4    for vagueness to bear, and so we ask you to enjoin the law.

5                    THE COURT:  Thank you.

6        I'll turn to counsel for the defendant.

7                    MR. GASKINS:  Thank you, Your Honor.  Just to

8    address those points, and something we have really haven't

9    talked about today, but there is still the standing issue.

10   Under *Clapper v. Amnesty International U.S.A.*, a party cannot

11   manufacture standing merely by inflicting harm on themselves

12   based on their fears of hypothetical future harm.  That is

13   certainly not impending.  Further, hypertechnical theories as

14   to what a statute might cover and hypothetical cases which

15   conjure up uncertainty in the meaning of words cannot form the

16   basis of a facial attack on a statute.

17       This whole statement that the Oklahoma standard --

18   Academic Standards don't address every single issue, I just

19   don't think that's a fair point.  Certainly the -- the Academic

20   Standards are not going to discuss every possible thing that

21   could be taught.  But as we're talking -- as we're thinking

22   about racial issues and what we're talking about today, they do

23   specifically allow for the discussion of the evolution of race

24   issues, discussion of bias, discrimination, those type of

25   things are covered in the regulations.  So these hypertechnical

1    theories that the plaintiffs have come up with that -- this

2    hypothetical case that -- which may -- you know, may result in

3    someone being upset with them doesn't form the basis of a

4    facial attack on the statute.  So --

5              THE COURT:  But do you recognize some difficulty

6    there?  I mean, certainly the Oklahoma Academic Standards, I

7    mean, these are not rules of the road, rules of the highway

8    where you can stop on red and go on green.  They're expressed

9    as broad concepts because you can't address every specific

10   thing to teach and, therefore, there's some amount of

11   interpretation that has to go along with it.

12             MR. GASKINS:  Right.  And the punishment -- to

13   punish someone for violating the statute requires a willful

14   violation, which I believe provides the protection to the

15   teachers on that issue.  And I think some of the examples even

16   given today was Tulsa and Mustang schools, not all of those

17   have been successful prosecutions of various individuals.  And

18   if they are, they certainly would have an as-applied challenge

19   that they would be able to come to this court or some other

20   court and vindicate their rights on that, but we have these

21   specific parties that are not facing imminent punishment that

22   have these hypertechnical theories that this thing may harm

23   them one day, which I don't think is sufficient for a facial

24   attack and is not sufficient to -- to have standing to make

25   such a claim here.

1          THE COURT:  All right.  Anything else you want me
2   to know?

3          MR. GASKINS:  No, Your Honor.

4          THE COURT:  Okay.  All right.  Well, thank you
5   both.  And let me give the other defendants' counsel a chance
6   to say anything that they want to.

7          MR. FUGITT:  Nothing from Edmond Public Schools.

8          MR. WEITMAN:  Your Honor -- and I'm sorry.  I don't
9   mean to belabor points, but I'm a lawyer and I can't help
10  myself.  So I'll take just a couple of seconds of your time.

11      The plaintiffs have conceded that they had no right to a
12  particular orientation course.  They have conceded as a matter
13  of law that House Bill 1775 could not reach the classroom of
14  the University of Oklahoma because of our unique constitutional
15  standing.

16      This Court has pointed out and it's been admitted that
17  there's no enforcement mechanism within the rules.  And to the
18  extent any -- or within the statute, and to the extent any
19  enforcement would take place, that would have to be spelled out
20  in rules promulgated by the state regents, not by the
21  University of Oklahoma.

22      So there's really nothing for this Court to enjoin against
23  the University of Oklahoma and it should not exercise the
24  authority of the federal court and the authority of federal law
25  to enjoin us from enforcing a law that we don't enforce anyway.

1    Thank you.

2            THE COURT:  Pardon me.

3        All right.  I thank you all for a good argument.  I have

4    started to cough, so now is a good time to stop.

5        Thank you, all.  We're adjourned.

6                        (Court adjourned.)

7                    REPORTER'S CERTIFICATION

8            I, Emily Cripe, Federal Official Realtime Court

9    Reporter, in and for the United States District Court for the

10   Western District of Oklahoma, do hereby certify that pursuant

11   to Section 753, Title 28, United States Code that the foregoing

12   is a true and correct transcript of the stenographically

13   reported proceedings held in the above-entitled matter and that

14   the transcript page format is in conformance with the

15   regulations of the Judicial Conference of the United States.

16                        Dated this 19th day of December, 2023.

17

18

19                    **/S/ Emily Cripe**
                     EMILY CRIPE, CSR
20                   Federal Official Court Reporter

21

22

23

24

25