# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BLACK EMERGENCY RESPONSE TEAM et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. CIV-21-1022-G |
| GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, et al., | ) ) ) ) |
| Defendants. | ) ) |

## ORDER OF PRELIMINARY INJUNCTION

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 27) and

Supplements thereto (Doc. Nos. 79, 83, 100, 168, 169),[1] asking the Court to enjoin officials

of the State of Oklahoma and the University of Oklahoma[2] from enforcing Oklahoma

---

[1] Plaintiffs are: Black Emergency Response Team; University of Oklahoma Chapter of the American Association of University Professors; Oklahoma State Conference of the National Association for the Advancement of Colored People; American Indian Movement Indian Territory; Precious Lloyd *ex rel.* S.L.; Anthony Crawford; and Regan Killackey.

[2] Defendants are: Genter Drummond, in his official capacity as Oklahoma Attorney General; Ryan Walters, in his official capacity as Oklahoma Superintendent of Public Education; Zachary Archer, Donald Burdick, Sarah Lepak, Katie Quebedeaux, and Kendra Wesson, in their official capacities as members of the Oklahoma State Board of Education; Kevin Stitt, in his official capacity as Governor of Oklahoma; Jack Sherry, Dennis Casey, Steven Taylor, Courtney Warmington, P. Mitchell Adwon, Jeffrey Hickman, Dustin Hilliary, Ken Levit, and Michael Turpen, in their official capacities as the Oklahoma State Regents for Higher Education (collectively, the "State Defendants"); and John R. "Rick" Braught, Anita Holloway, Rick Nagel, Robert Ross, Natalie Shirley, and Eric Stevenson in their official capacities as members of the Board of Regents of the University of Oklahoma (collectively, the "University Defendants"). All claims against Defendants University of Oklahoma Board of Regents and Independent School District No. 12 of Oklahoma County, Oklahoma, have been dismissed pursuant to a separate order of the Court.

House Bill 1775 ("H.B. 1775" or "the Act") and its implementing regulations.  The parties have submitted additional responses and briefing on the Motion.  *See* Doc. Nos. 58, 60, 61, 66, 90, 91, 96, 97, 146, 148, 158.  In addition, on December 4, 2023, the Court heard argument from counsel.  *See* Doc. No. 160.[3]

## I.   BACKGROUND

Governor Kevin Stitt signed Oklahoma House Bill 1775 ("H.B. 1775" or "the Act") into law on May 7, 2021.  The Act, codified in title 70, section 24-157 of the Oklahoma Statutes, and its implementing regulations, codified in Oklahoma Administrative Code § 210:10-1-23 (the "Implementing Rules"),[4] prohibit the training or teaching of specified subjects in Oklahoma schools.

With respect to public colleges and universities, the Act directs:

No enrolled student of an institution of higher education within The Oklahoma State System of Higher Education shall be required to engage in any form of mandatory gender or sexual diversity training or counseling; provided, voluntary counseling shall not be prohibited.  Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited.

Okla. Stat. tit. 70, § 24-157(A)(1).  The Act directs the Oklahoma State Regents for Higher Education (the "State Regents") to promulgate rules to implement the provisions of section

---

[3] Both Plaintiffs and Defendants declined to present any testimony or evidence beyond the affidavits and documents attached to their various filings.

[4] Unless stated otherwise, references herein to the Act encompass the Implementing Rules, as such rules are authorized in and required by the Act to implement the provisions of the Act.  *See* Okla. Stat. tit. 70, § 24-157(A)(2), (B)(2).

24-157(A), but they have not yet done so.  *See id.* § 24-157(A)(2); Univ. Defs.' Mot. to

Dismiss (Doc. No. 51) at 19.

With respect to school districts, charter schools, and virtual charter schools

(collectively, "K-12 Schools"), the Act directs:

> No teacher, administrator or other employee of a school district, charter
> school or virtual charter school shall require or make part of a course the
> following concepts:
>
>   a. one race or sex is inherently superior to another race or sex,
>
>   b. an individual, by virtue of his or her race or sex, is inherently racist,
>      sexist or oppressive, whether consciously or unconsciously,
>
>   c. an individual should be discriminated against or receive adverse
>      treatment solely or partly because of his or her race or sex,
>
>   d. members of one race or sex cannot and should not attempt to treat
>      others without respect to race or sex,
>
>   e. an individual's moral character is necessarily determined by his or her
>      race or sex,
>
>   f. an individual, by virtue of his or her race or sex, bears responsibility
>      for actions committed in the past by other members of the same race
>      or sex,
>
>   g. any individual should feel discomfort, guilt, anguish or any other form
>      of psychological distress on account of his or her race or sex, or
>
>   h. meritocracy or traits such as a hard work ethic are racist or sexist or
>      were created by members of a particular race to oppress members of
>      another race.

Okla. Stat. tit. 70, § 24-157(B)(1).  This prohibition is limited by a clause providing that

"[t]he provisions of this subsection shall not prohibit the teaching of concepts that align to

the Oklahoma Academic Standards."  *Id.* § 24-157(B).   The Oklahoma Academic

Standards ("Academic Standards") are educational objectives developed by the State

Board of Education and approved by the Oklahoma Legislature reflecting subject matter

standards for public school students in Oklahoma.  *See id.* § 11-103.6(A).  Public school

3

districts are required to develop and implement curriculum based on the Academic Standards. *See id.* The Act's Implementing Rules authorize the State Department of Education to suspend or revoke the license or certificate of K-12 School employees found to have violated the Act. *See* Okla. Admin. Code § 210:10-1-23(j).

