IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs,*

v.                                                      No.   21-cv-1022-G

GENTNER DRUMMOND, *et al.*,

*Defendants* 1–18.

## STATE DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO COMPEL AND FOR ENTRY OF ESI ORDER

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................1

ARGUMENT AND AUTHORITIES ..............................................................................4

   I.   The discovery sought by Plaintiffs exceeds the scope of their equal
protection claim. ........................................................................................................5

   II.  State Defendants' declining to submit a privilege log is permissible. ..................11

   III. The individual requests are individually objectionable. ...........................................12

       1.   All Documents and Correspondence concerning HB 1775 or the Rules ......12

       2.   All Documents and Correspondence between You and Legislators
regarding the drafting of HB 1775. .................................................................13

       3.   All Documents and Correspondence between You and Legislators
regarding the enactment of HB 1775. .............................................................13

       4.   All Documents and Correspondence between You and Legislators
regarding the implementation of HB 1775. .....................................................13

       5.   All Documents and Correspondence between You and other
Defendants regarding the drafting of HB 1775. ...............................................13

       6.   All Documents and Correspondence between You and other
Defendants regarding the enactment of HB 1775. ..........................................13

       7.   All Documents and Correspondence between You and other
Defendants regarding the implementation of HB 1775. ..................................14

       8.   All Public Statements made by You regarding HB 1775. ...............................15

       9.   All Documents and Correspondence relating to Public Statements
made by any Legislator concerning HB 1775. .................................................16

       10.  All Documents and Correspondence relating to any policies,
procedures, rules, guidance, trainings, or presentations regarding HB
1775. ..................................................................................................................16

       11.  All Documents and Correspondence relating to any formal or informal
complaints made under HB 1775 or the Rules. ................................................17

       12.  All Documents and Correspondence relating to any response to any
formal or informal complaint concerning HB 1775. ........................................17

       13.  All reports or other Documents developed by the State Department of
Education pursuant to Section (i) of the Rules, and all Documents and
Correspondence related thereto. .......................................................................17

14.  All Documents and Correspondence related to the SBE's decision to downgrade Tulsa Public Schools' accreditation status to "Accredited with Warning" on July 28, 2022. ..................................................................................18

15.  All Documents and Correspondence related to the SBE's decision to downgrade Mustang Public Schools' accreditation status to "Accredited with Warning" on July 28, 2022. ............................................................................18

16.  All Documents and Correspondence related to proposed or actual changes made to the curriculum or course list of any Oklahoma public school pertaining to any topics purportedly implicated by HB 1775, such as CRT, George Floyd, the Black Lives Matter movement, 2020 Racial Justice Protests, DEI, or Historically Marginalized Students or Persons. ..........19

17.  All Documents and Correspondence concerning any works of literature removed from the curriculum of any Oklahoma public school pertaining to any topics purportedly implicated by HB 1775, such as CRT, George Floyd, the Black Lives Matter movement, 2020 Racial Justice Protests, DEI, or Historically Marginalized Students or Persons. .......................19

18.  All Documents and Correspondence concerning the decision to suspend Oklahoma House Rule 8.21 (c) in connection with the enactment of HB 1775. ...............................................................................................................20

19.  All Documents and Correspondence between You and other Persons, including Legislators and other Defendants, concerning CRT, George Floyd, Black Lives Matter, Racial Justice Protests, DEI, or Historically Marginalized Students or Persons. ..........................................................22

IV. The dispute concerning the ESI is not the proper subject of a motion to compel. ........................................................................................................................24

CONCLUSION .........................................................................................................26

## TABLE OF AUTHORITIES

### Cases

*Aikens v. Deluxe Fin. Servs., Inc.*,
217 F.R.D. 533 (D. Kan. 2003)........................................................................ 13, 16

*Almonte v. City of Long Beach*,
478 F.3d 100 (2d Cir. 2007).................................................................................10

*Am. Trucking Ass'ns, Inc. v. Alviti*,
14 F.4th 76 (1st Cir. 2021)......................................................................................5

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002)................................................................................................6

*Barton v. Tomacek*,
No. 11-CV-0619-CVE-TLW, 2012 WL 4735927 (N.D. Okla. Oct. 3, 2012) ........5

*Bastien v. Off. of Senator Ben Nighthorse Campbell*,
390 F.3d 1301 (10th Cir. 2004) ...........................................................................10

*Bolles v. Allstate Ins. Co.*,
No. CIV-24-284-R, 2025 WL 92943 (W.D. Okla. Jan. 14, 2025) ...........................5

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ................................................................................................6

*Buonauro v. City of Berwyn*,
No. 08-C-6687, 2011 WL 116870 (N.D. Ill. Jan. 10, 2011) ....................................7

*Cardenas v. Dorel Juvenile Grp., Inc.*,
232 F.R.D. 377 (D. Kan. 2005)............................................................................13

*Citizens for Const. Integrity v. United States*,
57 F.4th 750 (10th Cir. 2023) ..........................................................................5, 14

*CompSource Mut. Ins. Co. v. State ex rel. Okla. Tax Comm'n*,
2018 OK 54, 435 P.3d 90 .......................................................................................7

*Ctr. for Biological Diversity v. Norton*,
336 F. Supp. 2d 1149 (D.N.M. 2004).......................................................10, 22, 23

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) .................................................................................................10

*DIRECTV, Inc v. Puccinelli*,
224 F.R.D. 677 (D. Kan. 2004)............................................................................11

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ...............................................................................................7

*Dyas v. City of Fairhope,*
   No. 08–0232–WS-N, 2009 WL 3151879 (S.D. Ala. Sept. 24, 2009) ......................................7

*Elk City Golf & Country Club, Inc. v. Phila. Indemnity Ins. Co.,*
   CIV-18-196-D, 2019 WL 6053020 (W.D. Okla. Nov. 15, 2019) ...................................... 4, 20

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
   545 U.S. 546 (2005) ......................................................................................................7

*Glenwood Springs Citizens' All. v. U.S. Dep't of Interior,*
   No. 20-cv-00658-CMA, 2021 WL 916002 (D. Colo. Mar. 10, 2021) ...................................9

*Glossip v. Chandler,*
   No. CIV-14-0665-F, 2020 WL 7220789 (W.D. Okla. Dec. 7, 2020)....................................10

*Haynes v. Caporal,*
   1977 OK 166, 571 P.2d 430....................................................................................7

*Hutchinson v. Proxmire,*
   443 U.S. 111 (1979) ..................................................................................................10

*In re Hubbard,*
   803 F.3d 1298 (11th Cir. 2015) .....................................................................................9

*In re Sealed Case,*
   121 F.3d 729 (D.C. Cir. 1997) ............................................................................... 10, 22

*Keenan v. Texas Produc. Co.,*
   84 F.2d 826 (10th Cir. 1936) ...................................................................................4

*La Union Del Pueblo Entero v. Abbott,*
   68 F.4th 228 (5th Cir. 2023) ............................................................................... 9, 14

*League of United Latin Am. Citizens v. Abbott,*
   708 F. Supp. 3d 870 (W.D. Tex. 2023) .........................................................................9

