# EXHIBIT 4

**IN THE SUPREME COURT OF THE STATE OF OKLAHOMA**

FILED
SUPREME COURT
STATE OF OKLAHOMA

JAN 3 0 2025

JOHN D. HADDEN
CLERK

| | |
|---|---|
| [1] BLACK EMERGENCY RESPONSE TEAM | ) ) ) |
| [2] UNIVERSITY OF OKLAHOMA CHAPTER OF THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS | ) ) ) ) Supreme Court No. CQ-122472 ) |
| [3] AMERICAN INDIAN MOVEMENT INDIAN TERRITORY | ) U.S. District Court No. CIV-21-1022-G ) (Oklahoma County, Oklahoma) ) U.S. District Court Judge Charles B. Goodwin ) |
| [4] PRECIOUS LLOYD, as next of friend of S.L. | ) ) ) |
| [5] ANTHONY CRAWFORD | ) ) |
| [6] REGAN KILLACKEY, | ) ) |
| Plaintiffs/Appellants, | ) ) |
| v. | ) ) ) |
| [1] GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, | ) ) ) |
| [2] RYAN WALTERS, in his official capacity as Oklahoma Superintended of Public Instruction, | ) ) ) ) |
| [3] ZACHARY ARCHER, [4] DONALD BURDICK [5] SARAK LEPAK, [6] KATIE QUEBEDEAUX, [7] KENDRA WESSON, in their official capacities as members of the Oklahoma State Board of Education, | ) ) ) ) ) ) ) ) ) ) |

[8] KEVIN STITT, in his official capacity as            )
Governor of Oklahoma,                                   )
                                                        )
[9] JEFFREY HICKMAN,                                    )
[10] MICHAEL TURPEN,                                    )
[11] JACK SHERRY,                                       )
[12] DENNIS CASEY,                                      )
[13] STEVEN TAYLOR,                                     )
[14] COURTNEY WARMINGTON,                               )
[15] P. MITCHELL ADWON,                                 )
[16] JEFFERY HICKMAN,                                   )
[17] DUSTIN HILLIARY,                                   )
[18] KEN LEVIT,                                         )
[19] MICHAEL TURPEN, in their official                  )
capacities as the Oklahoma State Regents for            )
Higher Education,                                       )
                                                        )
[20] JOHN R. BRAUGHT                                    )
[21] ROBERT ROSS                                        )
[22] NATIALIE SHIRLEY,                                  )
[23] ERIC STEVENSON,                                    )
[24] ANITA HOLLOWAY,                                    )
[25] RICK NAGEL                                         )
[26] KENNETH S. WAITS, in their official                )
capacities as members of the Board of Regents           )
of the University of Oklahoma.                          )

Defendants/Appellees.

**PLAINTIFFS/APPELLANTS' BRIEF IN CHIEF CONCERNING THE QUESTIONS OF LAW CERTIFIED BY THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA TO THE OKLAHOMA SUPREME COURT**

**Certified Questions from the United States
District Court for the Western District of Oklahoma
Case No. CIV-21-1022-G
The Honorable Judge Charles B. Goodwin Presiding**

January 30, 2025

Respectfully submitted,

Adam H. Hines
Oklahoma Bar Number: 35640
Megan Lambert
Oklahoma Bar Number: 33216
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
ahines@acluok.org
mlambert@acluok.org

Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
SCHULTE ROTH & ZABEL LLP
919 Third Avenue New York, NY
10022
douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com

# INDEX

**ISSUE PRESENTED** ................................................................................................. 1

*Constitutional Provisions*

Okla. Const. art. XIII, § 8 ........................................................................................ 1

*Statutes*

70 O.S. § 24-157 ................................................................................................. 1, 2

**SUMMARY OF RECORD** ...................................................................................... 2

*Constitutional Provisions*

Okla. Const. art. XIII, § 8 ........................................................................................ 6

*Statutes*

70 O.S. § 24-157 ........................................................................................... 3,4,5,6

*Cases*

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
   508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). ......................................................... 3

**SUMMARY OF THE ARGUMENT** ...................................................................... 7

*Constitutional Provisions*

Okla. Const. art. XIII, § 8 ........................................................................................ 7

*Statutes*

70 O.S. § 24-157 ..................................................................................................... 8

*Cases*

*Arizonans for Official English v. Arizona*,
   520 U.S. 43, 75–76 (1997)...................................................................................... 7

*Childers v. Arrowood*,
   2023 OK 74, ¶ 15, 541 P.3d 825, 83 ...................................................................... 8

*England v. Louisiana State Bd. of Med. Exam'rs,*
    375 U.S. 411, 416 (1964) ................................................................................ 10

*Expressions Hair Design v. Schneiderman,*
    581 U.S. 37, 56–57 (2017) ................................................................................ 7

*Harrison v. NAACP,*
    360 U.S. 167, 177 (1959) .................................................................................. 10

*Hill v. Colorado,*
    530 U.S. 703, 732 (2000) ................................................................................... 8

*Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.,*
    2007 OK 21, ¶ 6, 158 P.3d 461, 464 ................................................................ 8

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco, Cal.,*
    545 U.S. 323, 339 (2005) .................................................................................. 10

*White Star Petroleum, LLC v. MUFG Union Bank, N.A.,*
    2020 OK 89 ¶ 8, 480 P.3d 887, 890 ................................................................. 8

### Other Authorities

MaryAlice Parks, Tesfaye Negussie, & Quinn Scanlan, *Educators Say They Fear Oklahoma Law
    Restricts Teaching "Killers of the Flower Moon" Book*, ABC News, (March 10, 2024),
    https://perma.cc/R4DS-G3DL (last visited on Jan. 7, 2025) ........................... 9

Allison Herrera, *Oklahoma Lt. Gov. Matt Pinnell: HB 1775 Needs to be 'Clarified' as Spotlight
    Shines on State's History*, KOSU NPR, (June 20, 2023)
    https://perma.cc/4B5M-AYTJ (last visited on Jan. 7, 2025) ........................... 9

**ARGUMENT** .......................................................................................................... **10**

### Cases

*Assessments for Tax Year 2012 of Certain Properties Owned by Thorneberry v. Wright*
    2021 OK 7, ¶ 15, 481 P.3d 883, 892 ................................................................. 11

*Anaya-Smith v. Federated Mut. Ins. Co.,*
    2024 OK 34, ¶ 25, 549 P.3d 1213, 1221 .......................................................... 10

*Bayouth v. Dewberry,*
    2024 OK 42, ¶ 16, 550 P.3d 920, 927 ............................................................... 11

*Childers v. Arrowood,*
    2023 OK 74, ¶ 15, 541 P.3d 825, 83 ................................................................. 11

*Cox v. Dawson,*
   1996 OK 11, ¶ 20, 911 P.2d 272, 281 ................................................................ 10

*McIntosh v. Watkins,*
   2019 OK 6, ¶ 4, 441 P.3d 1094, 1096 ........................................................... 10, 11

*Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.,*
   2007 OK 21, ¶ 6, 158 P.3d 461, 464 ............................................................. 10, 11

*Special Indem. Fund v. Choate,*
   1993 OK 15, ¶ 38, 847 P.2d 796, 807 ................................................................ 10

*White Star Petroleum, LLC v. MUFG Union Bank, N.A.,*
   2020 OK 89 ¶ 8, 480 P.3d 887, 890 ............................................................. 10, 11

*Wylie v. Chesser,*
   2007 OK 81, ¶ 20, 173 P.3d 64, 72 .................................................................. 10

**I. CERTIFIED QUESTIONS ONE THROUGH THREE** ................................................. **12**

*Constitutional Provisions*

Okla. Const. art. XIII, § 8 ............................................................................. 12, 13

*Statutes*

70 O.S. § 24-157 .......................................................................................... 12, 15, 16

*Cases*

*Am. Airlines, Inc. v. Okla. Tax Comm'n,*
   2014 OK 95, ¶ 41, 341 P.3d 56 ....................................................................... 15

*Bd. Of Regents of Univ. of Oklahoma v. Baker,*
   1981 OK 160, ¶ 8, 638 P.2d 464, 467 ............................................................... 12

*Cooper Industries, Inc. v. Aviall Services, Inc.,*
   2007543 U.S. 157, 167 (2004) ......................................................................... 15

*Franco v. State,*
   2020 OK CIV APP 64, ¶ 28–29, 482 P.3d 1, 9 ........................................... 12, 13

*Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.,*
   2007 OK 21, ¶ 6, 158 P.3d 461, 464 ........................................................... 15, 16

*Pyeatte v. Bd. of Regents of Univ. Of Okla.*,
   102 F. Supp. 407, 413 (W.D. Okla. 1951) *aff'd* 343 U.S. 936.................................. 12

*Reitner v. Sonotone Corp.*,
   442 U.S. 330, 339 (1979) ........................................................................................ 15

*Schlumberger Technology Corp. v. Paredes*,
   2023 OK 42, ¶ 15, 528 P.3d 772, 778 ...................................................................... 17

*State ex rel. Wise v. Whistler*,
   1977 OK 61, ¶ 8, 562 P.2d 860, 862) ....................................................................... 15

*Toch, LLC v. City of Tulsa*,
   2020 OK 81, ¶ 25, 474 P.3d 859, 867. ...................................................................... 15

*United States v. Wood*,
   571 U.S. 31, 45–46 (2013) ........................................................................................ 15

*Zaloudek Grain Co. v. CompSource Oklahoma*,
   2012 OK 75, ¶ 14, 298 P.3d 520, 523 ....................................................................... 16

## Other Authorities

*Requirement*, Black's Law Dictionary (12th ed. 2024).................................................. 14

*Requirement*, Websters Dictionary,
   https://perma.cc/9XMB-PSD6 (last visited on Jan. 29, 2025).................................. 14

*Present*, Oxford English Dictionary,
   https://perma.cc/DY4Y-9J2E (last visited Jan. 7, 2025) ......................................... 16

*Present*, Merriam-Webster Dictionary,
   https://perma.cc/BBM3-WRY9 (last visited Jan. 7, 2025)....................................... 16

**II. CERTIFIED QUESTIONS FOUR THROUGH SIX** ................................................... **17**

## Statutes

70 O.S. § 24-157 .................................................................................................... *passim*

## Cases

iv

*Assessments for Tax Year 2012 of Certain Properties Owned by Thorneberry v. Wright*
    2021 OK 7, ¶ 15, 481 P.3d 883, 892 ............................................................ 24, 25

*Bayouth v. Dewberry,*
    2024 OK 42, ¶ 16, 550 P.3d 920, 927 ............................................................ 24

*CompSource Mut. Ins. Co. v. State ex rel. Oklahoma Tax Comm'n,*
    2018 OK 54, ¶ 41, 435 P.3d 90, 104 ............................................................ 27

*Head v. McCracken,*
    2004 OK 84, ¶ 13, 102 P.3d 670, 680 ............................................................ 23, 27

*Honeyfund.com, Inc. v. DeSantis,*
    622 F. Supp. 3d 1159, 1182 (N.D. Fla. 2022) ............................................................ 24

*Honeyfund.com Inc. v. Governor, State of Fla,*
    94 F. 4th 1272 (11th Cir. 2024) ............................................................ 24

*Local 8027 v. Edelblut,*
    2024 WL 2722254, (D.N.H. 2024) ............................................................ 24

*McIntosh v. Watkins,*
    2019 OK 6, ¶ 4, 441 P.3d 1094, 1096 ............................................................ 18, 20

*Naifeh v. State ex rel. Oklahoma Tax Comm'n,*
    2017 OK 63, ¶22, 400 P.3d 759, 766 ............................................................ 27

*Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.,*
    2007 OK 21, ¶ 6, 158 P.3d 461, 464 ............................................................ 15, 16, 23

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
    508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). ............................................................ 26

*State ex rel. Wise v. Whistler,*
    1977 OK 61, ¶ 8, 562 P.2d 860, 862) ............................................................ 19

*Toch, LLC v. City of Tulsa,*
    2020 OK 81, ¶ 25, 474 P.3d 859, 867. ............................................................ 19

*United States v. Wood,*
    571 U.S. 31, 45–46 (2013) ............................................................ 19

*White Star Petroleum, LLC v. MUFG Union Bank, N.A.,*
    2020 OK 89 ¶ 8, 480 P.3d 887, 890 ............................................................ 24

*Other Authorities*

Athena D. Mutua, *The Rise, Development and Future Directions of Critical Race Theory and Related Scholarship*, 84 DENV. U. L. REV. 329, 333 (2006) .................................................................. 26

Comm. Substitute for Engrossed H.B. 1775, 58th Leg., 1st Sess. (Okla. 2021), https://perma.cc/5TTR-EX7Z (S. Comm. Substitute, Apr. 6, 2021) ........................................... 25

H.B. 1775, 58th Leg., 1st Sess. (Okla. 2021), https://perma.cc/CFU4-XLWD (as introduced, Jan. 20, 2021).................................................. 25

Jennie A. Hill, *Legitimate State Interest or Educational Censorship: The Chilling Effect of Oklahoma House Bill 1775*, 75 OKLA. L. REV. 385 (2023) ....................................................................... 25

Kimberlé Williams Crenshaw, *The First Decade: Critical Reflections, or a "Foot in the Closing Door,"* 49 UCLA L. REV. 1343, 1345–65 (2002) .................................................................. 26

*Norm*, Websters Dictionary, https://perma.cc/RBG7-LSP5 (last visited on Jan. 7, 2025)...................................................... 21

President Trump Remarks at White House History Conference, Nat'l Archives Museum (Sept. 17, 2020), https://perma.cc/M5ND-6UJH (last visited on Jan. 7, 2025) ........................................... 26

*Require*, Websters Dictionary, https://perma.cc/SU78-BZGT (last visited on Jan. 7, 2025)...................................................... 18

*Require*, Cambridge Dictionary, https://perma.cc/SU78-BZGT (last visited on Jan. 7, 2025)...................................................... 18

*Require*, Oxford English Dictionary, https://perma.cc/3F5Z-LP6E (last visited on Jan. 7, 2025) ...................................................... 18

Twitter, (Sept. 5, 2025 at 6:52am), https://perma.cc/Z6TV-GSQS (last visited on Jan. 7, 2025) .......................................... 25

**CONCLUSION** ..................................................................................................... **27**

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

| | |
|---|---|
| BLACK EMERGENCY RESPONSE TEAM, *et al.*, | ) ) ) |
| Plaintiffs/Appellants, | ) ) |
| v. | ) Supreme Court No. CQ-122472 ) |
| GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.*, | ) U.S. District Court No. CIV-21-1022-G ) (Oklahoma County, Oklahoma) ) U.S. District Court Judge Charles B. Goodwin |
| Defendants/Appellees. | ) ) ) |

**PLAINTIFFS/APPELLANTS' BRIEF IN CHIEF CONCERNING THE QUESTIONS OF LAW CERTIFIED BY THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA TO THE OKLAHOMA SUPREME COURT**

Pursuant to this Court's December 16, 2024 Order directing briefing in this case, Plaintiffs/Appellants ("the Plaintiffs") submit their Brief in Chief concerning the U.S. District Court for the Western District of Oklahoma's six certified questions to this Court.

**ISSUE PRESENTED**

The District Court for the Western District of Oklahoma certified six questions about House Bill 1775 (70 O.S. 24-157) ("H.B. 1775" or the "Act") to this Court. The first question asks whether the Act violates the Oklahoma Constitution. The subsequent five questions ask this Court to interpret select provisions of the Act. The questions are:

1. Does title 70, section 24-157(A)(1) of the Oklahoma Statutes violate article XIII, section 8 of the Oklahoma Constitution? In other words, does the Oklahoma Legislature have the power to regulate the affairs of the University of Oklahoma, or other universities or colleges impacted by the Act, to the extent done in section 24-157(A)(1)?

1

2. As it relates to section 24-157(A)(1)'s prohibition of "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex," what is the meaning of the term "requirement?"

3. As it relates to section 24-157(A)(1)'s prohibition of "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex," what does it mean to "present[]" race or sex stereotyping or a bias on the basis of race or sex?

4. As it relates to title 70, section 24-157(B)(1) of the Oklahoma Statutes' directive that "[n]o teacher, administrator or other employee of a school district, charter school or virtual charter schools shall require or make part of a course the following concepts: . . . ," what does it mean to "require" an identified "concept[]?"

5. As it relates to section 24-157(B)(1)(c), what does it mean to "make part of a course the . . . concept[]: . . . an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex?"

6. As it relates to section 24-157(B)(1)(d), what does it mean to "make part of a course the . . . concept[]: . . . members of one race or sex cannot and should not attempt to treat others without respect to race or sex?

(alterations in original).

