# EXHIBIT 5



ORIGINAL

FILED
SUPREME COURT
STATE OF OKLAHOMA

MAR - 3 2025

JOHN D. HADDEN
CLERK

## IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

BLACK EMERGENCY RESPONSE TEAM, )
*et al.*, )
)
           Plaintiffs/Appellants, )
)
v. )  Supreme Court No. CQ-122472
)
GENTNER DRUMMOND, in his official )  U.S. District Court No. CIV-21-1022-G
capacity as Oklahoma Attorney General, *et al.*, )  (Oklahoma County, Oklahoma)
)  U.S. District Court Judge Charles B. Goodwin
           Defendants/Appellees. )
)

**PLAINTIFFS/APPELLANTS' ANSWER BRIEF TO STATE AND UNIVERSITY
DEFENDANTS' OPENING BRIEFS CONCERNING THE QUESTIONS OF LAW
CERTIFIED BY THE UNITED STATES DISTRICT COURT FOR THE WESTERN
<u>DISTRICT OF OKLAHOMA TO THE OKLAHOMA SUPREME COURT</u>**

---

**Certified Questions from the United States
District Court for the Western District of Oklahoma
Case No. CIV-21-1022-G
The Honorable Judge Charles B. Goodwin Presiding**

---

March 3, 2025

Respectfully submitted,

Adam H. Hines
Oklahoma Bar Number: 35640
Megan Lambert
Oklahoma Bar Number: 33216
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
ahines@acluok.org
mlambert@acluok.org

Received: 3-3-25
Docketed:
Marshal: 7M
COA/OKC:
COA/TUL:

Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
SCHULTE ROTH & ZABEL LLP
919 Third Avenue New York, NY
10022
douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com
kevin.johns@srz.com

Sumayya Saleh
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
*ssaleh@lawyerscommittee.org*

Emerson Sykes
Leah Watson
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
*esykes@aclu.org*
*lwatson@aclu.org*

*Counsel for Plaintiffs*

# INDEX

SUMMARY OF RESPONSE..................................................................................1

**I. CERTIFIED QUESTION ONE: THE ACT & ART. XIII, § 8 OF THE OKLAHOMA CONSTITUTION**..................................................................................2

### Cases

*Bd. of Regents of Univ. of Okla. v. Baker,*
    1981 OK 160, 638 P.2d 464..........................................................4

*Siloam Springs Hotel, LLC v. Century Sur. Co.,*
    2017 OK 14, 392 P.3d 262..........................................................3

### Constitutional Provisions

Okla. Const. art. XIII, § 8.........................................................*passim*

Okla. Const. art. XXIV, §§ 1-3.....................................................5

### Statutes

20 O.S. § 21-1602 ...................................................................2

**II. CERTIFIED QUESTIONS TWO AND THREE: "REQUIREMENT" & "PRESENTS" IN SECTION A**..................................................................................6

### Cases

*Circuit City Stores, Inc. v. Adams,*
    532 U.S. 105 (2001)..............................................................7

*CompSource Mut. Ins. Co. v. State ex rel. Oklah. Tax Comm'n,*
    2018 OK 54, 435 P.3d 90..........................................................7

*Haynes v. Caporal,*
    1977 OK 166, 571 P.2d 430........................................................7

*United States v. Powell,*
    423 U.S. 87 (1975)..............................................................7, 8

### Other Authorities

*Ejusdem generis*, Black's Law Dictionary (12th ed. 2024)..........................7

### Statutes

70 O.S. § 24-157..................................................................7

i

**III. CERTIFIED QUESTION FOUR: "REQUIRE" IN SECTION B............................9**

*Statutes*

70 O.S. § 24-157..................................................................................11

*Other Authorities*

*Require*, Webster's Dictionary, https://perma.cc/SU78-BZGT........................10

**IV. CERTIFIED QUESTION FIVE: BANNED CONCEPT (c)..................................12**

*Cases*

*Am. Airlines, Inc. v. Okla. Tax Comm'n,*
    2014 OK 95, 341 P.3d 56...............................................................14

