IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

BLACK EMERGENCY RESPONSE TEAM, *et al.*,

*Plaintiffs,*

v.

No.  CIV-21-1022-G

GENTNER DRUMMOND, *et al.*,

*State Defendants* 1–18.

## STATE DEFENDANTS' MOTION FOR PROTECTIVE ORDER AGAINST PLAINTIFFS' NOTICES OF DEPOSITION AND SUBPOENAS TO TESTIFY AT A DEPOSITION IN A CIVIL TRIAL

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
ZACH WEST, OBA #30768
  *Director of Special Litigation*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

WILL FLANAGAN, OBA #35110
ELLEN CARR, OBA #36074
  *Assistant Solicitors General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:      (405) 521-3921
William.Flanagan@oag.ok.gov
Ellen.Carr@oag.ok.gov

*Counsel for State Defendants*

## <u>TABLE OF CONTENTS</u>

**BACKGROUND** ................................................................................................2

**ARGUMENT AND AUTHORITIES** ...............................................................4

I. Plaintiffs' Request for Depositions of Carlisha Bradley, Joy Hofmeister, and Ryan Walters are Improper in their Entirety. .........................................4

    *a. Plaintiffs have failed to meet their burden to notice Ryan Walters for a deposition.* ...........................................................................................5

    *b. Former officials Carlisha Bradley and Joy Hofmeister oppose their depositions, and they will not yield relevant evidence for Plaintiffs.* ................7

II. The Proposed Topics for Examination in Plaintiffs' Rule 30(b)(6) Depositions of the State Regents and Board of Education Are Overbroad and Improper. ........9

    1. The drafting and enactment of HB 1775, including HB 1775's Legislative Record. ....................................................................................................11

    2. The implementation of HB 1775. ....................................................................11

    3. The enforcement of HB 1775 and the responses thereto and effects thereof. ....................................................................................................11

    4. Conversations between You and Legislators concerning HB 1775. ..............13

    5. Conversations between You and other Defendants concerning HB 1775. ....................................................................................................14

    6. The decision to suspend Oklahoma House Rule 8.21(c) in connection with the enactment of HB 1775. ....................................................................14

    7. Your promulgation of the Rules, including all discussion, debate, and votes associated therewith. ....................................................................15

    8. Reports or other Documents developed by the State Department of Education pursuant to Section (i) of the Rules. .........................................16

    9. Your decision to downgrade Tulsa Public Schools' accreditation status to "Accredited with Warning" on July 28, 2022. ...........................17

    10. Your decision to downgrade Mustang Public Schools' accreditation status to "Accredited with Warning" on July 28, 2022. ...........................17

    11. Policies, procedures, rules, guidance, trainings, or presentations regarding HB 1775. ..............................................................................18

    12. Formal or informal complaints made under HB 1775 or the Rules. ..............18

    13. Responses to formal or informal complaints made under HB 1775 or the Rules. ....................................................................................................18

    14. Your knowledge and understanding of Legislative Statements concerning HB 1775. ..............................................................................19

**15. HB 1775's impact on students and educators of color, including but not limited to Black and Indigenous students and educators.**....................................20

**16. Your Public Statements regarding HB 1775.**............................................20

**17. Proposed or actual changes made to the curriculum or course list of any Oklahoma public school made or proposed after HB 1775's enactment.**..........21

**18. Works of literature removed from the curriculum of any Oklahoma public school made since HB 1775's enactment.**..................................................21

**19. Memoranda, research, written analysis, white papers, reports, or opinions relied upon, created by, or reviewed by You regarding HB 1775's drafting, enactment, implementation, or enforcement.**...........................................21

**CONCLUSION** .....................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Amann v. Office of Utah Att'y Gen.*,
   No. 2:18-cv-00341-JNP-DAO 2025 WL 895128 (D. Utah, March 24, 2025)........................8

*Bogan v. City of Boston*,
   489 F.3d 417 (1st Cir. 2007) .........................................................................................5

*Bruesewitz v. Wyeth, LLC*,
   562 U.S. 223 (2011)................................................................................................. 13, 20

*Carlson v. Colo. Center for Reproductive Med., LLC*,
   341 F.R.D. 266 (D. Colo. 2022) .....................................................................................4

*Citizens for Const. Integrity v. United States*,
   57 F.4th 750 (10th Cir. 2023)........................................................................................10

*Dist. of Columbia v. Heller*,
   554 U.S. 570 (2008)......................................................................................................13

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024)............................................................................................. 7, 8, 10

*Dep't of the Interior v. Klamath Water Users Prot. Ass'n*,
   532 U.S. 1 (2001) .........................................................................................................15

*In re Office of the Utah Att'y Gen.*,
   56 F.4th 1254 (10th Cir. 2022).....................................................................................5, 8

*In re U.S. Dep't of Educ.*,
   25 F.4th 692 (9th Cir. 2022).........................................................................................5, 6

*In re United States*,
   197 F.3d 310 (8th Cir. 1999)........................................................................................5, 6

*Lederman v. New York City Dep't of Parks and Recreation*,
   731 F.3d 199 (2d Cir. 2013) ...........................................................................................8