## II.   PLAINTIFFS' CLAIMS

Plaintiffs bring suit under 42 U.S.C. § 1983, requesting preliminary and permanent injunctive relief, as well as a declaratory judgment that the Act is unconstitutional facially and as applied under the First and Fourteenth Amendments to the United States Constitution. *See* Am. Compl. (Doc. No. 50) at 76.

Specifically, Plaintiffs contend that:

1. The Act is unconstitutionally vague, facially and as applied by Defendants, in violation of the Fourteenth Amendment;

2. The Act infringes on the right of students to receive information, facially and as applied by Defendants, in violation of the First Amendment;

3. The Act is overbroad and imposes impermissible viewpoint-based restrictions, facially and as applied by Defendants, in violation of the First Amendment; and

4. The Act violates the Equal Protection Clause of the Fourteenth Amendment.

*See id.* ¶¶ 156-189.

III.    ANALYSIS

Federal Rule of Civil Procedure 65 sets forth requirements for a district court to issue a preliminary injunction.  *See* Fed. R. Civ. P. 65(a).  "Because a preliminary injunction is an extraordinary remedy never awarded as of right, the movant must make a clear and unequivocal showing it is entitled to such relief."  *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021) (citation and internal quotation marks omitted).  As explained by the Tenth Circuit,

> Ordinarily, a movant seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest.

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

"[C]ourts disfavor some preliminary injunctions and so require more of the parties who request them."  *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (internal quotation marks omitted).

> Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial.  Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win.  To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-

merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Id.* (citations and internal quotation marks omitted).

Here, the Court finds that the preliminary relief sought by Plaintiffs is not a disfavored injunction. First, a preliminary injunction would not disturb the status quo. The status quo is the last "uncontested" and "peaceable" status between the parties "before the dispute developed." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (internal quotation marks omitted). In the context of a newly enacted statute challenged on constitutional grounds, the status quo is the period prior to the statute's enactment. *See BNSF Ry. Co. v. City of Edmond*, No. CIV-19-769-G, 2019 WL 5608680, at *2 n.1 (W.D. Okla. Oct. 30, 2019). Second, injunctive relief would be prohibitory, rather than mandatory, because such relief would not "affirmatively require [Defendants] to act in a particular way." *Schrier*, 427 F.3d at 1261 (internal quotation marks omitted). It instead would only enjoin Defendants from taking action to enforce the Act. Finally, a preliminary injunction would not irreversibly afford Plaintiffs all the relief they could recover at trial, because a prohibition on enforcing the Act could be undone at the conclusion of a determination on the merits. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247-48 (10th Cir. 2001).

### A. Likelihood of Success on the Merits

Plaintiffs' request for preliminary injunctive relief relies upon two arguments. First, Plaintiffs contend that the Act is impermissibly vague and thereby violates the Fourteenth Amendment's guarantee of due process. Second, Plaintiffs contend that the Act infringes

upon the First Amendment rights of educators to speak on certain subjects and the corollary right of students to hear that speech.  *See* Pls.' Mot. Prelim. Inj. at 18-28.

### 1. *Plaintiffs' Fourteenth Amendment Challenge*

A vague law violates the Fourteenth Amendment's guarantee of due process, as citizens are entitled to know what the law is so they can conform their conduct to it.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And citizens are entitled to laws of sufficient clarity that they leave no room for capricious enforcement by judges, police, or other officials.  *See Sessions v. Dimaya*, 584 U.S. 148, 175 (2018) (Gorsuch, J., concurring in part) (noting that vague laws "can invite the exercise of arbitrary power . . . by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up").  This due process guarantee is compromised when a statute "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement."  *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) (internal quotation marks omitted).

Courts recognize that "we can never expect mathematical certainty from our language" and, so, some level of inexactness will not offend the guarantee of due process.  *Grayned*, 408 U.S. at 110; *see also Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016) (Souter, J.) ("Because words are rough-hewn tools, not surgically precise instruments, some degree of inexactitude is acceptable in statutory language." (alteration, omission, and internal quotation marks omitted)).  "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the

nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).  Factors considered in "deciding whether a challenged statute provides fair notice" include "the enactment's purpose, the harm it attempts to prevent, whether there is a scienter requirement, and the interpretations of individuals charged with enforcement." *Jordan v. Pugh*, 425 F.3d 820, 825 (10th Cir. 2005).

Importantly here, a law that "threatens to inhibit the exercise of constitutionally protected rights," like the right to free speech, will prompt a "stringent vagueness test." *Vill. of Hoffman Ests.*, 455 U.S. at 499; *see also NAACP v. Button*, 371 U.S. 415, 432 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.").  And, while as a general matter "enactments with civil rather than criminal penalties" have been given "greater tolerance," civil statutes that impose severe penalties— such as "strip[ping] persons of their professional licenses and livelihoods"—may warrant the same high expectation of clarity.  *Vill. of Hoffman Ests.*, 455 U.S. at 498-99; *Dimaya*, 584 U.S. at 184-85 (Gorsuch, J., concurring in part).