*Lerblance v. Calyx Energy III, LLC,*
   CV-23-47-JFH-GLJ, 2024 WL 3275789 (E.D. Okla. July 2, 2024) ....................................24

*McGee v. Hayes,*
   43 F. App'x 214 (10th Cir. July 22, 2002) .....................................................................4

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ..................................................................................................18

*Murphy v. Deloitte & Touche Grp. Ins. Plan,*
   619 F.3d 1151 (10th Cir. 2010) .....................................................................................4

*NLRB v. Sears, Roebuck & Co.,*
   421 U.S. 132 (1975) ..................................................................................................10

*Piper v. Chris-Craft Indus., Inc.*,
430 U.S. 1 (1977) ......................................................................................................7

*Plummer v. Summer Transp., Inc.*,
CIV-19-00359-PRW, 2021 WL 6754751 (W.D. Okla. Jan. 28, 2023) ....................4

*Robinson v. City of Arkansas City, Kan.*,
No. 10-1431-JAR-GLR, 2012 WL 603576 (D. Kan. Feb. 24, 2012) ....................12

*Rodger v. Elec. Data Sys., Corp.*,
155 F.R.D. 537 (E.D.N.C. 1994) ...............................................................................7

*Sonnino v. Univ. of Kansas Hosp. Auth.*,
221 F.R.D. 661 (D. Kan. 2004) ...............................................................................11

*Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.*,
446 U.S. 719 (1980) ...................................................................................................9

*Thompson v. Lantz*,
2009 WL 3157561 (D. Conn. Sept. 25, 2009) .........................................................24

*United States v. Johnston*,
146 F.3d 785 (10th Cir. 1998) .................................................................................11

*United States v. O'Brien*,
391 U.S. 367 (1968) ...................................................................................................6

*United States v. Winner*,
641 F.2d 825 (10th Cir. 1981) .................................................................................19

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) ...................................................................................................6

*Vandelay Ent., LLC v. Fallin*,
2014 OK 109, 343 P.3d 1273...................................................................................23

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
429 U.S. 252 (1977) ..................................................................................7, 8, 9, 20, 21

*Wagner v. Dryvit Sys., Inc.*,
208 F.R.D. 606 (D. Neb. 2001) ...............................................................................11

**Statutes**

OKLA. STAT. tit. 12, § 2502 .............................................................................11, 17, 19

## Other Authorities

Brianna Bailey, *Hear and Read Ryan Walters' Full Remarks About the Tulsa Race Massacre*,
THE FRONTIER ...............................................................................................16

*Enactment*,
BLACK'S LAW DICTIONARY (12th ed. 2024) ................................... 23, 24

Justin Allen Rose, *Legislators Turn to 'Bill Shucking' to Keep Dying Policy Ideas Alive*,
ABC7NEWS (Apr. 10, 2024).............................................................................21

## Rules

Fed. R. Civ. P. 26............................................................................................ 3, 4

Fed. R. Civ. P. 34.............................................................................................25

## Constitutional Provisions

U.S. CONST. art. I, § 6.......................................................................................9

State Defendants and Plaintiffs fundamentally disagree over the permissible scope of discovery in this case. To recap, this Court has dismissed several claims, and it has certified various important questions to the Oklahoma Supreme Court, which is receiving argument from the parties on those questions now. The lone claim that has moved forward in discovery is Plaintiffs' equal protection claim, which this Court declined to dismiss because of certain factual disputes. Doc. 172 at 30. Despite this, Plaintiffs are seeking incredibly broad discovery from both the State Defendants and the University of Oklahoma. Moreover, they appear to seek the same scope of discovery that they would have otherwise sought if every claim was currently open to discovery. In declining to dismiss the equal protection claim, this Court gave Plaintiffs an inch, and they are attempting to take a mile. Overall, Plaintiffs' requests are mostly irrelevant to the sole claim at issue, they are wildly overbroad, and they ask for massive amounts of privileged material, including several years' worth of litigation material the Attorney General's Office has compiled while defending this case. As such, this Court should deny the motion to compel or make clear that the scope of discovery is not as broad as Plaintiffs claim.

## BACKGROUND

On October 19, 2021, Plaintiffs filed their original complaint, Doc. 1, and on November 9, 2021, they filed an amended complaint, Doc. 50. Plaintiffs alleged four different claims based on the U.S. Constitution. Specifically, they argued that the Act was unconstitutionally vague under the Fourteenth Amendment, it infringed on students' right to information contra the First Amendment, it consisted of viewpoint discrimination in violation of the First Amendment, and it was infected with racial animus in violation of the Fourteenth Amendment. Doc. 50 at ¶¶ 156–189. On June 14, 2024, this Court dismissed or stayed all of Plaintiffs' claims, with the sole exception of their equal protection claim. Doc. 172 at 28–31. In denying State Defendants' motion to dismiss that claim, the Court referred to certain "factual disputes" that prevented dismissal. *Id.* at 30. Subsequently, on August 30, 2024, this Court entered its discovery scheduling order limiting discovery to Plaintiffs' equal protection

claim. Doc. 210. Discovery on this claim is currently scheduled to conclude in approximately six months, on August 1, 2025. Doc. 225.

Plaintiffs served State Defendants—a group of 18 including the Attorney General, Governor, and Education Superintendent—with their First Requests for Production of Documents on September 25, 2024. Doc. 223-1. By their plain terms, Plaintiffs seek discovery, without limitation, of virtually every document and piece of correspondence relating to the Oklahoma Legislature's drafting and enactment of HB 1775, as well as the subsequent three-year implementation and application thereof, including all documents relating to the legal defense of HB 1775 in the present case. *See id.* For example, Plaintiffs asked for "All Documents and Correspondence concerning HB 1775 and the Rules[,]" as well as "All Documents and Correspondence related to proposed or actual changes made to the curriculum . . . of any Oklahoma public school pertaining to any topics purportedly implicated by HB 1775, such as CRT, George Floyd, the Black Lives Matter movement, 2020 Racial Justice Protests, DEI, or Historically Marginalized Students or Persons." Doc. 223-1, RFPs Nos. 1 & 16.

On September 30, 2024, Plaintiffs sent State Defendants a proposed confidentiality agreement and a proposed electronically stored information protocol ("ESI protocol").[1] Counsel for State Defendants have been involved in discovery in several different cases recently—including with international corporations—and this is the first time that counsel have been asked to sign an ESI protocol. After receiving the protocol, State Defendants forwarded the protocol to, among others, IT personnel within the State to ascertain whether the protocol was achievable or overly burdensome.

State Defendants' examination of the requests revealed that there was a fundamental disagreement between the parties over the appropriate scope of discovery. On October 22, 2024, State Defendants' counsel emailed Plaintiffs' counsel to request an extension of time to respond to

---

[1] The confidentiality agreement is not at issue in this motion. The parties are still in the process of negotiating over this document after several proposed revisions from both sides.

Plaintiffs' first requests for production. Exhibit 1. Plaintiffs never responded. On October 25, 2024, State Defendants served their responses and objections to the requests, informing Plaintiffs that such sweeping discovery is inconsistent with the relevancy and proportionality requirements outlined in Federal Rule of Civil Procedure 26(b)(1). *See* Doc. 223-2. On November 15, 2024, in response, Plaintiffs sent State Defendants a written letter maintaining the relevancy of their broad discovery responses. *See* Doc. 223-3. These exchanges touched off a series of meetings between the parties.