## SUMMARY OF RECORD

1.      In 2020, Oklahomans and Americans across the country engaged in demonstrations, marches, and protests calling for racial justice in all sectors of society. Am. Compl. Doc. 50 ¶ 78–79. As part of this movement, Oklahoma students and educators renewed their efforts to incorporate culturally responsive curricula and programming in Oklahoma education. *Id.* ¶ 7. These efforts included demonstrations at the University of Oklahoma ("OU") to encourage a safer campus for minority students. *Id.* ¶¶ 82, 87. Oklahoma City Public Schools adopted a resolution to address the problems of racism and bigotry. *Id.* ¶ 88. Tulsa Public Schools held a training for teachers about developing more coursework addressing racism. *Id.* ¶ 89.

2.      In April 2021, the Oklahoma Legislature responded to this nationwide conversation about race. Specifically, the Senate Education Committee completely replaced a bill originally

about medical services for athletes with the language that would eventually become the Act codified as 70 OS. § 24-157 ("H.B. 1775" or "the Act"). Am. Compl. ¶ 110. The final text includes restrictions on presenting "any form of race or sex stereotyping or a bias on the basis of race or sex" in "any orientations or requirement" at public colleges and universities and lists eight prohibited concepts that cannot be "require[d] or ma[d]e part of a course." 70 O.S. § 24-157(1). These banned concepts were copied verbatim from President Donald Trump's Executive Order 13950 ("EO 13950"). In December 2020, a federal court barred EO 13950 from going into effect, because its prohibitions were vague and likely violated the First Amendment rights of government contractors and grantees. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). Still, the Oklahoma Legislature subsequently introduced the Act, importing wholesale those same banned concepts. Am. Compl. ¶ 45.

3.      On May 7, 2021, Governor Stitt signed the Act into law, and it became effective on July 1, 2021. *Id.* ¶ 38.

4.      In its final form, the Act provides:

Section (1)A(1): "No enrolled student of an institution of higher education within the Oklahoma State System of Higher Education shall be required to engage in any form of mandatory gender or sexual diversity training or counseling; provided, voluntary counseling shall not be prohibited. Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited."

Section (1)(B)(1): "No teacher, administrator or other employee of a school district, charter school or virtual charter school shall require or make part of a course the following concepts:

      a. one race or sex is inherently superior to another race or sex,
      b. an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously,
      c. an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex,
      d. members of one race or sex cannot and should not attempt to treat others without respect to race or sex,
      e. an individual's moral character is necessarily determined by his or her race or sex,

      f. an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex,

      g. any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex, or

      h. meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race."

H.B. 1775 (A)(1)–(B)(1).

5.      Educators at all levels began making changes to coursework in response to H.B. 1775. Public school districts instructed teachers to comply with the Act by avoiding terms like "diversity" and "white privilege" in the classroom and acknowledged that "no one truly knows what [Section (1)(B)(1)(d)] means or can come to an agreement on its meaning." Edmond Pub. Sch. H.B. 1775 Slides Doc. 50-2; Edmond Pub. Sch. Written H.B. 1775 Guidance Doc. 50-1. While OU had previously responded to serious complaints of racism on campus by requiring all students to take a diversity, equity, and inclusion class, that class was made voluntary in response to H.B. 1775. Am. Compl. Doc. 50 ¶ 74.

6.      On October 19, 2021, Plaintiffs brought a challenge against the Act for violations of their constitutional rights under the First and Fourteenth Amendments. Compl. Doc. 1. Plaintiffs include students, parents, and faculty in Oklahoma public universities and schools across the state: Black Emergency Response Team, University of Oklahoma Chapter of the American Association of University Professors, Oklahoma State Conference of the National Association for the Advancement of Colored People, American Indian Movement Indian Territory, Student S.L., and Teachers Anthony Crawford and Regan Killackey.

7.      Ten days later, on October 29, 2021, Plaintiffs filed a Motion for Preliminary Injunction seeking to block enforcement of H.B. 1775 in its entirety. Pls. Mot. Prelim. Inj. Doc. 27. On November 23, 2021, OU Regents Defendants and Edmond Public School Defendants each filed Motions to Dismiss Plaintiffs' Amended Complaint for lack of standing. Univ. Defs. Mot. Dismiss

Doc. 51; Edmond Pub. Sch. Mot. Dismiss Doc. 52. On January 25, 2023, State Defendants (Defendants 1-19) filed a Motion for Judgment on the Pleadings arguing that the Act is not vague and does not violate the First or Fourteenth Amendments. State Defs. Mot. J. Pleads. Doc. 106.

8.    On December 4, 2023, the District Court heard oral arguments on Plaintiffs' Motion for a Preliminary Injunction and Defendants' Motions to Dismiss and Motion for Judgment on the Pleadings. Dec. 4, 2023 Mot. Hr'g Tr. Doc. 162.

9.    On June 14, 2024, the District Court issued orders granting in part and denying in part Plaintiffs' Motion for a Preliminary Injunction and granting in part, denying in part, and reserving ruling in part, Defendants' Motions to Dismiss and Motion for Judgment on the Pleadings. Ord. Mot. Dismiss Doc. 172; Order Prelim. Inj. 173.

10.    The District Court preliminarily enjoined three provisions: (1) the second sentence of 70 O.S. § 24-157(A)(1), which prohibits "[a]ny orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex" because it "implicates the First Amendment rights of the university level instructor-Plaintiffs," Ord. Prelim. Inj. Doc. 173 at 11, and is likely "impermissibly vague in violation of the Fourteenth Amendment," Ord. Mot. Dismiss Doc. 172 at 26; (2) the word "require" in 70 O.S. § 24-157(B)(1) because it is "unconstitutionally vague" *id.* at 16.; and (3) enforcement of subsections (c) and (d) of 70 O.S. § 24-157(B)(1) in K-12 classrooms because the "provisions are simply unclear" and likely "impermissibly vague in violation of the Fourteenth Amendment." Ord. Mot. Dismiss Doc. 172 at 20; Ord. Prelim. Inj. Doc. 173 at 20, 27.

11.    Regarding the University Defendants' (Defendants 20-26) Motion to Dismiss, the District Court concluded "that an Oklahoma court would construe [the second sentence of 70 O.S. § 24-157(A)(1)] as a restriction on curricular speech." Ord. Mot. Dismiss Doc. 172 at 16. However,

5

the District Court "not[ed] the public importance of the subject matter of the Act and the lack of any opportunity for an Oklahoma court to determine how the Act should be construed." *Id.* at 22. The District Court therefore reserved ruling on Plaintiffs' First Amendment claims and Fourteenth Amendment vagueness claims against members of the University of Oklahoma Board of Regents challenging the second sentence of 70 O.S. § 24-157(A)(1), pending certification to and response from the Oklahoma Supreme Court. *Id.* at 34.

12.    Regarding the State Defendants' Motion for Judgment on the Pleadings, the District Court referenced its contemporaneous Order finding that the second sentence of 70 O.S. § 24-157(A)(1), the word "require" in 70 O.S. § 24-157(B)(1), and subsections (c) and (d) of 70 O.S. § 24-157(B)(1) are likely "impermissibly vague." *Id.* at 27. However, the District Court, "mindful of its limited role and that no Oklahoma court has had the opportunity to determine how the Act should be construed," reserved ruling on Plaintiffs' Fourteenth Amendment vagueness claims, pending certification to and response from the Oklahoma Supreme Court. *Id.* at 27, 35.

13.    On August 27, 2024, the District Court certified six questions to the Oklahoma Supreme Court. The first certified question concerns whether the Act violates Art. XIII, § 8 of the Oklahoma Constitution.  Ord. Cert. Qs. Doc. 208 at 7. The following five questions all concern issues of statutory interpretation on which the District Court seeks guidance before moving forward with Plaintiffs' claims against the Act under the First and Fourteenth Amendments of the U.S. Constitution. *Id.*; *see also* Ord. Mot. Dismiss Doc. 172 at 22, 27–28.

## SUMMARY OF THE ARGUMENT

The federal District Court seeks this Court's opinion on the statutory interpretation of H.B. 1775 and its interactions with the Oklahoma Constitution so the District Court can then fully resolve Plaintiffs' federal claims.