*Statutes*

70 O.S. § 24-157.............................................................................13, 14

*Other Authorities*

Okla. Admin. Code § 210:15-3-110........................................................13

**V. CERTIFIED QUESTION SIX: BANNED CONCEPT (d)....................................14**

**CONCLUSION........................................................................................15**

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

| | |
|---|---|
| BLACK EMERGENCY RESPONSE TEAM, *et al.*, | ) ) ) |
| Plaintiffs/Appellants, | ) ) |
| v. | ) Supreme Court No. CQ-122472 ) |
| GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.*, | ) U.S. District Court No. CIV-21-1022-G ) (Oklahoma County, Oklahoma) ) U.S. District Court Judge Charles B. Goodwin |
| Defendants/Appellees. | ) ) ) |

**PLAINTIFFS/APPELLANTS' ANSWER BRIEF TO STATE AND UNIVERSITY DEFENDANTS' OPENING BRIEFS CONCERNING THE QUESTIONS OF LAW CERTIFIED BY THE UNITED STATES DISTRICT COURT FOR THE WESTERN <u>DISTRICT OF OKLAHOMA TO THE OKLAHOMA SUPREME COURT</u>**

## SUMMARY OF RESPONSE

This Court should reject the State Defendants' misguided attempts to remake the Act with language entirely unmoored from the text, answer questions one through three based on Plaintiffs' textual arguments, and decline to answer questions four through six because the Legislature has failed to provide any reliable indication of intent.

State Defendants'[1] strained depictions of the Act as "straightforward and commonsensical" break down under scrutiny. Misrepresentations drive their insistence that this Court should not answer question one. Their proposed answers to questions two and three turn on arguments untethered from the text and backed up with nothing but unpersuasive legislator statements. Then, when addressing the impenetrable provisions in questions four through six regarding K-12, State

---

[1] State Defendants are Defendants 1-19 as listed on the cover page of Plaintiffs' Opening Brief.

1

Defendants reveal their actual request to this Court—namely, to toss out the ambiguous language and entirely remake the Act to conform with State Defendants' position. University Defendants'[2] arguments regarding questions one through three align with Plaintiffs'[3], absent disagreement over when and how to invoke this Court's canon of constitutional avoidance.

## I. CERTIFIED QUESTION ONE: THE ACT & ART. XIII, § 8 OF THE OKLAHOMA CONSTITUTION

### I.A – RESPONSE TO THE STATE DEFENDANTS

Contrary to State Defendants' insistence, this Court can and should address whether the Act violates art. XIII, § 8 of the Oklahoma Constitution. Oklahoma law allows this Court to answer certified questions when two conditions are met: the Court's "answer *may* be [(1)] determinative of an issue in pending litigation in the certifying court and [(2)] there is no controlling decision of the Supreme Court or Court of Criminal Appeals, constitutional provision, or statute of this state." 20 O.S. § 21-1602 (emphasis added). State Defendants argue that certified question one fails the first requirement, that the Court's "answer may be determinative of an issue" in the federal litigation. *See* State Defs. Op. Br. at 6-12. Their argument boils down to two points, both mistaken.

First, State Defendants argue that because the first certified question—whether the Act violates art. XIII, § 8 of the Oklahoma Constitution—was not an issue before the certifying court, any answer this Court might give would not be determinative of an issue in the case, thereby failing the first requirement of the certification statute. *See* State Defs. Op. Br. at 6-9. State Defendants,

---

[2] University Defendants are Defendants 20-26 as listed on the cover page of Plaintiffs' Opening Brief.
[3] Plaintiffs include the Black Emergency Response Team ("BERT"), the Oklahoma Chapter of the National Association for the Advancement of Colored People ("NAACP-OK"), the University of Oklahoma Chapter of the American Association of University Professors ("OU-AAUP"), the American Indian Movement Indian Territory, Precious Lloyd, as next of friend of S.L., Anthony Crawford, and Regan Killacky. Plaintiffs note that NAACP-OK was accidentally omitted from the cover page of Plaintiffs' Opening Brief.