*Magwood v. Patterson*,
   561 U.S. 320 (2010)................................................................................................. 8, 10

*Trentadue v. Integrity Comm.*,
   501 F.3d 1215 (10th Cir. 2007)................................................................................ 15, 18

*Vill. of Arlington Heights v. Metro. Hous. Dep't Corp.*,
   429 U.S. 252 (1977)........................................10, 11, 12, 14, 15, 16, 17, 19, 20

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008)........................................................................................12, 15, 16

## Rules

Fed. R. Civ. Proc. 26(b)(1)..............................................................................................2, 4

Fed. R. Evid. 401 ................................................................................................................4

Okla. Admin. Code § 210:10-1-23 ...................................................................................15

Oklahoma House of Representatives Rule 14.1...............................................................15

**<u>Other Authorities</u>**

OKLA. H. OF REPS. OFF. OF THE PARLIAMENTARIAN, PRECEDENTS OF THE OKLA. H. OF
    REPS.: H. PRECEDENTS, 50TH–59TH OKLA. LEGS. (2025)........................................15

The fact discovery deadline of August 1, 2025, is quickly approaching. All parties jointly sought an extension of the deadline on May 27, 2025, Dkt. 248, but that motion has not yet been granted.

The parties jointly sought an extension, among other things, because there is a dispute between Plaintiffs and State Defendants over the scope of discovery related to the sole claim currently being litigated in this Court, the Equal Protection claim. Specifically, after this Court denied State Defendants' motion for clarification, Dkt. 218, Plaintiffs filed a Motion to Compel on the issue on January 10, 2025, Dkt. 223, and the matter has been fully briefed since February 28, 2025, Dkt. 241. Now, with a little over a week left before the discovery cutoff, Plaintiffs have understandably issued Notices of Deposition and Subpoenas to Testify at a Deposition in a Civil Action to comply with the August 1, 2025, deadline. *See* Exhibits 1–6. State Defendants are similarly compelled to file this Motion for Protective Order. Importantly, the parties agree that this Motion for Protective Order, the Notices of Deposition, and Subpoenas to Testify at a Deposition in a Civil Action **will be withdrawn** by the parties if the extension of the discovery deadline jointly requested by the parties is granted.

But until that joint motion is granted, under Federal Rule of Civil Procedure 26(b)(2)(C), State Defendants respectfully request, for the following reasons, that this Court issue a protective order against Plaintiff and limit the scope of their deposition requests.

1

## BACKGROUND

In support, State Defendants would show the Court as follows:

1.    On June 14, 2024, this Court dismissed or stayed all of Plaintiffs' claims—with the lone exception of their Equal Protection claim. Dkt. 172 at 28–31. In doing so, the Court referred to certain "factual disputes" relating to the pending Equal Protection claim. *Id.* at 30.

2.    Subsequently, on August 30, 2024, this Court entered its discovery scheduling order with respect to the litigation of Plaintiffs' Equal Protection claim. Dkt. 210. Discovery on this claim is currently scheduled to conclude on or before August 1, 2025. Dkt. 225.

3.    On September 25, 2024, Plaintiffs served State Defendants with their First Requests for Production of Documents. *See* Attachment 1. By their plain terms, Plaintiffs sought discovery, without limitation, of nearly every document and piece of correspondence relating to the Legislature's drafting and enactment of HB 1775, as well as the subsequent three-year implementation thereof.

4.    On October 25, 2024, State Defendants served their responses and objections to the requests, informing Plaintiffs that such sweeping discovery were inconsistent with the relevancy and proportionality requirements outlined in FED. R. CIV. PROC. 26(b)(1). More particularly, few if any of Plaintiffs' requests for production were tailored toward the resolution of the sole claim at issue: whether both houses of the Legislature enacted, and the Governor signed into law, HB 1775 with the purpose to invidiously discriminate in violation of the Equal Protection Clause.

5.     State Defendants have made these objections in the good-faith belief that Plaintiffs' wide net far exceeds the proper scope of discovery contemplated by the Court in its scheduling order of August 30, 2024.

6.     On January 10, 2025, Plaintiffs filed a Motion to Compel State Defendants to Comply with Plaintiff's First Requests for Production and for Entry of ESI Order with Incorporated Memorandum of Law. On February 14, 2025, State Defendants filed a Response to the Motion, and Plaintiffs filed a Reply on February 28, 2025. To date, the Motion to Compel and for Entry of ESI is still pending with this Court.

7.     On May 3, 2025, Plaintiffs filed an unopposed, joint motion for hearing for the purposes of seeking the Court's guidance in light of the pending motions before the Court: at present, (1) Plaintiffs' Motion to Compel State Defendants to Comply with Plaintiffs' First Request for Production and Entry of ESI Order (Doc. 223)' and (2) Plaintiffs' and University Defendants' Motion to Stay Discovery. Further, on May 27, 2025, Plaintiffs filed an unopposed, joint motion for an Extension of Time to Complete Discovery Schedule Deadlines. At the time of this filing, these motions are still pending with the Court.