To properly evaluate the contention that the Act is unconstitutionally vague, the Court must consider the meaning of the challenged provisions of the Act.  In construing a state statute, a federal court must remain mindful that "state courts are the final arbiters of state law." *United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. 2004).  "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.* (alteration and internal quotation marks omitted).  "[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts and its deterrent effect on legitimate expression is both real

and substantial." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975) (citation omitted).   A federal court, however, is "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (internal quotation marks omitted); *see also Okla. State Conf. of NAACP v. O'Connor*, 569 F. Supp. 3d 1145, 1153 (W.D. Okla. 2021) (declining to "apply[] limitations to the [state] statute that simply do not exist in the text"). Because Oklahoma laws are severable by default, the Court may strike words from the statute to save it.   *See* Okla. Stat. tit. 75, § 11a(1); *Okla. Corr. Pro. Ass'n, Inc. v. Doerflinger*, 468 F. App'x 916, 917 (10th Cir. 2012).   But inserting words in order to achieve a particular construction "would exceed the power and function of the court, and would fail to bind state prosecutors, leaving the citizens of [Oklahoma] vulnerable to prosecutions under the actual language of the statute." *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194-95 (10th Cir. 2000).   Stated differently, the Court "will not rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988).

Because section 24-157(A) and section 24-157(B) impose different restrictions at different educational levels, the Court considers these provisions separately.[5]

### a.  Section 24-157(A)(1): Colleges and Universities

Section 24-157(A)(1) of the Act provides, in relevant part: "No enrolled student . . . . shall be required to engage in any form of mandatory gender or sexual diversity training

---

[5] The Supreme Court has clarified that in a facial challenge for vagueness the plaintiff is not required to show that the challenged statute is vague in all of its applications.  *See*

or counseling . . . . Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited." Okla. Stat. tit. 70, § 24-157(A)(1).

### 1) Prohibition of Mandatory Gender or Sexual Diversity Training and Counseling

As set forth by separate Order, the Court has determined that Plaintiffs lack standing to challenge the first sentence of section 24-157(A)(1), which provides that "gender or sexual diversity training or counseling" must be voluntary rather than mandatory. Plaintiffs' claims challenging this provision have been dismissed without prejudice for lack of subject-matter jurisdiction. Accordingly, no injunctive relief is warranted as to enforcement of the first sentence of section 24-157(A)(1).

### 2) Prohibition of Any Requirement or Orientation That Presents Race or Sex Stereotyping or Bias on the Basis of Race or Sex

Plaintiffs claim that the second sentence of section 24-157(A)(1), which prohibits "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex," is impermissibly vague under the Fourteenth Amendment and, therefore, enforcement of that provision should be enjoined. Defendants respond that the language of section 24-157(A)(1) is sufficiently clear. Because this aspect of the Act

---

*Johnson v. United States*, 576 U.S. 591, 602-03 (2015) (explaining that the Supreme Court's holdings "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp"). Under Tenth Circuit precedent, such a plaintiff "must show, at a minimum, that the challenged law would be vague in the vast majority of its applications; that is, that 'vagueness permeates the text of the law.'" *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (alteration an internal quotation marks omitted).

implicates the First Amendment rights of the university level instructor-Plaintiffs, the Court applies a "stringent vagueness test." *Vill. of Hoffman Estates*, 455 U.S. at 499.

When interpreting a statute, "[i]f the words of the statute have a plain and ordinary meaning, [the Court] appl[ies] the text as written." *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009); *accord Day v. Great Nw. Ins. Co.*, 623 F. Supp. 3d 1252, 1255 (W.D. Okla. 2022) (citing *Hamilton v. Northfield Ins. Co.*, 473 P.3d 22, 26 (Okla. 2020)).  As discussed in the Court's Order on Defendants' motions to dismiss and for judgment on the pleadings, entered contemporaneously with this Order, the Court construes the principal terms in the second sentence of section 24-157(A)(1) as follows.  Although the Act does not expressly define "orientation," the plain and ordinarily understood meaning of that term is, in this context, a program or course offered by universities and colleges to provide introductory information to new students.[6]  The text of the Act includes no definition or limiting modifier for the term "requirement."  The plain and ordinarily understood meaning of that term encompasses a broad range of activity[7] and would include, in context, everything from the courses demanded by a university for a degree to the assignments and readings demanded by a professor for a course.  The text of the Act also includes no definition or limiting modifier for the term "presents."  The plain and ordinarily

---

[6] *See Oxford English Dictionary*, s.v. "orientation (n.), sense 1.4," *accessible at* https://doi.org/10.1093/OED/5986710372 (2024) ("The process of familiarizing a new or prospective student, recruit, etc., with the content of a course, the basics of a subject, the nature of college life, etc.  Also: a course intended to provide such familiarization.").

[7] *See Oxford English Dictionary*, s.v. "requirement (n.), sense 3.b," *accessible at* https://doi.org/10.1093/OED/9723059198 (2024) ("Something called for or demanded; a condition which must be complied with.").

understood meaning of that term likewise encompasses a broad range of activity[8] and would include, in context, any situation in which race or sex stereotyping or bias is deliberately introduced or otherwise discussed.   Thus, again as discussed in the contemporaneous Order, the Court has concluded that an Oklahoma court would construe section 24-157(A)(1)'s prohibition of "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex" to be a restriction on curricular speech, specifically here the information a university level instructor-Plaintiff teaches in any orientation, required course, or course assignment.