One such meeting occurred on November 18, 2024. There, the parties met via electronic means and explained their various positions. Concerned that these differences may prove to be intractable and seeking to avoid potentially protracted discovery disputes, State Defendants decided to seek guidance from this Court on the permitted scope of discovery for Plaintiffs' equal protection claim, which would guide the parties through their dispute. *See* Fed. R. Civ. P. 26(b)(2)(C). Thus, State Defendants filed a Motion to Clarify on November 20, 2024. Doc. 217. That motion was denied on November 21, 2024, with this Court indicating that the parties should follow the typical motion to compel or motion for protective order process. Doc. 218.

Despite State Defendants' position that the Plaintiffs' discovery requests are objectionably overbroad in their entirety, State Defendants began the process of searching for communications between the then-Superintendent of Education (Joy Hofmeister) and the members of the Board of Education, the Governor, and any members of the Legislature between February 1, 2021 and May 7, 2021 to determine if there are any communications discussing H.B. 1775. State Defendants have begun a similar process regarding the Board of Regents.

Following the denial of the motion to clarify, the parties met on December 13, 2024. Prior to that meeting, State Defendants sent Plaintiffs an email outlining their position on the proposed ESI protocol and asking for small revisions to the proposed protective order. As to the ESI protocol, the internal IT team had still not provided an assessment of the feasibility of Plaintiffs' proposal. In light

3

of that delay, and mindful that there was no indication of any particular dispute between the parties about document formatting, State Defendants deemed it premature to sign onto a specific agreement. At the December meet and confer, the parties once again expressed their disagreements about the appropriateness of Plaintiffs' requests. Eventually, State Defendants requested that Plaintiffs provide suggested search terms for their requests, so they could ascertain if the discovery Plaintiffs sought was narrower than the text of the requests themselves. Plaintiffs declined. Instead, they filed their motion to compel. Doc. 223. While State Defendants urge this Court to deny the motion to compel, State Defendants welcome this Court's guidance on the scope of allowable discovery.

## ARGUMENT AND AUTHORITIES

The Federal Rules of Civil Procedure "will not permit unlimited discovery." *Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010). A party may only seek discovery of nonprivileged matters "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Discovery is not intended to be a 'fishing expedition.'" *Elk City Golf & Country Club, Inc. v. Phila. Indemnity Ins. Co.*, CIV-18-196-D, 2019 WL 6053020, at *1 (W.D. Okla. Nov. 15, 2019) (quoting *McGee v. Hayes*, 43 F. App'x 214, 217 (10th Cir. July 22, 2002)). The purpose of discovery "is to facilitate the proper disposition of the cause in an orderly manner[,]" not "merely to vex or harass litigants[,]" nor to be used "for a mere fishing expedition, nor for impertinent intrusion." *Keenan v. Texas Produc. Co.*, 84 F.2d 826, 828 (10th Cir. 1936). Accordingly, a court "must limit the frequency or extent of discovery . . . if it determines that" the discovery is outside the permissible scope of the Rules, unreasonably cumulative, can be obtained from a less burdensome source, or equally accessible to the requesting party. Fed. R. Civ. P. 26(b)(2)(C).

Generally, the movant bears the initial burden of establishing that the non-movant failed to respond, or provided an incomplete response, to discovery requests. *See Plummer v. Summer Transp., Inc.*, CIV-19-00359-PRW, 2021 WL 6754751, at *1 (W.D. Okla. Jan. 28, 2023). Similarly, when the

relevance of a particular discovery request "is not readily apparent, the party seeking the discovery has the burden to show the relevance of the information requested." *Barton v. Tomacek*, No. 11-CV-0619-CVE-TLW, 2012 WL 4735927, at *4 (N.D. Okla. Oct. 3, 2012) (citation omitted); *see also Bolles v. Allstate Ins. Co.*, No. CIV-24-284-R, 2025 WL 92943, at *1 (W.D. Okla. Jan. 14, 2025) (same).

## I.      The discovery sought by Plaintiffs exceeds the scope of their equal protection claim.

The sole claim at issue in discovery is whether the Oklahoma Legislature enacted HB 1775 with the purpose to discriminate in violation of the Equal Protection Clause. Doc. 210 at 2. But by the plain terms of their requests, Plaintiffs seek discovery, without limitation, of virtually every document and piece of correspondence relating to the Oklahoma Legislature's drafting and enactment of HB 1775, as well as the subsequent three-year implementation and application thereof. The very first request, for example, demands—from the Governor, Attorney General, Superintendent, all Board of Education members, and all Board of Regents members—"All Documents and Correspondence concerning HB 1775 or the Rules." Doc. 223-1, RFP No. 1. Thus, among countless other things, Plaintiffs are demanding every single attorney-client privileged document and every single attorney-client privileged email that has been sent or created for purposes of this litigation over a four-year period. (Indeed, it is a bit unclear why Plaintiffs bothered to make any more requests, given that this very first one encompasses practically anything and everything related to HB 1775.) Essentially, Plaintiffs appear to be seeking the same breadth of discovery that they would be seeking if every claim were currently open to discovery.

Even the subsequent requests seeking communications with Legislators or the Governor are clearly inappropriate. The Tenth Circuit recently instructed that "the statements of a few legislators concerning their motives for voting for legislation is a reed too thin to support the invalidation of a statute." *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 94 (2023); *see also, e.g., Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 90 (1st Cir. 2021) ("To the

extent that discriminatory intent is relevant, the probative value of the discovery sought by [plaintiffs] is further reduced by the inherent challenges of using evidence of individual lawmakers' motives to establish that the legislature as a whole enacted [the challenged law] with any particular purpose."). The Supreme Court, for its part, has similarly warned that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021) ("The 'cat's paw' theory has no application to legislative bodies . . . . [T]he legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. . . . [L]egislators have a duty to exercise their judgment . . . . It is insulting to suggest that they are mere dupes or tools."); *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (cautioning against the "speculation" inherent in "[t]rying to discern what motivates legislators individually and collectively").

Legislators are the ones who actually write the laws, and, as these citations show, courts have repeatedly indicated that their individual or personal views are irrelevant to determining whether a law a legislature has passed is constitutional or not. How much less relevant, then, are the views, documents, or communications of state officials who are *not* tasked with or constitutionally responsible for enacting the legislation in question, such as the Attorney General, various board members, and the Superintendent? And yet, Plaintiffs have demanded, under the auspices of a facial constitutional challenge to a duly enacted law, that numerous officials who did not enact the law cough up every single document and email related to that law, from both before and after enactment, no matter how irrelevant or privileged. This is both a fishing expedition and a farce.