In the process of ruling on Plaintiffs' Motion for Preliminary Injunction, the District Court considered the meaning of the Act as needed to assess Plaintiffs' vagueness claim. *See* Ord. Prelim. Inj. Doc. 173 at 8 ("To properly evaluate the contention that the Act is unconstitutionally vague, the Court must consider the meaning of the challenged provisions."). Yet the District Court was also aware that interpreting the Oklahoma Constitution and issuing final, binding interpretations of state law were outside of its purview as a federal court. *See* Ord. Mot. Dismiss Doc. 172 at 14 ("[A] federal court must remain mindful that state courts are the final arbiters of state law.") (internal citation marks omitted) So, it certified six questions to this Court to garner final answers on these interpretive questions that would enable it to move forward with Plaintiffs' federal claims. Ord. Cert. Qs. Doc. 208; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 75–76 (1997); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 56–57 (2017) (Alito, J. and Sotomayor, J., concurring) (explaining that the purpose of certification is to quickly garner authoritative answers to state law questions necessary for the federal court to address the federal issue).

Question one is relatively straightforward, asking whether Section A of the Act violates Art. XIII, § 8 of the Oklahoma Constitution. Article XIII, § 8 explains that "[t]he government of the University of Oklahoma shall be vested in a Board of Regents." This Court has construed that power broadly, determining that it includes near plenary power to direct the operations of the University of Oklahoma. Given this case law and the breadth of the legislature's attempted regulation, Section A of the Act violates Art. XIII, § 8 of the Oklahoma Constitution.

Questions two through six are statutory interpretation questions. So, the answers must follow this Court's directive when interpreting statutes: use the Act's text and, if necessary, extrinsic sources to discern legislative intent. *See Oklahoma City Zoological Tr. v. State ex rel.*

*Pub. Emps. Rels. Bd.*, 2007 OK 21, ¶ 6, 158 P.3d 461, 464; *see also Childers v. Arrowood*, 2023 OK 74, ¶ 15, 541 P.3d 825, 83; *White Star Petroleum, LLC v. MUFG Union Bank, N.A.*, 2020 OK 89 ¶ 8, 480 P.3d 887, 890. With H.B. 1775, the Oklahoma legislature passed the Act into law with the express intent to ban certain ideas and practices it disliked from Oklahoma's public schools. The text—this Court's first resort when interpreting a statute—tells us that much. It prohibits the presentation of "race or sex stereotyping" in any "orientation or requirement" in higher education and bans eight concepts in K-12 education. *See* 70 O.S. § 24-157. This text answers certified questions two and three because it clarifies that the legislature intended for "requirement" and "presents" to regulate classroom instruction in higher education. But while the text expresses this general intent to ban disfavored practices in public education, the Act's text implementing that ban in K-12 is at times confoundingly broad and at others too obtuse to understand for even the most sophisticated readers. In other words, the text in Section A—the higher education provision—is clear enough to answer questions two and three, while the text in Section B—the K-12 provision— provides no meaningful clarity to answer questions four through six.

The Plaintiffs, a diverse group of K-12 teachers and students, have said from the beginning that they do not know what these provisions regarding K-12 mean. *See* Am. Compl. Doc. 50 at 67; *see also* NACCP-OK Decl. Doc. 27-05 ¶¶ 15–21, Crawford Decl. Doc. 27-08 ¶¶ 14–21, Killacky Decl. Doc. 27-09 ¶ 16 (Oklahoma K-12 teachers describing their inability to discern how to comply with the Act). That is why Plaintiffs have argued from the outset that the Act is unconstitutionally vague. *See* Am. Compl. Doc. 50 at 67; Mot. Prelim. Inj. Doc. 27 at 12; *see also Hill v. Colorado*, 530 U.S. 703, 732 (2000). Other educators across the state have raised the same concerns in the media, questioning whether the Act prohibits them from teaching integral parts of Oklahoma

history such as the Osage Murders chronicled in the book and film "Killers of the Flower Moon."[1] Even Oklahoma's own Lieutenant Governor has stated publicly that the Act lacks clarity.[2] This failure to express how Section B of the Act works—i.e. what conduct is and is not prohibited—is so extreme that this Court's tools of statutory interpretation cannot resolve it.

This Court's goal when interpreting a statute is to discern and apply legislative intent. When doing so, it starts with the text, and if the text fails to adequately express the legislature's intent, it turns to extrinsic sources like legislative history. In this case, while the text can provide enough insight to clarify the meaning of "requirement" and "presents" in Section A, the ambiguity of "require" and the two banned concepts in Section B is too impenetrable to discern any clear legislative intent. Nor can extrinsic sources of legislative intent dispel the confusion in Section B because none of the historical context or bill amendments can clarify the provisions at issue.

So, as Plaintiffs explain in detail below, this Court's own guidelines for statutory interpretation prompt the following answers to certified questions two through six. For questions two and three, the breadth of the terms "requirement" and "present" demonstrate that Section A of the Act reaches college and university classrooms, preventing any discussion of race or sex stereotyping or bias. For questions four through six, the ambiguities of Section B's regulation of K-12 classrooms defy any attempt to reliably discern legislative intent. Thus, this Court should decline to answer questions four through six[3] and send these provisions back to the federal court

---

[1] MaryAlice Parks, Tesfaye Negussie, & Quinn Scanlan, *Educators Say They Fear Oklahoma Law Restricts Teaching "Killers of the Flower Moon" Book*, ABC News, (March 10, 2024), https://perma.cc/R4DS-G3DL (last visited on Jan. 7, 2025).

[2] Allison Herrera, *Oklahoma Lt. Gov. Matt Pinnell: HB 1775 Needs to be 'Clarified' as Spotlight Shines on State's History*, KOSU NPR, (June 20, 2023) https://perma.cc/4B5M-AYTJ (last visited on Jan. 7, 2025).

[3] Plaintiffs have maintained from the outset that certified questions regarding Section B of the Act are improper because the language fails to meet the federal standard for certification. *See* Pls. Proposed Statement of Facts and Cert. Qs., Doc. 184 at 14–15.

to resolve Plaintiffs' federal claims. *See England v. Louisiana State Bd. of Med. Exam'rs*, 375 U.S. 411, 416 (1964) (*citing Harrison v. NAACP*, 360 U.S. 167, 177 (1959) (postponing federal proceedings to garner authoritative interpretations of state law from state courts "does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise."); *see also San Remo Hotel, L.P. v. City & Cnty. of San Francisco, Cal.*, 545 U.S. 323, 339 (2005).

## ARGUMENT

### *Introduction & This Court's Rules of Statutory Interpretation*

This Court's lodestar when interpreting statutes is simple: discern and apply legislative intent. *See e.g., White Star Petroleum, LLC*, 2020 OK at ¶ 8, 480 P.3d at 889 ("Our primary goal when construing a statute is to ascertain and follow the intent of the Legislature."); *Anaya-Smith v. Federated Mut. Ins. Co.*, 2024 OK 34, ¶ 25, 549 P.3d 1213, 1221 ("When construing statutes, it is this Court's obligation to ascertain legislative intent."); *Wylie v. Chesser*, 2007 OK 81, ¶ 20, 173 P.3d 64, 72; *Special Indem. Fund v. Choate*, 1993 OK 15, ¶ 38, 847 P.2d 796, 807. This Court also aims for interpretations that are "reasonable and sensible" and avoid absurd results. *McIntosh v. Watkins*, 2019 OK 6, ¶ 4, 441 P.3d 1094, 1096. But, in the end, the overriding goal is to align with legislative intent. *Id.* ("Where a statute is ambiguous or its meaning uncertain it is to be given a reasonable construction, one that will avoid absurd consequences if this can be done without violating legislative intent."); *see also Cox v. Dawson*, 1996 OK 11, ¶ 20, 911 P.2d 272, 281.

This Court uses a two-step process for statutory interpretation to ascertain legislative intent. First, this Court analyzes the most direct expression of legislative intent—the text itself. *Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.*, 2007 OK at ¶ 6, 158 P.3d at 464 ("The legislature expresses its purpose by words."). It uses the plain and ordinary meaning of the text in concert with grammar rules and textual canons of statutory interpretation to determine if there is a

clear indication of legislative intent in the text. *Assessments for Tax Year 2012 of Certain Properties Owned by Thorneberry v. Wright*, 2021 OK 7, ¶ 15, 481 P.3d 883, 892 (explaining that the Court begins with a reading of the plain language to assess whether the provision is ambiguous); *see also Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.*, 2007 OK at ¶ 6, 158 P.3d at 464; *see also McIntosh v. Watkins*, 2019 OK at ¶ 4, 441 P.3d at 1096 (similar).