likewise, insist that without a determinative issue, any answer this Court might give would be an impermissible advisory opinion. *See* State Defs. Op. Br. at 11. But State Defendants conflate the individual *issues* in the case as synonymous with Plaintiffs' affirmative *claims* against the Act. *See* State Defs. Op. Br. at 7. It is true that Plaintiffs never challenged the law under the Oklahoma Constitution, but the University Defendants have insisted since the inception of the lawsuit that the Act does not apply to them, all because of art. XIII, § 8 of the Oklahoma Constitution. *See* Univ. Defs. Mot. Dismiss, Doc. 51 at 9; Univ. Defs. Prelim. Inj. Resp., Doc. 58 at 7-8. So, while the Oklahoma Constitutional *issue* is not part of Plaintiffs' *claims*, it is still an important and determinative *issue* in the case, especially for the University Defendants. As this Court has explained before "[a]ll that is required for us to answer a certified question is that the response be determinative of *a single issue in the cause* and that no controlling state law exist." *See Siloam Springs Hotel, LLC v. Century Sur. Co.,* 2017 OK 14, ¶ 16, 392 P.3d 262, 266 (emphasis added) (citation omitted). Since answering question one could be determinative of whether the University is bound by the Act at all, question one meets the requirements of the certification statute and this Court's case law.

Next, the State Defendants argue that if this Court answers question one, it should interpret art. XIII, § 8 to allow the Oklahoma Legislature to regulate any and all required student orientations at the University of Oklahoma ("OU"). *See* State Defs. Op. Br. at 14. Here, the State Defendants make a few leaps to reach that mistaken conclusion. First, they use the wrong standard. Instead of relying on this Court's holding in *Baker,* they quote from dicta in the case to insist that the Legislature can regulate "matters of statewide concern not involving internal university affairs." *See* State Defs. Op. Br. at 14. But crucially, this quote comes not from this Court's holding in *Baker,* but from its summary of a *California* Supreme Court case it used as background context

3

for its decision. *Bd. of Regents of Univ. of Okla. v. Baker*, 1981 OK 160, ¶ 17, 638 P.2d 464, 468. The correct standard comes from the Court's holding in *Baker*, where it determined that salary regulation was "an integral part of the power to govern the University and a function essential in preserving the independence of the Board." *Id.* at ¶ 19. Applying this standard reveals that the State Defendants' argument contravenes *Baker*.

For example, even if State Defendants' interpretation of "requirement" to mean "required orientations" was correct, such orientations are surely a "integral part" of governing OU and "essential in preserving the independence of the Board." *Id.* State Defendants attempt to argue otherwise by saying that employee salaries, at issue in *Baker*, are more "core" to the University than student interactions such as required orientations. State Defs. Op. Br. at 14. Given that the University's ultimate end is to educate students, not employ faculty and staff, it is hard to understand how employee salaries could be more "core" to the University than preparing students for college via required orientations. Common sense would suggest the opposite—the University's students are its most essential mission, and decisions such as employee salaries are simply a means to that end. Plus, as Plaintiffs explained in their opening brief, the text of Section A clarifies that "requirement" includes classroom instruction, and as the University aptly articulated in their opening brief, "there is nothing more central to the University" than "curricula and educational requirements." *See* Univ. Defs. Op. Br. at 12.

The State Defendants' final tactic is a warning that interpreting art. XIII, § 8 of the Oklahoma Constitution to prohibit legislative regulation of student orientations would turn OU into an uncontrollable "sovereign unto itself." State Defs. Op. Br. at 14. Such an interpretation is supposedly dangerous because it would mean the Legislature and the People of Oklahoma would be "powerless to regulate the University in virtually any way." *Id.* But the People of Oklahoma are

4

not "powerless" in the face of an independent University. Indeed, the People of Oklahoma are the ones who thought it wise to create an independent University in the first place. They enshrined it in the Oklahoma Constitution via a statewide vote, and for good reason: as the University Defendants explained in their opening brief, before the addition of art. XIII, § 8, the University's administration changed with the political winds, undermining the State's long-term goals of building an effective, reputable public university. *See* Univ. Defs. Op. Br. at 4-6. Just as the People of Oklahoma granted this power via constitutional amendment, they, and *only* they, can take it away. *See* Okla. Const. art. XXIV, §§ 1-3 (describing the processes for amending the Oklahoma Constitution that all require a state-wide vote). In fact, H.B. 1775 has proven the wisdom of insulating the University from political interference. The Legislature, caught up in the politics of the moment, has tried to undermine and circumvent art. XIII, § 8 with H.B. 1775. So, while State Defendants warn that it would be dangerous to assure the University of its constitutional authority, the opposite is true. The real danger would be allowing the Legislature to set aside the Oklahoma Constitution to serve the politics of the moment.