8.     On July 17, 2025, because of the impending deadlines, Plaintiffs served State Defendants with two deposition subpoenas: one for Carlisha Bradley, a former member of the State Board of Education, and one for Joy Hofmeister, a former State Superintendent of Public Instruction. Plaintiffs also served three notices of depositions on Ryan Walters, the Oklahoma State Regents for Higher Education ("State Regents"), and the Oklahoma State Board of Education ("OSBE"), over email. All prospective deponents have vigorously objected to being deposed by Plaintiffs.

9.      On July 23, 2025, all parties met and conferred regarding the present discovery dispute, in accordance with Local Rule 37.1 before filing this Motion for Protective Order. The parties were unable to reach an agreement as to the substance of this Motion.

## ARGUMENT AND AUTHORITIES

Again, Plaintiffs' discovery should be limited to the sole issue of whether the Oklahoma Legislature enacted HB 1775 with the purpose to discriminate in violation of the Equal Protection Clause. Dkt. 172 at 28–31. Plaintiffs' requests for depositions are either improper altogether or, if proper generally, are beyond the scope of their only claim: facial violations of the Equal Protection Clause. The irrelevant nature of Plaintiffs' requests warrants a protective order, as they unduly burden State Defendants and unwilling third parties to gather information and participate in depositions that are highly unlikely to support Plaintiffs' facial challenge. For the reasons set forth below, this Court should limit discovery in this case to its proper scope and issue a protective order over Plaintiffs' improper requests.

## I.    Plaintiffs' Request for Depositions of Carlisha Bradley, Joy Hofmeister, and Ryan Walters are Improper in their Entirety.

As with all discovery, depositions are subject to Rule 26(b)(1)'s command that discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense *and* proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). Evidence is "relevant" when "it has any tendency to make a fact more or less probable than it would without the evidence." Fed. R. Evid. 401. And "when the relevance of a discovery request or device is not apparent on the face of the request . . . itself, the proponent of the discovery bears the burden of making the initial showing of relevance." *Carlson v. Colo. Center for Reproductive Med., LLC*, 341 F.R.D. 266, 275 (D. Colo. 2022) (citations omitted).

Plaintiffs have failed to make their initial relevance showings in subpoenaing current and former State officials with little or no relation to the enactment of the challenged legislation, including former officials who are no longer part of this lawsuit and vehemently oppose testifying on these matters of which they have little relevant knowledge. For the reasons set forth below, a protective order is appropriate to limit the scope of Plaintiffs' deposition requests.

a. **_Plaintiffs have failed to meet their burden to notice Ryan Walters for a deposition._**

Ryan Walters is the current Superintendent of Public Instruction in Oklahoma. The Tenth Circuit has adopted an "extraordinary circumstances test" that proponents of a deposition must show to depose current high-ranking officials such as Walters. Plaintiffs, here, must show that:

> (1) the official has first-hand knowledge related to the claim being litigated; (2) the testimony will likely lead to the discovery of admissible evidence; (3) the deposition is essential to the party's case; and (4) the information cannot be obtained from an alternative source or via less burdensome means.

_In re Office of the Utah Att'y Gen._, 56 F.4th 1254, 1260 (10th Cir. 2022) (citations omitted).

Indeed, although "circuits vary on what constitutes extraordinary circumstances . . . nearly all of them agree that a party must show at a minimum that the information sought is not obtainable from another source." _Id._ (citing _Bogan v. City of Boston_, 489 F.3d 417, 423 (1st Cir. 2007)). And "[s]ome circuits require that to qualify as an extraordinary circumstance warranting the deposition of a high-ranking official, the information sought must be 'essential' to the plaintiff's case." _Id._ (citing _In re U.S. Dep't of Educ._, 25 F.4th 692, 702 (9th Cir. 2022); _In re United States_, 197 F.3d 310, 314 (8th Cir. 1999)). The Tenth Circuit reasoned that information

is only "essential" when it is "absolutely needed"—something higher than the mere "relevance" discovery standard. *Id.* at 1264 (citing *U.S. Dep't of Educ.*, 25 F.4th at 702; *In re United States*, 197 F.3d at 314).

Plaintiffs have not and cannot show that Superintendent Walters' deposition testimony is essential to their Equal Protection Clause claim or that Walters alone may provide the relevant evidence they seek. More importantly, Plaintiffs have failed to prove that Superintendent Walters has "first-hand knowledge related to the claim being litigated." *Id.* Plaintiffs have not put forward any explanation as to why Superintendent Walters—a member of the *executive* branch of Oklahoma at the time of HB 1775's passage—would be essential to their facial Equal Protection Clause Violation claims regarding state legislation. Nor have they shown that Superintendent Walters had any direct knowledge regarding the legislative process while he was serving as Governor Stitt's Secretary of Education when HB 1775 was enacted.