Applying these definitions together, the Court further determines that the second sentence of section 24-157(A)(1) would prohibit a professor from endorsing discriminatory beliefs during an orientation or course.   The ambiguity of the term "presents" means, however, that the provision also could reasonably be construed to mean that a professor is prohibited from describing or identifying discriminatory beliefs in an orientation or course. Likewise, the provision also could reasonably be construed to mean that a professor is prohibited from discussing or assigning the reading of a work in which the author describes or identifies discriminatory beliefs—for example, an analysis of how historic beliefs about race led to the enslavement and subjugation of Black men and women as depicted in Mark

---

[8] *See Oxford English Dictionary*, s.v. "present (v.), sense 1.7.a," *accessible at* https://doi.org/10.1093/OED/5912943123 (2024) ("To make clear to the mind or thought; to convey, suggest, or exhibit to mental perception; to put forward for reflection, consideration, or scrutiny; to set forth, describe.").

Twain's *Huckleberry Finn* or an analysis of how current stereotypes about gender affect the employment opportunities of women.

Implicitly recognizing this ambiguity, Defendants have differing interpretations of how to interpret "requirement" in the second sentence of section 24-157(A)(1). The State Defendants insert the word "similar" to modify "requirement," so as for the prohibition to extend to "orientation[s]" "or similar requirements." State Defs.' Resp. (Doc. No. 61) at 22. The University Defendants merge "requirement" with "orientation" to create a prohibition on "required orientations." Univ. Defs.' Resp. (Doc. No. 58) at 7-8. The Court rejects Defendants' invitation to add limiting modifiers that would implement their preferred interpretations of section 24-157(A)(1), whether it be to recast the statute as applying only to a "required orientation" or to orientations and "similar requirements" that endorse racial or sexual stereotyping or bias. As noted above, a federal court is not empowered to rewrite a state statute in this manner. *See Stenberg*, 530 U.S. at 944; *see also Okla. State Conf. of NAACP*, 569 F. Supp. 3d at 1153.

The Court concludes that Plaintiffs have made a strong showing that section 24-157(A)(1)'s prohibition of "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex," Okla. Stat. tit. 70, § 24-157(A)(1), is so indefinite "that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1038 (10th Cir. 2009) (alteration and internal quotation marks omitted).

b. *Section 24-157(B)(1): K-12 Schools*

Plaintiffs likewise claim that section 24-157(B)(1) is void for vagueness in violation of the Fourteenth Amendment and, therefore, enforcement of that provision should be enjoined.  Defendants respond that the prohibitions of section 24-157(B)(1) are clearly defined.

As set forth by separate Order, the Court has determined that Plaintiffs' assertion of First Amendment protection for the speech regulated by section 24-157(B)(1) is unavailing because state and local authorities are permitted to regulate the curricular speech of K-12 teachers.  While the absence of a free speech interest, and the fact that section 24-157(B)(1) is a civil statute, might suggest that a greater latitude for vagueness should be allowed, the Court is not convinced that is so.  Considering the relevant factors, *see Jordan*, 425 F.3d at 825, what is most notable here is that the Act's Implementing Rules authorize the State Department of Education to suspend or revoke the license or certificate of K-12 School employees found to have violated the Act.  *See* Okla. Admin. Code § 210:10-1-23(j).[9] Given the severity of potential consequences for K-12 teachers upon a violation of section 24-157(B)(1), the Court applies a stringent vagueness test.[10]

---

[9] The Implementing Rules impose a scienter requirement for the revocation of teacher licenses but not for the suspension of teacher licenses.  *Compare* Okla. Admin. Code 210:10-1-23(j)(1) (stating "State Department of Education shall make a determination of whether to initiate proceedings to suspend the license or certificate of any school employee who is found to have violated" section 24-157(B)(1)), *with id.* at 210:10-1-23(j)(2) (stating "State Board of Education shall initiate proceedings to revoke the license or certificate of any school employee for 'willful violation' of" section 24-157(B)(1)).

[10] The Court would reach the same result if a less stringent vagueness test were applied.

*1)  To Require the Prohibited Concepts*

Each prohibition in section 24-157(B)(1) begins with the same introductory verb clause: "No [school personnel] *shall require or make part of a course* the following concepts . . . ."  Okla. Stat. tit. 70, § 24-157(B)(1) (emphasis added).  Plaintiffs criticize this introductory directive as, among other things, lacking clarity as to whether it prohibits personnel from merely addressing the cited concepts.  *See* Pls.' Mot. Prelim. Inj. at 19.

There are two aspects of section 24-157(B)(1)'s introductory verb clause: to "require" a prohibited concept and to "make part of a course" a prohibited concept.  The Court agrees with Defendants that when the phrase "make part of a course" is read in conjunction with the eight prohibited concepts themselves, the plain and ordinarily understood meaning of section 24-157(B)(1) is to prohibit school personnel from directly endorsing, promoting, or inculcating any concept as a normative value.

The same cannot be said of the term "require" as used in section 24-157(B)(1).  As a threshold matter, the phrase presents an illogical mismatch between verb and object.  It would be logical and fall within normal usage to say that a *concept*—that is, an idea or a notion—may be *taught*, or for that matter to say that a *concept* may not be *required*—i.e., ordered or made compulsory—*to be taught*.  But to generally direct that a *concept* may not be *required* opens the statute to a variety of interpretations.

The State Defendants urge the Court to fix this mismatch by interpreting section 24-157(B)(1)'s "require . . . the . . . concepts" to mean that no school personnel shall "teach the specified concepts as being true."  Okla. Stat. tit. 70, § 24-157(B)(1); Tr. Mot. Hr'g 47:14-16 (Doc. No. 162); *see also* State Defs.' Resp. at 24-25.  But, again, a federal court

15

is not empowered to rewrite a state statute by adding such modifiers. *See Stenberg*, 530 U.S. at 944; *Okla. State Conf. of NAACP*, 569 F. Supp. 3d at 1153. Considering the plain text of the statute, and giving each word its ordinary meaning, the Court concludes that Plaintiffs have sufficiently shown that section 24-157(B)(1) is unconstitutionally vague as to the term "require" in the introductory verb clause.