In the end, the intent of the Legislature as a whole is most properly inferred from HB 1775's statutory text, which itself "memorialize[s]" the intent of the entire deliberative body. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002). After all, "inquiries into legislative motives 'are a hazardous

matter.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022); *see also Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26 (1977) ("Reliance on legislative history in divining the intent of Congress is, as has often been observed, a step to be taken cautiously."). The Oklahoma Supreme Court has even held that the testimony of an individual legislator "is not competent on the intent of the Legislature as a whole" because "the Legislature communicates its intent as a body." *CompSource Mut. Ins. Co. v. State ex rel. Okla. Tax Comm'n*, 2018 OK 54, ¶ 40, 435 P.3d 90, 104; *see also Haynes v. Caporal*, 1977 OK 166, ¶ 10, 571 P.2d 430, 434 ("Testimony of individual legislators or others as to happenings in the Legislature is incompetent, since that body speaks solely through its concerted action as shown by its vote."). Even to the extent legislative purpose or history is conceivably relevant to Plaintiffs' claim— which State Defendants dispute—this information is accessible to Plaintiffs through the public record of H.B. 1775. Any other extrinsic materials or opinions would not be reliable sources of insight into legislative motivations. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("Not all extrinsic materials are reliable sources of insight into legislative understandings . . . .").

Plaintiffs' motion to compel largely ignores this binding precedent. Instead, Plaintiffs rely on a sweeping interpretation of a Supreme Court case analyzing an equal protection allegation elucidated in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 254 (1977). Doc. 223 at 7–8. Plaintiffs appear to believe that *Arlington Heights* and the Federal Rules of Civil Procedure authorize them to obtain discovery into anything and everything that they could remotely perceive as circumstantial evidence. *Id.* However, the scope of discovery, even in the discrimination context, is not unlimited. *See Rodger v. Elec. Data Sys., Corp.*, 155 F.R.D. 537, 539 (E.D.N.C. 1994). Indeed, despite various litigants arguing that *Arlington Heights* has dramatically expanded the scope of discovery, multiple courts have observed that "it has done very nearly the opposite." *Dyas v. City of Fairhope*, No. 08–0232–WS-N, 2009 WL 3151879, at *9 (S.D. Ala. Sept. 24, 2009); *see also Buonauro v. City of Berwyn*, No. 08-C-6687, 2011 WL 116870, at *6 (N.D. Ill. Jan. 10, 2011).

*Arlington Heights* involved an as-applied challenge to a decision by a single town. It arose from a town's decision to deny a zoning request, the approval of which was necessary to build low-income housing. 429 U.S. at 254. The relevant decision makers included a plan commission and the seven member "Village Board." *Id.* at 258. To determine whether a discriminatory purpose was a motivating factor, the Supreme Court mentioned several potential factors. Those factors are (1) whether the decision "bears more heavily on one race than another"; (2) the "historical background" and specific sequences of events leading up to the challenged decision; (3) certain "departures from the normal procedure or practices"; and (4) "the legislative or administrative history" of the decision. *Id.* at 266–68. Importantly, the Court also warned that "judicial inquiries into legislative or executive motivation represent a **substantial intrusion into the workings of other branches of government**." *Id.* at 268 n.18 (emphasis added). Thus, this examination must be "sensitive" and acknowledge the unique privileges owed to the Legislature and government officials. *Id.* at 266–68.

Here, to the contrary, Plaintiffs have filed a facial challenge against a state law that unambiguously applies to each teacher and student in Oklahoma in the same manner. As should be obvious, the cases are not identical, or even that similar. And yet Plaintiffs rely almost entirely on *Arlington Heights* in making extraordinarily broad initial discovery requests. To give another example, Plaintiffs seek all communications involving any employee of State Defendants—again, the Governor, Attorney General, numerous board members, the Superintendent, etc.—and any other person *in the world* "concerning CRT, George Floyd, Black Lives Matter, Racial Justice Protests, DEI, or Historically Marginalized Students or Persons." Doc. 223-1, RFP No. 19. This fishing expedition does nothing to advance the Court's knowledge of whether *the Legislature* enacted H.B. 1775 with a discriminatory purpose. The rest of Plaintiffs' requests are similarly facially irrelevant to the sole issue still active in this case. It simply cannot be the case that Plaintiffs can survive dismissal based on certain "factual disputes," Doc. 172 at 30, and then demand virtually every document each State Defendant has that

is related in any way to HB 1775.

Again, in denying dismissal this Court referenced certain "factual disputes" that gave rise to plausible allegations. *Id.* In particular, the Court pointed to the Legislature's deviation from its normal procedures, the historical background of the Act, and specific statements made by individual legislators as examples of allegations that made Plaintiffs' equal protection claim plausible. *Id.* Logically, then, discovery should be limited to these realms, at most. *Arlington Heights*, that is, cannot possibly stand for the proposition that Plaintiffs may survive a motion to dismiss because of specific factual disputes and then demand every document under the sun from an entire State Government. That is not the "sensitive inquiry" *Arlington Heights* demands. 429 U.S. at 266. Instead, "discovery requests should be narrowly tailored to address the factual issues raised by Defendants' Motion to Dismiss." *Glenwood Springs Citizens' All. v. U.S. Dep't of Interior*, No. 20-cv-00658-CMA, 2021 WL 916002, at *2 (D. Colo. Mar. 10, 2021)

Moreover, several of Plaintiffs' requests implicate the legislative and deliberative privileges, among others. The scope of the legislative privilege "is necessarily broad." *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 236 (5th Cir. 2023). It is derived from the U.S. Constitution's Speech and Debate Clause. *See* U.S. CONST. art. I, § 6, cl. 1. Even though this clause applies only to federal lawmakers, the Supreme Court has "also recognized that state legislators enjoy common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause." *Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980) (citation omitted). This privilege "protects the legislative process itself, and therefore covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015). In effect, "this privilege extends well beyond the act of voting for or against a particular piece of legislation." *League of United Latin Am. Citizens v. Abbott*, 708 F. Supp. 3d 870, 877 (W.D. Tex. 2023). For instance, "[i]t covers

material prepared for a legislator's understanding of legislation, lobbying conversations encouraging a vote on pending legislation, and even materials the legislator possesses related to potential legislation—*i.e.*, 'all aspects of the legislative process.'" *Id.* (citation omitted); *see also Almonte v. City of Long Beach*, 478 F.3d 100, 103 (2d Cir. 2007) ("[L]egislative immunity applies not only to . . . vote[s] . . . , but also to any discussions and agreements . . . prior to the vote, regardless of whether those discussions and agreements took place in secret."). To be sure, although the privilege protects such "legislative" acts, it does not protect acts that are merely "political." *Bastien v. Off. of Senator Ben Nighthorse Campbell*, 390 F.3d 1301, 1315 (10th Cir. 2004). Thus, the privilege does not protect press releases, *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979), or "the everyday task of gathering views and information from constituents and others through informal contacts." *Bastien*, 390 F.3d at 1316.

The deliberative process privilege also supports State Defendants' objections in this case. This privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated" from discovery. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotations and citation omitted). Without this privilege, "the quality of agency decisions" would be threatened by the lack of "open and frank discussion" between government officials. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001). The privilege applies to both state and federal officials. *See Glossip v. Chandler*, No. CIV-14-0665-F, 2020 WL 7220789 (W.D. Okla. Dec. 7, 2020) (unpublished). Two requirements must be met for the deliberative process privilege to apply: "the material must be predecisional and it must be deliberative." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). A document is predecisional when it is "prepared to assist an agency decisionmaker in arriving at his decision." *Ctr. for Biological Diversity v. Norton*, 336 F. Supp. 2d 1149, 1153 (D.N.M. 2004) (citations omitted). A document is deliberative "if it relates to government decision-making and its disclosure to the public would expose an agency's decision-making process in such a way as to discourage candid

discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id.* Thus, any document from State Defendants or the Legislature involving the decision to engage in enforcement under the Act or even discussions about the policy considerations of voting for the Act would be subject to the deliberative process privilege.