Second, if the text fails to clarify legislative intent, the Court uses extrinsic sources such as legislative history, borrowed statutes, and historical context to do so. *See Childers v. Arrowood*, 2023 OK at ¶ 15, 541 P.3d at 831; *White Star Petroleum, LLC*, 2020 OK at ¶ 8, 480 P.3d at 890 ("If doubt as to the statute's meaning exists, it can be resolved by looking at legislative history."); *Bayouth v. Dewberry*, 2024 OK 42, ¶ 16, 550 P.3d 920, 927 ("In analyzing legislative intent, words adopted from other sources are generally presumed . . . to adopt the body of learning from which it was taken . . ."); *Assessments for Tax Year 2012 v. Wright*, 2021 OK at ¶ 8, 481 P.3d at 886 ("[H]istorical context may be a component for judicial application of legislative intent."). In short, this Court implements legislative intent as expressed by the text itself, and if the text is ambiguous, it turns to substantive canons of statutory interpretation and extrinsic evidence to discern and apply legislative intent.

In this case, the text clearly expresses the desire to ban discussion of disfavored ideas from Oklahoma's public schools. So, the text can answer questions two and three because the text clarifies that "requirement" and "presents" were intended to regulate Oklahoma's higher education classrooms. But questions four through six all concern how the Act bans ideas in K-12, asking what it means to "require" a banned concept in K-12 and what two of those banned concepts themselves mean. Ord. Cert. Qs. Doc. 208, 7. Here, the text crumbles, leaving the reader adrift in

ambiguous verb phrases and triple negatives. Thus, the Argument proceeds in two parts, each applying this Court's two-step statutory interpretation process by first examining the text and then turning to extrinsic sources of intent if the text remains ambiguous.

## I. CERTIFIED QUESTIONS ONE THROUGH THREE

The provision at issue in questions one through three is excerpted below. Question one asks whether Section 1(A)(1) of the Act violates Art. XIII, § 8 of the Oklahoma Constitution. Ord. Cert. Qs. Doc. 208 at 7. Question two inquires into the meaning of "requirement," and question three seeks the meaning of "presents." *Id.*

> "Any orientation or **requirement** that **presents** any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited."

70 O.S. § 24-157(A)(1) (emphasis added).

### *I.A Question One: Because Article XIII, Section 8 of the Oklahoma Constitution reserves broad and exclusive regulatory power over the University of Oklahoma to the University of Oklahoma Board of Regents, the Act's attempt to regulate classroom instruction and on campus orientations violates the Oklahoma Constitution.*

The Oklahoma State Constitution dictates that "[t]he government of the University of Oklahoma shall be vested in a Board of Regents." Okla. Const. Art. 13, § 8. This Court has explained before that it has "no doubt" that the constitutional status of the Board of Regents' authority was "intended to limit legislative control over University affairs." *Bd. Of Regents of Univ. of Oklahoma v. Baker*, 1981 OK 160, ¶ 8, 638 P.2d 464, 467. Indeed, the Regents' power is "very broad and necessarily includes the power to pass all rules and regulations." *Franco v. State*, 2020 OK CIV APP 64, ¶ 28–29, 482 P.3d 1, 9 *(quoting Pyeatte v. Bd. of Regents of Univ. Of Okla.*, 102 F. Supp. 407, 413 (W.D. Okla. 1951) *aff'd* 343 U.S. 936.) But this Court and the Oklahoma Court of Civil Appeals have defined the Regents' authority more broadly, holding that the power vested in the Regents by the Oklahoma Constitution is so broad that it "implies a negation of its exercise

by any other office or department." *Baker*, 1981 OK at ¶ 7, 638 P.2d at 466 (discussing the limits of the legislature's power to regulate OU when deciding that a statute requiring OU to increase the salaries of all its employees violated Art. XIII, § 8 of the Oklahoma Constitution); *see also Franco v. State*, 2020 OK CIV APP at ¶¶ 28–29, 482 P.3d at 9 (discussing the breadth of the Regents' power under the Oklahoma Constitution when deciding whether the faculty handbook's rules for hiring faculty applied to a contract dispute).

The University Defendants have argued, and the Plaintiffs agree, that this case law means the legislature lacks the power to dictate the content of "orientations" at the University of Oklahoma. During oral arguments on Plaintiffs' Motion for Preliminary Injunction, the University Defendants clarified their position, saying "[w]e don't even think the legislature had the authority to require OU to make [changes to the content of orientations] because that is an on-campus educational issue." *See* Mot. Hr'g Tr., Doc. 162 at 40–41. So, based on the University's reading, Section A violates the Oklahoma Constitution because it usurps the constitutional authority of the Board of Regents to regulate on-campus orientations.

Even if this Court decides the legislature does have the authority to regulate on-campus orientations, Section A still violates Art. XIII, § 8 because it also aims to regulate in-class instruction. For reasons discussed in Part I.B, "requirement" and "presents" demonstrate the legislature's intent for Section A to regulate in-class instruction. If the breadth of the Board of Regents' power preempts any legislative power to require salary increases at the University of Oklahoma (*see Baker*, 1981 OK at ¶ 20), it certainly preempts the legislature's attempt to regulate classroom instruction. This Court suggested as much in *Baker*, explaining that while the salary legislation was not as extreme as "an attempt to suppress academic freedom" it nevertheless was beyond the power of the legislature. *Baker*, 1981 OK at ¶ 20. And while the University Defendants

13

do not agree with Plaintiffs' interpretation of the Act, they do agree that "the legislature is without authority to dictate academic content." *See* Univ. Prelim. Inj. Resp. Doc. 58 at 7–8.

### II.B Certified Questions Two & Three: The text of Section (1)(A)(1) demonstrates that the terms "requirement" and "presents" aim to regulate a broad range of speech and implicate in-class instruction at Oklahoma's universities and colleges.

Question two concerns the meaning of the term "requirement" in Section A. In the context of higher education, the term "requirement" encompasses classes, courses, and other mandatory prerequisites essential for academic progression and graduation. *Black's Law Dictionary* defines "requirement" as something "an employer, university, etc. sets as a necessary qualification."[4] Webster's Dictionary defines "requirement" as "something essential to the existence or occurrence of something else" and provides this example of the word in context: "failed to meet the school's requirements for graduation."[5] In the context of higher education, such requirements include general education courses, degree-specific classes, research, and other conditions of graduation. Further, classroom activities—whether lectures, assigned readings, or participation in discussions—are "requirements" for students who must complete coursework to earn grades or degrees. The District Court came to this same conclusion, finding that "requirement" in this context "would include . . . everything from the courses demanded by a university for a degree to the assignments and readings demanded by a professor for a course." Ord. Prelim. Inj. Doc. 173 at 11. That is why the District Court concluded that "the provision, based on its plain language, applies to and restricts curricular speech." Ord. Mot. Dismiss Doc. 172 at 4.

Yet, the University and State Defendants insist that "requirement" is simply another way of saying "orientation." *See* Univ. Prelim. Inj. Resp. Doc. 58 at 6; State Mot. J. Pleadings Reply Doc. 112 at 8–9. Such an interpretation not only defies the context of the text itself, as

---

[4] *Requirement*, Black's Law Dictionary (12th ed. 2024).
[5] *Requirement*, Websters Dictionary, https://perma.cc/9XMB-PSD6 (last visited on Jan. 29, 2025).

demonstrated by the District Court's reasoning, but also ignores the rule against surplusage, given that the same sentence of Section A also mentions "orientation." *Am. Airlines, Inc. v. Okla. Tax Comm'n*, 2014 OK 95, ¶ 41, 341 P.3d 56 (holding that every part of a statute should be operative without rendering any language superfluous or useless, A.K.A. the rule against surplusage); *see also Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.*, 2007 OK at ¶ 6, 158 P.3d at 464 ("Courts must 'if possible, construe a statute to give every word some operative effect'") (citing *Cooper Industries, Inc. v. Aviall Services, Inc.* 543 U.S. 157, 167 (2004)). Accordingly, this Court imposes a strong assumption that each word in a statute adds some unique meaning. Since every word in the Act is presumed to have a distinct meaning, ascribing the same meaning to "requirement" as "orientation" contradicts the rule against surplusage.