### I.B – RESPONSE TO THE UNIVERSITY DEFENDANTS

Plaintiffs largely agree with the University Defendants on the substance of art. XIII, § 8's effect on the Act—i.e. that the Legislature lacks the authority to regulate student orientations, let alone classroom content. But the parties differ over the proposed solution. The University argues that this Court should invoke the constitutional avoidance canon and interpret the Act not to apply to OU, leaving unanswered questions as to the Act's application to Oklahoma's other systems of higher education. *See* Univ. Defs. Op. Br. at 13-14. Avoidance is only appropriate where there are multiple plausible interpretations, but as Plaintiffs explained in their opening brief, here there is only one. *See* Pls. Op. Br. at 14-16. And neither the University nor the State Defendants have

offered any evidence from the Act's text, title, historical context, or committee amendments to suggest that the Legislature intended for the Act not to apply to the University of Oklahoma. As such, this Court should confirm that Section A of the Act violates art. XIII, § 8 of the Oklahoma Constitution and leave it to the federal courts to decide how to adjudicate the federal claims.

## II. CERTIFIED QUESTIONS TWO AND THREE: "REQUIREMENT" & "PRESENTS" IN SECTION A

### *II.A RESPONSE TO THE STATE DEFENDANTS*

Instead of engaging with the text, State Defendants rely on unpersuasive legislative statements to support their wholesale rewriting of Section A. Nothing they provide overcomes all the textual evidence to the contrary that Plaintiffs outlined in their opening brief—the presence of the disjunctive between "orientation *or* requirement," the dictionary definitions of "requirement," and the rule against surplusage. *See* Pls. Op. Br. at 14-16.

While the State Defendants correctly recognize that "[s]tatutory interpretation begins with the text," their arguments do not.[4] *See* State Defs. Op. Br. at 16-18. Instead, they start with (1) explanations of legislative intent unmoored from the text and (2) legislator statements that this Court has repeatedly insisted carry no weight in its statutory interpretation. The Legislature's goal in Section A, according to State Defendants, was to protect the free speech rights of university students. State Defs. Op. Br. at 15-16. But State Defendants offer no textual evidence for this argument. Instead, they point to a single statement from Rep. Kevin West to justify their legislative intent argument before turning to the text in the following paragraph and retrofitting it to match Rep. West's statements. *Id.* at 15-16. Leading with legislator statements undermines State

---

[4] For example, the State Defendants do not refer to any dictionary definitions, the most basic tool of textual statutory interpretation, when arguing for their interpretations of "requirement" or "presents." *See* State Defs. Op. Br. at 15-23.

Defendants' entire argument because this Court has for decades instructed that legislative statements are not competent evidence for statutory interpretation. *See, e.g., CompSource Mut. Ins. Co. v. State ex rel. Okla. Tax Comm'n*, 2018 OK 54, ¶ 40, 435 P.3d 90, 104 ("[T]he Legislature communicates its intent as a body, and testimony of individuals involved in the legislative process of creating a statute is not competent on the intent of the Legislature as a whole"); *Haynes v. Caporal*, 1977 OK 166, ¶ 10, 571 P.2d 430, 434 ("Testimony of individual legislators or others as to happenings in the Legislature is incompetent, since that body speaks solely through its concerted action as shown by its vote" (citation omitted)).