In a similar vein, Plaintiffs cannot show that Superintendent Walters will provide them with relevant testimony vis-à-vis his current position as Oklahoma State Superintendent of Public Instruction. Superintendent Walters assumed his elected office in 2023, several years after HB 1775 came through the legislative process. Plaintiffs have put forward a facial challenge of HB 1775, and any present testimony about the current *enforcement* of HB 1775 by the Department of Education and Board of Education would not be particularly relevant to a facial challenge to the legislative enactment of the law. This is especially so given that none of the Plaintiffs are the subjects of any HB 1775 enforcement actions; *i.e.*, they are not in a position to bring an as-applied challenge to any particular enforcement action or claim that Walters' testimony is somehow essential to that challenge. Even ignoring this, that Walters

oversees enforcement of HB 1775 is certainly not enough to show that he has first-hand knowledge that is "essential" to Plaintiffs' case here, such that one of Oklahoma's high-ranking state officials should be permitted to be dragged into a day-long deposition.

In sum, Plaintiffs have not and cannot meet the high burden needed to depose Oklahoma Superintendent of Public Instruction. And in the unlikely event that they can somehow meet the Tenth Circuit's standard, any testimony Walters could provide would not be probative of legislative intent needed to bring a facial challenge to a state law.

### b. *Former officials Carlisha Bradley and Joy Hofmeister oppose their depositions, and they will not yield relevant evidence for Plaintiffs.*

Plaintiffs have failed to meet their burden of showing how deposing Carlish Bradley and Joy Hofmeister will be relevant to their facial Equal Protection Clause challenge to HB 1775. Notwithstanding the fact that the subpoena bears no indication of the purported relevance of either Bradley's or Hofmeister's testimony, Plaintiffs cannot meet this burden even if they tried.

Joy Hofmeister served as the Oklahoma Superintendent of Public Instruction from 2015 to 2023. But as a general matter, and absent some indication otherwise, the testimony of a state *executive* branch official can hardly be considered relevant to the circumstances surrounding the passage and enactment of *legislation*. In the same way that the statements or testimony of one legislator is hardly probative of the legislative intent needed to lodge a facial challenge, even less probative would be testimony of a government official who happened to be in office at the time the legislation passed through a separate branch of government. In short, Hofmeister's testimony would not be probative evidence of the legislative intent behind HB 1775. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) ("the

text of a law controls over purported legislative intentions unmoored from any statutory text");
*see also Magwood v. Patterson*, 561 U.S. 320, 334 (2010) (the Court "cannot replace the actual text
with speculation as to Congress' intent").

The same applies to the Carlisha Bradley subpoena. Bradley served on the Oklahoma
State Board of Education starting in 2019 and ending in 2022. Again, like Hofmeister,
Bradley's office was executive, not legislative. Moreover, Bradley's relationship to this case is
even more tenuous because she was just one member on a seven-member executive board.
Again, it stands to reason that if a legislator's comments on a given piece of legislation are not
probative of legislative intent, similar comments by a member of an executive agency would
be even less probative of the same intent. *See Corner Post, Inc.*, 603 U.S. at 815.

Hofmeister and Bradley also fall within the "extraordinary circumstances" standard as
set forth in *In re Office of the Utah Att'y Gen.*, 56 F.4th 1254, 1260 (10th Cir. 2022). Indeed, since
the Tenth Circuit issued that decision, a district court within the Tenth Circuit have found that
"the reasoning . . . that it would be improper for a court to probe the mental processes of a
high-ranking official, is still relevant even after an official leaves office." *Amann v. Office of Utah
Att'y Gen.*, No. 2:18-cv-00341-JNP-DAO 2025 WL 895128 at *3 (D. Utah, March 24, 2025).
Appellate courts outside of the Tenth Circuit have similarly found that the extraordinary
circumstances test applies to former officials. *See, e.g. In re United States Dep't of Ed.*, 25 F.4th
692, 705 (9th Cir. 2022) (applying the extraordinary circumstances test to then-Secretary of
Education Betsy DeVos although her term as Secretary ended); *Lederman v. New York City Dep't
of Parks and Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) (finding that the exceptional
circumstances test applied to the former mayor of New York City). In short, former high-

ranking officials like Hofmeister and Bradley should not be subject to a day-long fishing expedition.

On top of all that, both Hofmeister and Bradley are now private citizens and third parties who strongly oppose testifying in this case. They are not willing or even semi-willing third-party witnesses. That is yet another reason why Plaintiffs' attempt to force Bradley and Hofmeister into testifying about legislation that they are only tenuously connected with at best should fail. Hofmeister and Bradley's personal feelings about HB 1775, whatever they may be, are not relevant evidence that Plaintiffs may use to bolster their case. Plaintiffs' effort here is somewhat akin to asking this Court to force third parties to submit an amicus brief—it is clearly improper.

In sum, Plaintiffs have not and cannot show that the testimony from Hofmeister and Bradley would yield relevant and essential evidence to their facial attack against HB 1775. A protective order is proper here to limit discovery to relevant matters. Their depositions should be struck entirely. [1]

## II. The Proposed Topics for Examination in Plaintiffs' Rule 30(b)(6) Depositions of the State Regents and Board of Education Are Overbroad and Improper.