### 2) *To Make the Prohibited Concepts Part of a Course*

As to the second aspect of the introductory verb clause, and the eight prohibited concepts in subsections 24-157(B)(1)(a) through (h), the Court finds that the resulting directives are—with two exceptions—sufficiently clear to give ordinary people fair notice of the conduct prohibited thereby and, further, are not so standardless as to invite arbitrary enforcement. The Court emphasizes that, in so finding, it has construed the directives in subsections 24-157(B)(1)(a) through (h) as narrow in scope in light of both the plain text of the statute itself and the statute's express incorporation of the Academic Standards as a "safe harbor" such that teaching any concepts that "align with" an Academic Standard is permitted under the Act.

> a. *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . one race or sex is inherently superior to another race or sex . . . ."*

The directive in subsection (a) is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment. The text prohibits teaching that any single race

is of higher value than another race or that any sex is of higher value than another sex.[11]
Contrary to Plaintiffs' arguments, this provision does not reasonably prohibit teaching
about how mistaken beliefs about the superiority of one race or sex have existed in history,
how such beliefs exist now, or how those beliefs have affected or currently affect the
actions of people or institutions.

> b.  *"No [school personnel] shall . . . make part of a course the . .*
> *. concept[]: . . . an individual, by virtue of his or her race or*
> *sex, is inherently racist, sexist or oppressive, whether*
> *consciously or unconsciously . . . ."*

The directive in subsection (b) is likewise sufficiently clear to satisfy the due process
requirement of the Fourteenth Amendment.  The text prohibits teaching that a person,
simply as a result of belonging to any particular race or sex, has the characteristic of being
prejudiced against other persons because of their belonging to a different race or sex, or
the characteristic of keeping others in subjection or hardship because of their belonging to
a different race or sex.[12]  Contrary to Plaintiffs' arguments, this text does not reasonably

---

[11] *See* Oxford English Dictionary, s.v. "superior (adj.), sense II.7.a," *accessible at*
https://doi.org/10.1093/OED/3488245575 (2024) ("Higher in notional or abstract rank, or
in a scale or series; of a higher or better nature or character.").

[12]   *See*  Oxford  English  Dictionary,  s.v.  "racist  (adj.),"  *accessible  at*
https://doi.org/10.1093/OED/1166463562 (2024) ("Prejudiced,  antagonistic,  or
discriminatory towards a person or people on the basis of their membership of a particular
racial or ethnic group, typically one that is a minority or marginalized; expressing or
characterized  by  racism.");  *id.*,  s.v.  "sexist  (adj.),"  *accessible  at*
https://doi.org/10.1093/OED/3045936212 (2024) ("Of, relating to, or characteristic of
sexism or sexists; that advocates or practi[c]es sexism, esp. against women."); *id.*, s.v.
"sexism  (n.2),"  *accessible  at*  https://doi.org/10.1093/OED/3048626588  (2024)
("[P]rejudice, stereotyping, or discrimination, typically against women, on the basis of
sex");  *id.*,  s.v.  "oppressive  (adj.),  sense  2.b,"  *accessible  at*
https://doi.org/10.1093/OED/6548577607 (2024) ("Of a person, social group, government,
etc.: that oppresses (oppress v. 3a); characterized by or disposed to such oppression;

prohibit teaching that an action by a person or an institution is racist or sexist or results in undue oppression, or that inaction by a person or an institution in the face of racism or sexism is itself racist or sexist. And the text does not prohibit teaching that an institution or a policy that contributes to or perpetuates a preference for one race over another is racist, or that an institution or a policy that contributes to or perpetuates a preference for one sex over another is sexist.

> c. *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex . . . ."*
>
> -and-
>
> d. *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . members of one race or sex cannot and should not attempt to treat others without respect to race or sex . . . ."*

The Court will discuss subsections (c) and (d) together. Subsection (c) prohibits making part of a course that it is acceptable for a person to "receive adverse treatment" due to that person's race or sex. Okla. Stat. tit. 70, § 24-157(B)(1)(c). Subsection (d) prohibits making part of a course that it is unacceptable for a person to "attempt to treat others without respect to race or sex." *Id.* § 24-157(B)(1)(d). Thus, the construction of both provisions depends in part on the meaning of the words "treat" and relatedly "treatment."

---

tyrannical."); *id.*, s.v. "oppress (v.), sense 3.a," *accessible at* https://doi.org/10.1093/OED/1037181714 (2024) ("To keep (a person or group of people, esp. a minority or other subordinate group) in subjection and hardship by the unjust exercise of authority, power, or strength; to exploit; to tyrannize over.").

The term "treat" is not defined in the Act and the use of that term has not been addressed by any Oklahoma court, either as to the Act generally or as to subsections (c) and (d) specifically.  As used, "treat" is not subject to any modifier beyond subsection (c)'s—but not subsection (d)'s—specification that the treatment be "adverse."