Finally, much of the material sought is protected by the attorney-client privilege. The attorney client privilege protects communications between an attorney and the client "who consults an attorney with a view towards obtaining legal services or is rendered professional legal services by an attorney." OKLA. STAT. tit. 12, § 2502(A)(2). The "communication between a lawyer and client must relate to legal advice or strategy sought by the client." *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998). As Plaintiffs filed their lawsuit in October 2021, almost all—if not all—communication between the Attorney General's office and State Defendants after that time period relating to HB 1775 are protected by attorney-client privilege, as are the Attorney General's numerous internal documents and emails relating to the defense of HB 1775.

## II.     State Defendants' declining to submit a privilege log is permissible.

While privilege logs are common in discovery disputes, they are not always required or ubiquitous. The general rule, after all, is that "**[u]nless a request is overly broad, irrelevant, or unduly burdensome on its face**, the party asserting the objection has the duty to support its objections*." Sonnino v. Univ. of Kansas Hosp. Auth.*, 221 F.R.D. 661, 671 n.36 (D. Kan. 2004) (emphasis added). Indeed, some courts have held that where a discovery request is facially over broad, unduly burdensome, or irrelevant, a general objection will suffice. *See Wagner v. Dryvit Sys., Inc.*, 208 F.R.D. 606, 610 (D. Neb. 2001); *DIRECTV, Inc v. Puccinelli*, 224 F.R.D. 677, 688 (D. Kan. 2004). Therefore, when courts find requests "facially objectionable in [their] entirety," the requests do not "obligate [respondents] to produce any documents or to identify documents protected by privilege or as work product." *Robinson v. City of Arkansas City, Kan.*, No. 10-1431-JAR-GLR, 2012 WL 603576, at *11 (D.

Kan. Feb. 24, 2012). As stated above, Plaintiffs' requests are facially unreasonable and additionally facially implicate various different privileges. Thus, it was proper for State Defendants to respond with their fundamental objection and refuse to turn over a privilege log.

In the end, declining to compile a privilege log was the only practical and reasonable approach for Defendants. As discussed above, the breadth of Plaintiffs' requests is so overbroad that it would encompass *countless* privileged documents—including every document or email created by the Attorney General's office during the multi-year course of this litigation. Logging each and every such document and email for a four-year period would truly be absurd; it is a task that, by itself, could take years. And it would be years utterly wasted, given the complete irrelevance of such material to the question of whether the Legislature, in 2021, somehow violated the equal protection clause by enacting various provisions that expressly combat racism and sexism in Oklahoma education.

## III.  The individual requests are individually objectionable.

While State Defendants' fundamental objection stands on its own, a request-by-request examination of Plaintiffs' submitted discovery requests illustrates their irrelevant and improper nature.

### 1.  All Documents and Correspondence concerning HB 1775 or the Rules.

On its face, this request asks for every potential document for a five-year period from every Defendant possibly concerning the Act. It is extraordinarily overbroad in several respects. First, it is not tailored at all to determining whether the Legislature enacted the Act with a discriminatory purpose. Again, this request appears to serve as a catch-all that sweeps in every single other request. It seeks all emails or documents from every single employee within the State Department of Education, the Board of Regents of Higher Education, the Attorney General's Office, and the Governor's Office that could possibly concern the Act over a course of five years. The employees of all those offices combined number in at least the hundreds, and probably the thousands. The vast majority of those employees bear no relevance towards ascertaining whether the Legislature possessed

12

a discriminatory intent in enacting HB 1775. For example, the request on its face would apply to an Attorney General employee who was hired three years after the Act's passage in the Criminal Appeals Unit. This person's documents or writings on the Act, to the extent they even exist, would be irrelevant to Plaintiffs' claims. Second, this request uses the broad term "concerning" to define the scope of the request. Courts have often held that such "omnibus terms" are facially overbroad because they require parties "either to guess or move through mental gymnastics . . . to determine which of many pieces of paper may conceivably contain some detail, either obvious or hidden, within the scope of the request." *Cardenas v. Dorel Juvenile Grp., Inc.*, 232 F.R.D. 377, 380–82 (D. Kan. 2005) (citation omitted).

When presented with State Defendants' concerns concerning the irrelevance and overbreadth of the request, Plaintiffs refused to provide a suggested list of search terms or list of people for whom to search. This request is a quintessential fishing expedition. *See Aikens v. Deluxe Fin. Servs., Inc.*, 217 F.R.D. 533, 538 (D. Kan. 2003) ("a request or interrogatory is unduly burdensome on its face if it uses the omnibus term 'relating to' or 'regarding' with respect to a general category or group of documents"). Further, the request does not account for the clear attorney-client issues. In October 2021, Plaintiffs filed their lawsuit seeking a declaration that the Act was facially unconstitutional. Doc. 1. During the course of defending the State, counsel within the Attorney General's office has produced thousands of documents and emails. These include research, drafts of briefs, and strategic discussions involving the State's legal defense. Thus, they are clearly privileged information. And again, Plaintiffs' request for a privilege log would require an immense burden for State Defendants.

> **2.** **All Documents and Correspondence between You and Legislators regarding the drafting of HB 1775.**
> **3.** **All Documents and Correspondence between You and Legislators regarding the enactment of HB 1775.**
> **4.** **All Documents and Correspondence between You and Legislators regarding the implementation of HB 1775.**
> **5.** **All Documents and Correspondence between You and other Defendants regarding the drafting of HB 1775.**
> **6.** **All Documents and Correspondence between You and other Defendants regarding the enactment of HB 1775.**

7.     **All Documents and Correspondence between You and other Defendants regarding the implementation of HB 1775.**

While State Defendants object to these requests as irrelevant or privileged, State Defendants have begun the process of searching for responsive documents, especially in regard to communications with the Legislature. To do so, State Defendants have started the process of searching for emails that include "H.B. 1775" or other variants of the term that were sent between the various entities represented in this lawsuit and individual legislators during the time period of February 1, 2021 and May 7, 2021. Given the multiple layers of State Defendants, and their separation from each other, this process has already taken significant time and effort, and it has barely gotten off the ground. Plaintiffs' overly broad definition of "You" and "Your" further compounds the issue as it includes every employee within the organizations regardless of how thinly—if at all—they are connected to HB 1775. For example, the State Board of Regents does not maintain its emails on the OMES server. Thus, their email searches must be done separately from any of the others.