The presence of the disjunctive between the words ("orientation *or* requirement") makes justifying the same meaning even harder. 70 O.S. § 24-157(A)(1) ("Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited."). As this Court has explained: "or" is a "disjunctive particle" that is almost always "used to express an alternative or give a choice of one among two or more things." *Toch, LLC v. City of Tulsa,* 2020 OK 81, ¶ 25, 474 P.3d 859, 867 (citing *State ex rel. Wise v. Whistler*, 1977 OK 61, ¶ 8, 562 P.2d 860, 862). In rare cases, "or" can introduce a phrase that is synonymous with what it precedes. *Toch, LLC v. City of Tulsa*, 2020 OK 81, ¶ 25, 474 P.3d 859, 867 (citing *United States v. Wood*, 571 U.S. 31, 45–46 (2013) ("Batman or the Caped Crusader")). But such rare cases are disfavored because "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise." *Id.* (*quoting Reitner v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)). Thus, for "orientation" and "requirement" to mean the same thing, the State and University Defendants must offer strong evidence of legislative intent

to add redundant language to the statute. If the legislature meant "required orientation" or "orientation or similar requirements," it would have said so. *See Zaloudek Grain Co. v. CompSource Oklahoma*, 2012 OK 75, ¶ 14, 298 P.3d 520, 523 (holding that if the legislature is aware of how to impose limitations in certain contexts, but it chooses not to, that omission is interpreted as intentional).

Question three concerns the meaning of the word "presents" in Section A. The word "presents" is similarly broad in context, covering any mention of racial or sex stereotypes or bias. 70 O.S. § 24-157(A)(1) ("Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex shall be prohibited.") Stereotypes and biases are "present[ed]" when someone brings them "into the presence of" someone else for any purpose.[6] In the context of "orientation[s] or requirement[s]" in higher education, such a broad term communicates that professors cannot even describe discriminatory beliefs as part of history in the classroom without the risk of violating the law. This interpretation is why Plaintiffs challenged the Act on academic freedom grounds. Am. Compl. Doc. 50 at 69–71. The District Court found this interpretation likely, providing further justification for its injunction against this provision. Ord. Prelim. Inj. Doc. 173 at 12.

In sum, the plain text of Section A communicates that it reaches into college classrooms, making a resort to extrinsic sources of legislative intent unnecessary. *See Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.*, 2007 OK at ¶ 6, 158 P.3d 461 at 464 ("When the language of the statute is plain, it will be followed without further inquiry.").

Finally, given the underlying academic freedom issues, it is also worth addressing how this Court's doctrine of constitutional avoidance could affect the answers to questions two and three.

---

[6] *Present*, Oxford English Dictionary, https://perma.cc/DY4Y-9J2E (last visited Jan. 7, 2025); *see also Present*, Merriam-Webster Dictionary, https://perma.cc/BBM3-WRY9 (last visited Jan. 7, 2025).

While Plaintiffs argue below that the text in Section A demonstrates an intent to regulate classroom instruction, such an interpretation of the law would violate the First Amendment's protections for academic freedom. *See* Pls. Mot. Prelim. Inj. Doc. 27, 16–19. When this Court faces two possible interpretations of a statute, one that is constitutional and another that is not, the Court adopts the constitutional interpretation, unless the parties provide exceptional evidence that the unconstitutional interpretation is correct. *See Schlumberger Technology Corp. v. Paredes*, 2023 OK 42, ¶ 15, 528 P.3d 772, 778. Thus, even though Plaintiffs believe classroom regulation was the legislature's intent in Section A, Plaintiffs also recognize that this Court's constitutional avoidance doctrine may counsel in favor of a different interpretation. Regardless, Plaintiffs' concern in Section A is the harm to university teachers and students who, as of now, do not know for certain whether Section A regulates their classrooms.

## II: CERTIFIED QUESTIONS FOUR THROUGH SIX

Unlike the provisions in certified questions two and three, the text of the provisions at issue in questions four through six offer no clarity. Rather, it tangles up broad terms like "require," "adverse treatment," and "discriminate" with frequent, confusing use of the disjunctive ("or"), and even a triple negative to create a confusing morass that leaves the reader with no clarity as to what conduct it does and does not prohibit.  Extrinsic evidence is similarly unhelpful because while it clarifies the legislature's intent to ban the ideas generally, it still fails to demonstrate how the legislature aimed to ban these concepts in K-12. So, applying this Court's tools of statutory interpretation to these provisions leads to the same conclusion—these provisions are too devoid of any clear legislative intent to interpret.

### II.A The Text: Textual and Grammar Canons of Construction Cannot Clarify the Language in Certified Questions Four Through Six

Question four concerns the verb "require" in the introductory clause of Section 1(B)(1):

> "No teacher, administrator or other employee of a school district, charter school or virtual charter school shall **require or make part of a course** the following concepts: . . ."

Considering the breadth of the verb "require" and the surrounding text in this section, deciding on any single meaning for "require" is impossible. H.B. 1775 (B)(1).

Webster's Dictionary defines "require" as "to demand as necessary or essential."[7] The Cambridge English Dictionary defines it as "to need something or to make something necessary."[8] Other popular dictionaries define it similarly.[9] But the context surrounding "require" quickly begins to confound any clarity those definitions might provide. *See e.g. Mcintosh v. Watkins*, 2019 OK at ¶ 4, 441 P.3d at 1096 (explaining that this Court interprets provision in context, considering all the provisions and surrounding words and phrases) ("This Court will not limit consideration to one word or phrase but will consider the various provisions to . . . give effect to the legislative intent."). Here, "require" exists in the context of all of Section B of the Act, which prohibits K-12 teachers, administrators, and employees from "requir[ing] or mak[ing] part of a course" the concepts disfavored by the legislature.

So, what does it mean to "require" a banned concept? The District Court found it impossible to answer this question. It described using "require" in this way as "an illogical mismatch between verb and object" because "to generally direct that a *concept* may not be *required* opens the statute to a variety of interpretations." Ord. Prelim. Inj. Doc. 173 at 15 (emphasis in original). One reason "require" is so confusing in Section B is that K-12 education is compulsory in Oklahoma.[10] So, anything that happens in a K-12 school is technically "required." But such a

---

[7] *Require*, Websters Dictionary, https://perma.cc/SU78-BZGT (last visited on Jan. 7, 2025).
[8] *Require*, Cambridge Dictionary, https://perma.cc/SU78-BZGT (last visited on Jan. 7, 2025).
[9] *Require*, Oxford English Dictionary, https://perma.cc/3F5Z-LP6E (last visited on Jan. 7, 2025).
[10] Unlike higher education, where many programs are optional, Section B addresses K-12 education, where the vast majority of courses and programming are required as part of compulsory public education. So where "requirement" can provide some clarity in higher education because it narrows where conduct is

simple answer proves useless when you try to put it into practice. Take the first banned concept: "one race or sex is inherently superior to another race or sex." 70 O.S. § 24-157 (1)(B)(1)(a). If the prohibition on "requir[ing]" means this concept cannot appear anywhere in a compulsory K-12 school, then the discussion of racism and sexism in history would be prohibited, as would assigning any history textbook that explained the history of racism and sexism. Such a result would be an absurd overreach, and neither Plaintiffs nor any Defendants argue that such a broad interpretation was the legislature's intent. But such an interpretation is one way the text could be read, demonstrating just how imprecise and confusing the law is.

The other verb phrase in Section 1(B)(1), "or make part of a course," also demonstrates how confounding "require" is. To analyze how "require or make part of a course" functions in context, this section must first address what "or" means. Here, the disjunctive "or" indicates that "require" and "make part of a course" have different meanings. As explained in Part I, this Court recognizes three possible meanings of "or." It almost always treats "or" as a "disjunctive particle" used to express one of two possible meanings or pose a choice among two or more things. *Toch, LLC v. City of Tulsa,* 2020 OK at ¶ 24, 474 P.3d at 867 (citing *State ex rel. Wise v. Whistler*, 1977 OK 61, ¶ 8, 562 P.2d 860, 862). The third possibility, that "or" introduces another word with the same meaning, is exceedingly rare because of the high likelihood of confusion, and this Court's cannons of statutory interpretation disfavor it. *Id.* (citing *United States v. Wood*, 571 U.S. at 45–46 ("Batman or the Caped Crusader")).