After starting off backwards by prioritizing extrinsic evidence before the text of the Act, State Defendants do return with a few textual arguments. For example, they argue that the *ejusdem generis* textual canon of construction counsels in favor of interpreting "requirement" to have a similar meaning as "orientation." *See* State Defs. Op. Br. at 20. But a closer look reveals that the canon does not apply here. Black's Law Dictionary defines *ejusdem generis* as "holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Ejusdem generis*, Black's Law Dictionary (12th ed. 2024). The trouble is that "requirement" is not the type of "general word or phrase" contemplated by the canon, nor is there a "list of specifics" that precedes "requirement." The phrase is "[a]ny orientation or requirement." *See* 70 O.S. § 24-157(A)(1). Comparing that to the two phrases at issue in the cases State Defendants cite for support demonstrates how inapplicable *ejusdem generis* is here. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113-15 (2001) (applying *ejusdem generis* to the phrase ". . . or any other class of workers engaged in foreign or interstate commerce"); *United States v. Powell*, 423 U.S. 87, 90-91 (1975) (considering the application of ejusdem generis to the phrase ". . . other firearms capable of being concealed on the

person"). *United States v. Powell* is particularly unhelpful for the State Defendants. There, the Court ultimately refused to apply *ejusdem generis* because it was not "supported by evidence of congressional intent over and above the language of the statute." *Id.* In other words, the text of the statute at issue in *Powell* all weighed against the *ejusdem generis* interpretation. The same is true of "requirement" here. Even if *ejusdem generis* could apply to "requirement," all the textual evidence counsels against it. Thus, the canon cannot rule because the text—this Court's primary source of legislative intent—does not support it for all the reasons Plaintiffs explain in their opening brief. *See* Pls. Op. Br. at 14-16.

State Defendants' argument regarding question three—the meaning of "presents" in Section A—runs even further afield from the text. After admitting that "presents" has "many different uses," State Defendants pivot their entire argument to a baseless assertion that "it is patently obvious" that "presents" communicates the same idea as it does in a court of law—*i.e.*, to present an argument that the "party desires to be accepted as true." State Defs. Op. Br. at 21. Calling this interpretation of "presents" patently obvious is strange given that: (1) the State Defendants point to *zero* textual or extrinsic evidence of this meaning, citing instead to a number of cases where this Court has used "presents" in that way, which has no bearing on how the Legislature used it in the Act, *see* State Defs. Op. Br. at 21-22; (2) this meaning was certainly not "patently obvious" to a federal district court judge who rejected this interpretation, *see* Prelim. Inj. Order, Doc. 173 at 12 and (3) Plaintiffs, which include university professors bound to confront the term, found it deeply confusing and far from "patently obvious." *See* OU-AAUP Decl., Doc. 27-4 at 2.

***II.B RESPONSE TO THE UNIVERSITY DEFENDANTS***

The University makes one argument regarding questions two and three—that this Court should again invoke the constitutional avoidance doctrine and interpret "requirement" and "presents" not to reach the college classroom because of the academic freedom issues that would otherwise arise. *See* Univ. Defs. Op. Br. at 15-17. As Plaintiffs explained in their opening brief and reaffirm above, Section A's plain text covers university "requirements" generally, including academic requirements. That is why Plaintiffs challenged Section A on academic freedom grounds. *See* Am. Compl., Doc. 50 at 69-71. But Plaintiffs also recognize that if this Court invokes constitutional avoidance to justify interpreting Section A as not reaching university classrooms, that outcome will also resolve Plaintiffs' academic freedom concerns.

### III. CERTIFIED QUESTION FOUR: "REQUIRE" IN SECTION B

One flaw undergirds many of the State Defendants' arguments for questions four through six. Instead of offering strong affirmative arguments for their interpretations, State Defendants spend much of their time arguing against broad interpretations of the provisions. *See* State Defs. Op. Br. at 23-29. These arguments amount to (1) since the broad interpretation cannot be right, (2) State Defendants' interpretation must be right. But as Plaintiffs demonstrated in their opening brief, the problem is that the interpretative choices here are not that simple. With broad general phrases throughout and a triple negative, these provisions could have countless different possible meanings. The Legislature has not provided any of the clarity necessary via the text or extrinsic sources to parse which meaning is correct. And the State Defendants have failed to extract any such clarity from what evidence does exist. That overriding confusion is why this Court should decline to answer questions four through six.