As noted above, Plaintiffs' discovery is limited to the sole issue of whether the Oklahoma Legislature enacted HB 1775 with the purpose to discriminate in violation of the Equal Protection Clause. For the reasons set forth below, many of Plaintiffs' proposed topics

---

[1] Alternatively, State Defendants submit that the length of Hofmeister's and Bradley's depositions should be significantly shortened. There is no reason whatsoever that unwilling third parties only tenuously connected to a case should be subject to a seven-hour deposition.

for examination for the State Regents for Higher Education and State Board of Education[2] are improper, as being overly broad, vague, or privileged, even considering the *Vill. of Arlington Heights v. Metro. Hous. Dep't Corp.*, 429 U.S. 252 (1977), factors. *Arlington Heights* lists five favors to consider when determining if Congress passed a statute with a discriminatory purpose: (1) the "historical background of the decision," (2) the "specific sequence of events leading up to the challenged decision," (3) "[d]epartures from the normal procedural sequence," (4) "[s]ubstantive departures," and (5) "legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body." *Id.* at 267-268.

As State Defendants have already explained, Dkt. 236 at 7-9, *Arlington Heights* cannot be squarely applied to this case, as it involved an as-applied challenge to a decision by a zoning board. *Id.* at 254. Thus, the scope of discovery in that case was relatively small and only involved the specific facts of the as-applied challenge. And while *Arlington Heights* discussed the role of legislative comments to discern legislative intent, there is plenty of more recent Supreme Court authority advising against *Arlington Heights'* more expansive approach in determining legislative intent. *See, e.g., Corner Post*, 603 U.S. at 815 ("the text of a law controls over purported legislative intentions unmoored from any statutory text."); *see also Magwood*, 561 U.S. at 334 (the Court "may not replace the actual text with speculation as to Congress' intent"); *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023) ("the statements of a few legislators concerning their motives for voting for legislation is a reed too thin to support invalidation of a statute"). The latter analysis should apply to this case.

---

[2] The Plaintiffs' Topics for Examination in their Rule 30(b)(6) Deposition Subpoenas are identical, except for four additional topics only found in the Board of Education subpoena: Topics 7, 8, 9, and 10. Exhibit 1 at 11.

Again, the difference in scope between *Arlington Heights* and this case is stark: *Arlington Heights* contemplated one zoning board's decision, whereas the present dispute concerns the enactment of a law that applies to all public schools statewide. The discovery demands between these two cases can hardly be analogized. While the facts of *Arlington Heights* contemplated limited discovery regarding one zoning board decision in one community, the present facts with respect to HB 1775 are far more expansive. To the extent that Plaintiffs' discussion topics even touch legislative intent, they are not subject to *Arlington Heights* because (1) Plaintiffs bring a facial challenge; and (2) the factual scope of *Arlington Heights* cannot be applied to the present challenge to HB 1775. State Defendants therefore object to the following topics in turn.

1. **The drafting and enactment of HB 1775, including HB 1775's Legislative Record.**

State Defendants object to this topic with respect to both the State Regents and the Board of Education as it is irrelevant to Plaintiffs' single Equal Protection Clause claim. Neither the State Regents nor the Board of Education were involved with the drafting and enactment of HB 1775, and thus their commentary on the drafting or enactment would have no relevance. As explained above, even comments of individual Legislators are not probative of legislative intent.

2. **The implementation of HB 1775.**
3. **The enforcement of HB 1775 and the responses thereto and effects thereof.**

Evidence of the implementation and enforcement of HB 1775 in the four years since it was enacted is not relevant information for a facial challenge alleging that the legislation was enacted with the purpose to discriminate. A facial challenge must prove that a given law is

unconstitutional in all applications, not that it might be unconstitutionally applied in specific circumstances. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) ("a plaintiff can only succeed in a facial challenge by 'establishing that no set of circumstances exists under which the Act would be valid'"). In other words, Plaintiffs must show "that the law is unconstitutional in all of its applications." *Id.* This would be true even under an expansive reading of *Arlington Heights*: evidence of implementation is not probative to show that the Legislature passed HB 1775 with a discriminatory purpose. Implementation comes after drafting, debating, and passage. In other words, any evidence of the implementation takes place *after* the "specific sequence of events leading up to the challenged decision" and is not relevant for legislative intent. *Arlington Heights*, 429 U.S. at 267–68.

It is also incredibly burdensome. Asking the Board of Education, in particular, to testify as to the details of four years' worth of investigations and enforcement is not proportionate to the needs of this case, even assuming it is relevant. And it does not resemble in any way the more limited situation in *Arlington Heights*.

In seeking information about the implementation and enforcement of HB 1775, Plaintiffs embark on a fishing expedition for information they do not need for a claim that they have not brought. As a result, a protective order is proper over this topic. While information about the State Regents' and OSBE's application and enforcement of HB 1775 could be relevant for an as-applied challenge, Plaintiffs have made no such as-applied claims against Board of Education or the State Regents. Rather, again, their beef is with the Legislature that passed HB 1775.