Mindful of a federal court's limited capacity in construing a state statute, the Court must evaluate subsections (c) and (d) based on the ordinary meaning of the word "treat," which is expansive in scope.[13]  The prohibitions in these subsections are not limited to the subjects of employment and admissions; indeed, the plain language of the prohibitions extends across every social, political, historical, and religious context.  Accordingly, the text of subsection (c) would prohibit teaching that it is ever proper to draw distinctions based on race or sex if they favor one group over another.  So, subsection (c) would prohibit a teacher from endorsing widely rejected ideas (e.g., that it is acceptable to restrict access to public accommodations based on race), which appears likely to have been the intended result.  But subsection (c) would also—on its face—prohibit a teacher from making part of a course ideas that are subjects of current political debate (e.g., whether it is permissible to consider race or sex in college admissions or through an affirmative action hiring plan) or ideas that are accepted by a significant number of people and are reflected in current law (e.g., that men but not women should be subject to military conscription).  In some instances, that type of broad scope might be merely broad and not also ambiguous, but here

---

[13] *See* Oxford English Dictionary, s.v. "treat (v.), sense 7.a," *accessible at* https://doi.org/10.1093/OED/5300748815 (2024) ("To deal with, behave or act towards (a person, animal, etc.) in some specified way; to 'use' (well, ill, properly, reverently, etc.).").

the totality of the Act reflects that these provisions are simply unclear.  Considering the relevant factors, the Court finds that there is a strong likelihood that Plaintiffs will be able to show that the text of subsection (c) does not provide fair notice to school administrators and teachers as to what is prohibited by that subsection and what is not and, therefore, that subsection (c) is impermissibly vague in violation of the Fourteenth Amendment.  *See Jordan*, 425 F.3d at 825.

Subsection (d) suffers from similar ambiguity.  The wording of this prohibition is cumbersome.  *Cf. Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1182 (N.D. Fla. 2022) (describing such a directive as "a rarely seen triple negative, resulting in a cacophony of confusion"), *aff'd sub nom. Honeyfund.com Inc. v. Governor, State of Fla.*, 94 F.4th 1272 (11th Cir. 2024).  The text of subsection (d) would prohibit teaching that it is impossible or undesirable to "treat" a person of one race in the same way as a person of another race, or to "treat" a person of one sex in the same way as a person of another sex. And so, like subsection (c), subsection (d) extends across various contexts and would prohibit making as part of a course the proposition that it is proper in any circumstance to draw distinctions based on race or sex.  The statute would appear to prohibit a teacher from endorsing widely rejected ideas (e.g., teaching that children *should* be judged by the color of their skin and *not* the content of their character), endorsing ideas that are subjects of current political debate (e.g., that facially neutral policies may, due to historical racial or sexual discrimination, result in disparate impact among races or sexes), and endorsing ideas that are widely accepted and are reflected in current law (e.g., that separate sports divisions may be established for boys and girls).  Again, upon considering the relevant factors, the

Court finds that there is a strong likelihood that Plaintiffs will be able to show that the text of subsection (d) does not provide fair notice to school administrators and teachers as to what is prohibited by that subsection and what is not and, therefore, that subsection (d) is impermissibly vague in violation of the Fourteenth Amendment.  *See Jordan*, 425 F.3d at 825.

At this preliminary stage, the Court finds that subsections (c) and (d) of section 24-157(B)(1) are unconstitutionally vague because their scope is so indefinite "that persons of common intelligence must necessarily guess at [their] meaning and differ as to [their] application."  *Kleinsmith*, 571 F.3d at 1038 (alteration and internal quotation marks omitted).

> e.  *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . an individual's moral character is necessarily determined by his or her race or sex . . . ."*

The directive in subsection (e) is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment.  The text prohibits teaching that a person is of a certain moral character due to the person's race or sex.[14]  As with subsection (b), the text does not prohibit teaching that a particular action by a person or institution—including a failure to recognize racism or sexism and to act to rectify it—is morally wrong.

> f.  *"No [school personnel] shall . . . make part of a course the . . . concept[]: . . . an individual, by virtue of his or her race or*

---

[14]  *See* Oxford English Dictionary, s.v. "character (n.), sense II.9.a," *accessible at* https://doi.org/10.1093/OED/4055170406 (2024) ("The sum of the moral and mental qualities which distinguish an individual or a people, viewed as a homogeneous whole; a person's or group's individuality deriving from environment, culture, experience, etc.; mental or moral constitution, personality.").

> *sex, bears responsibility for actions committed in the past by*
> *other members of the same race or sex . . . ."*

The directive in subsection (f) is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment. The text prohibits teaching that a person is responsible for the past actions of another person simply because they share a common race or sex. *See* Okla. Stat. tit. 70, § 24-157(B)(1)(f). Contrary to Plaintiffs' arguments, the text does not prohibit teaching about historical or current events in which members of one race or sex acted criminally, maliciously, or discriminatorily toward members of another race or sex. Nor does it reasonably preclude teaching that past actions of racism or sexism have resulted in present advantages for members of a certain race or sex or have resulted in present disadvantages for members of a certain race or sex.

> g.   *"No [school personnel] shall . . . make part of a course the . .*
> *. concept[]: . . . any individual should feel discomfort, guilt,*
> *anguish or any other form of psychological distress on account*
> *of his or her race or sex . . . ."*

The directive in subsection (g) is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment. The text prohibits making part of a course the concept that a person should feel discomfort, guilt, anguish, or distress because of the person's race or sex.[15] As with subsection (f), the text of subsection (g) does not prohibit teaching about historical or current events in which members of one race or sex acted

---

[15] *See* Oxford English Dictionary, s.v. "'on account of' in account (n.), sense P.1.d.iii.i," *accessible at* https://doi.org/10.1093/OED/1255070184 (2024) ("For the sake of, in consideration of; by reason of, because of.").

criminally, maliciously, or discriminatorily—or that past actions of racism or sexism have resulted in present advantages or disadvantages for members of a certain race or sex.