Moreover, many of those documents will be privileged or otherwise irrelevant. For example, any communication between the Attorney General's Office and the other State Defendants concerning HB 1775 following the filing of this lawsuit would be protected by attorney-client privilege. Especially because Plaintiffs filed a facial challenge to the law, any discussion involving any aspect of the Act's implementation between the Attorney General's Office and its clients would be protected. Similarly, any communication from individual legislators would be privileged under the legislative privilege as it is communication and documents created during the official legislative process. *See La Union Del Pueblo Entero*, 68 F.4th at 235. Further, the relevance of any such stray comments is diminished by binding precedent outlining the limited value of such comments. *See Citizens for Const. Integrity*, 57 F.4th at 768. ("the statements of a few legislators concerning their motives for voting for legislation is a reed too thin to support invalidation of a statute"). Any emails from an employee of

State Defendants to an individual legislator would be irrelevant and also likely privileged.

Similarly, requests 5 through 7 are irrelevant to understanding the intent of the Legislature. Again, the only issue subject to discovery is whether the *Legislature* enacted HB 1775 with a discriminatory motive. The documents and correspondence between the various State Defendants and other statements shed little light on the legislative motive in passing the Act.

**8.    All Public Statements made by You regarding HB 1775.**

Plaintiffs' definitions of "Public Statements" and "You" make this request extraordinarily broad. Again, Plaintiffs define "You" in such a way that includes all employees of the various State Defendants regardless of whether they are involved in HB 1775 in any way. "Public Statements" are defined as "any speeches; remarks; television, radio, or other, similar appearances; social media posts, comments, and interactions; statements to the press; and all other public statements and representations, in any form." By the terms of their request, Plaintiffs are literally asking State Defendants to comb through the social media activity of every single employee of every single State Defendant for the last five years. And the inclusion of social media "interactions" would seemingly sweep in every single social media "like" or something similar. This is self-evidently absurd. Not only are these statements, posts, and likes irrelevant to ascertaining legislative intent in 2021, but compiling them would impose severe and virtually impossible burdens on State Defendants. This request is clearly a fishing expedition designed in the hopes of finding something inflammatory or embarrassing, not a serious effort to ferret out discriminatory intent.[2] Finally, even if this request was limited to

---

[2] Plaintiffs claim Superintendent Walters stated "that the Tulsa Race Massacre should be taught in public schools without mentioning race." Doc. 223 at 10. This is an unfair characterization of the comments. The Superintendent made clear at the speaking engagement that: "all Oklahoma standards have to be taught. This is not an end-around to say, we're not going to teach the Tulsa Race Massacre. That is absolutely, certainly not the intention, it was verbatim in the bill to say all of these standards have to be taught." To a follow up question, he said: "I would never tell a kid that because of your race, because of your color of your skin, or your gender or anything like that, you are less of a person or … are inherently racist. That doesn't mean you don't judge the actions of individuals. Oh, you can,

public statements actually made by State Defendants, themselves, that information is equally as accessible to Plaintiffs as it is State Defendants.

> 9.    **All Documents and Correspondence relating to Public Statements made by any Legislator concerning HB 1775.**

State Defendants incorporate their previous objections to the scope of "Public Statements." State Defendants also object to the use of the words "relating to" public statements. *See Aikens*, 217 F.R.D. at 538 ("a request or interrogatory is unduly burdensome on its face if it uses the omnibus term 'relating to' or 'regarding' with respect to a general category or group of documents"). The broad scope of "Public Statements," which includes likes on social media, combined with "relating to" makes it impossible for State Defendants to comply with this request. This request also lacks proportionality because it is unclear why State Defendants would have any documents or correspondence surrounding public statements made by members of the Legislature, but the only way to determine this would be to search through the emails of every single employee of State Defendants looking for any mentions of any legislator. Moreover, any documents or correspondence from State Defendants about particular statements made by particular legislators would not be competent to interpret that legislator's intent or meaning. The potential relevance is substantially outweighed by the time that this search would take to complete.

> 10.    **All Documents and Correspondence relating to any policies, procedures, rules, guidance, trainings, or presentations regarding HB 1775**

The documents and correspondence relating to this request are not relevant to determining whether the Legislature enacted H.B. 1775 with a discriminatory intent. Any sort of guidance or training issued by a different governmental body well after the enactment of the challenged Act does

---

absolutely, historically, you should." Brianna Bailey, *Hear and Read Ryan Walters' Full Remarks About the Tulsa Race Massacre*, THE FRONTIER, https://www.readfrontier.org/stories/hear-and-read-ryan-walters-full-remarks-about-the-tulsa-race-massacre/.

not reflect the legislative motive for enacting HB 1775. To the extent that this question is seeking correspondence and documents from the State Board of Education surrounding the emergency rules promulgated after the Act's passage, any such documentation is privileged through the deliberative privilege. Any documents preceding the promulgation of the rules are pre-decisional and qualify as deliberative because they were created during the process of the Board and the Superintendent of Education setting rules and debating policy. Documents and correspondence created after the rules were promulgated are irrelevant.

> **11.      All Documents and Correspondence relating to any formal or informal complaints made under HB 1775 or the Rules.**
> **12.      All Documents and Correspondence relating to any response to any formal or informal complaint concerning HB 1775.**

These requests ask for information relating to all complaints—both informal and formal—that have been made over the past four or so years that HB 1775 has been in effect. These complaints appear to include those made by any person within the State, and given the breadth of Plaintiffs' requests, they likely include complaints made on social media that were not even filed officially with State Defendants. Any such documents or correspondence surrounding these complaints have only an attenuated link *at best* with the legislative intent in enacting HB 1775. More realistically, any complaints made pursuant to HB 1775 are irrelevant to whether the law itself was enacted with a discriminatory intent. Moreover, any deliberations between agencies concerning complaints are subject to the deliberative process privilege. Similarly, much of this material would be protected under the investigative privilege. *See, e.g.*, OKLA. STAT. tit. 12, § 2502(D)(7).

> **13.      All reports or other Documents developed by the State Department of Education pursuant to Section (i) of the Rules, and all Documents and Correspondence related thereto.**

This request is irrelevant to determining whether the Legislature enacted HB 1775 with a discriminatory intent. It is also overbroad in proportion to the needs of the case. Section (i) of the

Rules requires that school employees submit a report for each complaint under HB 1775 that is lodged at school. Similarly, the Department of Education is required to report quarterly on the number of complaints and violations that occurred. By asking for "all Documents and Correspondence related" to these reports, Plaintiffs have asked for every single complaint filed at every single school district in the state. This request is especially onerous and it is unclear what relevance individual complaints have in determining the scope of HB 1775 or the intent of the Legislature. Indeed, State Defendants have made this point before in responding to supplemental filings made by Plaintiffs pointing out individualized applications of HB 1775. *See* Doc. 90 at 2–5.