Of the three possibilities, "or" expressing that "require" and "make part of a course" have different meanings is by far the most reasonable. First, the context of Section B rules out the

_____

prohibited, "require" cannot do the same for K-12 because everything is required. Prohibiting any attempt to "require" the banned concepts (that are themselves broad and ambiguous) compounds the ambiguity because teachers and administrators could rightly interpret everything happening in K-12 schools as obligatory.

possibility that "or" indicates a choice among options. This provision offers no options for choice but instead issues commands about prohibited conduct, telling schoolteachers and administrators what they shall not do. *See* 70 O.S. § 24-157 (1)(B)(1). Offering "options" between two different, but similarly prohibited, delivery methods of banned concepts is illogical. Second, for "or" to express that "require" and "make part of a course" are different ways of saying the same thing (e.g. Batman or the Caped Crusader), the statute would need far more context supporting that interpretation, and there is no reason to believe that the average schoolteacher would understand the statutory directive in this way. That interpretation not only creates confusion because of the other more common uses of "or" but also violates the rule against surplusage by adding an entirely unnecessary phrase. These issues leave "or" in Section B with one reasonable meaning—clarifying that "require" and "make part of a course" have distinct meanings. Thus, interpreting "require" demands a cross reference with "make part of a course." *See Mcintosh v. Watkins*, 2019 OK at ¶ 4, 441 P.3d at 1096 (explaining that the Court always interprets words in a statute in the context of the surrounding provisions, not in a vacuum).

Though the District Court did not certify a specific question about "make part of a course," it is included as part of questions five and six, and the District Court's interpretation of the phrase is still a helpful tool in proving how impenetrable both "require" and "make part of a course" are. The District Court interpreted "make part of a course" to mean "directly endorsing, promoting, or inculcating any concept as a normative value." Ord. Prelim. Inj. Doc. 173 at 15. To promote one of the banned concepts as a normative value, is to teach students that one of the banned concepts

is a "principle of right action" and that people should use the concepts to "guide, control, or regulate proper and acceptable behavior."[11]

But accepting the District Court's interpretation of "make part of a course" as correct[12] reveals a structural conflict in "require or make part of a course." If (1) "make part of a course" prohibits teaching the concept as a normative value, and (2) "require" means something distinct from "make part of a course" because of "or," then (3) "require" becomes nonsensical regardless of its interpretation.

The first possibility is that "require" has a broader meaning than "make part of a course." This section already established that a broad, universal interpretation of "require" that bans the concepts in all contexts for K-12 is absurd and no party has argued for that meaning. And if "require" has some other meaning that is broader than "make part of a course" but narrower than a universal prohibition in K-12, the text provides zero insight into what that meaning might be. Regardless, if the meaning of "require" is broader than the meaning of "make part of a course," then "require" already encompasses all the same banned conduct as "make part of a course," turning "make part of a course" into meaningless surplusage that violates this Court's statutory interpretation rules.

The second possibility is for "require" to have a narrower meaning than "make part of a course." But that too would be nonsensical. "Require" is a single, broad word whereas "make part of course" is a more specific phrase that only applies to "course[s]." The legislature opting to use a broader phrase with less context to express a narrower meaning is absurd, especially when the

---

[11] *Norm*, Websters Dictionary, https://perma.cc/RBG7-LSP5 (last visited on Jan. 7, 2025) (defining norm as "an authoritative standard" and "a principle of right action binding upon the members of a group and serving to guide, control, or regulate proper and acceptable behavior).

[12] Plaintiffs respectfully disagree with the district court's interpretation of "make part of a course." *See* Pls.' Notice of Appeal, Doc. 187. But analyzing the court's interpretation still sheds light on the potential difficulties with any interpretations of these provisions.

rest of the statute is devoid of any context that might clarify that narrower meaning. In short, as the District Court put it, "require" is "illogical" and renders any clarifying interpretation impossible. Ord. Prelim. Inj. Doc. 173 at 15.

The confusion continues with the concepts themselves. Question five asks "what does it mean to: 'make part of a course the . . . concept . . . an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex?'" *See* Ord. Cert. Qs. Doc. 208 at 7; 70 O.S. § 24-157(1)(B)(1)(c). Question six asks "what does it mean to: 'make part of a course the . . . concept . . . members of one race or sex cannot or should not attempt to treat others without respect to race or sex?'" *See* Ord. Cert. Qs. Doc. 208 at 7; 70 O.S. § 24-157(1)(B)(1)(d).

One textual issue applies to both questions five and six. The breadth and imprecision of the word "treat," that appears in both subsection (c) and (d), is one reason the District Court found no possible narrowing construction in both subsections. Ord. Prelim. Inj. Doc. 173 at 19. The District Court highlighted the breadth and ambiguity of this term as troublesome because it could mean anything from "prohibt[ing] a teacher from endorsing widely rejected ideas (e.g. that it is acceptable to restrict access to public accommodations based on race" to "prohibit[ing] a teacher from making part of a course subjects of current political debate (e.g. whether it is permissible to consider race or sex in college admissions)." *Id.* at 19. And the text contains no qualifiers or clarifications to instruct the reader on which meaning the legislature intended, expanding again on all the previous confusion.

Concept (d), the provision at issue in question six, offers the most confusing language yet in the form of a triple negative. The concept reads: "*No* teacher . . . shall require or make part of a course the following concept[]: members of one race or sex *cannot and should not* attempt to treat

22

others *without* respect to race or sex." 70 O.S. § 24-157(1)(B)(1)(d) (emphasis added). Disfavor of double negatives is the most elementary of grammar rules for a reason. One negative makes a negative, but two negatives make a positive. So, with two negatives, the reader confronts a sentence with two negative words that a first glance suggests a negative reading. But logic dictates a positive reading because the two negatives cancel each other out. This provision expands on that confusion with yet a third negative.

The State Defendants' suggested solution to the triple negative asks too much of the reader and of this Court. They argue that the concept should be read as: "requiring that students should not be taught that "treat[ing] others without respect to race or sex" is impossible or undesirable." *See* State Prelim. Inj. Resps., Doc. 61 at 20. The problem is the legislature could have expressed that with different language, but instead, the text relies on this confusing triple negative. If the legislature could have communicated the same idea without a triple negative, using the confusing triple negative appears absurd and needlessly obtuse. Regardless, to reach the State Defendants' required interpretation would require this Court to rewrite the provision—authority this Court has placed beyond its reach because it would violate the separation of powers. *See Head v. McCracken*, 2004 OK 84, ¶ 13, 102 P.3d 670, 680 ("When a court is called on to interpret a statute, the court has no authority to rewrite the enactment merely because it does not comport with the court's view of prudent public policy."); *see also Oklahoma City Zoological Tr. v. State ex rel. Pub. Emps. Rels. Bd.*, 2007 OK at ¶ 6, 158 P.3d at 464.

The District Court likewise refused to adopt the State Defendant's interpretation, finding no reasonable narrowing interpretation available and refusing to read additional clarifying language into the statute. *See* Ord. Prelim. Inj. Doc. 173 at 20–21. The District Court was not alone, citing in its order to another court that described this language as "a rarely seen triple negative,

resulting in a cacophony of confusion." *Id.* (citing *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1182 (N.D. Fla. 2022) (granting Plaintiffs preliminary injunction against largely identical language in a similar statute), *aff'd sub nom. Honeyfund.com Inc. v. Governor, State of Fla.*, 94 F. 4th 1272 (11th Cir. 2024). Standing alone, subsection (d) has confounded multiple federal courts. *See also Local 8027 v. Edelblut*, 2024 WL 2722254, (D.N.H. 2024) (granting summary judgment on vagueness grounds concerning similar language). And when combined with all the preceding confusion about "require or make part of a course," subsection (d) only confirms that the provisions at issue in questions four through six provide no clarity as to the legislature's intent.

With the maze-like text of "require or make part of a course" and the two banned concepts offering so many questions but no answers, extrinsic evidence of legislative intent is the next step for this Court. But it too provides no clarity on these questions.

### II.B Extrinsic Sources of Legislative Intent Likewise Cannot Clarify the Language in Certified Questions Four Through Six

When the text fails to provide clarity, this Court consults extrinsic sources in many forms to discern legislative intent: legislative amendments, broader historical context, bill language copied from other sources, etc. *See White Star Petroleum, LLC*, 2020 OK at ¶ 8, 480 P.3d at 889–90 (explaining that legislative history can serve as a helpful indication of legislative intent); *Assessments for Tax Year 2012 v. Wright*, 2021 OK at ¶ 8, 481 P.3d at 886 (explaining that historical context can also clarify legislative intent); *Bayouth v. Dewberry*, 2024 OK at ¶ 16, 550 P.3d at 927 (explaining that copying language from another source into Oklahoma law can also clarify legislative intent). Here, while extrinsic sources demonstrate the same general intent as the text (i.e. to ban ideas and practices the government dislikes), these sources cannot clarify the provisions in questions four through six, regarding implementation in the K-12 classroom.