Before turning to State Defendants' specific arguments, Plaintiffs must clarify a dangerous mischaracterization. State Defendants repeatedly contend (with no citations) that Plaintiffs have argued that "require" in Section B "is so broad that it prohibits teachers from even mentioning or discussing the concepts." State Defs. Op. Br. at 23-24. This is incorrect. Rather, Plaintiffs argue that the broad terms in Section B, like "require," are so ambiguous that they offer no clear meaning. Pls. Op. Br. at 17. The trouble with the K-12 provisions is not that they clearly have broad meanings, it is that they are so ambiguous that there is no clear meaning for the public or even this Court to discern.

As for the core of State Defendants' position, they argue that "require" and "make part of a course" both prohibit the same conduct: "teaching the prohibited concepts as true." State Defs. Op. Br. at 23-25. Here, their argument does begin with the text and a dictionary definition of "require"—*i.e.*, that Merriam-Webster's Dictionary defines "require" as "to call for as *suitable* or *appropriate*." *See* State Defs. Op. Br. at 23-24. But the context Webster's provides for this definition of "require" proves how inapplicable it is here. Right below the "call for as suitable or appropriate" definition is an example of its use in a sentence: "the occasion *requires* formal dress."[5] There, the "suitable or appropriate" definition makes sense in context because dress codes for certain events call to mind social norms—*i.e.*, what is "suitable or appropriate" in a given situation. Unlike the dictionary example, the context of the Act is the schoolhouse, where "requir[ing]" has a distinct application. Homework, quizzes, worksheets, etc. are all things often "require[d]" in K-12 schools. So, contrary to what State Defendants insist, common sense does not support the permissive definition of "require." In fact, common sense cuts the other way because the school administrators, teachers and students who encounter this Act on a day-to-day basis naturally

---

[5] *Require*, WEBSTER'S DICTIONARY, https://perma.cc/SU78-BZGT (last visited Feb. 11, 2025).

consider it in the context of a school, where the more restrictive definition of require comes to mind first. Again, Plaintiffs are not arguing that this Court should interpret "require" to have a broad, restrictive definition. *See* Pls. Op. Br. at 19. But the context of the Act does not support State Defendants' narrowing definition either. That impasse is why the best path for this Court is to decline to answer this question and send it back to the federal court to adjudicate Plaintiffs' federal vagueness claim against this provision.

Beyond these contextual troubles, State Defendants' contention that "require" and "make part of a course" mean the same thing has another terminal flaw. The phrase is "require *or* make part of a course." 70 O.S. § 24-157(B)(1) (emphasis added). As Plaintiffs explained in their opening brief, multiple canons of statutory construction create a presumption against State Defendants' unnatural reading of "or" as separating two phrases with the same meaning. *See* Pls. Op. Br. at 19-20. And State Defendants tellingly failed to address this obstacle at all in their opening brief.

State Defendants argument that the Act's Oklahoma Academic Standards exception clears everything up is also unconvincing. *See* State Defs. Op. Br. at 23-25. Invoking the Academic Standards as a cure-all for ambiguity fails generally because the Standards are general guidelines for curricula, not specific lesson plans, and these guidelines often create more confusion, not less. For example, it is true that the Oklahoma Academic Standards require teaching about Jim Crow, the Ku Klux Klan, and the history of racism in America. But consider what reconciling that fact with the Act means in practice. Suppose a teacher is discussing Jim Crow in a high school class and a student asks, "Was affirmative action a response to Jim Crow?" The teacher thought the Academic Standards protected her because she knows she can require the lecture on Jim Crow because it is in the Standards, but can she *require* that the students listen to her answer about

11

affirmative action? The Standards do not mention affirmative action, and the teacher fears concept (c) prohibits discussing it. Here, the Academic Standards exception has only created more confusion because the standards allow teaching about racist practices like Jim Crow but fail to address all the attendant parts of history that often come up in those discussions. The trouble with "require," and all of Section B, is that it lacks any clarity for how to resolve these practical applications of the Act, leaving teachers lost when trying to react to these unpredictable moments that sprout up in classrooms every day. And as Plaintiffs explained in their opening brief, no textual or extrinsic evidence of legislative intent can reliably guide this Court to resolving that confusion. State Defendants' solution is to insert their construction even though there is no evidence of legislative intent to support it. This Court should decline that invitation to remake the act, decline to answer question four, and send this provision back to the federal courts to adjudicate Plaintiffs' federal vagueness claim against it.