Finally, any requests for the reactions to and effects of HB 1775 are also overbroad in that they ask for the State Regents and the OSBE to comment on third-party details, such as the actions of the general public or the Legislature. This is out of the scope of discovery and any third-party reactions would not be relevant information that Plaintiffs could use to bring a facial challenge to HB 1775 that the legislation's purpose was to discriminate.

### 4.    Conversations between You and Legislators concerning HB 1775.

Plaintiffs' request for testimony on all conversations between the State Regents and Board of Education and any legislator is overbroad and should be limited to the proper scope of discovery; *i.e.*, to the period immediately surrounding HB 1775's passage. Here, there is no limiting principle, and as written, the topic could extend to any conversation the Board and the State Regents have ever had with the legislators regarding HB 1775 over a nearly five-year period—most of that post-dating the law's enactment. This is improper and is not probative of any legislative intent to discriminate. The difference between pre-enactment and post-enactment conversations is important: although conversations before and concurrent with HB 1775's enactment may be proper, conversations post-enactment would be irrelevant to prove any facial Equal Protection Clause challenge. *Contrast Dist. of Columbia v. Heller*, 554 U.S. 570, 605 (2008) ("Legislative history . . . refers to the pre-enactment statements of those who drafted or voted for a law.") *with Bruesewitz v. Wyeth, LLC*, 562 U.S. 223, 242 (2011) (finding that the phrase "[p]ost-enactment legislative history" is "a contradiction in terms" because post-enactment statements "could have had no effect on the [legislative] vote."). Indeed, any evidence of the implementation that takes place *after* the "specific sequence of events leading up to the challenged decision" is not relevant evidence for proving legislative intent. *Arlington*

*Heights*, 429 U.S. at 267–68. As a result, Plaintiffs' overbroad request for testimony concerning all conversations between legislators and the Board of Education or State Regents regarding HB 1775 should be limited to the proper, relevant scope of discovery.

**5.    Conversations between You and other Defendants concerning HB 1775.**

The same reasoning in Topic 4 above applies here to Topic 5, and even more so. Here, no legislators are involved at all. Any conversations between any Defendants and the non-legislative Board of Education and the State Regents—regardless of the timing of the discussion—would not be relevant evidence that could prove the Legislature's intentions in passing HB 1775. Even ignoring that, any alleged conversations occurred post-enactment are not probative of legislative intent and would be irrelevant and improper for discovery, for the very reason that they occurred post-enactment. Again, the sole issue here is whether the *Legislature* acted with an intent to discriminate. Thus, this question is irrelevant and a protective order is necessary.

Topic 5 also implicates attorney client privilege concerns. "Conversations" could extend to a number of matters regarding the lawsuit, including the Defendants' legal strategy, internal deliberations, or other candid conversations protected by the attorney-client or deliberative process privileges. To the extent that Topic 5 would implicate these conversations or deliberations, a protective order is necessary.

**6.    The decision to suspend Oklahoma House Rule 8.21(c) in connection with the enactment of HB 1775.**

Plaintiffs would probably assert that Topic 6 is relevant to prove that the decision to suspend Oklahoma House Rule 8.21(c) in connection with the enactment of HB 1775 was an invidious "departure from the normal procedural sequence" of House business. *Vill. of*

*Arlington Heights*, 429 U.S. at 267–68. But suspending House Rules is a normal, routine, and non-suspect practice that is hardly a hallmark of intentional discrimination in lawmaking. *See* OKLA. H. OF REPS. OFF. OF THE PARLIAMENTARIAN, PRECEDENTS OF THE OKLA. H. OF REPS.: H. PRECEDENTS, 50TH–59TH OKLA. LEGS. (2025) (House Parliamentarian noted at least fifteen examples in the last fifteen years of House members suspending rules in the ordinary course of House business);[3] *see also* Oklahoma House of Representatives Rule 14.1.

Notwithstanding the fact that a routine House Rule suspension is hardly a "departure from normal procedure" as contemplated in *Arlington Heights*, it is highly unlikely that anyone in the Board of Education or the State Regents would have any information as to the normal course of business or the suspension of a rule in the Oklahoma House of Representatives. A protective order is proper here to limit the scope of discovery to matters within the deponents' knowledge or realm of interest, as opposed to just randomly asking members of the executive branch about House procedures.

   7.   **Your promulgation of the Rules, including all discussion, debate, and votes associated therewith.**
Plaintiffs define "Rules" in Topic 7 as "HB 1775's implementing regulations, codified as Okla. Admin. Code § 210:10-1-23." Exhibit 1 at 8, 11. Any discussion of these implemented rules would only be relevant for an as-applied challenge to H.B. 1775 and would not be relevant evidence that tends to prove that the Legislature acted with discriminatory intent in passing HB 1775. By definition, these regulations are for the after-the-fact *implementation* of HB 1775, not for its passage. Again, facial challenges do not consider the specific factual

---

[3]       Available      at      https://former.okhouse.gov/Documents/Precedents/Precedents%20-%2058th%20OK%20Leg%20(2021-2022).pdf.

circumstances surrounding an entity's implementation or enforcement of a given law. Instead, Plaintiffs must show "that the law is unconstitutional in all of its applications," not just the State Regents' or Board of Education's applications of HB 1775. *Washington State Grange*, 552 U.S. at 449. Moreover, the sole current claim is that HB 1775's purpose was to discriminate. Implementation has nothing to do with why the Legislature passed the law. And the *Arlington Heights* factors do not contemplate the discoverability of post-enactment evidence outside of the legislative process. *Vill. of Arlington Heights*, 429 U.S. at 267–68. The implementation of HB 1775 does not implicate the historical background of the passage of the Act, the specific sequence of events leading up the passage of the HB 1775, any departures from normal procedure or substance, or any legislative or administrative history.