Notably, contrary to Plaintiffs' concerns, the text of subsection (g) does not prohibit the teaching of subjects involving race or sex merely because they might cause a student to feel discomfort or distress.  Take as an example a student who is discomfited upon learning about a historical event in which persons of her race harmed persons of another race.  That student's reaction to the facts of the event would not, absent more, mean that a teacher impermissibly taught that the student "*should* feel discomfort . . . *on account of* . . . her race."  *Id.* § 24-157(B)(1)(g) (emphasis added).  Any reaction by the student would instead be due to historical fact: e.g., the cruelty of the acts at issue and the harm that was experienced because of those acts.  In other words, while a teacher may and should teach about events that make students uncomfortable, such coursework is distinct from teaching students that their race or sex should *itself* be a cause for discomfort or shame.  The Court construes the text of subsection (g) as prohibiting the latter conduct, not the former.

> h.  "*No [school personnel] shall . . . make part of a course the . . . concept[]: . . . meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.*"

The directive in subsection (h) prohibits teaching that a meritocratic system or characteristics such as a strong work ethic are in and of themselves racist or sexist or were devised to keep members of another race or sex in subjection or hardship.[16]  Whatever

---

[16] *See* Oxford English Dictionary, s.v. "oppress (v.), sense 3.a," *accessible at* https://doi.org/10.1093/OED/1037181714 (2024) ("To keep (a person or group of people,

might be said about the necessity of this prohibition, the Court finds that the text is sufficiently clear to satisfy the due process requirement of the Fourteenth Amendment.

### i.   The Oklahoma Academic Standards as a Safe Harbor

Further, the safe harbor of the Academic Standards limits the scope of each of the directives set forth above, expressly protecting the teaching of "concepts that align to" listed topics that include, and reasonably require discussion of, past and present race and sex discrimination.  *See id.* § 24-157(B) (prescribing that "[t]he provisions of this subsection shall not prohibit the teaching of concepts that align to the Oklahoma Academic Standards").  These subjects include historical events and ideas: slavery in America and its political and economic consequences;[17] the ratification of the Constitution and the founders' treatment of enslaved persons and all women;[18] the colonization of tribal lands and the United States' subsequent interactions with American Indians,[19] including policies of conquest and forcible removal of tribes and attempted assimilation;[20] the women's suffrage movement;[21] the role of slavery "as the principal cause of increased sectional

---

esp. a minority or other subordinate group) in subjection and hardship by the unjust exercise of authority, power, or strength; to exploit; to tyrannize over.").

[17] *See 2019 Oklahoma Academic Standards for Social Studies* at 5.1.5, 5.2.8, 5.4.2, 8.3.3, 8.9, WH.2.4, *available at* https://sde.ok.gov/oklahoma-academic-standards (last updated Oct. 11, 2023).

[18] *See id.* at 8.3.3, 8.12.2.

[19] *See id.* at 3.2.2, 3.3.8, 4.3.1, 5.2.6, 8.3.4, 8.8.4, OKH.2.3, OKH.2.4, OKH.3.1.

[20] *See id.* at 3.2.2, 3.3.8, 8.4.2, 8.7.3, 8.12.5, OKH.2.3, OKH.2.4, OKH.3, OKH.5.1, USH.1.3.

[21] *See id.* at 8.2.2, 8.9.5, USH.2.1, USH.2.3.

polarization leading to the Civil War";[22] the Reconstruction Era and adoption of the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution;[23] civil rights struggles in America, including Black Codes and Jim Crow Laws;[24] the founding of Oklahoma and the effect of federal policies on American Indians during early statehood;[25] the disenfranchisement of minorities and racial tensions in twentieth-century America (expressly including the "Tulsa Race Riot"[26] and the internment of Japanese-Americans during World War II[27]);[28] and the "major events, personalities, tactics[,] and effects of the Civil Rights Movement."[29]  The protected topics also include the effects of past bias and discrimination on current behavior[30] and "ongoing issues including immigration, criminal justice reform, employment, environmental issues, race relations, civic engagement, and education."[31]

These standards largely if not entirely embrace the topics identified by Plaintiffs as potentially affected by subsections (a), (b), (e), (f), (g), and (h) of the Act.  As to subsections

---

[22] *Id.* at 8.10, 8.11.

[23] *See id.* at 8.12.

[24] *See id.* at 8.9.3, 8.12.2, 8.12.3, 8.12.4, USH.1.2.

[25] *See id.* at OKH.4, OKH.5.1.

[26] *See id.* at OKH.5.2, USH.4.1.

[27] *See id.* at USH.5.1.

[28] *See id.* at USH.2.1.G, USH.4.1.B.

[29] *Id.* at OKH.6.1, USH.7.1.

[30] *See id.* at PS.7.2 ("Explain how bias, discrimination and use of stereotypes influence behavior with regard to gender, race, sexual orientation and ethnicity . . . .").

[31] *Id.* at OKH.6.9; *see also id.* at OKH.6.5, USH.7.2, USH.9.3.

(c) and (d) of the Act, however, the Court finds that even the broad reach of the Academic Standards does not fully mitigate the vagueness of those directives.  The broad scope of the terms "treat" and "treatment" in subsections (c) and (d) implicates concepts beyond those listed in, or that reasonably "align to," the Academic Standards.