> **14.    All Documents and Correspondence related to the SBE's decision to downgrade Tulsa Public Schools' accreditation status to "Accredited with Warning" on July 28, 2022.**
> **15.    All Documents and Correspondence related to the SBE's decision to downgrade Mustang Public Schools' accreditation status to "Accredited with Warning" on July 28, 2022.**

These requests are improper for several reasons. First, the decisions to enforce the Act stand for themselves and could be challenged in as-applied actions. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) ("For a host of good reasons, courts usually handle constitutional claims case by case, not en masse."). Neither Mustang Public Schools nor Tulsa Public Schools has chosen to do so. Plaintiffs have already filed briefing outlining their view of the significance of these actions, and State Defendants have responded accordingly. *See* Docs. 83 & 90. State Defendants oppose Plaintiffs' consistent efforts to litigate the as-applied instances of enforcement within their facial challenge of HB 1775. Second, to the extent that there are any communications between the Attorney General's Office and the Board of Education concerning these matters, they are privileged. Those emails would involve an attorney and client discussing the scope and application of the law that was the subject of the lawsuit triggering the representation. Third, to the extent that the request is asking for internal correspondence within the Board of Education, any relevant material is privileged under the

deliberative process privilege. The correspondence would have occurred during the decision-making process of the Board. Fourth, as this information necessarily would have been created in connection to a specific enforcement action, it is also protected under investigative privilege. *See United States v. Winner,* 641 F.2d 825, 831 (10th Cir. 1981); OKLA. STAT. tit. 12, § 2502 (protecting communications between public officers and attorneys about investigations). As there is no reason for any other State Defendant to communicate with the State Board of Education concerning SBE's decision to enforce HB 1775 against Tulsa Public Schools and Mustang Public Schools, this request is unduly burdensome.

> **16.    All Documents and Correspondence related to proposed or actual changes made to the curriculum or course list of any Oklahoma public school pertaining to any topics purportedly implicated by HB 1775, such as CRT, George Floyd, the Black Lives Matter movement, 2020 Racial Justice Protests, DEI, or Historically Marginalized Students or Persons.**
> **17.    All Documents and Correspondence concerning any works of literature removed from the curriculum of any Oklahoma public school pertaining to any topics purportedly implicated by HB 1775, such as CRT, George Floyd, the Black Lives Matter movement, 2020 Racial Justice Protests, DEI, or Historically Marginalized Students or Persons.**

Plainly, these two requests are not tailored to understanding legislative intent. Individual decisions made by individual school districts do not shed any light on the Legislature's motive for enacting HB 1775. These requests are also exceptionally overbroad. To begin, it is not readily apparent how several of the terms are implicated by HB 1775. For instance, George Floyd's death in 2020 is unlikely to feature in any works of literature used or removed in a classroom. Further, Plaintiffs have defined these topics so broadly that the burden placed on State Defendants is not proportional to the amount of potentially relevant documents. "Critical Race Theory," for instance, is defined as "the framework to identify and challenge ways racism is embedded in American society. As used herein, 'Critical Race Theory' encompasses Your references to 'Black communism,' 'divisive concepts,' 'equity,' 'indoctrination,' 'Marxist ideology,' 'Marxism,' 'oppression,' 'privilege,' 'race essentialism,' 'racism,' 'racist,' 'spirit murder,' 'systemic racism,' 'The 1619 Project,' 'white fragility,' 'white

supremacy,' 'woke' speech, the 'woke agenda,' and 'wokeness.'" Doc. 223-1, Definition (7). This is absurd. Similarly, Plaintiffs have requested communication or documentation for every instance in which a book that discusses such common themes is removed from the curriculum of any public school. This is plainly overbroad and not proportional to the needs of the case. Here, Plaintiffs have taken an implausibly expansive interpretation of topics affected by the Act and are engaged in a fishing expedition. *See Elk City Golf & Country Club, Inc.*, 2019 WL 6053020, at *1.

Even under Plaintiffs' expansive interpretation of *Arlington Heights*, these requests are overbroad and irrelevant. One of the *Arlington Heights* factors is whether "the official action . . . 'bears more heavily on one race than another.'" 429 U.S. at 266. But HB 1775 applies the same to all teachers and students. To shoehorn these requests into the *Arlington Heights* framework, Plaintiffs have implausibly expanded the scope of HB 1775 into "erasing the role of race from what students are taught" to argue that these requests are relevant to their disparate impact claims. Doc. 223 at 10. This Court should not allow Plaintiffs to define HB 1775 as affecting every single aspect of education potentially involving race to sweep in curriculum changes throughout the State.[3] At a bare minimum, this Court should wait to rule on this point until the Oklahoma Supreme Court has had the opportunity to construe key portions of the Act narrowly.

> **18.    All Documents and Correspondence concerning the decision to suspend Oklahoma House Rule 8.21 (c) in connection with the enactment of HB 1775.**

This is one of Plaintiffs' narrower requests, although that is not saying much, and it is still problematic. Oklahoma House Rule 8.21(c) provides that "[t]he House shall not consider a motion to adopt a Senate amendment . . . unless it is limited to matters germane to the bill or resolution." HB

---

[3] As an example of Plaintiffs' attempts on this front, Plaintiffs repeated their complaints about Edmond Public Schools' adjustment of their class reading list. Doc. 223 at 11. Edmond Public Schools rebutted these claims previously. *See* Doc. 60 at 6–7, Doc. 60-1, Doc. 60-2.

1775 originally involved different subject matter and was rewritten in the Senate. *Bill Information for HB 1775*, OKLA. STATE LEGISLATURE.[4] Therefore, according to this House Rule, the only way the bill could be heard in the House is if the Germaneness Rule was suspended. This led unsurprisingly to the House suspending the rule in order to vote on the legislation. The idea that this suspension is relevant to whether the Legislature, as a whole, enacted HB 1775 with a discriminatory intent is a stretch. *Arlington Heights* did not hold that each departure from procedural norms is automatically relevant in resolving an equal protection claim. Instead, it stated that "[d]epartures from the normal procedural sequence also *might* afford evidence that improper purposes are playing a role. Substantive departures too *may be* relevant." *Arlington Heights*, 429 U.S. at 267 (emphases added). A plaintiff must still provide some reason or evidence for why the irregularity might possibly be relevant, and Plaintiffs have not done so. Indeed, perhaps inadvertently, Plaintiffs admitted just how commonplace suspending the Germaneness Rule is when they referred to the term of art of the Senate's decision to "shuck" the existing subject matter. Doc. 223 at 14; *see also* Justin Allen Rose, *Legislators Turn to 'Bill Shucking' to Keep Dying Policy Ideas Alive*, ABC7NEWS (Apr. 10, 2024) (listing several examples of shucked bills in the 2024 legislative session).[5] There is no reason to think that suspending an internal House germaneness requirement before having an open question and answer period, debate, and an open vote is relevant in any way to whether the House—or the Senate—enacted HB 1775 with a discriminatory purpose. At a bare minimum, Plaintiffs have never explained how the dots are supposed to be connected here.

Regardless, it is exceedingly unlikely that any State Defendants possess any communication or documents pertaining to the House's decision to suspend its germaneness rule. It is an internal House procedure that is of no concern to any State Defendant. House members understand and know the House rules much better than anyone else in state government, so there would be little need for

---

[4] *Available at* https://www.oklegislature.gov/BillInfo.aspx?Bill=hb1775&Session=2100.
[5] *Available at* https://www.kswo.com/2024/04/10/legislators-turn-bill-shucking-keep-dying-policy-ideas-alive/.

members to reach out to State Defendants about the decision to suspend the germaneness rule. But searching for such communications or documents is still unduly burdensome, given how many State Defendants there are and the application of the requests to all employees.