H.B. 1775 was filed on January 20, 2021, as a bill concerning medical services for student athletes.[13] But a few months later, on April 6, 2021, the Senate Education Committee scrapped the entirety of the original bill to replace it with language that eventually became the Act at issue in this case.[14] The new language was familiar. A few months earlier, President Donald Trump had issued Executive Order 13950 ("the EO"), prohibiting the U.S. military, agencies, and government contractors from promoting or requiring a list of nine concepts. *See* Exec. Ord. 13950, Sec. 2. Eight of those nine concepts appeared verbatim in the new H.B. 1775, becoming banned concepts for K-12 public schools in Oklahoma. *See* 70 O.S. § 24-157, 1(B)(1). The bill passed through both houses of the legislature on May 3, 2021, as an emergency bill, allowing it to go into effect almost immediately. In short, the Oklahoma legislature rushed a retrofitted copy of President Trump's EO into law.

This copied language proves that the EO and national political movement surrounding it serve as helpful historical context for H.B. 1775's intent. *Assessments for Tax Year 2012 v. Wright*, 2021 OK 7 at ¶ 8, 481 P.3d at 886 (using historical issues surrounding interpretation of the tax code to clarify the legislature's intent) ("[T]here is no doubt that historical events may have explanatory authority when used as part of a textual analysis of a specific legislative enactment.").

Here, the context surrounding the Act began in the runup to the 2020 U.S. presidential election with a flurry of statements from President Trump concerning what he called "a sickness that cannot be allowed to continue."[15] This "sickness" was sex and racial bias training and Critical

---

[13] For a detailed account of the legislative history preceding the passage of H.B. 1775, *see* Jennie A. Hill, *Legitimate State Interest or Educational Censorship: The Chilling Effect of Oklahoma House Bill 1775*, 75 OKLA. L. REV. 385 (2023); *see also* H.B. 1775, 58th Leg., 1st Sess. (Okla. 2021), https://perma.cc/CFU4-XLWD (as introduced, Jan. 20, 2021).
[14] See Comm. Substitute for Engrossed H.B. 1775, 58th Leg., 1st Sess. (Okla. 2021), https://perma.cc/5TTR-EX7Z (S. Comm. Substitute, Apr. 6, 2021).
[15] Twitter, (Sept. 5, 2025 at 6:52am), https://perma.cc/Z6TV-GSQS (last visited on Jan. 7, 2025).

Race Theory[16] ("CRT"). A White House press conference followed the next week where Trump

called CRT "toxic propaganda" and "ideological poison that, if not removed, [would] . . . destroy

our country."[17] President Trump issued the EO soon after. But before the EO made it to the

Oklahoma legislature, a federal court enjoined parts of it for vagueness. According to the court,

the text in Sections 4 and 5 of the EO was so obtuse that it failed to provide adequate notice of

what conduct was prohibited. *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d at

543–45. Nevertheless, four months later, the Oklahoma legislature copied the eight banned

concepts in H.B. 1775 word-for-word from the enjoined section of the EO. *Compare* 70 O.S. § 24-

157, 1(B)(1), *with* Exec. Ord. 13950 at § 5. This historical and textual connection to the EO

suggests that the Oklahoma legislature's intent with H.B. 1775 was to follow in the footsteps of

the EO—i.e. ban certain ideas and practices with which the government disagrees.

Yet as dangerous as Plaintiffs believe such an intent is, it does not help this Court answer

the narrower issues of certified questions four through six, such as: (1) when are the concepts

banned; and (2) what do the concepts themselves mean? The history surrounding the Act's passage

contains no guidance for when the concepts should be banned in K-12 schools because the

concepts were copied from President Trump's EO which concerned federal agencies and

contractors. Nor is there legislative history that could clarify what the concepts mean. The final

concepts went unchanged from the text originally introduced by the Senate Education Committee,

leaving the Court with no amendment history that might provide some insight. And the legislator

---

[16] CRT emerged as a framework in legal scholarship in the 1970s, analyzing the way race and racism had embedded itself in American law and policy. *See* Kimberlé Williams Crenshaw, *The First Decade: Critical Reflections, or a "Foot in the Closing Door*," 49 UCLA L. REV. 1343, 1345–65 (2002) (tracing the origins and emergence of CRT); Athena D. Mutua, *The Rise, Development and Future Directions of Critical Race Theory and Related Scholarship*, 84 DENV. U. L. REV. 329, 333 (2006).
[17] President Trump Remarks at White House History Conference, Nat'l Archives Museum (Sept. 17, 2020), https://perma.cc/M5ND-6UJH (last visited on Jan. 7, 2025).

comments during floor debates are no help because this Court does not consider the comments of individual legislators as evidence of legislative intent. *CompSource Mut. Ins. Co. v. State ex rel. Oklahoma Tax Comm'n*, 2018 OK 54, ¶ 41, 435 P.3d 90, 104; *Naifeh v. State ex rel. Oklahoma Tax Comm'n*, 2017 OK 63, ¶22, 400 P.3d 759, 766. Therefore, the public and this Court are left with only the text as a guide. But as explained above, the text's broad phrases, confusing use of the disjunctive, and triple negatives, leave all those charged with interpreting the Act lost.

This Court has a duty to interpret the law. *Head v. McCracken*, 2004 OK at ¶ 13, 102 P.3d at 680. ("A court is duty-bound to give effect to legislative acts"). But the Court likewise has a duty not to rewrite statutes when it lacks any clear indication of legislative intent. *Id.* ("When a court is called on to interpret a statute, the court has no authority to rewrite the enactment.") In Section B of the Act, the legislature has copied indecipherable provisions into Oklahoma law from a national movement to suppress disfavored ideas, leaving Oklahoma teachers unsure of whether they can even teach classics such as Harper Lee's *To Kill A Mockingbird* because of its commentary on systemic racism. *See* Killacky Decl. Doc. 27-09 ¶ 16. This ambiguity is why Plaintiffs challenged the Act as unconstitutionally vague. *See* Am. Compl. Doc. 50 at 66. And as the above sections demonstrate, the Act proves so impenetrable that even this Court's tools of statutory interpretation cannot clarify questions four through six and therefore will not facilitate the District Court's resolution of Plaintiffs' claims. Thus, this Court should simply decline to answer questions four through six and send these provisions back to federal court.

## CONCLUSION

WHEREFORE, for the reasons stated herein, the Plaintiffs respectfully request that this Court provide the following answers to District Court's certified questions:

**Certified Question One:** 70 O.S. § 24-157 (1)(A)(1) violates Art. XIII, § 8 of the Oklahoma Constitution.

**Certified Question Two:** according to the plain text, the legislature intended the term "requirement" in 70 O.S. § 24-157 (1)(A)(1) to include university and college classroom instruction.

**Certified Question Three:** according to the plain text, the legislature intended the term "present" in 70 O.S. § 24-157 (1)(A)(1) to include any and all discussion of "race or sex stereotyping or . . . bias."

**Certified Questions Four Through Six:** it is impossible to discern a clear legislative intent for the term "require" in 70 O.S. § 24-157 (1)(A)(1) nor subsection (c) or subsection (d) because the text itself is too ambiguous and extrinsic sources of legislative intent provide no additional clarity.

Respectfully submitted,

*s/Adam H. Hines*
Adam H. Hines
Oklahoma Bar Number: 35640
Megan Lambert
Oklahoma Bar Number: 33216
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org
ahines@acluok.org

Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
SCHULTE ROTH & ZABEL LLP
919 Third Avenue New York, NY 10022

28

douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com

## CERTIFICATE OF MAILING

I hereby certify that a true and correct copy of the above and foregoing document was on the ___30___ day of January, 2025, e-mailed and mailed to the following, to-wit:

M. DANIEL WEITMAN, OBA #17412
TINA S. IKPA, OBA #32193
660 Parrington Oval, Suite 213
Norman, Oklahoma 73109
dan.weitman@ou.edu
tsikpa@ou.edu

and

GARRY M. GASKINS, II, OBA NO. 20212
ZACH WEST, OBA NO. 30768
WILL FLANAGAN, OBA NO. 35110
OFFICE OF ATTORNEY GENERAL STATE OF OKLAHOMA
313 N.E. 21st Street Oklahoma City, OK 73105
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov

*s/Adam H. Hines*
Adam H. Hines