## IV. CERTIFIED QUESTION FIVE: BANNED CONCEPT (c)

For concept (c), State Defendants hinge much of their argument on the assumption that their baseless interpretation of "require" from question four is correct and fail to meaningfully engage with one of the most confusing phrases in concept (c)—adverse treatment. As Plaintiffs explained above, State Defendants' argument that "require" means "endorse as true" is rife with logical flaws and selective ignorance of the text and its context. And without that narrowing construction for "require," the meaning of concept (c) at issue in this question is again impossible to discern. Take, for example, State Defendants' response to the District Court's concern that concept (c) could ban a teacher from teaching about the draft because the draft discriminates on the basis of sex. State Defendants argue that, because "require" means "endorse as true," a teacher could teach about the draft, as long as they do not explicitly endorse the idea that the draft should

discriminate on the basis of sex. *See* State Defs. Op. Br. at 27. But if "require" does not mean "endorse as true"—because neither the text nor any extrinsic source support that reading—then the District Court is right to fear that a teacher would be scared to teach about the draft in any context because the meaning of "require" is so ambiguous when applied to concept (c).

Here, the academic standard the State Defendants cite again highlights the potential for confusion, not clarity. The standard only says to teach about "the institution of a draft." Okla. Admin. Code § 210:15-3-110(c)(2)(C). With only such general guidance to teach about the draft, teachers would be right to fear that while they can teach about some parts of the draft, they must somehow avoid talking about the historical debate over whether the draft should include women because that reads a lot like "requiring" that students learn about the concept that "an individual should be discriminated against . . . because of his . . . sex." 70 O.S. § 24-157(B)(1)(c). The same fear plagues teachers who want to require reading *To Kill a Mockingbird* but hesitate because it could be interpreted as "requiring" students to read stories where characters insist that "individual[s] should be discriminated against . . . because of his or her race." *Id.*; *see also* Killacky Decl., Doc. 27-09 ¶ 16.

All these hypotheticals deal with only part of the problem in concept (c). One of the concept's most troublesome phrases is "adverse treatment." To see the ambiguity in practice, consider again the example of the teacher asked about affirmative action while discussing Jim Crow. "Adverse treatment" is so general that the teacher cannot know whether she can discuss affirmative action's history because it might be "requir[ing]" discussion about the idea that "an individual should . . . receive adverse treatment . . . because of . . . race." Instead of wrestling with these issues, State Defendants simply label the phrase as possessing a "similar meaning" to "discriminate." State Defs. Op. Br. at 26. But the text is "an individual should be discriminated

against *or* receive adverse treatment . . ." *See* 70 O.S. § 24-157(B)(1)(c) (emphasis added). So, State Defendants are again asking this Court to ignore its presumption against "or" separating two phrases with the same meaning. And interpreting the two phrases to have the same meaning would likewise render "adverse treatment" meaningless surplusage in the statute, violating another of this Court's canons. *Am. Airlines, Inc. v. Okla. Tax Comm'n*, 2014 OK 95, ¶ 41, 341 P.3d 56, 66. Given those canons, "adverse treatment" must have some distinct meaning, but State Defendants offer no guidance on what it is, nor does the remainder of the Act or any of its extrinsic history. *See* Pls. Op. Br. at 24-27 (demonstrating how extrinsic evidence offers no clarity on the meaning of provisions in Section B of the Act). All this compounding ambiguity leaves concept (c) without any reliable indication of legislative intent. Thus, this Court should decline to answer question five.