Notwithstanding these significant relevance concerns, surely "**all** discussion, debate, and votes" associated with the promulgation of the Rules is overbroad and contains information that is protected by the deliberative process privilege, "which shields 'documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated.'" *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (quoting *Dep't of the Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 8 (2001)). The Board of Education's deliberations, discussions, and votes fit squarely within the deliberative process privilege that seeks to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Klamath*, 532 U.S. at 8–9l. As a result, at minimum this Court should issue a protective order with respect to Topic 7 and uphold the deliberative process privilege.

8.  **Reports or other Documents developed by the State Department of Education pursuant to Section (i) of the Rules.**

16

Section (i) of Okla. Admin. Code § 210:10-1-23 ("the Rules") requires public schools to "report . . . each complaint filed pursuant to subsection (g)(1) to the Oklahoma State Department of Education." Subsection (g)(1) requires public schools to "develop a process for students, parents, teachers, school staff and members of the public to file a complaint alleging a violation of [HB 1775]." Okla. Admin. Code § 210:10-1-23(g)(1). These reports have nothing to do with why the Legislature passed HB 1775, the sole pending claim, and did not take place within *Arlington Heights'* contemplated time frame: namely, the period in which the legislative drafted, deliberated, and enacted HB 1775.  *Arlington Heights* 429 U.S. at 267–68.

Moreover, any information from Board of Education about these administrative complaints would potentially only be relevant in an as-applied challenge to HB 1775. State Defendants will not belabor the point: specific evidence of enforcement or implementation efforts are not relevant to a purely facial challenge of a given law alleging that the Legislature acted with a discriminatory purpose in passing the law. Here, the Rules are pure implementation and enforcement measures used by OSBE and the Department of Education. As a result, they are improper for discovery in this facial challenge of state law based solely on showing that the legislation was passed to discriminate. A protective order is proper with respect to Topic 8.

9.    **Your decision to downgrade Tulsa Public Schools' accreditation status to "Accredited with Warning" on July 28, 2022.**
10.   **Your decision to downgrade Mustang Public Schools' accreditation status to "Accredited with Warning" on July 28, 2022.**

Again, any evidence of specific implementation or enforcement efforts by OSBE is irrelevant to show the purpose for passing the law in the first place. *See Washington State Grange*, 552 U.S. at 449. As noted above, any evidence of the specific implementation or enforcement

of HB 1775 with respect to these school districts is out of the scope of this challenge. The implementation of HB 1775 does not implicate the historical background of the passage of the Act, the specific sequence of events leading up the passage of the HB 1775, any departures from normal procedure or substance, or any legislative or administrative history, *Arlington Heights*, 429 U.S. at 267–68.  A protective order, as a result, is proper here. In addition, this is a facial challenge, and neither Tulsa Public Schools nor Mustang Public Schools are parties here, nor have they brought any lawsuit. Finally, these topics are overbroad and almost certain to involve privileged material, both under the deliberative and attorney-client privileges.

> **11.  Policies, procedures, rules, guidance, trainings, or presentations regarding HB 1775.**

Again, any evidence of specific implementation efforts by the Board of Education or State Regents is irrelevant to show that the Legislature acted with discriminatory intent in passing HB 1775. Any Rules promulgated by executive agencies in after the passage of HB 1775 are not probative evidence to show legislative intent. As explained above, *Arlington Heights* does not contemplate the discoverability of post-enactment, non-legislative implementation of the challenged law. *Vill. of Arlington Heights*, 429 U.S. at 267–68.  A protective order is needed to properly limit the scope of discovery to evidence properly used in a facial equal protection challenge. Many of the same objections voiced above in regard to Topic 7 apply to this Topic, as well.

> **12.  Formal or informal complaints made under HB 1775 or the Rules.**
> **13.  Responses to formal or informal complaints made under HB 1775 or the Rules.**

Any testimony about formal or informal complaints made under HB 1775 or the Rules is not relevant to prove that the Legislature passed HB 1775 with a discriminatory purpose.

Again, Topics 13 and 14 contain evidence of **implementation** and **enforcement** pf HB 1775, not its drafting or enactment. As a result, any discussion about complaints made in the aftermath of HB 1775's passage is irrelevant and not central to the *Arlington Heights* factors that focus on pre-enactment statements and evidence. *Arlington Heights*, 429 U.S. at 267–68.