### c.  Conclusion

The Court's role here is not to assess whether the Act is needed or wise but to evaluate whether its language is so vague that the Act "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *StreetMediaGroup*, 79 F.4th at 1253 (internal quotation marks omitted).  As set forth above, the Court finds that Plaintiffs have established a substantial likelihood of success on the merits insofar as (1) their claim that section 24-157(A)(1)'s prohibition of "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex" is impermissibly vague in violation of the Fourteenth Amendment; and (2) their claim that section 24-157(B)(1) is impermissibly vague in violation of the Fourteenth Amendment, as to the use of the introductory verb clause term "require," and with respect to subsections (c) and (d) in their entirety.  Okla. Stat. tit. 70, § 24-157(A)(1), (B)(1).[32]

---

[32]Although the Act lacks a severability clause, Oklahoma law presumes statutes are severable absent a finding that the valid provisions "are so essentially and inseparably connected with" the void provisions that "the court cannot presume the Legislature would have enacted the remaining valid provisions without the void one[s]" or that the remaining valid provisions "standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent."  Okla. Stat. tit. 75, § 11a(1).  The Court finds that

### 2. *Plaintiffs' First Amendment Challenge*

Plaintiffs also contend that a preliminary injunction should issue because the Act infringes upon the rights of educators to teach certain information and the corollary right of students to hear that information. *See* Pls.' Mot. Prelim. Inj. at 22-28.

With respect to section 24-157(A)(1) of the Act, which applies to public universities and colleges, the Court has determined—as set forth by separate Order—that Plaintiffs lack standing to challenge the first sentence of that provision, and—as set forth above—that Plaintiffs have made a strong showing that the second sentence of that provision is unconstitutionally vague. Therefore, the Court need not reach Plaintiffs' First Amendment challenge to section 24-157(A)(1).

With respect to section 24-157(B)(1) of the Act, which restricts what K-12 School personnel in Oklahoma may make part of a course, the Court has determined—as set forth by separate Order—that Plaintiffs' claims based on the First Amendment should be dismissed because Plaintiffs have not shown that section 24-157(B)(1) infringes on their First Amendment rights. Therefore, no injunction would be appropriate based on Plaintiffs' claims challenging section 24-157(B)(1) as violative of the First Amendment.

---

excising the second sentence from section 24-157(A)(1), "require or" from section 24-157(B)(1), and subsections (c) and (d) of section 24-157(B)(1) in their entirety, does not impair the validity of the remainder of those sections or preclude a presumption that the Legislature would have enacted the remaining provisions without those terms.

B.  *Irreparable Harm*

 "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."  *Dominion Video Satellite*, 269 F.3d at 1156.  "Any deprivation of any constitutional right fits that bill."  *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019).  Because Plaintiffs have made a strong showing of likelihood of success on the merits of their Fourteenth Amendment claims to the extent set forth above, "no further showing of irreparable injury" is required.  *Id.* at 805.

C.  *Balance of Equities and the Public Interest*

The third and fourth preliminary injunction standards—whether "the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction" and whether "the injunction would not be adverse to the public interest," *Dominion Video Satellite*, 269 F.3d at 1154—merge when, as here, the government is opposing the preliminary injunction.  *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The State Defendants contend that a preliminary injunction would deprive Oklahomans of a law prescribing a public education "crafted out of the state's democratic process and policy judgments."  State Defs.' Resp. at 30.  But the State has no legitimate interest in enforcing a law determined to be unconstitutionally vague.  *See Free the Nipple-Fort Collins*, 916 F.3d at 807 ("[I]t's always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks omitted)); *Planned Parenthood of Ark. & E. Okla. v. Cline*, 910 F. Supp. 2d 1300, 1308 (W.D. Okla. 2012) ("The public has an interest in constitutional rights being upheld and in

unconstitutional decisions by the government being remedied."). These considerations weigh in favor of imposition of an injunction.

    *D. Security*

    Although no party has addressed the provision of a bond, Federal Rule of Civil Procedure 65(c) requires the giving of security as a condition precedent to the granting of a preliminary injunction. "However, the Court has discretion to require only a nominal bond, or no bond at all," where, as here, "issues of overriding public concern or important federal rights are involved." *Entm't Merchants Ass'n v. Henry*, No. CIV-06-675-C, 2006 WL 2927884, at *4 (W.D. Okla. Oct. 11, 2006) (citing *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964)). Defendants will suffer no financial harm from an imposition of preliminary injunctive relief. The security requirement of Rule 65(c) shall be waived.

CONCLUSION

    For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (Doc. No. 27) is GRANTED IN PART and DENIED IN PART, as follows:

    Defendants herein, their officers, agents, servants, employees, and attorneys, and persons who are in active concert or participation with those individuals, are hereby ENJOINED from enforcing, until such time as a final decision is issued on the merits of this case:

- the provision: "Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex is prohibited." Okla. Stat. tit. 70, § 24-157(A)(1);

- the word "require" in the introductory verb clause in title 70, section 24-157(B)(1) of the Oklahoma Statutes;

- subsections (c) and (d) of title 70, section 24-157(B)(1) of the Oklahoma Statutes, in their entireties; or

- the Implementing Rules, to the extent they are inconsistent with this Order.

IT IS SO ORDERED this 14th day of June, 2024.

CHARLES B. GOODWIN
United States District Judge