> **19.      All Documents and Correspondence between You and other Persons, including Legislators and other Defendants, concerning CRT, George Floyd, Black Lives Matter, Racial Justice Protests, DEI, or Historically Marginalized Students or Persons.**

This request is overbroad, unduly burdensome, and disproportionate for the needs of this case for the reasons stated previously. Not only are the terms asked about defined exceptionally broadly, but this request is completely untethered from Plaintiffs' one live equal protection claim. This request is asking for every email and text message of every single employee of the several different State Defendants that discuss or touch on concepts such as "racism," "oppression," and "police reform." It would also require turning over every single email from the Department of Education that discusses minority students. Even if State Defendants were able to trawl through the massive number of documents that this would turn up, very few—if any—would be relevant, much less critical, to determining whether the Legislature passed HB 1775 with a discriminatory intent.

> **27. Any and all notes, memoranda, research, written analysis, white papers, reports, or opinions relied upon, created by, or reviewed by You regarding H.B. 1775's drafting.**

This request is irrelevant because any documents examined by State Defendants during the drafting process have no bearing on the motivation for the Legislature in its entirety. Similarly, any notes, research, memorandum, etc. created by State Defendants during the drafting process would likely be protected by the deliberative privilege. Two requirements must be met for the deliberative process privilege to apply: "the material must be predecisional and it must be deliberative. *In re Sealed Case*, 121 F.3d at 737. A document is predecisional when it is "prepared to assist an agency decisionmaker in arriving at his decision." *Norton*, 336 F. Supp. 2d at 1153 (quotations and citations

omitted). A document is deliberative "if it relates to government decision-making and its disclosure to the public would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id.* (quotation omitted). Here, any documents were created to assist both agency heads and the Legislature with determining whether to propose the bill that ended up being HB 1775. And the document would be deliberative because it relates to government decisionmaking. *See id.* at 1153. Similarly, the disclosure of material used by State Defendants to aid legislative drafting would chill candid discussion between the various state agencies and the Legislature in the future. Any documents from the Governor's office would likely also be protected under the executive privilege. *Vandelay Ent., LLC v. Fallin*, 2014 OK 109, ¶¶ 19–20, 343 P.3d 1273, 1277–78. The state interest is best served when the Legislature feels comfortable consulting relevant experts when drafting legislation.

> **28. Any and all notes, memoranda, research, written analysis, white papers, reports, or opinions relied upon, created by, or reviewed by You regarding H.B. 1775's enactment.**

This request is similarly irrelevant to Plaintiffs' equal protection claim. Black's Law Dictionary defines "enactment" as "[t]he action or process of making into law." *Enactment*, BLACK'S LAW DICTIONARY (12th ed. 2024). As this request does not involve the drafting stage, it is solely focused on the legislative process, such as votes and debates. Any material—if it exists—reviewed by State Defendants during this time is irrelevant to ascertaining legislative intent. All that matters is the intent of the legislators. And that can be readily obtained through the text of HB 1775, and perhaps the legislative history. To the extent that this request targets the Governor's office, any documents would be protected under the executive privilege. *Vandelay*, 2014 OK 109, ¶¶ 19–20, 343 P.3d at 1277–78. This request imposes a significant burden on State Defendants without a corresponding degree of significant relevance.

**29. Any and all notes, memoranda, research, written analysis, white papers, reports, or opinions relied upon, created by, or reviewed by You regarding H.B. 1775's implementation.**

Any material referenced by this request after this lawsuit was filed on October 19, 2021, Doc. 1, is likely protected under attorney-client privilege. Other material is likely protected under the deliberative process or executive privilege. Regardless, this request is irrelevant to determining whether HB 1775 was *enacted* with a discriminatory purpose. "Implementation" is also not defined in the request. With how expansive Plaintiffs' other discovery requests are, this request likely includes any research reviewed by any State employee that even touches on racism or oppression.

## IV.    The dispute concerning the ESI is not the proper subject of a motion to compel.

Plaintiffs' request for this Court to impose an ESI order on State Defendants is premature and meritless. The parties have not disagreed about the formatting of any documents. Thus, Plaintiffs' request for an order dictating, in minute detail, the formatting of production is premature and a waste of this Court's valuable time. Should disputes arise concerning the formatting of production, the parties must attempt to work such disputes out through the meet and confer process before bringing the issue before this Court. This Court should refuse to consider Plaintiffs' premature request for an ESI order in the absence of any dispute between the parties regarding the formatting of production.

Further, State Defendants object to Plaintiffs' request for enforcement of the proposed ESI protocol as it is an attempt to obtain documents that Defendants cannot be compelled to produce under the Federal Rules. Under the Rules, "[a] party cannot be compelled to create, or cause to be prepared, new documents solely for their production. Rule 34 only requires a party to produce documents that are already in existence." *Lerblance v. Calyx Energy III, LLC,* CV-23-47-JFH-GLJ, 2024 WL 3275789, *3 (E.D. Okla. July 2, 2024) (quoting *Thompson v. Lantz,* 2009 WL 3157561, *1 (D. Conn. Sept. 25, 2009)). Thus, this Court "cannot compel Defendant[s] to create [] report[s] from [their] data

24

base[s] by extracting certain information [] and creating a report that does not already exist." *Id.*

Plaintiffs' proposed ESI protocol requires Defendants to create or include numerous new documents that are distinct from the requested records themselves solely for the purpose of responding to Plaintiffs' requests. Examples of such documents include: (1) image load files, Doc. 223-4 at ¶ 8; and (2) .DAT text files for scanned documents with catalogs of metadata, organized according to Plaintiffs' preference, *id.* at ¶¶ 9–10. Production of such documents and files is beyond the scope of Rule 34 because they do not currently exist. Therefore, the motion should be denied.

Moreover, the motion should be denied because Plaintiffs did not request the aforementioned documents in their Requests for Production. Plaintiffs sent twenty-nine production requests to State Defendants, but did not include any request for image load files or .DAT text files. State Defendants should not be ordered to produce files, whether pursuant to the terms of an ESI or any other means, absent formal discovery from Plaintiffs specifically requesting that such files be produced.

Finally, Plaintiffs' proposed ESI protocol requires State Defendants to comply with unreasonably accelerated deadlines for future requests for production. Specifically, under the protocol, after receiving imaged documents in their preferred format, Plaintiffs could request that the same images be produced in native format. *Id.* at ¶ 23(b). While Rule 34 provides parties thirty days to respond to such requests, the ESI would require State Defendants to produce the documents or object within only five (5) days of the request. *Compare* Fed. R. Civ. P. 34, *with* Doc. 223-4 at ¶ 23(b). Plaintiffs' dramatically shortened response deadline is impractical—especially in light of the overly broad nature of their requests. Accordingly, State Defendants object to entry of the proposed ESI protocol as it unreasonably shortens State Defendants' deadlines to respond to future requests for production.

This Court should deny Plaintiffs' request for enforcement of their proposed ESI.

## **CONCLUSION**

State defendants respectfully request that the Court deny this motion.

Respectfully submitted,

*s/ Garry M. Gaskins, II*

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
ZACH WEST, OBA #30768
  *Director of Special Litigation*
WILL FLANAGAN, OBA #35110
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:(405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for State Defendants*