## V. CERTIFIED QUESTION SIX: BANNED CONCEPT (d)

The State Defendants' attempts to explain away concept (d)'s triple negative demonstrates (1) how extensively State Defendants are asking this Court to rewrite the Act, and (2) how impossible it is to truly clarify this language. State Defendants' final ask of the Court regarding concept (d)'s triple negative is to "hold that this provision simply prohibits teaching students that racial colorblindness or the attempt to treat others without respect to race or sex is an impossible or unworthy goal." State Defs. Op. Br. at 29. Instead of trying to explore all the possible permutations of the triple negative to explain what the text itself actually means, State Defendants label the concept "unique" and ask this Court to conduct a wholesale rewrite of the concept, replace one of the negatives with the phrase "colorblindness," which is simply another negative that appears nowhere else in the text, and add qualifiers like "impossible" and "unworthy," which again are negatives that appear nowhere else in the text. *See* State Defs. Op. Br. at 27-29. Even in their attempt to rewrite the Act, State Defendants still resort to a negative-laden phrase.

14

State Defendants' justification for this rewrite is similarly illogical. State Defendants argue that concept (d) cannot have a broad meaning that "prohibit[s] teaching that sometimes differences in sex do matter" because that would conflict with Oklahoma and federal law that recognizes differences between the sexes. *See* State Defs. Op. Br. at 28. The State Defendants are correct that many problems exist with a broad interpretation of concept (d). However, just because one broad interpretation cannot be right does not mean State Defendants' interpretation must be right. Section (d)'s ambiguous language can be interpreted in a myriad of ways. The obstacle is that concept (d)'s confusing language provides the public and this Court with no clear indication of which of those different meanings the Legislature intended.

The Legislature passed concept (d) into law with language so ambiguous that Plaintiffs challenged it as unconstitutionally vague, and the federal court agreed. *See* Prelim. Inj. Order, Doc. 173 at 20–21. Now, State Defendants ask this Court to rewrite the entire provision, ignore the confusing triple negative and read in its place phrases and meanings that appear nowhere in the Act. This Court's lodestar for statutory interpretation is legislative intent for a reason; the Court's role is to interpret the will of the legislature as expressed in the text, not construct intent from whole cloth in order to try and save the statute. When faced with provisions so devoid of any clear legislative intent, like those at issue in questions four through six, the Court's only safe course of action is to abstain from answering at all.

## CONCLUSION

WHEREFORE, for all these reasons, Plaintiffs respectfully request that this Court reject the State Defendants' misguided attempts to remake the Act with language entirely unmoored from the text, answer questions one through three based on Plaintiffs' textual arguments, and

15

decline to answer questions four through six because the Legislature has failed to provide any reliable indication of intent.

Respectfully submitted,

_s/Adam H. Hines_
Adam H. Hines
Oklahoma Bar Number: 35640
Megan Lambert
Oklahoma Bar Number: 33216
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org
ahines@acluok.org

Douglas Koff
Julia Beskin
Sara Solfanelli
Kevin Scot Johns
SCHULTE ROTH & ZABEL LLP
919 Third Avenue New York, NY
10022
douglas.koff@srz.com
julia.beskin@srz.com
sara.solfanelli@srz.com

Sumayya Saleh
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
_ssaleh@lawyerscommittee.org_

Emerson Sykes
Leah Watson
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

*esykes@aclu.org*
*lwatson@aclu.org*

*Counsel for Plaintiffs*

## CERTIFICATE OF MAILING

I hereby certify that a true and correct copy of the above and foregoing document was on the ___3___ day of March, 2025, e-mailed and mailed to the following, to wit:

M. DANIEL WEITMAN, OBA #17412
TINA S. IKPA, OBA #32193
660 Parrington Oval, Suite 213
Norman, Oklahoma 73109
dan.weitman@ou.edu
tsikpa@ou.edu

and

GARRY M. GASKINS, II, OBA NO. 20212
ZACH WEST, OBA NO. 30768
WILL FLANAGAN, OBA NO. 35110
OFFICE OF ATTORNEY GENERAL STATE OF OKLAHOMA
313 N.E. 21st Street Oklahoma City, OK 73105
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov

*s/Adam H. Hines*
Adam H. Hines