Additionally, Topics 13 and 14 likely request privileged material. The State Regents' and Board of Education's receipt of and responses to these complaints are likely covered by the agencies' deliberative process or investigative privileges. *See Trentadue*, 501 F.3d at 1226. Any record of decision-making and discussion thereof within the agency is subject to this deliberative privilege. The attorney-client privilege almost certainly applies, as well. To the extent that these agencies' investigations required deliberation and candid communication within the agency, those statements are privileged and a protective order should shield them from disclosure or discussion during a deposition.

### 14. Your knowledge and understanding of Legislative Statements concerning HB 1775.

Topic 14 is improperly ambiguous and irrelevant to the Equal Protection claim. For starters, the requested topic is unclear: is the request referring to official legislative statements? Comments from individual Legislators? Or the legislative language itself? The ambiguous nature of the proposed topic alone warrants a protective order.

But even if the request is deemed unambiguous, the substance under any reading of the request is irrelevant to the Plaintiffs' claim that the Legislature acted with discriminatory intent when passing HB 1775. Foundationally, as described above, Defendants maintain that individual legislative statements are not probative of legislative intent to begin with. But an even more tenuous vehicle for discerning legislative intent would be a state agency's

interpretation or understanding of legislative statements. A protective order is necessary to limit the scope of discovery to relevant evidence Plaintiffs may use to prove their Equal protection claim.

**15. HB 1775's impact on students and educators of color, including but not limited to Black and Indigenous students and educators.**

Plaintiffs' request is improperly overbroad and ambiguous. It is impossible for the State Regents and the State Board of Education to testify as to the collective experience of minority students throughout all Oklahoma school districts. Some students may feel empowered by the new changes combating racism and sexism, while others may have different experiences. This isn't just a loaded question for these agencies to answer: it's an impossible one. This Court should not allow Plaintiffs to subject the State Regents and Board of Education to sweeping and generalized prompts about the general feeling among minority students and educators, nor are general feelings of "impact" relevant to the facial constitutionality of HB 1775, even under the *Arlington Heights* factors.

**16. Your Public Statements regarding HB 1775.**

As described above, State Defendants maintain that individual statements of Legislators—the individuals drafting and voting on prospective laws—are not probative of legislative. It stands to reason, then, that statements made by an executive agency with no legislative power or connection to HB 1775 would be even less relevant to a facial challenge.

While State Defendants maintain that the statements of the State Regents and Board of Education are irrelevant in their entirety, there is a difference in relevance between pre-enactment and post-enactment statements. While Plaintiffs, yet again, place no limiting

principle on the timing of these requested statements, the distinction between pre-enactment and post-enactment statements is significant in determining the legislative intent.

Here, any statements made by the State Regents and Board of Education after the enactment of HB 1775 are irrelevant to Plaintiffs' claim that the Legislature acted with discriminatory intent in passing HB 1775. *See Bruesewitz*, 562 U.S. at 242. This conclusion fits *Arlington Heights*: none of the five factors contained therein contemplate any kind of post-enactment statements from Legislators, let alone non-legislative agencies. 429 U.S. 267–68. As a result, a protective order is most proper over all statements made by the State Regents and OSBE, regardless of its pre or post enactment timing.

> **17.    Proposed or actual changes made to the curriculum or course list of any Oklahoma public school made or proposed after HB 1775's enactment.**
> **18.    Works of literature removed from the curriculum of any Oklahoma public school made since HB 1775's enactment.**

Topics 17 and 18 not only ask for irrelevant information about the **implementation** of HB 1775 that is not useful to Plaintiffs' Equal Protection claim but also ask for information that the State Regents and Board of Education cannot reasonably be expected to possess. The requests ask for "proposed or actual changes" to the curricula of every single district in the State and "works of literature removed from the curriculum of *any* Oklahoma public school." While it would be a herculean task to check with every single school in the state about *actual* changes promulgated throughout the state, it is an even more impossible task to check for all *proposed* (and implicitly rejected) changes throughout the whole state. Such a request is unduly burdensome and should be limited. A protective order is necessary here.

> **19.    Memoranda, research, written analysis, white papers, reports, or opinions relied upon, created by, or reviewed by You regarding HB 1775's drafting, enactment, implementation, or enforcement.**

Topic 19 is irrelevant to the extent that the request asks for documents regarding the implementation and enforcement of HB 1775, as the implementation and enforcement materials are not relevant to the Plaintiffs' claim that the Legislature acted with discriminatory intent in passing HB 1775. And Topic 19 is arguably still irrelevant with respect to any materials regarding the drafting and enactment of HB 1775, as the State Regents and Board of Education are not legislative entities whose statements are probative of legislative intent. This Court should issue a protective order limiting the scope of the depositions to proper, relevant topics.

## CONCLUSION

For all the reasons stated herein, the State Defendants respectfully request that this Court issue a protective order properly limiting the scope of discovery in this case.

Respectfully submitted,

s/ Garry M. Gaskins, II

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
ZACH WEST, OBA #30768
  *Director of Special Litigation*
WILL FLANAGAN, OBA #35110
ELLEN CARR, OBA #36074
    *Assistant Solicitors General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
Ellen.Carr@oag.ok.gov

*Counsel for Defendant*

23